**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| **JARVIS SIMS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.:** |
| ) | **1:22-cv-00099-JRH-BKE** |
| **CITY OF AUGUSTA-RICHMOND** ) | |
| **COUNTY** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

COMES NOW Defendant City of Augusta-Richmond County and, pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 56.1, and files this Memorandum of Law in Support of Defendant's Motion for Summary Judgment.

## I.   <u>INTRODUCTION</u>

Plaintiff Jarvis Sims is a former Deputy Administrator for the City of Augusta-Richmond County (the "City"). Plaintiff brings this action pursuant to the Americans with Disability Amendments Act ("ADAAA"), the Age Discrimination in Employment Act ("ADEA"), and the Family and Medical Leave Act ("FMLA"). In essence, Plaintiff alleges that the City subjected him to discrimination and retaliation when he was terminated on April 1, 2021, which he contends was motivated by his prior use of medical leave and/or a possible need for additional leave in the future.

Plaintiff's claims are entirely without merit. The undisputed facts reveal that shortly before Plaintiff's termination, the City hired a new Administrator, Odie Donald, to lead its government. As is the common practice of new top-level administrative leaders in local governments, sports, and other business organizations, Mr. Donald wanted to bring in his own handpicked staff and to make organizational changes so that he could accomplish the goals and directives for which he

was hired.  Thus, Mr. Donald made the decision to simultaneously separate both Plaintiff and his co-Deputy Administrator – who had never taken any medical leave or requested any type of accommodation – so that he could give the City a fresh start.  And, just like the administrator before him, Mr. Donald replaced the prior Deputy Administrators with two new Deputy Administrators, neither of whom were significantly older than Plaintiff.  In addition to these undisputed material facts, it is uncontroverted that Mr. Donald (1) played no role in Plaintiff's prior FMLA leave requests (which were granted in full), (2) had no knowledge of Plaintiff's medical condition or the reason behind the leave in the first place, and (3) had no knowledge or expectation that Plaintiff might potentially need additional leave in the future.  There is likewise no evidence that Plaintiff was treated differently than any similarly situated comparator, no evidence of any discriminatory remarks made about him or his condition, and no evidence that Mr. Donald or anyone else was frustrated about his prior use of medical leave.  In other words, this is an incredibly weak case in which there is virtually no evidence whatsoever that supports Plaintiff's speculative claims.  Thus, summary judgment is due on all of Plaintiff's claims.

## II.   SUMMARY OF THE UNDISPUTED MATERIAL FACTS[1]

### A.   The City's Organizational Structure.

The City of Augusta-Richmond County (the "City) is a consolidated local government which constitutes both a county and a municipality. (Deposition of Former Administrator Odie Donald ("Donald Dep.") at 11:12-13; Deposition of Anita Rookard ("Rookard Dep.") at 8:11-17; Augusta-Richmond County, GA Charter, Art. V, § 1-27.) The City's Mayor and Board of Commissioners are elected officials who oversee the governmental and legislative functions of the

---

[1] The City incorporates by reference its Statement of Material Facts as to Which There is No Genuine Issue to be Tried ("SMF").  For the same of brevity, the City provides a general overview of the undisputed facts, which are described in more detail in the SMF.

City. (Donald Dep. at 13:4-7.) The City's Administrator, who reports directly to the Mayor and Commission, oversees the day-to-day operations of the government. (Donald Dep. at 13:9-18, 15:9-16:3; Rookard Dep. at 11:23-12:8.) Below the Administrator are typically two Deputy Administrators, each of whom is responsible for overseeing eight of the City's sixteen departments and their respective directors. (Deposition of Plaintiff Jarvis Sims ("Pl. Dep.") at 47:20-49:10, 56:11-15, 125:17-126:19; Rookard Dep at 11:23-12:8; Donald Dep. at 17:8-18:25.)

**B.**    **Plaintiff's Hire as Deputy Administrator and Brief Tenure as Interim Administrator.**

Former City Administrator Janice Allen Jackson offered Plaintiff (who was born in 1969) the position of Deputy Administrator on July 20, 2018, and Plaintiff began working for the City in that role on August 13, 2018 as an at-will employee. (Pl. Dep. at 46:12-47:19, 53:22-55:14; Pl. Dep. Ex. 3.) Around the same time, Administrator Jackson also hired Tony McDonald, who was born in 1960, to serve as a Deputy Administrator. (Pl. Dep. at 46:9-47:19; 30(b)(6) Dep. 10:3-18.)

In April of 2019, the Commission voted to release former Administrator Janice Allen Jackson. (Pl. Dep. at 69:3-17.) Plaintiff was subsequently appointed to serve as the Interim Administrator, a position he held until November 14, 2020. (Pl. Dep. at 70:2-14, 75:2-8.)

The City publicly posted an opening for the Administrator position, but Plaintiff chose not to apply for the permanent position. (Pl. Dep. at 75:2-77:20.) Instead, he began looking for new jobs in the metro-Atlanta area, apparently realizing that the forthcoming administrator would likely want to make certain organizational changes.  (Id.)  The City conducted a nationwide search for the Administrator position and, ultimately, hired Odie Donald (who was born in 1978) for the Administrator position, and he subsequently began working in that role on November 14, 2020. (Pl. Dep. at 76:2-3, 77:25-78:3; Donald Dep. 8:16-17, 10:15-21.)

**C.**     **Plaintiff Requests and Receives an Extended Paid Leave of Absence.**

Plaintiff suffers from renal disease.  Just prior to new Administrator Donald's start date, Dr. Matthew Diamond – who had been treating Plaintiff for Chronic Kidney Disease – recommended placing Plaintiff on a peritoneal dialysis catheter, which was needed to begin the process of dialysis. (Pl. Dep. at 79:24-81:3; Pl. Dep. Ex. 10.) As such, on November 12, 2020, Plaintiff submitted to the City's Human Resources Department a doctor's note advising that he was scheduled to have surgery on December 15, 2020 and would need to be out for work for several months following the procedure. (Pl. Dep. at 81:9-13, 82:2-8; Pl. Dep. Ex. 10.) Additionally, Plaintiff submitted FMLA certification paperwork to the City's Human Resources Department, which indicated that he would need a leave of absence from December 15, 2021 through February 15, 2021. (Pl. Dep. at 87:4-11; Pl. Dep. Ex. 11.) It is undisputed that the City fully approved Plaintiff's initial FMLA leave request.  (Pl. Dep. at 88:9-17; Ex. 12 to Pl. Dep.)

Shortly following the initial FMLA approval, Plaintiff informed Director of Human Resources Anita Rookard that his symptoms were now worsening and that his doctor wanted him to immediately start leave to prepare for surgery. (Pl. Dep. at 90:1-13.) The same day, updated FMLA certification paperwork and a doctor's note was transmitted, now recommending that Plaintiff's leave begin on November 20, 2020 and end on February 15, 2021.  (Pl. Dep. at 91:15-92:4; Pl. Dep. Ex. 14.) Once again, the City fully accommodated and granted Plaintiff's request for FMLA leave, beginning on November 20, 2020 and running through February 15, 2021. (Pl. Dep. at 92:5-93:9; 96:12-21; Pl. Dep. Ex's 15 & 17.) The City further notified Plaintiff that once he returned from FMLA leave on February 15, 2021, he would have exhausted his 12-weeks of FMLA entitlement for the year and would not be eligible for additional FMLA leave until November 20, 2021. (Pl. Dep. at 96:22-97:6; Pl. Dep. Ex. 17.)

Notably, Mr. Donald played no role whatsoever in any discussions surrounding the decision to grant Plaintiff FMLA leave and was never even aware of Plaintiff's medical condition or the reason for his leave of absence.  (Donald Decl. ¶ 5).  While Plaintiff delivered a letter to Mr. Donald's executive assistant informing him that he would be out between November 20, 2020 and February 15, 2021 (Pl. Dep. Ex. 18), Plaintiff never had any discussions with Mr. Donald regarding the nature of his medical condition or the reasons for his leave of absence. (Pl. Dep. at 100:12-19; Donald Dep. at 110:19-111:1, 113:24-114:5.) Additionally, neither Ms. Rookard nor anyone else spoke to Mr. Donald about Plaintiff's medical condition or the reason for the leave. (Donald Dep. at 52:20-54:4; Rookard Dep. at 55:24-56:20, 65:8-66:14; Pl. Dep. 101:5-102:20.)

Next, on February 15, 2021, the City received a letter from Dr. Diamond indicating that Plaintiff would need additional time to recover and would not be cleared to return to work until February 25, 2021. (Pl. Dep. at 107:4-109:6; Pl. Dep. Ex. 20.) The City once again granted Plaintiff's request for additional leave through February 25, 2021, even though his FMLA entitlement expired on February 15, 2021. (Pl. Dep. at 109:7-17, 112:14-16.) It is undisputed that because Plaintiff had now exhausted all of his accrued sick and vacation leave (which was used to cover the leave between November 20, 2021 and February 15, 2021), the City paid Plaintiff for the additional period of leave through the City's sick pool bank.  (Pl. Dep. at 109:18-110:22, 111:9-24; Pl. Dep. Ex's 21 and 22).

**D.**     **Plaintiff's Discussions with Rookard About a Possible Future Kidney Transplant.**

Plaintiff returned to work on February 25, 2021. (Pl. Dep at 112:20-21.) Shortly following his return, he spoke with HR Director Rookard to advise that he was in the process of seeking a donor for a kidney transplant, that he was having friends and family members tested to see if they were a match for his blood type, and that he would potentially need some additional leave in the

future.  (Pl. Dep. at 113:8-115:8; Rookard Dep. at 59:16-60:4, 63:13-20.) Plaintiff admits that he never provided any specific dates on which he might potentially need additional leave, never submitted a formal request for additional leave associated with a kidney transplant, and never sent anyone in Human Resources any records showing a need for leave on specific dates.  (Pl. Dep. 115:19-116:12, 116:13-117:14).

In the event that Plaintiff remained employed by the City and that the transplant had occurred at some point prior to November 2021, Plaintiff would not have been eligible for additional leave pursuant to the FMLA, because his 12-week entitlement had already been exhausted; however, Plaintiff would have been eligible to take additional sick pool time after he used his accrued sick and vacation time, which Ms. Rookard communicated to Plaintiff. (Pl. Dep. at 98:1-9, 113:8-115:18; Rookard Dep. at 60:9-61:5, 99:19-20.) In order for the Human Resources Department to grant a request for leave for medical reasons, the request for leave would need to be in writing and would need to provide specific dates for the requested leave. (Rookard Dep. at 100:11-22.)  But, again, Plaintiff never provided Ms. Rookard nor any other employees in Human Resources with any documentation requesting additional leave for a transplant, never had a date certain scheduled for a transplant, and as of Plaintiff's March 30, 2023 deposition, **had still not received a kidney transplant**. (Pl. Dep. at 45:20-24, 99:3-8, 116:7-12, 117:4, 117:15-120:7). In addition, at no point prior to his April 1, 2021 termination did Plaintiff, Ms. Rookard, or **anyone else** inform Mr. Donald that Plaintiff might potentially need additional medical leave in the future following his February 25, 2021 return to work.  (Pl. Dep. at 101:5-19; Donald Decl. ¶ 7; Rookard Dep. at 19-21; Donald Dep. at 69:11-16, 91:14-18.)

E.     **Administrator Donald Terminates Both Deputy Administrators and Replaces Them with New Deputy Administrators Who Are Not Substantially Younger.**

After Administrator Donald took office and spent a few months evaluating the efficiency

of the Office of the Administrator, he decided to reorganize the Administrator's office by bringing on two new Deputy Administrators to serve with him, just as the Administrator before him had done.  (Donald Decl. ¶ 3; Donald Dep. Ex. 1, Response to Interrogatory No. 9). At his deposition, Mr. Donald analogized his decision to terminate the two prior Deputy Administrators (Plaintiff and McDonald) and to replace them with two new Deputy Administrators by repeatedly comparing himself to the practice of new leaders in sports, local government, and other organizations to bring on new staff following a change in leadership:

> [I]t is common practice that as – of similar in positions like Administrator, city managers, professional basketball coach, athletic director – you know, those types of roles, as you come in, you know, you evaluate an organization and you bring in staff…You know, it – it would be the equivalent of Damon Stoudamire at Georgia Tech who just started as their new coach who is bringing in a new coaching staff now that he's looked and evaluated and, you know, things of that nature.  I think that would be similar to here.
>
> …
>
> You are expected to deliver at a high level…And when being brought in to a situation, you have expectations to deliver at potentially higher level than there was before…And so my decision in the role, personnel or otherwise, were made to ensure that we deliver at the highest level.
>
> …
>
> [I]t's the equivalent of – and using sports, for example.  If you run the wildcat offense before and, you know, the organization didn't reach the playoffs, then you may come in and run the I formation …which requires different personnel.

(Donald Dep. at 47:23-48:11, 58:7-15, 60:5-12; Donald Decl. ¶ 13.) Mr. Donald also testified that it is a common practice in local government organizations that when a change in leadership occurs, "there are staff and organizational changes…And I think that would be true for me as well." (Donald Dep. at 66:2-14; Donald Decl. ¶ 13).[2]

---

[2] Notably, Plaintiff acknowledged in his deposition that "[s]ome organizations retain the staff and some managers change the staff" under such circumstances, that when a new mayor or new governor are elected that it is not uncommon for the new administration to bring on new staff or to make changes in the organization, and that the

As such, on April 1, 2021, Plaintiff was called into a meeting with Mr. Donald and Ms. Rookard inside Mr. Donald's office, during which Mr. Donald informed Plaintiff that he was being terminated, and was provided a termination letter which indicated that, "As the new Administrator, [Mr. Donald had] decided to give [the] Office of the Administrator a fresh start." (Pl. Dep. at 149:21-151:18, 151:19-150:20; Pl. Dep. Ex. 29; Donald Dep. at 46:23-47:15; Donald Dep. Ex. 4.) Mr. Donald also terminated the other Deputy Administrator, Tony McDonald, on the same day he terminated Plaintiff and for the same reason. (Pl. Dep. at 151:24-152:5; Donald Dep. 49:1-10; Donald Decl. at ¶¶ 11-15, Ex. A.) In fact, Mr. Donald provided Mr. McDonald with the same termination letter he provided Plaintiff. (Donald Decl. at Ex. A.) There is no record evidence that Tony McDonald took FMLA or medical leave at any point during his employment with the City, nor any evidence of Mr. McDonald requesting any type of accommodation related to a medical condition.  (Pl. Dep. 157:2-19; 30(b)(6) Dep. 10:19-11:19).

Following Plaintiff's and Mr. McDonald's termination, the City began the process of recruiting two new Deputy Administrators to fit "the new direction of the office." (Donald Dep. at 49:5-10, 50:10-51:6.)  Ultimately, Mr. Donald hired Charles Jackson, who was born in 1973, and Tanikia Jackson, who was born in 1974, to replace Plaintiff and Mr. McDonald as Deputy Administrators. (Rookard Dep. at 70:19-22; Donald Dep. at 49:14-50:13; Rookard Decl at ¶¶ 6,8.) Both Deputy Administrators are only approximately four years younger than Plaintiff. (Pl. Dep. at 164:10-18, 164:20-165:2.)

---

same is often true when a new general manager or an athletic director takes over a sports organization. (Pl. Dep. at 135:12-16, 163:2-18.)

### III.    ARGUMENT AND CITATION OF AUTHORITY

**A.    Plaintiff Cannot Establish that City Failed to Provide Him with a Reasonable Accommodation Under the ADA (Count I).**

In Count I of Plaintiff's Complaint, he alleges that the City failed to accommodate him by refusing to provide him use of the "sick pool" and by allegedly failing to provide "additional time off for his surgery." (Doc. 1, Compl., ¶¶ 43, 45.) These allegations are completely baseless.

To establish a claim for failure to accommodate, Plaintiff must show that (1) he is disabled, (2) he is a qualified individual, and (3) he was discriminated against because of his disability by the City's failure to provide a reasonable accommodation. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001); Greenberg v. BellSouth Telecommunications, Inc., 498 F.3d 1258, 1263 (11th Cir. 2007). "An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." Lucas, 257 F.3d at 1269-60. Notably, an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363-64 (11th Cir. 1999).

### 1.    The City Never Denied Any of Plaintiff's Accommodation Requests.

An essential element of a failure to accommodate claim requires establishing that the employer failed to provide the employee with a reasonable accommodation for his disability. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007). Plaintiff undisputedly cannot establish this element as the City granted each and every one of Plaintiff's requests for leave and requests for extensions of leave.

In this regard, Plaintiff first requested FMLA leave from December 15, 2020 through February 15, 2021, which the City agreed to provide. (Pl. Dep. at 87:4-11, 88:9-17; Pl. Dep. Ex. 11, 12.) Plaintiff then requested to push the start date of his FMLA leave to November 20, 2020,

and yet again, the City accommodated the request. (Pl. Dep. at 91:15-93:9, 96:12-21; Pl. Dep. Ex.'s 14-15, 17.) Next, Plaintiff requested to extend his leave through February 25, 2021. (Pl. Dep. at 107:4-109:6; Pl. Dep. Ex. 20.) Once again, the City granted Plaintiff's request for additional leave, despite his FMLA entitlement expiring on February 15, 2021. (Pl. Dep. at 109:7-17, 112:14-16.) Moreover, contrary to Plaintiff's allegation in his Complaint that the City denied his use of the sick pool, Plaintiff now admits that the extended leave after he exhausted his FMLA was paid through the sick pool bank. (Pl. Dep. at 109:18-110:22, 111:9-24; Pl. Dep. Ex's 21 and 22).[3]

Apart from Plaintiff's requests for leave, which the City granted, Plaintiff did not request any other accommodations.[4] Thus, Plaintiff cannot establish that the City failed to provide him with a reasonable accommodation, as required to establish a failure-to-accommodate claim.

## 2.   Plaintiff's Mere Mentioning of Potential Need of Future Leave for a Surgery That Has Still Never Occurred Is Not a Request for Accommodation.

Again, while employers are required to reasonably accommodate disabled employees who are otherwise qualified, that duty "is not triggered unless a ***specific demand*** for an accommodation has been made." Gaston, 167 F.3d at 1363 (emphasis added); see also Owens v. Governor's Office of Student Achievement, 52 F.4th 1327, 1334 (11th Cir. 2022) (applying same standard to Rehabilitation Act claims). And, of course, to establish a failure to accommodate claim, the employee-plaintiff must also show that the requested accommodation was actually denied. Id.

Simply put, Plaintiff was never denied any accommodation that he specifically requested

---

[3] Q. "So do you have any reason to dispute that you were, in fact, paid for 60 hours out of the sick pool bank?" A. "No." Q. "Okay. Well, you have an allegation in your complaint that you were denied the use of sick pool to cover your extended leave of absence. And that's simply not true, is it?" A. "When my leave was extended, I see I use our – they use additional time sick leave pool. So I see that, yes." (Pl. Dep. 111:21-112:6).

[4] While Plaintiff alleges as part of his ADEA claim – rather than his ADA failure to accommodate claim – that the City also "refused to consider retraining or relocating the Plaintiff to another position," Plaintiff admitted that prior to his termination, he never asked to be demoted, reassigned, or retrained as a result of his medical condition. (Pl. Dep. at 170:23-172:6.)

or that he actually needed.  In this regard, to the extent Plaintiff claims that he was denied leave following his February 25, 2021 return to work for a potential kidney transplant, it is undisputed that he has **never actually found a donor and to this day has never undergone a kidney transplant**.  (Pl. Dep. at 45:20-24, 99:3-8, 116:7-12, 117:4, 117:15-120:7).  This undisputed fact is alone fatal to the claim.  Moreover, when Plaintiff returned to work, while he advised Ms. Rookard that he would potentially need some additional leave in the future as he was in the process of seeking a kidney transplant, (Pl. Dep. at 113:8-115:8; Rookard Dep. at 59:16-60:4, 63:13-20), Plaintiff never provided Ms. Rookard or any other employees in Human Resources with any documentation requesting additional leave for a transplant and never had a date certain scheduled for a transplant. Thus, Plaintiff's statement that he might potentially need additional leave in the future was simply not a request for accommodation and, in any event, it was never denied[5] and no harm occurred because it **still has not taken place**.  Thus, Plaintiff's failure to accommodate claim is baseless and should be dismissed with prejudice.

**B.**    **Plaintiff Cannot Establish Disability Discrimination or Retaliation Under the ADA (Counts II & III) or Retaliation Under the FMLA (Count V).**

In Count II of Plaintiff's Complaint, which asserts a retaliation claim under the ADA, he alleges that the City discriminated against him for requesting a reasonable accommodation by treating him more harshly than his non-disabled peers and wrongfully terminating him. (Doc. 1, Compl., ¶¶ 55, 56.) Specifically, Plaintiff alleges that the City denied his requests for reasonable accommodation, failed to "investigate or remediate his claims of discrimination and retaliation,

---

[5] In fact, Ms. Rookard told Plaintiff that while he would not have been eligible for additional leave pursuant to the FMLA in the event of the kidney transplant surgery that never occurred, Plaintiff would have been eligible to take additional sick pool time in connection with the potential need for leave after he used his accrued sick and vacation time. (Pl. Dep. at 98:1-9, 113:8-115:18; Rookard Dep. at 60:9-61:5, 99:19-20.)

punish[ed] him with points[6] that he should not have been awarded, treat[ed] him more harshly than his non-disabled peers, and, ultimately, wrongfully terminat[ed] him." (Id.)  Plaintiff makes nearly identical allegations in Count III, which asserts a discrimination claim under the ADA.  (Id. at ¶¶ 60-70).  Similarly, Plaintiff alleges that he was subjected to "harassment and terminat[ion]" in retaliation for his FMLA leave in Count V of his Complaint.  (Id. at ¶¶ 82-90).  The "harassment" allegations are based on the assertion that Plaintiff was purportedly excluded from meetings (Pl. Dep. 128:4-21) and that Mr. Donald made critical and demeaning comments about his work following Plaintiff's return on February 25, 2021.  (Pl. Dep. 136:4-138:19).[7]  Plaintiff contends that all of these actions occurred between February 25, 2021 and April 1, 2021.  (Pl. Dep. 29:16-32:3, 32:4-33:17, 35:10-23; Pl. Dep. Ex. 2).  But at the end of day, Plaintiff's claims are mostly about the timing of his termination in relation to his prior use of leave.  (Pl. Dep. at 166:4-13).

Given that Plaintiff cannot establish direct evidence of discrimination or retaliation,[8] each of the foregoing claims are governed by the familiar McDonnell Douglas analysis.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973).  In this regard, to establish a *prima facie* case of retaliation under the ADA and the FMLA, Plaintiff must show that (1) he engaged in a statutorily

---

[6] Plaintiff and his counsel admitted at his deposition and in response to Defendant's Interrogatories the assertion that Plaintiff was punished with "points" that he should not have been awarded was a "typo" and is not part of his claims.  (Pl. Dep. at 30:15-31:5; Pl. Dep. Ex. 31, Response to Interrogatory No. 17 ("Please disregard references to 'points' as this was a typographic error.")).

[7] It is notable that at no point prior to Plaintiff's termination did he ever complain about Mr. Donald's alleged "harassment."  It was only after his termination meeting that he met with EEO Compliance Director Phyllis Johnson. (Pl. Dep. at 61;13-62:4; 168:1-169:24.)

[8] "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] ... constitute direct evidence of [] discrimination." Ritchie v. Indus. Steel, 426 F. App'x 867, 871 (11th Cir. 2011) (quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)).  "For a statement to constitute direct evidence, it must be made by a person involved in the challenged decision" and related to the decision-making process itself.  Lewis v. Sch. Bd. Of Palm Beach Cnty., 850 Fed. Appx. 674, 678 (11th Cir. 2021) (citing Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998)).  Here, Plaintiff admits that nobody ever made any ageist comments or derogatory comments about his medical condition or use of FMLA leave, and that no one ever told him (orally or in writing) that his termination had anything to do with his prior use of FMLA leave, his age, or his medical condition.  (Pl. Dep. at 73:9-11, 154:4-9, 161:12-163:1, 165:11-18.)  Thus, direct evidence does not exist in this case.

protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278 (11th Cir. 1997); Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (11th Cir. 2000). Similarly, to establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must show he: (1) is disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of his disability. Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255–56 (11th Cir. 2007).  The third element of a traditional discrimination case is typically shown by establishing that the employee (a) sustained an adverse employment action and (b) was treated less favorably than similarly situated employees outside of his protected class. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1216 (11th Cir. 2019).  If the *prima facie* case is met, "the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action" and, "[i]f the employer does so, the burden shifts back to the employee to produce evidence that the employer's reason is pretextual." Munoz v. Selig Enters., Inc., 981 F.3d 1265, 1275 (11th Cir. 2020).

1.  **The Alleged Exclusion of Plaintiff From Meetings and Donald's Alleged Critical Comments Do Not Constitute Adverse Employment Actions.**

In the discrimination context, to establish an adverse employment action, a plaintiff must plausibly allege that his or her employer materially and negatively altered the terms or benefits of the plaintiff's employment. See Monaghan v. World Pay US, Inc., 955 F.3d 855, 860 (11th Cir. 2020) (stating that adverse employment actions "consist of things ... like terminations, demotions, suspensions without pay, and pay raises or cuts ...."). On the other hand, the adverse action standard for retaliation claims is "more relaxed." Crawford v. Carroll, 529 F.3d 961, 973 (11th Cir. 2008). An action is sufficiently adverse for purposes of a retaliation claim when that action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

- 13 -

Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). However, even in Burlington, the Supreme Court differentiated between "significant" and "trivial" harms and reminded district courts that anti-retaliation statutes do not "set forth 'a general civility code for the American workplace.'" Id. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Simply put, adverse actions – under either the discrimination or retaliation standard – do not include "those petty slights or minor annoyances that often take place at work and that all employees experience," including personality conflicts, snubbing, and a simple lack of good manners. Id.

Under this standard, it is clear that Plaintiff's alleged "exclusion" from workplace meetings following his return to work and Mr. Donald's alleged criticism of his work and "demeaning comments" do not constitute adverse employment actions. As an initial matter, the **only** alleged "meeting"[9] Plaintiff could identify at his deposition as having allegedly been "excluded" from was a one-on-one meeting (at some unspecified date) between Mr. Donald and the Director of Housing Development, and he is not aware of **any meetings** following his return from leave that included all directors or department heads in which he was not invited to attend. (Pl. Dep. at 129:2-19, 120:20-131:7). Plaintiff also admits that nothing prevented or prohibited the Administrator from meeting one-on-one with a particular director, and that he suffered no material consequence (such as a loss of pay or demotion) as a result of missing any such meeting. (Pl. Dep. at 129:2-131:13). In turn, while Plaintiff claims Mr. Donald would make demeaning comments about his work, frequently made changes to his work, and was "very critical" of him (Pl. Dep. at 136:4-138:19), Plaintiff admitted that Mr. Donald made similar comments to the other Deputy Administrator, that

---

[9] Further, Plaintiff's allegation that he was excluded from a meeting constitutes hearsay, because it was testified to by Plaintiff on behalf of Housing Development Director Hawthorne Welcher, who has not testified in this action. Defendant objects to the consideration of this testimony. See Fed. R. Evid. 802.

Mr. Donald' style was "direct," that Mr. Donald did not mince words when he was critical of someone's work product, and that none of Mr. Donald's comments referenced his age, disability, or use of leave. (Pl. Dep. at 138:20-140:24).  In essence, there is no evidence whatsoever linking Mr. Donald's treatment of Plaintiff to a protected characteristic or a protected activity.

In light of the foregoing, aside from his termination, Plaintiff did not sustain any adverse employment actions under applicable precedent.  For instance, even cases involving significantly greater alleged adverse actions than those alleged by Plaintiff here – *i.e.*, being excluded from a meeting or having a supervisor be critical about his work product – have been routinely found insufficient.  See, e.g., Laster v. Georgia Dept. of Corrections, 2023 WL 5927140, *3 (11th Cir. Sept. 12, 2023) ("Requiring an employee to perform an undesirable job is not an adverse employment action for the purposes of a discrimination claim, as long as there is no allegation that the assignment came with any material change in the terms or benefits of employment (e.g., a reduced salary)."); Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 587–89 (11th Cir. 2000), abrogation on other grounds recognized by Crawford, 529 F.3d at 970–74 & n.14; Kidd v. Mando Am. Corp., 731 F.3d 1196, 1203 (11th Cir. 2013) ("Work assignment claims strike at the very heart of an employer's business judgment and expertise .... And it is by now axiomatic that Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions." (internal quotation marks and citations omitted)); Valdez v. Staples, Inc., 2009 WL 10666053, *19 (N.D. Ga. Jan. 15, 2009) (threatening to change plaintiff's schedule and cut hours for one week by some unknown amount was insufficient to support a retaliation claim); Tran v. The Boeing Co., 190 Fed.Appx. 929, 934 n.3 (11th Cir. 2006) (per curiam) (holding that while termination was adverse employment action, plaintiff's other allegations were not, including receiving excess work, being denied permission to work on a project others also were not assigned

to and almost being moved to another building); <u>Byrd v. Auburn Univ.</u>, No. 2:05CV835-CSC, 2007 WL 1140424, at *13-14 (M.D. Ala. 2007) (holding that allegations of hostile treatment, criticism of work performance, offensive and critical emails, and a critical memorandum were not materially adverse employment actions but, at best, were personality conflicts, petty slights, minor annoyances, or trivial conduct); <u>Varrone v. Hospital Auth. of Valdosta and Lounds County, Ga.</u>, 2023 WL 2527868, *6 (M.D. Ga. Mar. 15, 2023) (noting that "Defendant's disciplinary measures against Plaintiff – write ups and critical feedback – and Plaintiff's subjective fear of termination would not constitute an adverse employment action…"); <u>Vargas v. Michaels Stores, Inc.</u>, No. 8:16-CV-1949-T-33JSS, 2017 WL 2931379, at *13 (M.D. Fla. July 10, 2017) ("The Court agrees the [performance improvement plan] was not an adverse employment action."); <u>Carroll v. Ceridian Benefits Servs.</u>, No. 8:11-CV-1063-T-24, 2012 WL 5431007, at *9 (M.D. Fla. Nov. 7, 2012) (placement on a PIP was not an adverse action in support of either a race discrimination claim or retaliation claim).

2.   **Defendant Has Articulated a Legitimate, Non-Discriminatory, and Non-Retaliatory Basis for its Treatment of Plaintiff, Which He Cannot Prove to be Merely a Pretext (or Coverup) for Intentional Discrimination or Retaliation.**

a.   **The City Has Met Its "Exceedingly Light" Burden.**

Even giving Plaintiff the benefit of the doubt, the City has articulated legitimate, non-discriminatory, and non-retaliatory reasons for Plaintiff's termination, and he has failed to create a genuine issue of material fact regarding pretext with respect to his ADA discrimination and retaliation and FMLA retaliation claims.[10]  Again, the record reflects that Odie Donld – the newly appointed City Administrator – wanted to give the Office of the Administrator a "fresh start" and

---

[10] <u>See</u> <u>Morrison v. City of Bainbridge</u>, 432 F. App'x 877, 881 n. 2 (11th Cir. 2011) (per curiam) (unpublished) (citation omitted) ("[W]hen an employer has offered a legitimate, nondiscriminatory reason for an [adverse employment action], whether a plaintiff made out a prima facie case is almost always irrelevant in considering a motion for summary judgment.").

- 16 -

to handpick his own Deputy Administrators, just as the previous Administrator was permitted to do (and did when simultaneously hiring Plaintiff and Mr. McDonald). (Donald Dep. at 47:23-48:11, 58:7-15, 60:5-12; Donald Decl. ¶ 13). As this Court is well aware, making changes in staff is certainly not unusual following a change in top-level leadership, particularly in the governmental arena. (Donald Dep. at 66:2-14; Donald Decl. ¶ 13; Pl. Dep. at 135:12-16, 163:2-18).

Notably, this very Court has previously found the City's articulated explanation in this case to constitute a legitimate, non-discriminatory explanation in an analogous decision. See, e.g., Mawulawde v. Bd. of Regents of Univ. Sys. of Georgia, No. CV 105-099, 2009 WL 10678751, at *16 (S.D. Ga. Mar. 27, 2009) (JHR), aff'd, 372 F. App'x 51 (11th Cir. 2010) (finding that a new chief wanting to bring on his own team of surgeons was a legitimate, non-discriminatory reason for terminating the plaintiff). Other district courts within the Eleventh Circuit have as well. See, e.g., Rossi v. Fulton Cnty., Ga., No. 1:10-CV-4254-RWS-AJB, 2013 WL 1213149 (N.D. Ga. Jan. 31, 2013), report and recommendation adopted sub nom. Rossi v. Fulton Cnty. Bd. of Assessors/Fulton Cnty. Tax Assessors Off., No. 1:10-CV-4254-RWS, 2013 WL 1213139, at *24 (N.D. Ga. Mar. 22, 2013) (finding terminating the plaintiff because the office was going in a "new direction" was a legitimate, nondiscriminatory reason for the plaintiff's termination); Morris v. Bessemer Bd. of Educ., No. CV-10-BE-2402-S, 2013 WL 549896, at *16 (N.D. Ala. Feb. 13, 2013) (acknowledging "that the Board's articulated reason for not renewing Morris's Head Coach job – wanting to move in a new direction in the hopes of ultimately securing a state basketball title – is a legitimate, non-retaliatory reason"). See also Davis v. New York City Health & Hosps. Corp., 640 F. Supp. 155, 159 (E.D.N.Y. 1986) (finding that the employer advanced a legitimate, non-discriminatory reason for seeking plaintiff's resignation, i.e., the new executive director wished to bring in his own team of associates). Thus, the City has clearly met its "exceedingly

light" burden of production, and it is the Plaintiff's burden to establish pretext. Ellison v. St. Joseph's/Candler Health Sys., Inc., 775 F. App'x 634, 644 (11th Cir. 2019) (citing Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1060-61 (11th Cir. 1994)).

        **b.**      **Plaintiff Cannot Establish a Material Question of Fact as to Pretext.**

Pretext is a difficult standard to meet, and it is the lynchpin on which most courts in these types of claims grant summary judgment. "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." Tolley v. United Parcel Serv., 2006 WL 486523, at *5 (N.D. Ga. Feb. 27, 2006) (citation and internal marks omitted). "Thus, the inquiry is limited to whether [the City] offered an honest, nondiscriminatory explanation for terminating [Plaintiff], regardless of whether the decision might have been mistaken." Id. (citations omitted); see also Castillo v. Roche Labs., Inc., 467 F. App'x 859, 863 (11th Cir. 2012) (per curiam) (unpublished) (citation omitted) ("That an employer's legitimate belief was mistaken is irrelevant so long as [discriminatory] animus did not motivate it."). Thus, to establish pretext, Plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265-66 (11th Cir. 2010) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc))[11]; see also Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir. 2007).

---

[11] See East v. Clayton Cnty., 436 F. App'x 904, 912 (11th Cir. 2011) ("[I]f the employer acted on its honestly-held belief that the employee had engaged in misconduct, even if it was mistaken, there is no discrimination."); Rojas

Simply put, Plaintiff has not put forth any evidence to rebut the City's rationale behind his termination. For instance, there is no evidence of any discriminatory remarks that were made by Mr. Donald (or anyone else) towards Plaintiff, nor is there any evidence that Mr. Donald was even aware of why Plaintiff needed FMLA leave or might potentially need additional leave in the future (for the kidney transplant surgery that never materialized), let alone that Mr. Donald ever even reviewed Plaintiff's medical file.  (Pl. Dep. at 73:9-11, 161:12-163:1, 165:11-18; Donald Decl. ¶ 16; Rookard Decl. ¶ 9.) Nor is there any evidence that Plaintiff was treated differently from a similarly situated comparator, such as his co-Deputy Administrator, Mr. McDonald, who was terminated on the **same day for the same reason** and who never took FMLA leave or requested any type of accommodation.  (Donald Decl. ¶¶ 11-17, Ex. A).[12]

Plaintiff has also not adduced any evidence that the City's reason for terminating him was not the real reason for his termination. Compare Morris, 2013 WL 549896 at *16 (The plaintiff's testimony provided that the decision maker's "real reason for his 'new direction' indicat[ed] that [the decision maker] was tired of [the plaintiff's complaints] and wished to get rid of her for that reason.").  There is simply no evidence of a pretextual coverup, and no evidence that the two Deputy Administrators hired to replace Plaintiff or McDonald were unqualified or less qualified.

Further, Plaintiff cannot point to a single inconsistency in the City's articulated reason for Plaintiff's termination. In this regard, Plaintiff's termination letter provided that he was being terminated "to give [the] Office of the Administrator a fresh start." (Pl. Dep. at 149:21-151:18,

---

v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one.").

[12] While Plaintiff will attempt to downplay this point, that Mr. McDonald was similarly terminated on the same day and for the same reason, as well as the fact that – unlike Plaintiff – Mr. McDonald never took FMLA leave or requested any type of accommodation, is a compelling contextual fact that strongly supports the lack of any improper motive. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 743 (11th Cir. 1996) (on summary judgment, inferences may be drawn "only if they are reasonable in view of other undisputed background or contextual facts…").

151:19-150:20; Pl. Dep. Ex. 29; Donald Dep. at 46:23-47:15; Donald Dep. Ex. 4.)  In Mr. Donald's

deposition, he continued to deliver the same narrative for why the City terminated Plaintiff. Mr.

Donald was clear throughout his deposition that he simply followed the same practice as new

leaders in sports, local governments, and other organizations to bring in a new staff. See Donald

Dep at 47:25-48:5 ("[I]t is common practice that as – of similar in positions like Administrator,

city managers, professional basketball coach, athletic director – you know, those types of roles, as

you come in, you know, you evaluate an organization and you bring in staff.")  These same reasons

were also consistently articulated in the City's EEOC position statement.  (Rookard Decl. ¶ 11,

Ex. A, EEOC Position Statement at p. 2 ("Preliminary Statement") and p. 6; Donald Decl. ¶ 13).[13]

Moreover, as in Davis, "Plaintiff, alone, was not singled out." 640 F. Supp. at 159 ("Several

other employees were removed when Rhoder assumed command.") Mr. Donald also terminated

the other Deputy Administrator, an individual who did not take FMLA leave or any other sort of

medical leave, never informed the City that he was disabled, never requested any disability-related

accommodation, and who the City did not regard as disabled. (30(b)(6) Dep. at 10:19-11:19.) The

equal treatment of Plaintiff and Mr. McDonald provides further credence to the legitimacy of the

City's articulated reason for Plaintiff's termination. See Mawulawde, 2009 WL 10678751 at *16

---

[13] Plaintiff even acknowledged in his deposition that "[s]ome organizations retain the staff and some managers change the staff" under such circumstances, that when a new mayor or new governor are elected that it is not uncommon for the new administration to bring on new staff or to make changes in the organization, and that the same is often true when a new general manager or an athletic director takes over a sports organization. (Pl. Dep. at 135:12-16, 163:2-18.) Plaintiff's own acknowledgment is evidence of the lack of pretext behind the City's decision to terminate him. See Mawulawde, 2009 WL 10678751 at *16 (JHR) (finding that the plaintiff's "acknowledge[ment] in his deposition that it is common practice for chiefs of sections in hospitals to have a significant role in choosing who will be on their surgical team" supported a finding that the plaintiff failed to meet his burden by showing by a preponderance of evidence that the defendants' stated reasons for his termination were pretextual).

("The fact that both a black surgeon and a white surgeon were fired adds credence to Defendants'
contention that Dr. Landolfo simply wanted his own team.")[14]

While Plaintiff may believe the City's decision to terminate his employment was "unfair,"
his subjective disapproval or disagreement with his employer's reasoning is insufficient to
establish pretext. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1333 (11th Cir. 1998)
("[T]he heart of the pretext inquiry is not whether the employee agrees with the reasons that the
employer gives for the discharge, but whether the employer really was motivated by those
reasons."); Copeland v. CVS Pharmacy, Inc., No. 1:03-CV-3854-JOF, 2006 WL 2699045, at
*47 (N.D. Ga. Sept. 15, 2006) (stating that plaintiff must do more than question the fairness or
wisdom of employer's decision in order to show pretext). Simply put, Plaintiff's subjective beliefs
are insufficient to create any triable issue of pretext. See Holifield v. Reno, 115 F.3d, 1555, 1565
(11th Cir. 1997) (dismissing plaintiff's complaint and holding that plaintiff's unsubstantiated
allegations of discrimination did not refute employer's legitimate, nondiscriminatory reason and
that summary judgement was warranted); Coutu v. Martin County Board of County
Commissioners, 47 F.3d 1068, 1073-74 (11th Cir. 1995) (stating conclusory allegations of
discrimination, without more, is not sufficient to raise inference of pretext of intentional
discrimination where employer has offered extensive evidence of legitimate, non-discriminatory
reasons for its actions).

Finally, while Plaintiff may rely on the alleged close "temporal proximity" between his
FMLA leave and his termination, the Eleventh Circuit has repeatedly made clear that "temporal
proximity by itself generally cannot prove that an employer's proffered reasons are pretextual."

---

[14] There is also no evidence that the decision-maker, Mr. Donald, was aware of or feared Plaintiff's possible
need for additional leave in the future.  (Pl. Dep. at 101:5-19; Donald Decl. ¶ 7; Rookard Dep. at 19-21; Donald Dep.
at 69:11-16, 91:14-18; Rookard Decl. ¶ 9.)

Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1219–20 (11th Cir. 2021); see also Gogel v. Kia

Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1137, n.15 (11th Cir. 2020) (en banc) (same); A.P. v.

Fayette County School District, 2023 WL 4174070, *10 (11th Cir. June 26, 2023) ("But temporal

proximity can't, by itself, show pretext.")[15]  Thus, while the close temporal proximity between

Plaintiff's use of FMLA leave and his termination might potentially be sufficient to establish a

*prima facie* case of ADA or FMLA retaliation, it clearly cannot satisfy the pretext burden standing

alone.  And because it does stand alone, summary judgment is plainly due in favor of the City.

**C.**     **Plaintiff Cannot Establish a Material Dispute of Fact on his ADEA Claim.**

        In Count IV of Plaintiff's Complaint, he alleges that the City discriminated against him

because of his age and that his age was the but-for cause of his termination. This claim is entirely

without merit. (Doc. 1, Compl. at ¶¶ 71-81).  While all of his claims are weak, this is the weakest.

        **1.**     **Plaintiff Cannot Establish a Prima Facie Case of Age Discrimination.**

        Because Plaintiff cannot establish any direct evidence of age discrimination, his age

discrimination claim must be analyzed using the familiar burden-shifting framework established

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[16] To establish a *prima facie* case of

age discrimination, Plaintiff must prove, among other elements, that he was replaced by a

**substantially younger** person. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1359

(11th Cir. 1999)  He cannot establish this essential element.

---

[15] While close temporal proximity between the protected conduct and the adverse employment action can establish pretext ***when coupled*** with other evidence, temporal proximity alone is plainly insufficient. See Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1328 (11th Cir. 2020) (temporal proximity of less than two months was insufficient by itself to establish pretext); Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (the close temporal proximity of two weeks was evidence of pretext but "probably insufficient to establish pretext by itself"); Wascura v. City of South Miami, 257 F.3d 1238, 1244–45 (11th Cir. 2001) (a three and one-half month period between the employee's protected conduct and her termination was, standing alone, insufficient to demonstrate pretext).

[16] Again, Plaintiff cannot establish direct evidence of age discrimination. Plaintiff was never told that he was terminated due to his age, and none of the termination paperwork references his age. (Pl. Dep. at 154:8-9.)

The Eleventh Circuit has previously held that an age difference of just a few years may be sufficient to establish that a plaintiff was replaced by someone "substantially younger." See, e.g., Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (five years is sufficient); Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir. 1997) (per curiam) (three years is sufficient); Carter v. Miami, 870 F.2d 578, 583 (11th Cir. 1989) (four years is sufficient). The Eleventh Circuit, however, has offered a message of caution when determining whether an employee is "substantially younger:"

> We recognize that we have previously held, in cases where plaintiffs presented substantial evidence of discriminatory animus beyond mere age difference, that a smaller age difference was sufficient to meet the "substantially younger" element of the ADEA prima facie case. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir.1999) (holding that a 37–year–old was "substantially younger" than a 42–year–old plaintiff); Carter v. DecisionOne Corp., 122 F.3d 997, 1003 (11th Cir.1997) (holding that a 39–year–old was "substantially younger" than a 42–year–old). But we agree with the district court that, in this case, Mr. Suarez failed to create an inference of discrimination because a six-year age difference, without more, does not establish that Mr. Suarez's age was the but-for cause of the School Board's failure to hire him. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) ("The prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."). See also Steele v. United States VA, 2011 WL 2160343, at *10 (M.D.Fla. June 1, 2011) (concluding that a 13–year age difference, without more, is insufficient to meet this standard); Matthews v. City of Dothan, 2006 WL 3742237, at *12 (M.D.Fla. Dec. 18, 2006) (ruling that a six-year age difference was insufficient to create an inference of age discrimination, when no other evidence of discriminatory animus was present).

Suarez v. School Board of Hillsborough County, Florida, No. 15-12891, 2016 WL 212503, at *9 n.1 (11th Cir. Jan. 19, 2016).

Here, Plaintiff was born in 1969 and was 52 years old at the time of his termination.  (Pl. Dep. at 34:4-8).  Ultimately, Mr. Donald hired Charles Jackson (born in 1973) and Tanikia Jackson (born in 1974) to replace Plaintiff and Mr. McDonald as Deputy Administrators. (Rookard Dep.

at 70:19-22; Donald Dep. at 49:14-50:13; Donald Decl. ¶ 18; Rookard Decl. ¶ 8.)  In other words, there was roughly a four-year age gap between the Plaintiff and his replacement.  In this regard, the relevant inquiry is "whether, in addition to the [four-year] age difference between [Plaintiff] and [his] replacement[s], there is substantial evidence of discriminatory animus." Howard v. Jackson Cnty. Health Care Auth., No. 5:15-CV-00393-CLS, 2016 WL 2766782, at *11 (N.D. Ala. May 13, 2016). Plaintiff cannot point to a mere scintilla of evidence sufficient to create an inference of age discrimination.

Unlike in Damon or Carter where the plaintiffs presented evidence of discriminatory animus beyond a mere age difference, Plaintiff admits that Mr. Donald never made any comments about Plaintiff's age and that no one ever told him he was terminated because of his age. (Pl. Dep. at 132:4-6, 138:20-140:24, 154:8-9.) Further, Mr. Donald did not even know the ages of any of the Deputy Administrators that worked for him, let alone the ages of Plaintiff's or Mr. McDonald's replacements at the time they were hired. (Donald Dep. at 75:5-10; Donald Decl. ¶ 20.) Without a shred of evidence suggesting discriminatory animus, Plaintiff cannot establish that he was replaced by a substantially younger individual and thus he cannot establish a *prima facie* case of age discrimination. See Steele v. U.S. Dep't of Veteran Affs., No. 8:10-CV-732-T-24EAJ, 2011 WL 2160343, at *10 (M.D. Fla. June 1, 2011) (finding that a 13-year age difference, without more, is insufficient to show that the plaintiff's replacement was substantially younger); Matthews v. City of Dothan, No. 1:04-CV-640-WKW, 2006 WL 3742237, *12 (M.D. Ala. Dec. 18, 2006) (finding that a six-year age difference, without more, is insufficient to create an inference of age discrimination).[17]

---

[17] To the extent Plaintiff contends that the City's alleged refusal to consider retraining or relocating him to another position is a violation of the ADEA (Compl., ¶ 76), such contention is without legal justification as the ADEA does not require an employer to accommodate an individual because of his age. See Long v. Printpack, Inc., No. 1:10-CV-0196-TCB, 2010 WL 11596910 (N.D. Ga. June 14, 2010) ("[T]he ADEA does not contain a provision requiring

**2.** **Plaintiff Cannot Establish Pretext With Respect to his ADEA Claim**.

For the same reasons articulated above, Plaintiff cannot establish that his termination (or any other alleged discriminatory treatment) had anything to do with his age.  Ms. Rookard, who was involved in the FMLA leave process and discussions about the potential need for additional leave in the future – unlike Mr. Donald – is even older than the Plaintiff.  (Rookard Dep. at 8:11-13; Pl. Dep. at 34:4-8, 72:20-73:17; Rookard Decl. ¶ 10).  Odie Donald is also over the age of 40 and was at the time of the termination decision.  (Pl. Dep. at 76:2-3, 77:25-78:3; Donald Dep. 8:16-17, 10:15-21; Donald Decl. ¶ 3.)  But most importantly, there is simply no evidence of a pretextual coverup, any ageist statements made in context of the termination decision, or otherwise any evidence to support a pretext analysis in connection with Plaintiff's ADEA claim.  Thus, summary judgment is due on this basis as well.

## IV.  CONCLUSION

For all the foregoing reasons, Defendant is entitled to summary judgment and this matter should be dismissed in its entirety, with prejudice.

Respectfully submitted, this 18th day of September 2023.

FREEMAN MATHIS & GARY, LLP

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212
Emily M. Walker
Georgia Bar No. 221826
*Attorneys for Defendant*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960

---

an employer to provide a reasonable accommodation for age.") And even if the ADEA required employers to accommodate an employee because of his age, which it does not, it is uncontroverted that Plaintiff never requested to be demoted, reassigned, or retrained prior to being informed of his termination, nor is there any evidence that any other similarly situated comparator was treated differently in this regard. (Pl. Dep. at 170:23-172:6.)

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed this MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will automatically send an email notification of said filing to counsel of record.

This 18th day of September, 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212
Emily M. Walker
Georgia Bar No. 221826
*Attorneys for Defendant*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960
E: jbennett@fmglaw.com
E: emily.walker@fmglaw.com