## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| **JARVIS SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **1:22-cv-00099-JRH-BKE** |
| **CITY OF AUGUSTA-RICHMOND** | ) | |
| **COUNTY** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant City of Augusta-Richmond County, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, and submits its Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried in Support of Its Motion For Summary Judgment.

### I.      The City of Augusta-Richmond County

**A.      The City's Organizational Structure**

1.

The City of Augusta-Richmond County (the "City) is a consolidated local government which constitutes both a county and a municipality. (Deposition of Former Administrator Odie Donald ("Donald Dep.")[1] at 11:12-13; Deposition of Anita Rookard ("Rookard Dep.")[2] at 8:11-17; Augusta-Richmond County, GA Charter, Art. V, § 1-27.)[3]

---

[1] Cited excerpts and exhibits from the deposition of Odie Donald are attached hereto as Exhibit 1.

[2] Cited excerpts and exhibits from the deposition of Anita Rookard are attached hereto as Exhibit 2.

[3] This Court may take judicial notice of the City's Charter.  See Stewart v. City of Greensboro, Ga., 2020 WL 1551828, *11, n. 130 (M.D. Ga. Mar. 31, 2020) (taking judicial notice of charter); Rowan v. City of Avon Park, 2012 WL 2872300 at *1, n.3 (S.D. Fla. July 12, 2012) (same).  See https://library.municode.com/ga/augusta-richmond_county/codes/code_of_ordinances?nodeId=CH_CH1AD_ART5CH_S1-27AUCHCOCOCRPO

2.

The City's Mayor and Board of Commissioners are elected officials who oversee the governmental and legislative functions of the City. (Donald Dep. at 13:4-7.)

3.

The City's Administrator reports to the Mayor and Commission and oversees the day to day operations of the government. (Donald Dep. at 13:9-18, 15:9-16:3; Rookard Dep. at 11:23-12:8.)

4.

The Administrator is responsible for hiring and firing his or her own Deputy Administrators and other individuals within the Office of the Administrator. (Donald Dep. 38:16-39:5.)

5.

On the other hand, the Board of Commissioners votes to confirm the hiring and firing of Director-level employees. (Donald Dep. at 38:16-39:5.)

6.

Below the Administrator are typically two Deputy Administrators, each of whom are responsible for overseeing eight of the City's sixteen departments and their respective directors. (Deposition of Plaintiff Jarvis Sims ("Pl. Dep.")[4] at 47:20-49:10, 56:11-15, 125:17-126:19; Rookard Dep at 11:23-12:8; Donald Dep. at 17:8-18:25.)

**B.    The City's Equal Employment Opportunity Policy**

7.

The City maintains an Equal Employment Opportunity Policy within its Policy and Procedures Manuel. (Pl. Dep. at 59:18-60:3; Pl. Dep. Ex. 5.)

---

[4] Cited excerpts and exhibits from the deposition of Plaintiff Jarvis Sims are attached hereto as Exhibit 3.

8.

The Equal Employment Opportunity Policy prohibits discrimination on the basis of age, disability, and any other characteristic protected by federal, state, or local law. (Pl. Dep. at 60:7-13; Pl. Dep. Ex. 5.)

9.

The Equal Employment Opportunity Policy also prohibits harassment of any employee on the basis of the employee's age, disability, or any other protected characteristic. (Pl. Dep. at 60:14-17; Pl. Dep. Ex. 5.)

10.

Further, the Equal Employment Policy provides that any employee who feels he or she is experiencing a suspected incident of discrimination or harassment should report such to his or her supervisor or the City's EEO Department. (Pl. Dep. at 60:18-61:5; Pl. Dep. Ex. 5.)

11.

It is also the City's policies to comply with federal anti-retaliation laws.  (Rule 30(b)(6) Deposition of the City, with Anita Rookard as designee ("30(b)(6) Dep.")[5] at 41:3-21, 42:2-5).

12.

The City's EEO Department is a separate and independent office from the Office of the Administrator, meaning that the Administrator cannot direct the EEO officer or tell them what to do. (Donald Dep. at 30:8-31:25; Rookard Dep. at 20:25-21:22.)

13.

If an employee requests an accommodation under the American with Disabilities Act ("ADA"), such request could come initially through Human Resources, but it would ultimately

---

[5] Cited excerpts and exhibits from the City's Rule 30(b)(6) are attached hereto as Exhibit 4.

been handled by the EEO Department. (Rookard Dep. at 24:22-25:11.)

14.

The Office of the Administrator does not handle requests for accommodations or leave-related requests. (Donald Dep. at 35:19-22, 36:2-17, 53:21-24.)

C.     **The City's Leave Policies**

15.

The City's Human Resources Department handles request for leave pursuant to the Family and Medical Leave Act ("FMLA"). (Rookard Dep. at 24:22-25:2.)

16.

Neither the Administrator nor Deputy Administrators are involved in the approval of FMLA or other leave of absence requests. (Rookard Dep. at 27:14-24; Donald Dep. 35:19-22, 36:2-17; Donald Decl. ¶ 6.) Once an individual is approved for FMLA leave, the Human Resources Department simply notifies the individual's department head or supervisor that he or she will be out on FMLA leave. (Rookard Dep. at 27:18-24; Donald Dep. 52:20-54:4.)

17.

In addition to sick, vacation, and annual leave, the City enables its employees to participate in a Sick Leave Pool to supplement an employee's loss of income during an extended leave of absence resulting from an employee's serious illness or injury. (Pl. Dep. 65:14-66:20; Pl. Dep. Ex. Ex. 6.)

18.

In order to participate in the Sick Leave Pool, an employee must first exhaust his or her Sick Leave and Annual Leave. (Pl. Dep. at 65:14-66:20; Pl. Dep. Ex. 6 at Section 100.018; Rookard Dep. at 54:4-7.)

- 4 -

19.

An employee can only use sick pool leave for a leave of absence associated with an illness, injury, or accident, as opposed to a routine doctor's appointment or a partial day absence, for example. (Pl. Dep. at 66:9-12, 68:1-69:2; Pl. Dep. Ex. 6 at Section 100.022.)

20.

Additionally, to use pooled leave, an employee must provide a doctor's statement containing the nature of the illness or injury, the anticipated recuperation period required, and the prognosis for recovery or return to work. (Pl. Dep. at 66:21-67:25; Pl. Dep. Ex. 6 at 100.022.)

**D.** **The City's Health Insurance Program**

21.

The City provides health care coverage through a medical plan through Blue Cross Blue Shield, which is administered by a third party company, EPIC. (30(b)(6) Dep. at 23:16-26:10.)

22.

The City does not make any personnel or employment-related decisions based on information received from EPIC or based on claims made by an employee under the City's health insurance plan.  (30(b)(6) Dep. at 28:10-25, 42:6-10.)

**II.   The Plaintiff's Employment with the City**

**A.   The Start of Plaintiff's Employment with the City**

23.

Former City Administrator Janice Allen Jackson offered Plaintiff the position of Deputy Administrator on July 20, 2018, and Plaintiff began working for the City in that role on August 13, 2018 as an at-will employee. (Pl. Dep. at 46:12-47:19, 53:22-55:14; Pl. Dep. Ex. 3.)

24.

Janice Allen Jackson also hired Tony McDonald, born in 1960, to serve as a Deputy Administrator around the same time she hired Plaintiff. (Pl. Dep. at 46:9-47:19; 30(b)(6) Dep. 10:3-18.)

25.

Plaintiff and Mr. McDonald were hired to replace the two prior deputy administrators.  (Pl. Dep. 47:20-50:25).

26.

On Plaintiff's first day of employment, he received a copy of the City's Policy and Procedures Manuel and signed a form acknowledging his receipt of the manual. (Pl. Dep. at 57:9-19; Pl. Dep. Ex. 4.)

27.

Additionally, on Plaintiff's first day of employment, he signed an Acknowledgment of Receipt of the Personnel Policy and Procedures Manual. (Pl. Dep. at 57:9-19; Ex. 4 to Pl. Dep.)

28.

Plaintiff admits he was aware that if he felt that he was being discriminated against or harassed he should report it to his supervisor or the EEO department, and further admits that he never made a complaint of discrimination, harassment, or retaliation to Human Resources or to the EEO office prior to his April 1, 2021 termination. (Pl. Dep. at 60:18-23, 65:7-13, 143:12-144:10, 144:11-145:12.)

**B.      The Plaintiff's Role as Interim Administrator**

29.

In April of 2019, the Commission voted to release former Administrator Janice Allen

Jackson from her position. (Pl. Dep. at 69:3-17.)

30.

Then, on April 16, 2019, the Commission voted to appoint Plaintiff as Interim Administrator, a position he served in until November 14, 2020. (Pl. Dep. at 70:2-14, 75:2-8; Pl. Dep. Ex.'s 7 and 9.)

31.

During Plaintiff's tenure at Interim Administrator, he promoted Maurice McDowell to Interim Deputy Administrator. (Pl. Dep. at 73:18-74:10.)

32.

Anita Rookard has served as the City's Human Resources Director since February 2020, when she was confirmed by the Board of Commissioners at Plaintiff's recommendation. (Rookard Dep. at 10:13-15; Pl. Dep. at 72:1-6; Declaration of Anita Rookard ("Rookard Decl.") ¶ 2).[6]

33.

Ms. Rookard was born in 1967, and she is one year older than Plaintiff, who has no belief that Ms. Rookard is ageist and whom he never heard make any ageist comments about him. (Rookard Dep. at 8:11-13; Pl. Dep. at 34:4-8, 72:20-73:17; Rookard Decl. ¶ 10)

34.

The City publicly posted an opening for the Administrator position, but Plaintiff did not apply for the permanent Administrator position, and instead began looking for new jobs in the metro-Atlanta area in the summer of 2020. (Pl. Dep. at 75:2-77:20.)

35.

The City conducted a nationwide search for the Administrator position and, ultimately,

---

[6] The Declaration of Anita Rookard is attached hereto as Exhibit 5.

hired Odie Donald, who was born in 1978, for the Administrator position, and he subsequently began working in that role on November 14, 2020. (Pl. Dep. at 76:2-3, 77:25-78:3; Donald Dep. 8:16-17, 10:15-21; Declaration of Odie Donald ("Donald Decl."), ¶ 3.)[7]

36.

On that same day (November 14, 2020), Plaintiff returned to his position of Deputy Administrator and Mr. McDowell was appointed Director of Parks & Recreation. (Pl. Dep. at 74:14-18, 79:6-10, Pl. Dep. Ex. 9.)

37.

Plaintiff admits that a Director role is a lower position in terms of the City's chain of command. (Pl. Dep. at 74:23-75:1.)

**C.**   **The Plaintiff Requests and Receives FMLA Leave as well as Additional Leave for Which He is Paid Through the Sick Pool**

38.

Plaintiff was diagnosed with Chronic Kidney Disease in 1998. (Pl. Dep. at 43:15-18.)

39.

In early November 2020, Plaintiff began experiencing worsening symptoms associated with his medical condition. (Pl. Dep. at 79:6-81:3.)

40.

During this period, Plaintiff was being treated by Dr. Matthew Diamond and Nephrology Associates in connection with Chronic Kidney Disease Stage V. (Pl. Dep. at 79:6-81:3; Pl. Dep. Ex. 10.)

41.

Due to Plaintiff's worsening symptoms, Dr. Diamond recommended placing Plaintiff on a

---

[7] The Declaration of Odie Donald is attached hereto as Exhibit 6.

peritoneal dialysis ("PD") catheter, which was needed to begin the process of dialysis. (Pl. Dep. at 79:24-81:3; Pl. Dep. Ex. 10.)

42.

On November 12, 2020, Plaintiff submitted to the City's Human Resources Department a note from Dr. Diamond advising the City that Plaintiff was scheduled to a have a PD catheter placed on December 15, 2020 and would need to be out for work for three full months following the procedure. (Pl. Dep. at 81:9-13, 82:2-8; Pl. Dep. Ex. 10.)

43.

Additionally, on November 12, 2020, Plaintiff submitted FMLA certification paperwork to the City's Human Resources Department, which indicated that he would need a leave of absence from December 15, 2021 through February 15, 2021. (Pl. Dep. at 87:4-11; Pl. Dep. Ex. 11.)

44.

On November 16, 2020, the City approved Plaintiff's request for FMLA leave from December 15, 2020 until February 15, 2021. (Pl. Dep. at 88:9-17; Ex. 12 to Pl. Dep.)

45.

Next, on November 18, 2020, Plaintiff emailed Ms. Rookard, "Please call me ASAP." (Pl. Dep. at 89:16-25; Ex. 13 to Pl. Dep.)

46.

Plaintiff subsequently informed Ms. Rookard that his symptoms were worsening and that his doctor wanted him to immediately start leave to prepare for surgery. (Pl. Dep. at 90:1-13.)

47.

The same day, Dr. Diamond provided the City with updated FMLA certification paperwork and a doctor's note recommending that Plaintiff's leave begin on November 20, 2020

(instead of the previously-recommended date of December 15, 2020) to allow him time to prepare for his procedure and to attend appointments preceding placement of the PD catheter. (Pl. Dep. at 91:15-92:4; Pl. Dep. Ex. 14.)

48.

The City again accommodated and granted Plaintiff's request, and notified Plaintiff that he would be entitled to up to twelve (12) weeks of FMLA beginning on November 20, 2020 and running through February 15, 2021.  (Pl. Dep. at 92:5-93:9; 96:12-21; Pl. Dep. Ex's 15 & 17.)

49.

At the time of Plaintiff's approval for FMLA leave, he had accrued 165.80 hours of sick leave and 198.45 hours of vacation time and was eligible for sick pool pay following the exhaustion of his accrued leave. (Pl. Dep. at 93:2-94:8; Pl. Dep. Ex. 15.)

50.

The City notified Plaintiff that once he returned from FMLA leave on February 15, 2021, he would have exhausted his 12-weeks of FMLA entitlement for the year and would not be eligible for additional FMLA leave until November 20, 2021. (Pl. Dep. at 96:22-97:6; Pl. Dep. Ex. 17.)

51.

Plaintiff admits that he received all of the FMLA leave that he requested. (Pl. Dep. at 96:6-97:9, 112:11-113:7.)

52.

On November 20, 2020, Plaintiff delivered a letter to Mr. Donald's executive assistant Wanda Gothie informing Mr. Donald that Plaintiff would be on FMLA leave from November 20, 2020 until February 15, 2021. (Pl. Dep. at 99:9-23; Ex. 18 to Pl. Dep.)

53.

Plaintiff never had any discussions with Mr. Donald regarding the nature of his medical condition or the reasons for his leave of absence. (Pl. Dep. at 100:12-19; Donald Dep. at 110:19-111:1, 113:24-114:5; Donald Decl. ¶ 5.)

54.

Additionally, neither Ms. Rookard nor anyone else spoke to Mr. Donald about Plaintiff's medical condition, and in fact, Mr. Donald had no knowledge regarding Plaintiff's medical condition or the reasons behind his need for a leave of absence. (Donald Dep. at 52:20-54:4; Rookard Dep. at 55:24-56:20, 65:8-66:14; Pl. Dep. 101:5-102:20; Donald Decl. ¶ 5.; Rookard Decl. ¶ 9)

55.

During Plaintiff's extended leave of absence, he continued to apply for new positions in the metro-Atlanta area.  (Pl. Dep. 102:21-105:16).

56.

On February 15, 2021, the City received a letter from Dr. Diamond indicating that Plaintiff would need additional time to recover and would be cleared to return to work on February 25, 2021. (Pl. Dep. at 107:4-109:6; Pl. Dep. Ex. 20.)

57.

The City once again granted Plaintiff's request for additional leave through February 25, 2021, even though his FMLA entitlement expired on February 15, 2021. (Pl. Dep. at 109:7-17, 112:14-16.)

58.

Because Plaintiff had exhausted all of his accrued leave, the City paid Plaintiff for the

additional period of leave through the sick pool bank.  (Pl. Dep. at 109:18-110:22, 111:9-24; Pl. Dep. Ex's 21 and 22).

59.

Accordingly, Plaintiff admitted at his deposition that the allegation in his Complaint that he was denied the use of the sick pool to cover his extended leave of absence is simply not true. (Pl. Dep. 111:25-112:6,[8] 112:7-113:7; see also Doc. 1, Compl. ¶¶ 24, 43).

60.

Plaintiff returned to work on February 25, 2021, and at no point between then and his April 1, 2021 termination did he submit any documentation from his doctor to Human Resources indicating that he needed any form of restrictions in order to perform his job duties, which he was capable of performing during that period. (Pl. Dep. at 108:15-109:6, 112:20-22, 171:18-172:6; see also Pl. Dep. Ex. 20, containing no medical restrictions post-February 25, 2021.)

61.

At no point prior to Plaintiff's April 1, 2021 termination did he ever ask to be demoted, reassigned, or to be retrained as a result of his medical condition.  (Pl. Dep. at 170:23-172:6.)

62.

When Plaintiff returned to work on February 25, 2021, Plaintiff again began accruing sick and vacation leave, and he had a remaining 420 hours in the sick pool bank for the rolling year. (Pl. Dep. at 111:9-24, 112:23-25; Pl. Dep. Ex. 22; Rookard Dep. at 52:4-53:7.)

---

[8] Q. "So do you have any reason to dispute that you were, in fact, paid for 60 hours out of the sick pool bank?" A. "No."  Q. "Okay.  Well, you have an allegation in your complaint that you were denied the use of sick pool to cover your extended leave of absence.  And that's simply not true, is it?"  A. "When my leave was extended, I see I use our – they use additional time sick leave pool.  So I see that, yes."  (Pl. Dep. 111:21-112:6).

**D.**     **The Plaintiff's Return to Work Between February 25, 2021 and April 1, 2021**

63.

On February 25, 2021, the same date that Plaintiff returned to work, Mr. Donald called an Administrative Team Meeting – which included Plaintiff, Mr. Donald, Mr. McDonald, and Executive Assistants Wanda Gothie and Jessica Wilford in attendance – during which Plaintiff and Mr. McDonald were assigned various action items related to their respective areas of responsibility. (Pl. Dep. at 122:19-125:8; Pl. Dep. Ex. 23.)

64.

Then, on March 5, 2021, Mr. Donald requested that Plaintiff and Mr. McDonald lead a Director's Meeting. (Pl. Dep. at 126:24-127:8.)

65.

During the month of March 2021, Plaintiff was also tasked with preparing an Environmental Services Transition Plan and was invited to attend (and not excluded from) an additional administrative team meeting held on March 25, 2021.  (Pl. Dep. 132:22-133:20, 136:4-138:19, 1451:4-142:22; Pl. Dep. Ex. 26.)

66.

While Plaintiff alleges in his Complaint that Mr. Donald "excluded Mr. Sims from communications, meetings, and strategy operations of the City," Plaintiff admitted at his deposition that he is not aware of any meetings that included all directors or department heads in which he was not invited to attend. (Pl. Dep. at 129:2-19.)

67.

The only "meeting" Plaintiff specifically recalls being "excluded" from was a meeting between Mr. Donald and Director of Housing Development Hawthorne Welcher at some point

between February 25, 2021 and April 1, 2021. (Pl. Dep. at 128:4-18, 142:23-143:11.)  He could not identify the participants or dates of any other alleged meetings that he was purportedly excluded from.  (Pl. Dep. at 129:20-131:7).

68.

Plaintiff admitted in his deposition that nothing precluded the Administrator from meeting one on one with Directors, and that he never experienced any loss of pay or a demotion as a result of being left out of any such meetings. (Pl. Dep. at 129:20-131:13.)

69.

No one ever told Plaintiff that he was being excluded from a meeting because he took FMLA leave, because of his age, or because of his medical condition. (Pl. Dep. at 131:15-132:21).

70.

Plaintiff never complained before his termination to either Anita Rookard or Odie Donald that he had ever been excluded from meetings or was being treated unfairly.  (Pl. Dep. 144:11-145:12).

71.

In Plaintiff's deposition, he claimed that Mr. Donald would make demeaning comments about his work product, frequently make changes to his work, and was "very critical" of him. (Pl. Dep. at 136:4-138:19, 138:20-140:24.)

72.

However, Plaintiff admitted that Mr. Donald made similar comments to the other Deputy Administrator, Mr. McDonald, that Mr. Donald's style was "direct" and that he did not mince words when he was critical of someone's work product, and that none of Mr. Donald's comments to Mr. Sims referenced his age, disability, or use of leave. (Pl. Dep. at 138:20-140:24.)

- 14 -

73.

Shortly following Plaintiff's return to work on February 25, 2021, he spoke with HR Director Anita Rookard to advise that he was in the process of seeking a donor for a kidney transplant, that he was having friends and family members tested to see if they were a match for his blood type, and that he would potentially need some additional leave in the future. (Pl. Dep. at 113:8-115:8; Rookard Dep. at 59:16-60:4, 63:13-20.)

74.

Plaintiff admits that he never provided any specific dates on which he might potentially need additional leave, never submitted a formal request for additional leave associated with a kidney transplant, and never sent anyone in Human Resources any records showing a need for leave on specific dates. (Pl. Dep. 115:19-116:12, 116:13-117:14).

75.

In the event of additional leave, Plaintiff would not have been eligible for additional leave pursuant to the FMLA, because his 12-week entitlement had already been exhausted; however, Plaintiff would have been eligible to take additional sick pool time after he used his accrued sick and vacation time, which Ms. Rookard communicated to Plaintiff. (Pl. Dep. at 98:1-9, 113:8-115:18; Rookard Dep. at 60:9-61:5, 99:19-20.)

76.

In order for the Human Resources Department to grant a request for leave for medical reasons, the request for leave would need to be in writing and would need to provide specific dates for the requested leave. (Rookard Dep. at 100:11-22.)

77.

Following Plaintiff informing Ms. Rookard that he might potentially need additional leave

at some unspecified future date, Ms. Rookard contacted Benefits Analyst Schevella Nicholes regarding her conversation with Plaintiff. (Rookard Dep. at 101:11-102:4.)

78.

In response to her conversation with Ms. Rookard, Ms. Nicoles sent the following email on March 2, 2021:

> Per our conversation this morning, you informed me that Jarvis R. Sims will need to take leave in May for a medical reason. Mr. Sims exhausted FMLA leave 2/15/2021, and he will not be eligible for FMLA again until November 20, 2022 granted he meets the hours worked requirement of 1,250 hours worked in the 12-months preceding the leave request. Mr. Sims, also, will not be able to use any remaining sick pool hours until he exhausts all leave accruals (Sick, Vacation, Compensatory Time, etc.)

(Rookard Dep. at 101:11-102:4; Rookard Dep. Ex. 7.)

79.

Plaintiff never provided Ms. Rookard nor any other employees in Human Resources with any documentation requesting additional leave for a transplant, never had a date certain scheduled for a transplant, and as of Plaintiff's March 30, 2023 deposition, had still not received a kidney transplant. (Pl. Dep. at 45:20-24, 99:3-8, 116:7-12, 117:4, 117:15-120:7.)

80.

At no point did Plaintiff, Ms. Rookard, or anyone else inform Mr. Donald that Plaintiff might potentially need additional medical leave in the future following his February 25, 2021 return to work.  (Pl. Dep. at 101:5-19; Donald Decl. ¶ 7; Rookard Dep. at 19-21; Donald Dep. at 69:11-16, 91:14-18; Rookard Decl. ¶ 9.)

81.

On March 18, 2021, Plaintiff emailed the Administrative Team to notify them that he would be attending a doctor's appointment on March 19, 2021 and would be out of the office for

a few hours. (Pl. Dep. at 148:25-149:4; Pl. Dep. Ex. 28.)

82.

Plaintiff did attend said appointment, suffered no adverse consequences, and was never

told that he could not or should not attend the appointment. (Pl. Dep. at 149:8-20.)

E.      **The Plaintiff's Termination**

83.

On April 1, 2021, Plaintiff was called into a meeting with Mr. Donald and Ms. Rookard

inside Mr. Donald's office, during which Mr. Donald informed Plaintiff that he was being

terminated, and was provided a termination letter which indicated that, "As the new Administrator,

[Mr. Donald had] decided to give [the] Office of the Administrator a fresh start" and which

indicated that Plaintiff was being terminated "without cause." (Pl. Dep. at 149:21-151:18, 151:19-

150:20; Pl. Dep. Ex. 29; Donald Dep. at 46:23-47:15; Donald Dep. Ex. 4; Donald Decl. ¶ 15, Ex.

A.)

84.

It is undisputed that Mr. Donald also terminated the other Deputy Administrator, Tony

McDonald, on the same day he terminated Plaintiff and for the same reason. (Pl. Dep. at 151:24-

152:5; Donald Dep. 49:1-10; Donald Decl. at ¶¶ 11-17, Ex. A.)

85.

In fact, Mr. Donald provided Mr. McDonald with the same termination letter he provided

Plaintiff. (Donald Decl. at ¶¶ 11-15, Ex. A.)

86.

Mr. Donald made the decision to terminate both Plaintiff and Mr. McDonald on April 1,

2021. (Donald Dep. at 70:8-11; Donald Decl. at ¶¶ 11-15, Ex. A; 30(b)(6) Dep. at 22:16-19.)

87.

Ms. Rookard was not involved in the decision to terminate either Plaintiff or Mr.

McDonald. (Rookard Dep. at 30:18-31:19, 31:20-32:16; Donald Decl. ¶ 14.)

88.

Ms. Rookard was not even aware of Mr. Donald's intention to terminate Plaintiff and Mr.

McDonald until Mr. Donald asked her to sit in on the termination meeting on April 1, 2021.

(Rookard Dep. at 31:1-5.)

89.

There is no record evidence that Tony McDonald took FMLA or medical leave at any point

during his employment with the City, nor any evidence of Mr. McDonald requesting any type of

accommodation related to a medical condition.  (Pl. Dep. 157:2-19; 30(b)(6) Dep. 10:19-11:19).

90.

During his deposition, Odie Donald testified that the explanation set forth in response to

Plaintiff's Interrogatory 9 adequately describes the basis for his decision-making, which the

response states as follows:

> When former Administrator Odie Donald took office, he wanted to reorganize the
> Administrator's office by bringing on two new deputy administrators to serve with
> him, just as the Administrator before him had done.  Particularly, Mr. Donald felt
> that the former administration office had become stagnant, and he wanted to create
> a more proactive office.  He noticed that the former administration was not meeting
> deliverables, e.g., balancing the budget.  Accordingly, Mr. Donald re-organized the
> Administrator's Office, including adding new positions and expanding the roles of
> other positions. As with the Administrator before him [i.e., Janice Allen Jackson],
> he wanted to pick his own Deputy Administrators. Thus, Plaintiff was terminated
> in order for Mr. Donald to handpick a staff curated to his vision for the
> Administrator's Office.

(Donald Dep. at 86:18-87:16; Donald Dep. Ex. 1, Response to Interrogatory No. 9; Rookard Dep.

Ex. 1, Response to Interrogatory No. 9.)  This articulated reason is consistent with the reason

previously articulated in Defendant's position statement to the EEOC.  (Rookard Decl. ¶ 11, Ex.

A, EEOC Position Statement at p. 2 ("Preliminary Statement") and p. 6; Donald Decl. ¶ 13).

91.

At his deposition, Mr. Donald also testified that during the early months of his tenure, he

evaluated the efficiency of the Office of the Administrator and determined what was needed to

improve the Office, and when asked why he waited until April 2021 to terminate Mr. Sims and

Mr. McDonald, Mr. Donald explained:

> I think as you come in, you – you know, early on, you find your way around the
> building and all that good stuff. You look at everything from the budget, which
> creates your programs, you know, and funds those, and how they operate; what the
> Commission is desiring from the organization; what the citizens would like to see.
> And then once you evaluate those things, you determine do you have the resources
> – personnel and everything else – to make that happen, and the make a decision
> based on that.

(Donald Dep. at 48:12-25; Donald Decl. ¶ 11.)

92.

Mr. Donald further analogized his decision to terminate the two prior Deputy

Administrators (Plaintiff and McDonald) and to replace them with two new Deputy Administrators

by repeatedly comparing himself to the practice of new leaders in sports, local government, and

other organizations to bring on new staff following a change in leadership:

> [I]t is common practice that as – of similar in positions like Administrator, city
> managers, professional basketball coach, athletic director – you know, those types
> of roles, as you come in, you know, you evaluate an organization and you bring in
> staff…You know, it – it would be the equivalent of Damon Stoudamire at Georgia
> Tech who just started as their new coach who is bringing in a new coaching staff
> now that he's looked and evaluated and, you know, things of that nature.  I think
> that would be similar to here.
>
> …
>
> You are expected to deliver at a high level…And when being brought in to a
> situation, you have expectations to deliver at potentially higher level than there was

before…And so my decision in the role, personnel or otherwise, were made to ensure that we deliver at the highest level.

…

[I]t's the equivalent of – and using sports, for example.  If you run the wildcat offense before and, you know, the organization didn't reach the playoffs, then you may come in and run the I formation …which requires different personnel.

(Donald Dep. at 47:23-48:11, 58:7-15, 60:5-12; Donald Decl. ¶ 13.)

93.

Mr. Donald also testified that it is a common practice in local government organizations that when a change in leadership occurs, "there are staff and organizational changes…And I think that would be true for me as well."  (Donald Dep. at 66:2-14; Donald Decl. ¶ 13.)

94.

Notably, Plaintiff acknowledged in his deposition that "[s]ome organizations retain the staff and some managers change the staff" under such circumstances, that when a new mayor or new governor are elected that it is not uncommon for the new administration to bring on new staff or to make changes in the organization, and that the same is often true when a new general manager or an athletic director takes over a sports organization. (Pl. Dep. at 135:12-16, 163:2-18.)

95.

Additionally, Plaintiff acknowledged that former Administrator Janice Allen Jackson similarly brought on Plaintiff and Mr. McDonald to replace the two prior Deputy Administrators. (Pl. Dep. at 163:19-165:4.)

96.

Mr. Donald believed that the government was not operating at the highest level of efficiency, as demonstrated by the Commission hiring him to replace the prior permanent Administrator. (Donald Dep. at 59:7-10.) In his deposition, Mr. Donald testified:

I think my decision – my view was that the original, I guess, setup, framework, personnel, all of those things – the person that was in the permanent role before me was terminated. … And I was selected to, technically, replace that person. … And that termination would reflect that the Commission did not see the government going to the highest level of efficiency, so they brought me in to do that. … And in doing so, you know, any adjustments and things of that nature were solely based on what I believe[d] the resources necessary, whether it be people resources, financial resource[s], organizational resources. That was – My decisions were based on that, not a – a person. So I think if you look at [Plaintiff's termination letter] – I think it – it mentions that as a new Administrator, I've decided to give the Office of the Administrator a fresh start.

(Donald Dep at 58:19-59:24; Donald Decl. ¶¶ 11-15.)

97.

There were no other reasons for Plaintiff' termination. (Donald Dep. at 79:3-6; Donald Decl. ¶ 16.)

98.

Plaintiff was born in 1969 and was fifty-two (52) years old at the time of his termination. (Pl. Dep. at 34:4-8.)

99.

Tony McDonald was born in 1960 and was sixty-one (61) years old at the time of his termination. (Rookard Decl. at ¶ 6.)

100.

Mr. Donald was not aware of Plaintiff's nor Mr. McDonald's age, and their ages had nothing to do with the decision to terminate Plaintiff and Mr. McDonald. (Donald Dep. at 75:5-10; Donald Decl. ¶ 16.)

101.

Plaintiff's prior use of FMLA leave, medical condition, and the potential need for a future leave of absence – of which Mr. Donald was never informed at any point prior to April 1, 2021 –

had no impact on the decision-making process.  (Donald Decl. ¶ 16).

102.

Mr. Donald never reviewed Plaintiff's personnel or medical files, and did not have access to those files. (Donald Dep. at 79:24-80:4; Rookard Dep. at 103:1-21; Rookard Decl. ¶ 9.)

103.

Plaintiff never heard Ms. Rookard, Odie Donald, or anyone else with the City ever make any ageist comments, nor any derogatory comment about his medical condition or use of leave. (Pl. Dep. at 73:9-11, 161:12-163:1, 165:11-18.)

104.

No one ever told Plaintiff verbally or in writing that his separation had to do with his use of FMLA leave, his age, or his medical condition. (Pl. Dep. at 154:4-9, 161:12-163:1; Donald Decl. Ex. A.)

105.

Mr. McDonald, who was terminated on the same date as the Plaintiff and for the same reasons, did not take FMLA leave or any other sort of medical leave, never informed the City that he was disabled, never requested any disability-related accommodation, and the City did not regard him as disabled. (30(b)(6) Dep. at 10:19-11:19; Donald Decl. ¶¶ 11-17, Ex. A.)

106.

Following Plaintiff's termination, he met with the City's EEO Compliance Director Phyllis Johnson. (Pl. Dep. at 168:1-15.) During the meeting, Plaintiff spoke to Ms. Johnson about his medical condition and his termination. (Pl. Dep at 168:16-169:24.)

107.

At no point prior to Plaintiff's termination did he speak with anyone within Human

Resources or the EEO Department regarding his alleged feeling of discrimination and/or harassment. (Pl. Dep. at 61:13-62:4; 168:16-169:24.)

### III.    The Structure of the Administrator's Office After Plaintiff's Termination

108.

Mr. Donald did not have any replacements in mind for Plaintiff and Mr. McDonald at the time of their termination. (Donald Dep. at 49:1-10.)

109.

Following Plaintiff's and Mr. McDonald's termination, the City began the process of recruiting two new Deputy Administrators to fit "the new direction of the office." (Donald Dep. at 49:5-10, 50:10-51:6.)

110.

Human Resources posted the job opening for the Deputy Administrator positions. (Rookard Dep. at 33:17-20.) However, Human Resources was not involved in the selection of the new Deputy Administrators. (Id.)

111.

Ultimately, Mr. Donald hired Charles Jackson and Tanikia Jackson to replace Plaintiff and Mr. McDonald as Deputy Administrators. (Rookard Dep. at 70:19-22; Donald Dep. at 49:14-50:13; Donald Decl. ¶ 18; Rookard Decl. ¶ 8.)

112.

Mr. Donald hired Charles Jackson on May 15, 2021. (Donald Decl. at ¶19; Rookard Decl. at ¶ 8.)

113.

Charles Jackson was born in 1973. (Rookard Decl. at ¶ 6.) He is only four years younger

than Plaintiff. (Pl. Dep. at 164:10-18.)

114.

Mr. Donald hired Tanikia Jackson on August 7, 2021. (Donald Decl. at ¶ 19; Rookard Decl. at ¶ 6.)

115.

Tanikia Jackson was born in 1974. (Rookard Decl. at ¶ 6.) She is only four years younger than Plaintiff. (Pl. Dep. at 164:20-165:2.)

116.

Mr. Donald was not aware of either Tanikia Jackson's nor Charles Jackson's age or medical conditions (or lack thereof) when making the decision to hire them as the replacements for Plaintiff and Mr. McDonald. (Donald Dep. at 75:5-10; Donald Decl. ¶ 20.)

Respectfully submitted, this 18th day of September 2023.

**FREEMAN MATHIS & GARY, LLP**

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212
Emily M. Walker
Georgia Bar No. 221826
*Attorneys for Defendant*

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960
E: jbennett@fmglaw.com
E: emily.walker@fmglaw.com