EXHIBIT 1

```
             UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF GEORGIA
                   AUGUSTA DIVISION


JARVIS SIMS,                )
                            )
          Plaintiff,        )
                            )
v.                          ) Civil Action File
                            )
CITY OF AUGUSTA-RICHMOND ) No.: 1:22-cv-00099-JRH-BKE
COUNTY,                     )
                            )
          Defendant.        )
_____)
```

          Deposition of ODIE DONALD; taken for purposes

     stated herein; all formalities waived excluding

     the reading and signing of this deposition

     transcript; commencing at 9:57 a.m. on Thursday,

     April 20, 2023, at the offices of Freeman Mathis &

     Gary, LLP, 100 Galleria Parkway, Suite 1600,

     Atlanta, Georgia.

_____

               Perimeter Court Reporting, LLC
                Philips P. Thomas, CCR 2816
                   Post Office Box 2907
                  Cumming, Georgia 30028
                     (770)474-5192

**Odie Donald - April 20, 2023**

```
1   my questions, you let me finish my question, and we
2   don't talk on top of each other; otherwise, it's hard
3   for him to take it down.  And if I ask you the question
4   and you give me an answer, I'm going to assume you
5   understood the question.  Is that a fair assumption?
6        A    Yes.
7        Q    Okay.  And if I ask a bad question and it
8   doesn't make any sense, it's perfectly okay to say I
9   don't understand what you're trying to get at, rephrase
10  the question, and I'll do my best to do so.
11       A    Understood.
12       Q    All right.  Are you under the influence of
13  anything today that would prevent you from testifying
14  truthfully?
15       A    No.
16       Q    Okay.  What's your date of birth?
17       A        1978.
18       Q    And what is your current business address?
19       A    Atlanta City Hall.
20       Q    Okay.  I just wanted to make sure you were
21  still with the City of Atlanta.
22       A    Yes.
23       Q    And I don't -- Well, what county do you live
24  in right now?
25       A    Fulton.
```

Odie Donald - April 20, 2023

```
 1        Q     Okay.  And is there just one chief of staff?
 2        A     Yes.
 3        Q     Okay.  And do you have other folks reporting
 4   to you in that capacity?
 5        A     Yes.
 6        Q     All right.  Who are those folks?
 7        A     Three deputy chiefs of staff.
 8        Q     All right.  And how long have you been doing
 9   that?
10        A     Goodness -- February of 2022.
11        Q     Okay.  And is that when he got elected?
12        A     Yes.  With his --
13        Q     Roughly?
14        A     Correct.  Yes.
15        Q     Okay.  With his term.  All right.  So at
16   Augusta, you were the City Administrator; correct?
17        A     Yes, sir.
18        Q     Okay.  How long were you in that position?
19        A     I began that position in mid-November of
20   2020.  And I was in that role until the time that I
21   began work with the city of Atlanta.
22        Q     Okay.  And so I'm assuming that the reason
23   you left Augusta was to go be the chief of staff in
24   Atlanta?
25        A     Correct.
```

**Odie Donald - April 20, 2023**

```
1         Q     Okay.  Do you know how many employees Augusta
2    had when you were the City Administrator?
3         A     Approximately, 3,000, to 3,200.
4         Q     Okay.  And that's a unified government;
5    right?
6         A     Yes.
7         Q     Okay.
8         A     It's -- Yes.
9         Q     And I spoke to Ms. Rookard the other day --
10        A     I think the correct would be consolidated --
11        Q     Consolidated.
12        A     -- because theirs is different.  It's a
13   consolidated government.
14        Q     Okay.  My understanding is there's a mayor, a
15   council, and then, a City Administrator's office; is
16   that --
17        A     Correct.
18        Q     Are there any other bodies that exercise
19   control over that -- city? county?
20        A     Yeah.  Well, you have a variety of
21   constitutional offices.
22        Q     Okay.  Like sheriff and things like that?
23        A     Correct.
24        Q     Okay.  But as far as, you know, what I would
25   traditionally think there would be a city council and a
```

Odie Donald - April 20, 2023

1   what the interactions or power structures are between

2   the mayor, the Commission, and the Administrator's

3   office?

4        A    Yes.  The mayor and Commission are the

5   elected officials that oversee government for the

6   consolidated -- or oversee government functions for the

7   consolidated government of Augusta-Richmond County.

8        Q    Okay.

9        A    The Administrator, on their behalf, oversees

10  the operation of government.

11       Q    Okay.  Would it be fair to say they kind of

12  come up with the ideas and the policies, and then the

13  City Administrator makes those happen?

14       A    Yes.

15       Q    All right.  And I assume city Administrator's

16  office is the one that handles the day-to-day

17  functioning of the government.

18       A    Yes.

19       Q    Okay.  That office, is it just the

20  Administrator and the two deputies?

21       A    No.

22       Q    Okay.  Who else is in that office?

23       A    There is -- I mean, of course, administrative

24  staff -- capital projects, transparency.  We had an

25  economic development officer.  One of the

**Odie Donald - April 20, 2023**

1  I'm just trying to get to the best of your
2  recollection.
3      A     Understood.
4      Q     All right.  Could you kind of walk me through
5  a day in the life of what you would do as the
6  Administrator, and then kind of what the deputies would
7  do kind of day to day.  And I get it every day is
8  different, but . . .
9      A     Yeah.  It is -- it is very different.  But I
10 think the Administrator is pretty much responsible for
11 all of the activities on the non -- we'll call it
12 legislative side --
13     Q     Okay.
14     A     -- of government.  And days differ.  They
15 would include a variety of meetings; review of
16 documents; execution of documents -- let's see --
17 strategic planning; review of finances and status of
18 projects, you know, whether it be capital projects or
19 programmatic projects; updates on activities across the
20 government; it may include some state and federal
21 interaction from things that include grants -- you
22 know, for us public health emergency.  It was COVID --
23     Q     Okay.
24     A     -- during that time, so a review of health
25 numbers, impacts, and indicators; coordination of new

**Odie Donald - April 20, 2023**

```
 1   policy; inferences into old policy.  It is a very wide
 2   range -- and it may include prep for speaking
 3   engagements.
 4         Q    For whom?
 5         A    For anyone within the office, including
 6   myself.
 7         Q    Okay.
 8         A    We also provided support -- communications
 9   support across -- so I left off a person, now that I
10   say that.
11         Q    Okay.
12         A    We also had a communications, I guess,
13   officer.  I don't remember the exact title, but a --
14   you know, almost like a public information officer.
15         Q    I got you.
16         A    So we may respond to, you know, those
17   communications.  We started a newsletter, so review of
18   content and things of that nature, to increase the
19   public interaction.  And some public meetings would be
20   included such as town-hall preps, one-to-one meetings
21   with staff, the public, with elected leadership,
22   et cetera.
23         Q    Okay.
24         A    And of course, some things that I probably
25   did not include --
```

**Odie Donald - April 20, 2023**

1     Q     Sure.

2     A     -- that just happened within the day to day.

3     Q     Sure.  So I guess I'm just trying to think of

4  the role --

5     A     I'm sorry.  That was the -- that was in

6  general --

7     Q     Sure.

8     A     -- the Administrator.  But also, those tasks

9  would also be included for the deputies.  So it may

10  flow down.  So all of those things would touch the

11  office, and as a working Administrator, I did all of

12  those things --

13     Q     Okay.

14     A     -- but based on their subject area, the

15  service areas --

16     Q     Right.

17     A     -- the deputies would have some of that

18  engagement as well.

19     Q     Well, and that's what I was trying to

20  understand.  My -- and correct me if I'm wrong.  But my

21  understanding is, essentially, each deputy kind of

22  oversaw 8 department, kind of split those in half

23  between the two of them?

24     A     That may be correct.  I don't remember the

25  exact number.

**Odie Donald - April 20, 2023**

```
 1        Q     Okay.
 2        A     But yes, they would definitely oversee the
 3   different subject areas, and so . . .
 4        Q     Okay.
 5        A     You know, I guess I can give you an example.
 6        Q     Sure.
 7        A     If you have -- If -- If engineering is in
 8   your portfolio, you may help the engineering person
 9   prepare for the council meeting.
10        Q     Okay.
11        A     You might also approve a presentation at the
12   Chamber of Commerce, for that person, vet it, and allow
13   them to do it.  You may be called to do a meeting at a
14   local group, and you would present information.  There
15   may be documents that you would prep for signing for
16   their Administrator.  So --
17        Q     Okay.
18        A     -- all of those functions, but depending on
19   your service area is what --
20        Q     Right.
21        A     -- you would do.
22        Q     Okay.  So one of the two deputies would be,
23   essentially, the primary contact for folks in that
24   service area?
25        A     Service area.  Correct.  Internal and
```

Odie Donald - April 20, 2023

```
 1        A    Oh, no.

 2        Q    -- lawsuits?

 3        A    No.  No.

 4        Q    Okay.  And I think you've already answered

 5   this.  Have you ever been a witness or given testimony

 6   in any of those cases?

 7        A    Oh, no.  No.

 8        Q    Okay.  All right.  So let's go back to when

 9   you were the -- so not City Administrator, just

10   Administrator.  Is that --

11        A    Yeah.

12        Q    -- the correct term?

13        A    Yeah, I think that -- yeah, that's correct.

14        Q    Okay.  I understand that -- I'm going to say

15   the City just for simplicity, but --

16        A    Yeah.

17        Q    -- you know what I'm talking about -- that

18   they had an EEO office.

19        A    Yes.

20        Q    Okay.  And was that its own department?

21        A    Yeah, you know, I am not sure how it's

22   classified.  It is like a standalone.

23        Q    Okay.

24        A    It may actually be considered a peer to the

25   Administrator.
```

Odie Donald - April 20, 2023

```
 1        Q     Okay.

 2        A     Yeah.

 3        Q     I think Anita may have said that it was --

 4   maybe reports directly to the Commission.

 5        A     Correct.

 6        Q     Okay.

 7        A     So that's why I'm not sure --

 8        Q     That's fine.

 9        A     -- how it's -- if it's -- yeah.

10        Q     I guess this may be the simplest way to ask

11   it.  Do you have any involvement --

12        A     Oh, no.

13        Q     -- with them?  Okay.

14        A     Yeah.  So they are -- They are a separate

15   office outside of my purview is the --

16        Q     Okay.

17        A     -- best way to explain it.

18        Q     So you can't tell them what to do --

19        A     No.

20        Q     -- you're not involved in --

21        A     No.  They report --

22        Q     -- appeals or anything like that?

23        A     -- to the Commission.

24        Q     Okay.

25        A     Yeah.
```

**Odie Donald - April 20, 2023**

1   Administrator's office?

2       A    So technically, it is run through the law

3   department.

4       Q    Okay.

5       A    But later, we did create a transparency

6   officer role, which was something new that I wanted to

7   put in place to, you know, help increase public

8   confidence and make clear our compliance with any open

9   records.

10      Q    I got you.  Would that then be taking the

11  open records from the law department giving it to that

12  transparency officer?

13      A    No, I would not classify it as that.

14      Q    Okay.

15      A    It is simply kind of adding an extra layer of

16  transparency.

17      Q    Okay.  That's fair.

18      A    Yeah.

19      Q    While you were the Administrator, did you

20  ever have to handle any kind of requests for

21  accommodations for disabilities from employees?

22      A    No.  Those would go through HR.

23      Q    Okay.  Is that something that Anita

24  personally would handle or is there someone in HR that

25  deals with that?

**Odie Donald - April 20, 2023**

1      A    So that I could not tell you.

2      Q    Fair enough.  Well, let me ask it this way.

3  To your recollection, did HR ever come to you and say,

4  hey, one of your admin folks has requested an

5  accommodation, we need to talk about this?

6      A    Not to my knowledge.  What would occur is

7  that if a -- so if it were me, I would make a request

8  through HR --

9      Q    Uh-huh (affirmative).

10     A    -- they would -- I assume they would -- so I

11  never had to request one -- but I would assume that

12  they would vet it and give me insight on whether it's

13  approved or not, and then they would simply notify the

14  appropriate party that here is the accommodation and

15  here is what you should do.

16     Q    Okay.

17     A    That would not flow through my office at all.

18     Q    So basically, if it came to you somehow,

19  you'd just kick it over to HR, say do your thing and

20  then come back to me when you know?

21     A    Correct.  Yeah -- well -- but it would not

22  come to me.  So . . .

23     Q    Got you.

24     A    We're, I believe, trained -- or at least --

25  yeah, I'm pretty sure trained.  I've been in so many

**Odie Donald - April 20, 2023**

1   Administrator's role, from Augusta?

2        A     No.  Oh, no.

3        Q     Okay.

4        A     No.

5        Q     So what I'm trying to do is kind of figure

6   out the balance between HR and, essentially, you.

7        A     Okay.

8        Q     What kind of -- Like hiring and firing --

9        A     Okay.

10       Q     -- what was the scope of your authority for

11  hiring and firing folks, I guess, in two ways; one, in

12  your office, the Administrator's office --

13       A     Uh-huh (affirmative).

14       Q     -- and then, kind of in Augusta as a whole,

15  at least as you understood it.

16       A     Yeah.  So in my office, those

17  responsibilities, I have the ability to hire and fire

18  within allowable rules and regulations and policy.

19       Q     Okay.

20       A     Outside of my office, those decisions are

21  made by, you know, basically, two verticals.  If it's a

22  constitutional officer, it is the public by way of

23  their vote.

24       Q     Okay.

25       A     If it is a department head, it is the

**Odie Donald - April 20, 2023**

```
 1    Commission's decision.
 2         Q    Okay.  And then, is it fair to say that
 3    within each department, the head of each department
 4    kind of makes the call for staff?
 5         A    That is correct.
 6         Q    Okay.  So in practice, you wouldn't go into
 7    some other department and say, I don't like this
 8    lower-level employee, get rid of them?
 9         A    Correct.
10         Q    Okay.  If a department head wanted to hire or
11    fire someone within their department, did that have to
12    be approved by you?
13         A    Partially.
14         Q    Okay.
15         A    So they would have to fill out some type of
16    form and ensure that there is budget and things like
17    that available --
18         Q    Got you.
19         A    -- and then that sign-off is there.
20         Q    I got you.
21         A    Yeah.
22         Q    Would you classify more that -- I mean, did
23    you do any kind of substantive review at that point or
24    did you just say, if the budget works out and you want
25    them --
```

**Odie Donald - April 20, 2023**

1      Q    That's fine.

2      A    -- exactly who.

3      Q    Would that have been something that you would

4   also talk to HR about?

5      A    They may have been engaged in that -- Yeah, I

6   would imagine maybe HR and -- and legal.  Yes.

7      Q    Okay.  Was your primary contact in HR Anita

8   Rookard, or would you have talked to somebody else?

9      A    No, I wouldn't have spoken with anyone else.

10     Q    Okay.

11     A    Yeah.

12     Q    Did you discuss -- Let me just go ahead and

13  do this.

14          (Whereupon, Exhibit No. 4 was marked for

15          identification.)

16  BY MR. McBRIDE:  (Resuming)

17     Q    I am going to go ahead and show you what is

18  marked -- and it's out of order -- as Exhibit 4.

19     A    Okay.

20     Q    And just take a minute to look through that

21  and tell me if you recognize that document.

22     A    Yes, I recognize the document.

23     Q    Okay.  Tell me what this document is.

24     A    This is the termination letter to Mr. Jarvis

25  Sims.

**Odie Donald - April 20, 2023**

1      Q    Okay.  And it's dated April 1st, 2021;
2  correct?
3      A    Yes, sir.
4      Q    And it looks like, at the bottom, that's your
5  signature?
6      A    Yes, sir.
7      Q    On the second page, I should say.  And then,
8  looks like it was sent to Anita Rookard and Wayne
9  Brown.  HR, and General Counsel.
10     A    Yes, sir.
11     Q    Okay.  So before giving -- And my
12 understanding it says on here you, essentially, met
13 with Mr. Sims, gave him the letter, and I guess, talked
14 about it?
15     A    Yes, sir.
16     Q    Okay.  What I'm trying to understand is,
17 before this --
18     A    Uh-huh (affirmative).
19     Q    -- you talked to HR and legal about it.  Did
20 you ever talk to Mr. Sims and say, hey, I'm thinking
21 about letting you go, or have any discussions with him
22 about it?
23     A    No.
24     Q    What went into this decision?
25     A    Well, I think, you know, it is common

**Odie Donald - April 20, 2023**

1   practice that as -- of similar in positions like

2   Administrators, city managers, professional basketball

3   coach, athletic director -- you know, those types of

4   roles, as you come in, you know, you evaluate an

5   organization and you bring in staff.

6          You know, it -- it would be the equivalent of

7   Damon Stoudamire at Georgia Tech who just started as

8   their new coach who is bringing in a new coaching staff

9   now that he's looked and evaluated and, you know,

10  things of that nature.  I think that would be similar

11  to here.

12     Q    Can you kind of walk me through the timeline

13  of why this happened in April when you came in back in

14  November?

15     A    Yeah, that I -- I would not -- you know, I

16  think as you come in, you -- you know, early on, you

17  find your way around the building and all that good

18  stuff.  You look at everything from the budget, which

19  creates your programs, you know, and funds those, and

20  how they operate; what the Commission is desiring from

21  the organization; what the citizens would like to see.

22  And then once you evaluate those things, you determine

23  do you have the resources -- personnel and everything

24  else -- to make that happen, and then make a decision

25  based on that.

**Odie Donald - April 20, 2023**

1      Q     Did you have a person in mind to replace him

2    when you let him go?

3      A     No.

4      Q     Okay.

5      A     No.  We did a recruitment to land -- It was

6    actually more than one Administrator that -- Deputy

7    Administrator that was let go.

8      Q     Right.

9      A     There was another gentleman, Mr. McDonald.

10   And those two roles -- recruited for both.

11     Q     Okay.  And it looks like in the records --

12   and I know it's been a while --

13     A     Uh-huh (affirmative).

14     Q     -- I'll represent to you that -- Well, do you

15   remember who replaced Mr. Sims?

16     A     I do not.  I had two Deputy Administrators.

17   They started around the same time, not exactly.  I

18   think the gentleman --

19     Q     Was it Charles Jackson --

20     A     Mr. Jackson --

21     Q     Looked like you had Mr. Jackson and

22   Mrs. Jackson.

23     A     But they are not --

24     Q     Right.

25     A     Okay.  Yeah, they're not related or married

**Odie Donald - April 20, 2023**

1  or anything.  They just happen to have the same last

2  name.

3      Q    Yeah.  It looked like Charles Jackson was

4  hired to replace Mr. McDonald.  And then Tamika

5  Jackson --

6      A    Ms. Tanikia Jackson.

7      Q    Tanikia.

8      A    But no, I don't think that's correct.

9      Q    Okay.

10     A    There were two openings, and so there's not

11  -- they weren't necessarily hired to replace a specific

12  person --

13     Q    Got you.

14     A    -- because the vision for the office -- you

15  know, all of those roles that I mentioned to you --

16     Q    Uh-huh (affirmative).

17     A    -- were not necessarily all there when I

18  arrived.

19     Q    Okay.

20     A    So the office went in a completely different

21  direction.  So you may have still had the split of

22  departments, but there was also the office work and the

23  delivery of -- of excellent service differently than

24  before.  So . . .

25     Q    Okay.

**Odie Donald - April 20, 2023**

1     A     Yeah, it wouldn't have been to replace a
2  single person.  It is -- They were both hired as Deputy
3  Administrators to deliver the work.  So I wouldn't -- I
4  don't think it was in mind of -- not I don't think --
5  It was not in mind of one person replaces one person.
6  It is the new direction of the office.
7     Q     All right.
8     A     Yeah.
9     Q     So you had mentioned that you kind of came in
10 and did some evaluations.  Are there any like formal
11 evaluations of Mr. Sims that you did that would be in
12 writing somewhere?
13    A     No, I don't believe there was.
14    Q     Okay.
15    A     Again, the evaluation was more on the
16 progress of the government's service delivery more than
17 a person.  Yeah.
18    Q     Okay.  So Mr. Sims, before you got there,
19 was, essentially, in your position, right, as the
20 interim Administrator?
21    A     Yes.
22    Q     My assumption is that he was qualified to do
23 that job as he was in that position for a period of
24 time.  Is that fair from your perspective?
25    A     I would not know.

**Odie Donald - April 20, 2023**

```
 1        Q     Okay.

 2        A     So those decisions are made by the

 3   Commission, and so they would have to answer that

 4   question for you.

 5        Q     To your recollection, did the Commission or

 6   the mayor ever have negative things to say about

 7   Mr. Sims?

 8        A     Oh, I don't know.  They wouldn't have said

 9   those to me.

10        Q     Okay.

11        A     Yeah.

12        Q     So nobody said anything to you negative about

13   him?

14        A     No.

15        Q     Okay.  Did you do any kind of evaluation to

16   determine whether Mr. Sims would be a good fit for

17   another role at Augusta, prior to termination?

18        A     I don't believe so.  I am not -- I wouldn't

19   remember that, just to be honest.

20        Q     That's fair.  Were you aware that Mr. Sims

21   was on medical leave shortly after you started as

22   Administrator?

23        A     I believe so.  I believe I got a FMLA or, you

24   know, they told me that he was taking some time off for

25   FMLA.
```

Odie Donald - April 20, 2023

1   you do get notice when someone in the Administrator's

2   office is out on leave or taking medical leave or that

3   kind of thing?

4        A    Yes.

5        Q    Okay.  And to the extent you remember, was

6   that normally an e-mail? a phone call? a conversation?

7        A    Yeah, that, I don't remember.  It could

8   likely be an e-mail or a telephone call.  I -- I just

9   -- Yeah, I don't know what the process is in Augusta.

10       Q    Okay.  So when you came in to the role, what

11  were the job duties of the Deputy Administrator?

12       A    The job duties -- I mean, I guess they would

13  have been the same as what I described to you.  They

14  manage a portfolio.  They may get called on by either

15  the Administrator or the Commission.  You know, maybe

16  they speak to a community group or something of that

17  nature.  It would be mostly like a administrative

18  support for offices and the City.

19       Q    Okay.

20       A    Yeah.  And most of that stuff, I guess, would

21  be done by department heads, so it's managing the work

22  of department heads.

23       Q    Okay.

24            (Whereupon, Exhibit No. 10 was marked for

25       identification.)

**Odie Donald - April 20, 2023**

```
1          Q     Okay.

2          A     Yeah.

3          Q     Did you have conversations with HR or

4    Ms. Rookard about that time off?

5          A     I don't -- I think if I had any conversation,

6    it was just being noticed that, you know, he's -- he'll

7    be out for FMLA for a period of time.

8          Q     Okay.

9          A     Yeah.

10         Q     Did he or anybody else talk to you about his

11   kidney disease?

12         A     No.

13         Q     Okay.  And I assume then -- Well, did you

14   know anything about his medical condition or the need

15   for leave?

16         A     No.

17         Q     We'll go back to this.  You can hold onto it.

18   And I may not have mentioned this earlier.  If you need

19   to take a break at any time, just let me know.

20         A     Understood.

21         Q     Do you remember reviewing any kind of

22   documentation regarding his leave or medical condition?

23         A     No, I would not.  I would not.  That would

24   not come to me.

25         Q     And I think you already answered this.  But
```

**Odie Donald - April 20, 2023**

1  accurate depiction.  I think my perception was, as a

2  new Administrator, I look at it as similar as a -- I'll

3  continue to use like Georgia State, Georgia Tech --

4      Q    Sure.

5      A    -- college basketball.  I was not the same.

6      Q    Right.

7      A    You are expected to deliver at a high level.

8      Q    Right.

9      A    And when being brought in to a situation, you

10  have expectations to deliver at potentially a higher

11  level than there was before.

12      Q    Okay.

13      A    And so my decisions in the role, personnel or

14  otherwise, were made to ensure that we deliver at the

15  highest level.

16      Q    Okay.  Well -- And I guess I don't want to

17  beat the dead horse --

18      A    Uh-huh (affirmative).

19      Q    -- I'm just trying to understand was it your

20  view that Mr. Sims could not deliver at that higher

21  level?

22      A    I think my decision -- my view was that the

23  original, I guess, setup, framework, personnel, all of

24  those things --

25      Q    Uh-huh (affirmative).

**Odie Donald - April 20, 2023**

 1     A     -- the person that was in the permanent role
 2   before me was terminated.
 3     Q     Right.
 4     A     And I was selected to, technically, replace
 5   that person.
 6     Q     Right.
 7     A     And that termination would reflect that the
 8   Commission did not see the government going to the
 9   highest level of efficiency, so they brought me in to
10   do that.
11     Q     Okay.
12     A     And in doing so, you know, any adjustments
13   and things of that nature were solely based on what I
14   believe the resources necessary, whether it be people
15   resources, financial resource, organizational
16   resources.  That was -- My decisions were based on
17   that, not a -- a person.  So I think if you look at
18   your Exhibit 4 --
19     Q     Sure.
20     A     -- I think it -- it mentions that as a new
21   Administrator, I've decided to give the Office of the
22   Administrator a fresh start.  And that's -- that is --
23     Q     And is that what you meant by fresh start?
24     A     Correct.
25     Q     So I understand what I'm hearing you say --

**Odie Donald - April 20, 2023**

```
1        A    Uh-huh (affirmative).
2        Q    -- and correct me if I'm wrong -- is you just
3   had a different vision for this Deputy Administrator
4   position than what had existed before?
5        A    I think that is fair.  But I -- I don't
6   bundle it all in just a -- it's -- it's the equivalent
7   of -- and using sports, for example.  If you run the
8   wildcat offense before and, you know, the organization
9   didn't reach the playoffs, then you may come in and run
10  the I formation --
11       Q    Sure.
12       A    -- which requires different personnel.
13       Q    Okay.  Did you do any kind of evaluation of
14  Mr. Sims to determine whether he fit the criteria for,
15  you know, what you wanted for that Deputy Administrator
16  position?
17       A    What do you mean the criteria?  What do --
18       Q    Well --
19       A    Please explain.
20       Q    So I'm trying to use your sports metaphor and
21  probably --
22       A    Uh-huh (affirmative).
23       Q    It sounds like you wanted to run a different
24  type of office; fair?
25       A    Yes.
```

**Odie Donald - April 20, 2023**

1   it might be the exact same, you know, group of people

2   as before.  So I -- I think that is just, again, in the

3   business, it is a common practice that if a new mayor

4   comes in, there will be a different chief of staff.

5   But it doesn't always happen that way.

6        Q    Got you.

7        A    So I wouldn't -- wouldn't want to generalize

8   myself or the context of the business.  But I think

9   it's an expectation that when there are new leaders

10  that come in, there are staff and organizational

11  changes.

12       Q    Okay.

13       A    Yeah.  And I think that would be true for me

14  as well.

15       Q    For the record, I was a big fan of Phil

16  Jackson.  But Jerry Krause, he's on my list, he ruined

17  my childhood.

18       A    Okay.

19       Q    Wonderful team, and then he just blew it all

20  up.

21       A    Okay.

22       Q    Anyway.  All right.  Did you have any kind of

23  discussion, I guess, sharing your vision of the office,

24  or anything like that, with Mr. Sims when he came back

25  from FMLA leave?

**Odie Donald - April 20, 2023**

1  administrative office.

2      Q    So when Mr. Sims was out on FMLA, did you

3  just have the one deputy or did someone step up and

4  perform in his absence?

5      A    You know, I don't -- I don't -- no, I don't

6  think there was an interim deputy.  No, I don't

7  remember that.

8      Q    Okay.

9      A    I believe -- I mean, I would imagine I just

10 took on a portion of that work.

11     Q    Okay.  Did anyone in HR talk to you about

12 Mr. Sims needing to take some additional time off in

13 May for a transplant?

14     A    No, I wasn't aware of his -- Yeah, I would

15 not know his needs of that type.  That would go through

16 HR.

17     Q    Okay.  Did you ever talk to Ms. Rookard about

18 this lawsuit?

19     A    No.

20     Q    Anybody else?

21     A    Legal informed me.

22     Q    Legal?

23     A    Yeah.

24     Q    And I don't want to get into your

25 attorney-client communications.  I'm just trying to

**Odie Donald - April 20, 2023**

1    figure out would there have been any other person other

2    than, I guess, either internal or external legal

3    counsel that you would have discussed the allegations

4    of the lawsuit with?

5         A    No.  It would have just been legal.

6         Q    Okay.

7         A    Yeah.

8         Q    So was there any kind of panel or anybody

9    other than you that made the decision to let Mr. Sims

10   go?

11        A    No.

12        Q    Okay.

13        A    No, I don't believe so.  I would have -- I

14   think I would have, again, decided to go in another

15   direction, and then, you know, identified the process,

16   et cetera.

17        Q    When you were hiring to replace, did anybody

18   kind of help you with the hiring process or did you

19   have a panel of anybody that you consulted with?

20        A    I don't remember, actually.  I -- Yeah, I

21   don't -- That was a while ago.  I mean, I guess you do

22   the hiring through -- you post it through HR and, you

23   know, you get a -- Yeah, I don't remember.  Goodness.

24   That's -- Yeah, I got to think about that.

25        Q    That's fine.  I mean if you --

**Odie Donald - April 20, 2023**

1  changes, similar to like there wasn't a handoff from
2  the former to me.
3       Q    Right.
4       A    Or even the interim.  Yeah.
5       Q    Okay.  Do you recall if Ms. Jackson was
6  younger than Mr. Sims?
7       A    I don't.  Yeah, I actually probably wouldn't
8  know any of the ages of the four people who --
9       Q    Okay.
10      A    -- served under my leadership.  Yeah.
11      Q    Do you know if she had any kind of
12  disability -- Ms. Jackson?
13      A    I don't.  Yeah, I didn't know that Mr. --
14  Mr. Sims would have had one.  Yeah.
15      Q    Okay.
16      A    So I didn't -- yeah.  Nor Mr. Jackson.  So I
17  wouldn't -- yeah.
18      Q    Do you know anything -- well, I'm sure you
19  know something.  Were you involved in the City's health
20  insurance?
21      A    No, I wouldn't -- Yeah.  I guess, as the
22  Administrator, we have to authorize the budget for
23  procurements and things of that nature.
24      Q    Right.
25      A    But the actual delivery of insurance -- I was

**Odie Donald - April 20, 2023**

```
 1        Q     Okay.

 2        A     Yeah.

 3        Q     Were there any other reasons for Mr. Sims'

 4   termination, other than that fresh start that you

 5   talked about?

 6        A     No, not that I recall.

 7        Q     Okay.  At some point I think he sent you an

 8   e-mail about him applying for City Manager position

 9   somewhere else -- Forest Park.

10        A     Okay.

11        Q     Would that have played any role in wanting to

12   get rid of him?

13        A     Oh, no.  So that's the normal -- Like I said,

14   in the -- in the business -- I mean, I left Augusta

15   because I was recruited somewhere else.  So --

16        Q     Right.

17        A     -- that's just kind of a normal part of the

18   business.  Yeah.

19        Q     Do you review personnel files -- or did you

20   while you were at Augusta?

21        A     No.

22        Q     Okay.

23        A     Yeah.

24        Q     Did you ever review Mr. Sims' personnel file?

25        A     No.
```

**Odie Donald - April 20, 2023**

```
 1        Q     Okay.  And ever review his medical file?
 2        A     No.  Yeah, I wouldn't have access to it.
 3   That's not allowable, I don't believe, for me to even
 4   have access to that.
 5        Q     Okay.
 6        A     Yeah.
 7        Q     Other than legal, have you talked to anybody
 8   else about Mr. Sims' use of sick pool, his termination,
 9   or this lawsuit?
10        A     No.
11        Q     Okay.  Do you recall -- and you may not know
12   the answer to this.  But --
13        A     Uh-huh (affirmative).
14        Q     -- when an employee gets terminated -- and
15   specifically in Augusta --
16        A     Uh-huh (affirmative).
17        Q     -- they've got a work e-mail.  Was there a
18   policy in place to preserve access to those e-mail
19   accounts even after they're gone?
20        A     I would imagine so.
21        Q     Okay.
22        A     Yeah.  I mean, that's a standard thing
23   Augusta would have to do.  Yeah, they would have to
24   preserve everything just like any other.  Yeah.
25        Q     Okay.  And I just wanted to make sure it
```

**Odie Donald - April 20, 2023**

```
 1        Q    Okay.

 2        A    Yeah, don't -- I just don't know.

 3        Q    Okay.

 4        A    Yeah.

 5        Q    And that is perfectly fine.  Like I said,

 6   it's always tough with governments and corporations

 7   because you've got different people who know different

 8   things, and I got to figure out --

 9        A    Yeah.

10        Q    -- who knows what.

11        A    No, I think those would all come through

12   legal, based off it's talking about lawsuits and

13   administrative proceedings.  I don't even think this

14   would go through them.  It would have to go through

15   legal.

16        Q    Okay.

17        A    Yeah.

18        Q    Go ahead and turn to page 6 and read through

19   Interrogatory Number 9 and tell me if this response is

20   coming from you.

21        A    Yeah, I think this is what I explained to you

22   is that -- you know, stagnant.  I basically said

23   probably a different word.  And that, you know, I

24   wanted to accelerate, you know, the production of the

25   office.  But yeah, this is . . .
```

**Odie Donald - April 20, 2023**

1  Q   Is there anything in this Response Number 9

2  as it's written on the page here that you would

3  disagree with?

4  A   I don't think so.  I think, you know, I

5  mentioned to you the balancing of the budget.  You

6  know, one of the biggest things that Administrator has

7  to do is, you know, help set and balance the budget so

8  that all programs can be productive.  So . . .

9  Q   In terms of developing that new, I guess,

10 structure or vision for the office, is that all from

11 you or did you have other folks who helped you kind of

12 figure out the framework for that, if that makes sense?

13 A   No, that would be me.  Yeah, I mean, you --

14 you would have your leadership vision -- I guess, if

15 you're talking about the vision for the office, it

16 would be my vision.  Yeah.

17 Q   Yeah.  The vision and, I guess, the mechanics

18 of getting there.  So add this position, get rid of

19 that position, change these duties.  Is that all a you

20 thing or did you have a group that was kind of helping

21 you?

22 A   Oh, no, it wouldn't -- I wouldn't have a

23 group.  I mean, you would maybe confer with legal, you

24 know, but . . .

25 Q   Okay.

**Odie Donald - April 20, 2023**

1    that factual and legal gap.  I'm not trying to get you

2    into -- trick you into legal questions or anything like

3    that.  I'm just trying to say would you have any

4    factual information or would you have any opinion

5    testimony that would support a denial on Number 7, or

6    is that just something you'd leave to others?

7         A    I believe I would leave that to others.

8         Q    Okay.  That's fair.  And I think that's

9    consistent with what you've been saying.  I just want

10   to make sure --

11        A    Yeah.

12        Q    -- I'm not missing anything.  I think we've

13   already talked about that.

14             All right.  If you look at the top of page 4,

15   on Number 14, I think you testified earlier that you

16   were not aware of a request for additional leave;

17   correct?

18        A    That is correct.

19        Q    All right.  Is it also fair to say that you

20   would not be aware what Mr. Sims -- what communications

21   he would have had with other folks with the City?

22        A    Correct.  Yeah, I wouldn't -- If it was with

23   me, I would.  But yeah, if it wasn't to me, I wouldn't

24   know.

25        Q    That's fair.  So can you look at page 5,

**Odie Donald - April 20, 2023**

```
 1        Q     Any reason to believe that you wouldn't have
 2   received this FMLA Notice at that time?
 3        A     Yeah, I don't -- Yeah, I'm sure they sent --
 4   I mean, it says they sent it.  So, yeah.
 5        Q     Okay.
 6        A     They sent it.  Yeah.
 7        Q     Well, so the reason I ask that is, some of
 8   the partners in my firm hate e-mail.  So they --
 9        A     Uh-huh (affirmative).
10        Q     -- basically, they get e-mails, but then they
11   let somebody else print them out and read them.  Do you
12   actually read your e-mails as they come in, and use
13   e-mails?
14        A     I mean, I -- yeah, I read them.  I get so
15   many, I probably don't see them all.  But . . .
16        Q     That's fair.
17        A     I mean, this looks like something I probably
18   would have gotten and . . .
19        Q     Okay.  Did you have any discussions with
20   Ms. Rookard about this when it came in --
21        A     I don't --
22        Q     -- that you recall?
23        A     -- believe so.
24        Q     Would you have had any discussions with
25   Mr. Sims?
```

Odie Donald - April 20, 2023

1      A     No.

2      Q     Okay.

3            (Whereupon, Exhibit No. 9 was marked for

4      identification.)

5   BY MR. McBRIDE:   (Resuming)

6      Q     This is more of just trying to -- I came

7   across this and just curious what it is.

8      A     Uh-huh (affirmative).

9      Q     This is marked as Plaintiff's Exhibit 9.

10     A     Uh-huh (affirmative).

11     Q     Tell me if you recognize the e-mail or what

12  you're asking your deputies to do.

13     A     Looks like these are Requests for Leave, and

14  I'm just telling them to approve them because they've

15  come through.

16     Q     Are these requests for their own leave or is

17  this another employee?

18     A     So it doesn't actually say.

19     Q     Okay.

20     A     But whoever it is, it's basically just

21  saying, hey, approve their leave.  Yeah.

22     Q     So is that a normal -- I guess what I'm

23  thinking is I would have thought that would be an HR

24  issue.  Or is this like a vacation leave or?

25     A     Yeah, I would imagine.

**Odie Donald - April 20, 2023**

1       A    That's right.

2       Q    Got you.  All right.  That helps.  I think

3   we've already talked about 10.  That's the job

4   description.

5       A    Okay.

6            (Whereupon, Exhibit No. 11 was marked for

7            identification.)

8   BY MR. McBRIDE:  (Resuming)

9       Q    I'm going to hand you what is marked as

10  Plaintiff's 11.

11      A    Uh-huh (affirmative).

12      Q    So this looks like a letter back in November

13  of 2020, kind of around that same time of that e-mail

14  we were just talking about --

15      A    Uh-huh (affirmative).

16      Q    -- from Mr. Sims to you.  Do you recall

17  receiving this?

18      A    I do not.

19      Q    Okay.  And it looks like it's the same

20  information just saying --

21      A    Uh-huh (affirmative).

22      Q    -- hey, I'm going to be out on FMLA leave.

23      A    Uh-huh (affirmative).

24      Q    Do you have any recollection of having a

25  conversation, phone call, in-person discussion with

**Odie Donald - April 20, 2023**

1  Mr. Sims about this?

2      A    We definitely did not.  No.

3      Q    Okay.  Do you remember talking to Ms. Rookard

4  about that?

5      A    No.

6      Q    Okay.  And I'm guessing, since you don't

7  remember it, you don't remember doing anything in

8  response to receiving it?

9      A    No.

10     Q    Okay.  That's fair.

11          (Whereupon, Exhibit No. 12 was marked for

12      identification.)

13  BY MR. McBRIDE:  (Resuming)

14     Q    I'm going to hand you what's marked as

15  Plaintiff's 12.

16     A    Uh-huh (affirmative).

17     Q    So this is an e-mail chain about -- well, it

18  looks to be about a transition plan --

19     A    Uh-huh (affirmative).

20     Q    -- for one of your department heads.  Do you

21  recall this?

22     A    Uh-huh (affirmative).

23     Q    And it looks like, essentially, you asked

24  Mr. Sims to take a transition plan or some information

25  that you had and kind of turn it into a more robust

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| **JARVIS SIMS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CITY OF AUGUSTA-RICHMOND** | ) |
| **COUNTY** | ) |
| | ) |
| **Defendant.** | ) |

**CIVIL ACTION NO.:**
**1:22-cv-00099-JRH-BKE**

**DEFENDANT'S RESPONSES AND OBJECTIONS**
**TO PLAINTIFF'S FIRST INTERROGATORIES**

COMES NOW Defendant City of August-Richmond County and pursuant to Rule 33 of the

Federal Rules of Civil Procedure, hereby submits its Responses and Objections to Plaintiff's First

Interrogatories.

**I.      GENERAL STATEMENTS**

A.      The Responses set forth herein are based on the best information presently available

to Defendant. Defendant, however, has not completed its discovery and/or investigation of the

facts underlying this lawsuit, nor has it completed its preparation of this case for trial. Accordingly,

the Responses set forth herein are provided without prejudice to Defendant's right to amend,

supplement or change said Responses if and when additional, different, or more accurate

information becomes available. Moreover, these Responses are subject to correction for

inadvertent errors or omissions, if any such errors or omissions are later found to exist.

B.      By responding to Plaintiff's First Interrogatories, Defendant does not waive any

objections that may be appropriate to the use, for any purpose, by any party, of any of the



- 1 -

information contained in or derived from the Responses set forth herein or to the admissibility, relevancy or materiality of any such information as to any issue in this case.

## II.     **RESPONSES AND OBJECTIONS**

**INTERROGATORY NO. 1:**     Identify the person or persons who answered, or provided information to assist in answering, these interrogatories.

Response:     Defendant objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work product doctrine. Without waiving said objection, the written responses were prepared by Defendant's counsel and verified by Anita Rookard, Human Resources Director, c/o Defendant's counsel. Defendant further states that the information used to respond to these discovery requests was obtained primarily from the following individuals: Anita Rookard, Human Resources Director, c/o Defendant's counsel; Odie Donald, former City Administrator, 55 Trinity Avenue, Atlanta, GA 30303; Wayne Brown, c/o Defendant's counsel; and Rachel Mack, Deputy General Counsel, Augusta Law Departmnt, c/o Defendant's counsel.

**INTERROGATORY NO. 2:**     Identify any documents in your possession relevant to the issues in this case, including those relied upon or referenced in answering these interrogatories, and further identify the factual basis for any asserted or un-asserted privilege or objection which you contend relieves you of the obligation to produce such documents to Plaintiff.

Response:     Defendant refers Plaintiff to Defendant's Responses to Plaintiff First Requests for Production.

**INTERROGATORY NO. 3:**     Identify each and every person whom you know or believe to have knowledge of the relevant facts surrounding this matter and/or lawsuit, including

- 2 -

their full names, addresses, and telephone numbers. After identifying the person, please summarize

the facts to which you anticipate he or she could testify.

Response:     Defendant believes that the following individuals have knowledge of the

relevant facts surrounding this matter and/or lawsuit:

1.   The Plaintiff, c/o counsel for Plaintiff.  Plaintiff is expected to have information regarding his claims as alleged in the Complaint.

2.   Anita Rookard, Human Resources Director for Defendant, c/o counsel for Defendant. Ms. Rookard may have information regarding Plaintiff's personnel file, medical documentation, Plaintiff's FMLA leave, and Defendant's policies and procedures

3.   Odie Donald, former City Administrator for Defendant, City of Atlanta, 55 Trinity Avenue, Atlanta, Georgia 30303, 404-330-6100, oadonald@gmail.com. Mr. Donald may have information regarding Plaintiff's performance, the goals and directions of the City during his administration, and Plaintiff's termination.

4.   Matthew J. Diamond, DO, Nephrology Associates, PC, 701 Greene Street, Suite 200, Augusta, Georgia 30901, 706-722-6900. Dr. Diamond may have information regarding Plaintiff's medical conditions and medical treatment.

5.   Tony McDonald, current address and contact information unknown.     Mr. McDonald was a deputy administrator, hired on the same day as the Plaintiff, and terminated on the same day as the Plaintiff.

Defendant will supplement as necessary.

**INTERROGATORY NO. 4:**     Identify any expert whom you intend or may intend

to use as an expert witness if this case reaches trial, including the subject matter on which the

expert will testify, and the substance of all the facts and opinions to which the expert is expected

to testify, and a summary of the grounds for each opinion.

Response:     At this time, Defendant has not identified an expert witness for trial.  If

Defendant seeks to utilize expert testimony at trial, they will comply with the requirements set forth

in Rule 26 of the Federal Rules of Civil Procedure

**INTERROGATORY NO. 5:**      Identify any and all persons who have given written statements, mechanically recorded statements, or oral statements later reduced to writing, concerning the facts and circumstances of any of the matters complained of in Plaintiff's Complaint, and, as to each such statement please specify:

    (a)    the type of statement (written, recorded, oral, transcribed);

    (b)    the name and address of the person taking the statement;

    (c)    the date on which the statement was taken; and

    (d)    the name and address of the person currently in possession of the statement.

Response:      Defendant objects to the interrogatory to the extent that it seeks to elicit information that is protected by the attorney-client privilege and/or the work product doctrine. Without waiving and subject to said objections, Defendant responds that it does not have statements responsive to this interrogatory. Defendant will supplement as necessary.

**INTERROGATORY NO. 6:**      Identify each and every lawsuit, complaint, claim, EEOC claim, administrative proceeding, discrimination complaint, or other action in which Defendant has been named as a party in the last five years. For each lawsuit, complain, claim, or other action, identify all parties thereto; the date on which the action was initiated; the court or agency where the action was filed; the case claim, or action number; describe the nature of the action (e.g. workers' compensation claim; unemployment claim, contract dispute, etc.); and describe in detail how the complaint, lawsuit, or action was resolved.

Response:      Defendant objects to this interrogatory to the extent that it is overly broad and seeks information that is not relevant to any party's claim or defense or the proportional needs of the case. This interrogatory seeks information regarding *every* lawsuit or administrative proceeding filed against the City. The only lawsuit or administrative proceedings that could be

- 4 -

potentially relevant to this case are ones with similar cause of actions as the instant lawsuit. Accordingly, Defendant is limiting its response to employment lawsuits or administrative proceedings brought pursuant to the ADAA, ADEA, or FMLA. Subject to and without waiving the foregoing objection, the City has not had any employment lawsuits or EEOC Charges filed against them in the past five years based upon age discrimination, disability discrimination and/or retaliation, or violation of the FMLA.

**INTERROGATORY NO. 7:**     Identify each and every communication you have had with third parties regarding the subject matter of this lawsuit, either before or after the filing of the Complaint, including e-mails, phone calls, or text messages. Please provide a brief description of the nature of the communication and with whom the communication was had.

Response:     Defendant objects to this interrogatory to the extent that it seeks to elicit information that is protected by the attorney-client privilege and/or work product doctrine. Without waiving and subject to said objections, Defendant has not had any communications with third parties related to the subject matter of this lawsuit apart from counsel, including Defendant's former counsel McFadden Davis, LLC.     Defendant's counsel has also had privileged communications with Odie Donald. Defendant's counsel has also issued subpoenas for the production of documents to various third parties, as Plaintiff's counsel is aware.

**INTERROGATORY NO. 8:**     Identify each and every communication you or your employees have had regarding the subject matter of this lawsuit, including any communications regarding Plaintiff and other employees, named and unnamed in the Complaint, FMLA leave and termination, either before or after the filing of the Complaint, including e-mails, phone calls, or text messages. Please provide a brief description of the nature of the communication and with whom the communication was had.

- 5 -

Response:     Defendant objects to this interrogatory to the extent that it seeks to elicit information that is protected by the attorney-client privilege and/or work product doctrine. Without waiving and subject to said objections, Defendant refers Plaintiff to documents produced in response to Plaintiff's Request for Production Nos. 9, 10, 12, 14, 16, and 18.

**INTERROGATORY NO. 9:**     Identify any and all reasons for Plaintiff's termination.

Response:     When former Administrator Odie Donald took office, he wanted to reorganize the Administrator's office by bringing on two new deputy administrators to serve with him, just as the Administrator before him had done. Particularly, Mr. Donald felt that the former administration office had become stagnant, and he wanted to create a more proactive office. He noticed that the former administration was not meeting deliverables, e.g., balancing the budget. Accordingly, Mr. Donald re-organized the Administrator's Office, including adding new positions and expanding the roles of other positions. As with the Administrator before him, he wanted to pick his own Deputy Administrators. Thus, Plaintiff was terminated in order for Mr. Donald to handpick a staff curated to his vision for the Administrator's Office.

**INTERROGATORY NO. 10:**     Identify any and all instances when Plaintiff was harassed and humiliated by the Defendant's employees, including but not limited to Mr. Donald. Identify specific dates, circumstances, and the actions taken by the Defendants in reaction to the same.

Response:     Plaintiff was never harassed or humiliated by any employees or agents of Defendant. Further before the instant lawsuit, Defendant had no notice that Plaintiff believed himself to have been harassed by employees of Defendant since Plaintiff never filed any sort of grievance.

**INTERROGATORY NO. 11:** Identify all employees handling health insurance for Defendant, specifically the financial aspects.

Response: Defendant employs a Benefits Team within its Human Resources Department who handles health insurance.

**INTERROGATORY NO. 12:** For each Request for Admission denied by Defendant, please identify the facial basis for each denial.

Response: Defendant objects to this request, because providing a factual basis for each denial would constitute a separate, discrete interrogatory subpart for each response, and thereby exceed the limit of interrogatories permitted under the applicable rules. Subject to this objection, Defendant refers Plaintiff to Defendant's Responses and Objections to Plaintiff's First Request for Admissions.

**INTERROGATORY NO. 13:** Identify if Plaintiff was part of a pension program. If so, identify the details of the program, including but not limited to the length, eligibility, and salary designation.

Response: As a Georgia Municipal Employee, Plaintiff was a participant in the Defined Benefit Retirement Plan. Defendant refers Plaintiff to the Defined Benefit Retirement Plan bates stamped Augusta 000889-930 for specifics of the plan.

This 17th day of February, 2023.

**FREEMAN MATHIS & GARY, LLP**

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960
E: jbennett@fmglaw.com
E: emily.walker@fmglaw.com

*/s/ John D. Bennett*
John D. Bennet
Georgia Bar No. 059212
Emily M. Walker
Georgia Bar No. 221826
*Attorneys for Defendant*

- 7 -

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of DEFENDANT'S RESPONSES AND

OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES via email on the following

counsel of record:

Grant E. McBride, Esq.
Megan Murren Rittle, Esq.
SMITH, WELCH, WEBB & WHITE, LLC
2200 Keys Ferry Court
P.O Box 10
McDonough, Georgia 30253
gmcbride@smithwelchlaw.com
mmrittle@smithwelchlaw.com

This 17th day of February, 2023.

/s/ *John D. Bennett*
John D. Bennett
Georgia Bar No. 059212

- 8 -

*Augusta*
G E O R G I A

**Office of the Administrator**

Odie Donald II, Administrator
**Jarvis** R. Sims, Deputy Administrator
Tony McDonald, Deputy Administrator

Ste. 910 - Municipal Building
535 Telfair Street – Augusta, GA.30901
(706) 821-2400 – Fax (706) 821-2819

April 1, 2021
Jarvis Sims
Deputy Administrator

**Via Hand-Delivery**

RE: Termination Without Cause

Dear Mr. Sims,

As the new Administrator, I have decided to give Office of the Administrator a fresh start. Therefore, this is to inform you, on April 1, 2021, that your employment with Augusta Georgia is hereby terminated without cause and effective immediately. You are being released as a Deputy Administrator without cause.

Pursuant to Augusta, Georgia SES Severance Policy and Procedures (Commission Approved-11/5/2019) Section 2.0 (A)(1), which addresses "Discharges without Cause", you are eligible two months of severance pay and the same is being offered to you, subject to the execution of the attached Separation Agreement and Release of Claims and the approval of the Augusta, Georgia Commission, pursuant to the SES Severance Policy and Procedures. Pursuant to  the SES Severance Policy and Procedures your severance would be with salary continuation. However, if you would like lump-sum payout severance, please notify the HR director, Anita Rookard and me, via email, by April 8, 2021.

Your final paycheck for hours worked will be paid on the regularly scheduled payday following your last day of work (today).

Your present health insurance benefits will continue through the end this pay period (April 1, 2021) based on your employment. However, if you select severance with salary continuation, and the same is approved by the Commission, your present health insurance benefits will continue to the end of your severance period (two months). Your rights to continue health care coverage under COBRA will be provided to you by mail from our COBRA plan administrator by April 30, 2021.

You can contact Catherine Highsmith of the HR regarding your retirement plan distribution options. All Augusta, Georgia property issued to you and/or in your possession must be returned to me or the Human Resource Director (Anita Rookard) immediately, including, but not limited to, the following: cell phone, laptop, computer and related equipment, flash drives, disc and all other information storage devices, keys, badges, door fobs, security apparatus, files, documents, etc.



**PLAINTIFF'S EXHIBIT**
tabbies
**4**

For purpose of communications regarding any matter addressed above or relevant to your employment with Augusta, Georgia, please provide to HR Director Anita Rookard, in writing, the mailing address, email address and phone number by which you are to be contacted, if different from what HR Department has on file for you or if such changes in the future.
I would also like to take this opportunity to thank you for your service as an Augusta, Georgia employee.

Should you have any questions or concerns, feel free to contact me.
Sincerely,

Odie Donald
Administrator

Cc: Anita Rookard, HR Director
   Wayne Brown, General Counsel

# C E R T I F I C A T E

STATE OF GEORGIA        )

COUNTY OF COBB          )


       I, PHILIPS P. THOMAS, Certified Court Reporter in and for the State of Georgia, do hereby certify that the foregoing proceedings were taken down by me; that the foregoing proceedings were reduced to print by me; that the foregoing pages represent a true, correct, and complete transcript of the testimony given by the witness, who was first duly sworn by me; that I am not a relative, employee, attorney or counsel of any of the parties; that I am not a relative or employee of attorney or counsel for any of said parties; nor am I financially or otherwise interested in the outcome of the action.

       This certification is expressly withdrawn and denied upon the disassembly, photocopying, reproduction of electronic copies, and/or distribution of the foregoing transcript or any part thereof, including exhibits, unless said disassembly, photocopying, reproduction, and/or distribution is done by me and my signature and original seal is attached thereto.

       I further certify that the original of said deposition transcript shall be filed under seal with Grant E. McBride, Attorney at Law, Smith Welch Webb & White, LLC, 2200 Keys Ferry Court, McDonough, Georgia 30253.

       This, the 25th day of April 2023.


_____

           PHILIPS P. THOMAS
      Certified Court Reporter
       License Number 2816