EXHIBIT 2

```
1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF GEORGIA
2                      AUGUSTA DIVISION

3   JARVIS SIMS,                    )
                                    )
4        Plaintiff,                 )
                                    )
5   vs.                             )   Civil Action File
                                    )   No. 1:22-cv-00099-JRH-BKE
6   CITY OF AUGUSTA-RICHMOND        )
    COUNTY,                         )
7                                   )
         Defendant.                 )
8

9                          - - -

10                     DEPOSITION OF

11                     ANITA ROOKARD

12       commencing remotely at 9:56 a.m., on Wednesday,

13       April 19, 2023; taken pursuant to agreement of

14       counsel for purposes of cross-examination,

15       preservation of testimony, and all other

16       purposes allowed by the Federal Rules of Civil

17       Procedure; all formalities waived, excluding

18       the reading and signing of the deposition.

19

20

21

22
              Perimeter Court Reporting, LLC
23       Sharon J. Johnson, CCR B-1902, CVR-M 3291
                    Post Office Box 2907
24               Cumming, Georgia 30028
                    (770) 474-5192
25
```

**Anita Rookard - April 19, 2023**

 1 | here today is not to torture you.  So if you need to take
 2 | a break or anything like that, just wave your hand and
 3 | say, hey, I need to take a five-minute break.  I don't
 4 | know how long we'll go today, but if you want to take a
 5 | lunch, like a longer break for lunch, that's fine with
 6 | me.  You've just got to let me know.
 7 |         The last thing.  I have to ask this.  Are you
 8 | under the influence of anything that would prevent you
 9 | from testifying truthfully today?
10 |     A.    No, sir.
11 |     Q.    Okay.  Can you go ahead and tell me your year
12 | of birth?
13 |     A.        /1967.
14 |     Q.    Okay.  And you work for the City -- well,
15 | it's the City of Augusta-Richmond County?  It's a
16 | consolidated government, right?
17 |     A.    Yes.
18 |     Q.    Okay.  So if I say City of Augusta, just
19 | understand that I'm trying to refer to the consolidated
20 | government.  But that's who you work for currently,
21 | correct?
22 |     A.    Correct.
23 |     Q.    Okay.  And what is the -- what is your
24 | business address?
25 |     A.    It's 535 Telfair Street, Augusta, Georgia

**Anita Rookard - April 19, 2023**

 1     A.     No, sir.
 2     Q.     And what would you call your current business
 3  or profession?  Are you an HR professional?
 4     A.     I'm an HR professional.
 5     Q.     And how long have you been doing that?
 6     A.     About 20 years.
 7     Q.     And my understanding is you've been with
 8  Augusta since, what, 2020?
 9     A.     Yes, February of 2020.
10     Q.     Do you know how many employees Augusta has?
11     A.     Currently we have twenty-seven -- twenty-
12  seven five.  About 2,750.
13     Q.     How many of those folks -- well, let me ask
14  you.  What is your current title?
15     A.     Human Resource director.
16     Q.     And am I correct in assuming that you would
17  be the highest person in the Human Resources Department
18  at Augusta?
19     A.     You would be correct.
20     Q.     Okay.  How many folks do you have in the
21  Human Resources Department?
22     A.     Currently it's about 24.
23     Q.     Okay.  You haven't held any other position
24  with Augusta, correct?
25     A.     No, sir.

**Anita Rookard - April 19, 2023**

 1    Q.    Can you -- I know this is going to seem like
 2  a silly question for someone with a director title, but
 3  can you kind of give me an idea of what your job duties
 4  are?
 5    A.    Sure.  Like I said, I manage a group of about
 6  24.  We are responsible for benefits for Augusta.  We're
 7  responsible for retirement for Augusta.  We're
 8  responsible for all the training of employees in Augusta.
 9  We're responsible for the hiring process of all new hires
10  with Augusta.
11    Q.    Okay.  And I guess like a day in the life
12  kind of thing, do you do a lot -- are you a lot of hands-
13  on on these, or do you delegate these to other employees
14  in your department to handle the day in/day out?
15    A.    I delegate to my leadership team.
16    Q.    Okay.  Would I be correct in assuming that
17  you would be the primary HR contact for the city manager?
18    A.    Yes.
19    Q.    Okay.  So -- well, I guess the easiest way to
20  ask this, do y'all have an organizational chart for
21  Augusta?
22    A.    Yes, I'm sure we do.
23    Q.    Okay.  I'm just trying to fit in -- trying to
24  understand kind of how -- well, to the extent you know
25  the answer, can you describe to me how that government

**Anita Rookard - April 19, 2023**

1  works between the mayor, the Council, and the city

2  manager's office?

3      A.    We -- the commission is a group of 10, with

4  the mayor is 11.  Under -- and the mayor is to the side,

5  and the group of commissioner to one side.  The city

6  administrator falls underneath both.  Underneath the city

7  administrator would be all -- would be 16 different

8  departments.

9      Q.    Okay.  So I guess Human Resources, then, it

10  reports directly to the city administrator's office,

11  correct?

12      A.    Yes.

13      Q.    Okay.  Okay.  And when I say -- I mean, I

14  guess I'm assuming -- I know there's -- well, answer me

15  this.  Is the main leadership there still the city

16  administrator and two deputies?

17      A.    It is.

18      Q.    Okay.  And so do you all report directly to

19  the administrator or deal with the deputies, or how does

20  that interaction work usually?

21      A.    We work with the deputies.

22      Q.    Okay.  Would it be that one deputy manages

23  eight departments and the other deputy manages the other

24  eight departments?

25      A.    Yes.

**Anita Rookard - April 19, 2023**

1   mean, it sounds like you supervise HR professionals right

2   now, correct?

3        A.    Correct.

4        Q.    Is this -- so, I mean, this isn't a --

5   something that Georgia would require you to have before

6   you do it; it's just kind of an additional thing that

7   says, hey, you've gone through this organization's

8   training session to say that you are qualified to do this

9   thing?

10       A.    Yes.  No, it's not a certification that was a

11  part of my job application; It's just an additional

12  certification that as a HR professional you'd like to

13  have.

14       Q.    I gotcha.  So it's -- I guess there's this

15  SHRM, the national organization, basically is just saying

16  you are accredited to our standards; is that fair?

17       A.    Correct.

18       Q.    Okay.  All right.  Forgive me, but I have to

19  ask some offensive questions.  It's just part of this.

20             Have you ever been arrested?

21       A.    No, sir.

22       Q.    Have you ever been subject to any

23  professional discipline?

24       A.    No, sir.

25       Q.    Okay.  See, painless.

**Anita Rookard - April 19, 2023**

1              Have you ever been a party to a lawsuit?
2     A.    No, sir.
3     Q.    Have you ever been a witness or otherwise
4  involved in a lawsuit?
5     A.    No, sir.
6     Q.    So I know as part of discovery in this case
7  there were several -- and I'm sure it happens a lot.
8  There are several other claims where folks have made
9  claims against Augusta for discrimination or, you know,
10 other employment-related claims.
11             Are you ever involved in those when they get
12 to litigation, or is this the first one?
13    A.    This is my first one.
14    Q.    Okay.  Do you know who from the HR department
15 would have been involved in those other claims?
16    A.    They no longer work here.
17    Q.    I gotcha.  Is that -- are those people that
18 you were supervising, or are you talking about a prior HR
19 director?
20    A.    It would have been a prior HR director.
21    Q.    Okay.  And who was the prior HR director
22 before you, if you know?
23    A.    I'm not sure.
24    Q.    Okay.  That's fair.
25             My understanding -- correct me if I'm wrong

**Anita Rookard - April 19, 2023**

1    -- but Augusta has its EEO claims department; is that

2    right?

3        A.      They do.

4        Q.      Now, is that part of human resources?

5        A.      No, sir.

6        Q.      Okay.  Is it its own -- like we talked about

7    those 16 departments.  Is it its own department?

8        A.       It is its own department, but it's not a part

9    of the 16.

10        Q.      Okay.

11        A.      The Compliance Department answers to the

12    Commission.

13        Q.      Okay.  So it's called Compliance?

14        A.      Yes.

15        Q.      I guess, who's the director or who runs that

16    department?

17        A.      Ms. Phyllis Johnson.

18        Q.      And you say they report directly to the

19    commission?

20        A.      Yes.

21        Q.      And does that office interact with HR?

22        A.      We do, depending on the circumstance.

23        Q.      Do you -- and this may be just outside your

24    area, but do you understand how that process works if an

25    employee says, hey, I've got a problem, I want to file a

**Anita Rookard - April 19, 2023**

1  administrator?

2      A.      We would.

3      Q.      And then the city administrator is the one

4  that makes the determination on whether that grievance is

5  upheld or denied?

6      A.      They would listen to it, yes.  And then they

7  would either uphold the grievance or overturn the

8  grievance.  If the grievance is overturned, the employee

9  returns to work.  If the grievance is upheld, the

10  employee can go to the personnel board.

11      Q.      Okay.  So who in the administrator's office

12  handles those?  Is that the city administrator, or is it

13  the deputies, or what's the breakdown there?

14      A.      The city administrator.

15      Q.      Okay.  So I think that gives me what I need

16  to know on the grievance side.

17              And then I assume that if there's any kind of

18  discrimination-type complaint that you really wouldn't

19  know too much about that process; that'd be something to

20  ask Compliance?

21      A.      Correct.

22      Q.      Okay.  Is your office involved for -- not for

23  -- with ADA, requests for accommodations, FMLA, that kind

24  of thing?

25      A.      My office is involved in FMLA.  If an

**Anita Rookard - April 19, 2023**

 1  employee requests an accommodation, that would come to my
 2  office and then go to the Compliance office.
 3       Q.    Okay.  So you don't personally -- well, I
 4  guess two questions.  Your office, basically,
 5  accommodation requests, you intake the information, but
 6  that also gets kicked over to Compliance?
 7       A.    Correct.
 8       Q.    Do you have any personal involvement in that,
 9  in the initial gathering of information for requests and
10  that kind of thing?
11       A.    No, sir.
12       Q.    Okay.  What about FMLA, are you involved in
13  that process yourself?
14       A.    I'm not normally.
15       Q.    Okay.  I think in this case, you were
16  involved with Jarvis's request for FMLA, right?
17       A.    Correct.
18       Q.    Do you know why you were involved in his
19  situation when you normally wouldn't be?
20       A.    I do not.
21       Q.    Okay.  I mean, do you -- well, let me ask you
22  this.
23            Did you have like a work relationship with
24  Mr. Sims?  I mean in terms of like were you work friends
25  or anything like that that he felt like he could just

**Anita Rookard - April 19, 2023**

1  why he needed FMLA?

2      A.     No, sir.

3      Q.     Do you know if you had a conversation -- or

4  if he had a conversation with someone on your staff or in

5  the HR department about that?

6      A.     No, sir.

7      Q.     Okay.

8      A.     The fact that he needed FMLA is all we needed

9  to know.

10     Q.     Okay.  So does anybody else -- do any other

11 departments get involved in FMLA process, or is it all

12 internal to HR?

13     A.     I'm not sure I understand your question.

14     Q.     Yeah.  So I guess does the city administrator

15 or the deputy administrators have any say over FMLA or

16 get involved in the process one way or another?

17     A.     No, sir.

18     Q.     Okay.  But I assume that whatever department

19 the employee works in that's taking the FMLA, that

20 department is informed of the FMLA leave once it's

21 approved, correct?

22     A.     Once it's approved, we will notify the

23 department head to let them know that this employee will

24 be out for FMLA.

25     Q.     Okay.  Does the Council or Commission play

**Anita Rookard - April 19, 2023**

1   I guess in this case, the transition would have been from

2   Mr. Sims as the interim to Mr. Donald as the permanent,

3   correct?

4        A.     Correct.

5        Q.     Is there any kind of policy or anything else

6   that dictates how that transition takes place?

7        A.     No, sir.

8        Q.     Okay.  And that's what I'm trying to figure

9   out.  So it just sounds like Mr. Donald, he gets the

10  offer, he accepts, and then he comes in and kind of just

11  determines how he wants to get into that role and what

12  changes he wants to make and that kind of thing, correct?

13       A.     Correct.

14       Q.     Is there any policy, written or unwritten,

15  about keeping or getting rid of the deputies when a new

16  administrator comes in?

17       A.     No, sir.

18       Q.     Okay.  To your knowledge, were you involved

19  in any kind of evaluation or review of how the deputies

20  were performing once Mr. Donald got into the

21  administrator role?

22       A.     No, sir.

23       Q.     Okay.  And did he ever express to you -- and

24  when I say he, I'm talking about Mr. Odie Donald.  Did he

25  ever -- well, let me ask it this way.

**Anita Rookard - April 19, 2023**

1          When was the first time that you became aware
2    that he wanted to get rid of his administrators, his
3    deputies?
4          A.     When he brought me in the office the day of
5    the termination on April 1st.
6          Q.     Okay.  So my understanding is you weren't
7    consulted on that aspect of getting rid of the deputies
8    before it happened?
9          A.     Correct.
10         Q.     Do you know if anybody in the HR department
11   was consulted or involved in that process?
12         A.     No one.
13         Q.     And is that normal that you-all wouldn't be
14   consulted in a process of terminating an employee?
15         A.     It is normal for the administrator's office.
16         Q.     Okay.
17         A.     HR is not involved in how a new administrator
18   decides to set up or structure their office.  HR is not
19   involved in that.
20         Q.     Okay.  Did you -- well, you already said you
21   weren't consulted prior to the terminations on April 1st,
22   right?
23         A.     Correct.
24         Q.     Did you provide any feedback or
25   recommendations to Mr. Donald when you had that meeting

**Anita Rookard - April 19, 2023**

1   with him about it?

2      A.    No, sir.

3      Q.    Okay.  It was just I understand what you're

4   doing and I'll take care of the paperwork?

5      A.    No, sir.  I sat in the room as a witness.

6      Q.    I see.  Okay.  So this was -- so it wasn't a

7   consultation with you saying, hey, I'm going to do this;

8   it was just you're there as a witness when he hands the

9   letters to Mr. Sims and Mr. McDonald?

10     A.    Correct.

11     Q.    Okay.  Did you talk to Mr. Donald about that

12  afterwards?

13     A.    No, sir.

14     Q.    Okay.  Did Mr. Donald consult with you about

15  the process of hiring replacements for those folks?

16     A.    No, sir.

17     Q.    Okay.  From the records, it looks like the

18  replacement for Mr. Sims was -- is it Mrs. Jackson or

19  Ms. Jackson?

20     A.    I'm not sure who.  I know there were two

21  Jacksons.  I don't know how he structured them.

22     Q.    Okay.  What I'll represent to you is -- yeah,

23  I saw the two Jacksons too and I got a little confused.

24  But I think for Ms. Jackson there's a line on the

25  document that says, you know, position replacing and it

**Anita Rookard - April 19, 2023**

1    had Mr. Sims' name, so that's why I'm assuming that she's

2    the one that was hired to replace his position.

3         A.     Okay.

4         Q.     Is that fair -- is that a correct assumption,

5    if that's what the documents say?

6         A.     That's fair.  That's what the document says.

7         Q.     Okay.  And it looks like she was hired in

8    August of '21.  Any reason to think that's inaccurate?

9         A.     No, sir.

10        Q.     Okay.  And so I take it from your prior

11   answers that you would not have been involved in that

12   process of trying to find new candidates or know why

13   there was a four-month delay in replacing that position?

14        A.     I was involved in the hiring of the new

15   candidates, but there was no reasoning for a four-month

16   delay.

17        Q.     Okay.  When you say you were involved, were

18   you involved in the selection of that candidate?

19        A.     No, sir.  We were involved -- HR prepared the

20   -- put the posting out.

21        Q.     Gotcha.  Did you participate in any of the

22   interviews with Mr. Donald?

23        A.     I sat in on the interviews as an HR witness,

24   but I did not interview --

25        Q.     Okay.

**Anita Rookard - April 19, 2023**

1   then you will take your sick and accrued vacation.  It is

2   not common that someone goes out for FMLA and not use

3   sick leave and vacation.

4       Q.    Right.  And I'm just trying to figure out --

5   because I think in Mr. Sims' case, I mean, the -- what I

6   understand of his medical condition was that his doctor

7   was saying, look, it's going to take some time.  And so

8   there was additional time after he'd already taken FMLA

9   where he didn't have sick, he didn't have FMLA, he didn't

10  have vacation, right, when he came back in February?

11      A.    When he came back in February, he didn't have

12  any accrued leave.

13      Q.    Right.

14      A.    But, I mean, he earned it the day he started

15  coming back.

16      Q.    Yeah.  What's the rate at which you accrue

17  leave?

18      A.    Every pay period.

19      Q.    Do you know how many -- is it a certain

20  number of hours per pay period or --

21      A.    I think it's more like 5.5.  He was a deputy

22  so his may be a little more, but I'm thinking it's 5.5.

23      Q.    Hours?

24      A.    Yes.

25      Q.    And that's -- is that -- are you-all on a

**Anita Rookard - April 19, 2023**

1  two-week or bimonthly pay period?

2      A.      Every two weeks.

3      Q.      Okay.  So, basically, he wouldn't have earned

4  any or accrued any while out on FMLA, but as soon as he

5  came back on the 15th, or whatever day it is he came

6  back, he would start getting leave again or accruing --

7      A.      Correct.

8      Q.      Okay.  So then we get into this issue of the

9  sick pool.  Can you explain to me what that is?

10     A.      The sick pool is a voluntary participation

11 program of sick leave that all employees after your first

12 six months, a year to hire, can participate as long as

13 you have 100 hours, I think, of sick leave or 75 hours,

14 you can put -- give the sick leave pool 75 hours, and

15 that gets you into the program.

16     Q.      Okay.

17     A.      So you have that sitting there, and it allows

18 you to use for emergencies, medical emergencies.

19     Q.      Okay.  And I think in this case, there's no

20 dispute that Mr. Sims did -- was enrolled in that

21 program, correct?

22     A.      Correct.

23     Q.      Okay.  And I think you-all gave -- he ended

24 up using seven days or so of sick pool --

25     A.      Correct.

**Anita Rookard - April 19, 2023**

1    Q.    -- after his FMLA expired?

2    A.    Correct.

3    Q.    So this came up in his deposition.  What is

4    the process by which that sick pool gets approved?

5    A.    When you have exhausted your sick or accrued

6    vacation, if you participate in the sick leave pool, you

7    automatically -- it rolls over into the sick leave pool.

8    Q.    Okay.  So does anybody review these requests

9    for use for sick leave?  I mean, does anybody get denied

10   for the use of sick leave?

11   A.    No.  If you participate in the sick leave

12   pool, then you can use it.

13   Q.    Okay.  And so I think the policy talks about

14   there being a panel that approves or disapproves, but it

15   sounds like that that isn't in practice utilized,

16   correct?

17   A.    I'm not sure about a panel.  But if you

18   participate in the program, it allows you access to the

19   leave.

20   Q.    Okay.  Who all is involved -- like, let's say

21   I'm an employee and I want to use the sick pool.  Who do

22   I talk to?

23   A.    You would talk to -- number one, you would

24   talk with the person in payroll to make sure that you are

25   a participant, or at that time it would have been

**Anita Rookard - April 19, 2023**

 1    Schevella Nicholes to make sure you were a participant in

 2    the program.

 3         Q.    Okay.  So, basically, it's just reach out to

 4    Schevella, let her know you'd like to take it, and then

 5    it sounds like it's automatically approved?

 6         A.    It's automatically reviewed.

 7         Q.    Okay.  Who reviews it?

 8         A.    She does to make sure that you have it.

 9         Q.    Does that process ever get kicked up to you?

10         A.    No.

11         Q.    Okay.

12         A.    If you participate in the program, then you

13    have access to it.

14         Q.    Okay.

15              MR. MCBRIDE:  We've been going for about

16         an hour.  Would you be okay to take a quick

17         break?

18              THE WITNESS:  I'd be okay.

19              MR. MCBRIDE:  Okay.  Thank you so much.

20              Can we go off for a few?

21              (Whereupon, a break was taken from

22         11:07 a.m. until 11:14 a.m.)

23    BY MR. MCBRIDE:  (Resuming)

24         Q.    Did you have any discussions with Mr. Donald

25    about Mr. Sims' FMLA leave?

**Anita Rookard - April 19, 2023**

```
 1        A.      No, sir.

 2        Q.      I think you had mentioned before, generally,

 3   when FMLA is approved, there's some kind of communication

 4   to the department head about that, but I didn't -- I

 5   didn't see anything --

 6        A.      Correct.

 7        Q.      -- in the file.

 8                Would there have been some documentation of

 9   that that went to Mr. Donald or a phone call or something

10   like that?

11        A.      Mr. Donald received a phone call that

12   Mr. Sims would be out for FMLA, and he probably did

13   receive a document, either he did or his administrative

14   assistant received the FMLA document stating that he

15   would be out.

16        Q.      Okay.  So as I understand your testimony, it

17   would have been -- somebody in your office would have

18   reached out to say, hey, he's going to be out, but it

19   wouldn't have been you directly; is that fair?

20        A.      No, sir.

21        Q.      Okay.  Okay.  Do you know -- you may or may

22   not know this, but your department handles health

23   insurance, correct?

24        A.      Correct.

25        Q.      Is the city of self-insured, or do they have
```

**Anita Rookard - April 19, 2023**

1    Q.    Okay.  Do you know who -- I mean, do you know

2    who would have been from the HR department or

3    representing HR interests at that time?

4    A.    I do not.

5    Q.    Okay.  Do you know the individuals involved

6    in the Finance Department that deal with these things?

7    A.    The finance director, Ms. Donna Williams.

8    Q.    Donna Williams.  Okay.

9          If you have that claims data, specifically

10   for the 2021 -- well, the end of '21, beginning of '22,

11   can you provide that to Ms. Walker and then -- because I

12   think that's something we would have requested or would

13   have been in our request.  But if you can get that to

14   her, I can talk to her about that.

15   A.    Okay.

16   Q.    So after Mr. Sims came back from FMLA, it's

17   his belief that he spoke to you about needing to take

18   some additional time off in May.  Do you have any

19   recollection of that conversation?

20   A.    I think so.

21   Q.    What do you remember of it?

22   A.    Just that he said he may need additional time

23   off later on in the year.

24   Q.    Okay.  Do you recall if you talked about the

25   need for taking a transplant in that time frame?

**Anita Rookard - April 19, 2023**

1      A.      No, sir.

2      Q.      Okay.  And do you have any recollection that

3  he specifically said it would happen in May?

4      A.      He said sometime in May.

5      Q.      Okay.  And was the -- I guess, was the nature

6  of that conversation -- because he wouldn't have had FMLA

7  at that time, correct?

8      A.      He didn't request FMLA at that time.

9      Q.      Okay.  But he wouldn't have been eligible for

10  it until November, correct?  Or did you say he did not

11  request it?

12     A.      He did not request FMLA for that particular

13  time.  He just said he would need some additional time

14  off sometime in May.

15     Q.      Okay.  And I think from reading the

16  documents, he wouldn't have been eligible for FMLA leave

17  at that time, correct?

18     A.      Correct.

19     Q.      But he should have been in -- he should have

20  been eligible to take additional sick pool time; is that

21  right?

22     A.      Correct.  He would have been.

23     Q.      And then I assume whatever accrued

24  vacation/sick that he would have gotten between coming

25  back from FMLA and when he needed to go out; is that

**Anita Rookard - April 19, 2023**

```
1   right?

2        A.      Correct.

3        Q.      Can you take sick pool if you have accrued F

4   -- accrued vacation and sick leave?

5        A.      You have to use your accrued time first.

6        Q.      Okay.  But if that's something where your

7   accrued time is like a day -- I assume, basically, the

8   process would be to say, hey, I need -- I need this time

9   off, request the sick pool, and then it's sort of they

10  say, okay, well, we're going to take off your accrued

11  vacation/accrued sick first and then apply the rest to

12  sick pool.  Is that a fair summary of the process?

13       A.      Correct.

14       Q.      Okay.  Are you -- I think I know what the

15  answer to this is going to be, but I'm going to ask you.

16              Are you aware of the reasoning for Mr. Sims'

17  termination beyond the letter that Odie Donald sent him

18  or gave him?

19       A.      No, sir.

20       Q.      Okay.  And so based on what you said earlier,

21  I'm going to -- well, let me just ask you the question.

22              Are you aware that Mr. Donald or anyone from

23  your office or anyone from Augusta told Mr. Sims they

24  were considering terminating him before he was actually

25  terminated on April 1st?
```

**Anita Rookard - April 19, 2023**

1  reason to believe that would not be considered a

2  disability?

3        A.     I do not.

4        Q.     Okay.  Did you and Mr. Sims get into any

5  discussion about how that kidney disease affected him and

6  his ability to either live his life or do his job?

7        A.     No, sir, we did not.

8        Q.     Okay.  So I'm going to take from your

9  testimony that your conversations with him were very

10 high-level, not specific in details about what was going

11 on with him; is that right?

12       A.     Correct.

13       Q.     And you said you did not -- you were not

14 specifically aware that his request for more time in May

15 was related to a transplant?

16       A.     He said that he would need -- he may need

17 some additional time off in May.

18       Q.     Okay.  But you don't believe he ever told you

19 about a need for a transplant?

20       A.     I don't recall.

21       Q.     Okay.

22       A.     Because it was not in writing.

23       Q.     Well, right.  And I guess that's the other

24 thing is some of this probably happened, phone, in

25 person, that kind of thing, right?

**Anita Rookard - April 19, 2023**

1    Q.    Is his office -- or was his office near
2  yours?  Are y'all in the same building?
3    A.    No, sir.  They're on the ninth floor; I'm on
4  the fourth.
5    Q.    Okay.  So same building, different floors?
6    A.    Yes.
7    Q.    That makes sense.
8          And you don't recall having any kind of
9  discussion with Odie Donald about Mr. Sims' condition at
10 all; is that fair?
11   A.    None.  Correct.
12   Q.    Okay.  Would you have had a conversation with
13 anybody on the Commission about it?
14   A.    No, sir.
15   Q.    Who has access to Mr. Sims' personnel file?
16   A.    HR.
17   Q.    Does any other department have access to
18 those files?
19   A.    No, sir.
20   Q.    Would the -- would the administrator be able
21 to get access to those?
22   A.    If he asked or come down here to review a
23 file?
24   Q.    Okay.  So there's no policy that -- well, my
25 understanding is if the administrator said, hey, I'd like

**Anita Rookard - April 19, 2023**

```
 1   to see the personnel files of X, Y, and Z individual,
 2   there's no reason he wouldn't be able to get those,
 3   correct?
 4        A.    He would have to come down to my office to
 5   view them.
 6        Q.    Okay.  So --
 7              (crosstalk)
 8        A.    -- files out of my office.
 9        Q.    Okay.  That's fair.
10              So they're all paper files?
11        A.    Yes.
12        Q.    And no digital database that anyone can
13   access?
14        A.    No, sir.
15        Q.    Okay.  Did you ever have any text-message
16   communications with Mr. Donald or Mr. Sims?
17        A.    No, sir.
18        Q.    Any other medium you would have conversed in
19   other than e-mail or phone or in person?
20        A.    No, sir.
21        Q.    And I guess what I'm asking is Augusta
22   doesn't have any kind of, like, work chat thing?  I don't
23   even know what they're called these days.  We've got
24   some --
25        A.    You mean something like Teams?
```

**Anita Rookard - April 19, 2023**

1  She -- if she had a disability, she would discuss that

2  with her department head.

3      Q.      Okay.

4      A.      If she's requesting any type of

5  accommodation, then someone in my office would be made

6  aware of the accommodation she's requesting.

7      Q.      Okay.  And you're not aware that she's

8  requested any accommodation while she was there, correct?

9      A.      Correct.

10     Q.      Okay.  Do you have any reason describe her as

11  more qualified than Mr. Sims for the deputy administrator

12  role?

13     A.      I do not.

14     Q.      Do you know why she left Augusta?

15     A.      I do not.

16     Q.      And is Mr. Charles Jackson still with

17  Augusta?

18     A.      He is.

19     Q.      And I think we discussed earlier it was

20  Charles Jackson and Tanikia Jackson that replaced

21  Mr. McDonald and Mr. Sims, right?

22     A.      Correct.

23     Q.      Okay.  Are you aware of his age when he was

24  hired?  And by his, I mean Mr. Charles Jackson.

25     A.      I do not.

**Anita Rookard - April 19, 2023**

1      Q.     Let me -- well, that's fine.

2             Would granting him additional time through

3   that sick leave had been financially infeasible for

4   Augusta?

5             MS. WALKER:   Object to form.   You can

6       answer if you know.

7   BY THE WITNESS:   (Resuming)

8      A.     Would you ask the question again, please?

9      Q.     Sure.   I'm trying to get to the idea of an

10  undue hardship.   Generally, the idea is undue hardship is

11  something that is financially difficult for the employer

12  to manage.   And what I'm trying to figure out is, you

13  know, at that point, Mr. Sims did not have FMLA anymore,

14  correct?

15     A.     Correct.

16     Q.     His accrued leave would be fairly minimal,

17  having just come back in February, right?

18     A.     Correct.

19     Q.     But he was eligible for the sick pool?

20     A.     Correct.

21     Q.     And my understanding is the sick pool is sort

22  of designed for that exact situation, right, where you --

23     A.     Correct.

24     Q.     -- you've exhausted all your other means, but

25  you kind of pool these things and you get a little extra

**Anita Rookard - April 19, 2023**

1  time?

2       A.      That's right.

3       Q.      Okay.  And I guess my point is that's not

4  difficult or financially burdensome for the City to

5  accommodate to let him use that sick pool time, correct?

6       A.      I don't know if it is financially burdensome

7  to the City.  I know that it's a part of our procedure

8  and policy that if an employee needs to take additional

9  time off, if requested and placed in writing, then my

10  department does what we can to accommodate that request.

11       Q.      Right.  So -- and I guess I want to make

12  sure.  Are you saying that you didn't feel that that was

13  not a request that he made because it wasn't in writing?

14       A.      At that time, it was not a request because we

15  didn't know any dates.

16       Q.      Right.  And that's what I'm -- okay.

17               So your feeling is it wasn't a request for

18  time off because he didn't say, hey, I need it on May 1st

19  as opposed to sometime in May?

20       A.      When you request time off of any kind, you

21  would have to put it in writing and you would have to

22  give me dates.

23       Q.      Okay.  And did you communicate this back to

24  him, that his request wasn't sufficient enough for you to

25  act on it?

**Anita Rookard - April 19, 2023**

1    A.    What I stated to Mr. Sims at that time is

2  please put it in writing and let us know when you decide

3  what you're going to need.

4    Q.    Okay.  And was that a verbal conversation, a

5  phone conversation?

6    A.    It was verbal.

7    Q.    Okay.  Give me one second.  I might be about

8  done.

9          (Displaying Plaintiff's Exhibit No. 7.)

10  BY MR. MCBRIDE:  (Resuming)

11    Q.    So I guess I just want to make sure.  I'm

12  going to share with you an e-mail dated -- can you see

13  that okay?

14    A.    I can.

15    Q.    Let me zoom in a little bit, too, so we can

16  read it better.  It looks like it's an e-mail from

17  Schevella Nicholes dated March 3rd, 2021 to you, right?

18    A.    Uh-huh (affirmative).

19    Q.    And then it's per our conversation this

20  morning, you informed me that Jarvis Sims, blank, will

21  need to take leave in May for a medical reason.  And then

22  it says he exhausted his leave and goes on to talk about

23  other things.

24    A.    Uh-huh (affirmative).

25    Q.    Do you recall that conversation with

**Anita Rookard - April 19, 2023**

```
 1  Ms. Nicholes?

 2       A.     Yes.

 3       Q.     What was that conversation?

 4       A.     Just that, that that Mr. Sims is requesting

 5  additional time off in May.

 6       Q.     Okay.  And I guess that's what I'm trying to

 7  get at.  It doesn't -- from reading this e-mail, it

 8  doesn't seem like, you know, y'all were saying that's not

 9  specific enough; it sounds like this is let's put this in

10  motion because he's asked for this time.

11       A.     No, we can't put it in motion because there's

12  nothing there specific enough.

13              MR. MCBRIDE:  Okay.  Okay.  All right.

14              I don't think I have any further

15       questions.

16              MS. WALKER:  Can we take like a

17       10-minute break so I can look over notes before

18       redirect?

19              MR. MCBRIDE:  Sure.

20              MS. WALKER:  So off the record until

21       let's say 1:35?

22              MR. MCBRIDE:  Okay.  That's fine with

23       me.

24              (A break was taken from 1:24 p.m. until

25       1:32 p.m.)
```

**Anita Rookard - April 19, 2023**

```
1                        EXAMINATION
2    BY MS. WALKER:
3         Q.     Ms. Rookard, I just have a couple of follow-
4    up questions for you.  You mentioned earlier how the City
5    keeps -- or the Human Resource Department keeps a
6    personnel file for each employee; is that correct?
7         A.     Correct.
8         Q.     And you mentioned how the administrator could
9    come and ask you to review that personnel file?
10        A.     Correct.
11        Q.     Did Odie Donald ever requests to review
12   Mr. Sims' personnel file?
13        A.     No, ma'am.
14        Q.     Okay.  Does the City keep a medical file for
15   employees?
16        A.     We do.
17        Q.     Is that separate from the personnel file?
18        A.     It is.
19        Q.     Did Odie Donald ever request to review
20   Mr. Sims' medical file?
21        A.     No, ma'am.
22        Q.     Okay.  And when we were talking about sick
23   pool qualifications, you were saying that you're -- are
24   you aware under the sick pool policy there being like
25   certain qualifications you need to meet before you're
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **JARVIS SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **1:22-cv-00099-JRH-BKE** |
| **CITY OF AUGUSTA-RICHMOND** | ) | |
| **COUNTY** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSES AND OBJECTIONS**
**TO PLAINTIFF'S FIRST INTERROGATORIES**

COMES NOW Defendant City of August-Richmond County and pursuant to Rule 33 of the

Federal Rules of Civil Procedure, hereby submits its Responses and Objections to Plaintiff's First

Interrogatories.

## I.      GENERAL STATEMENTS

A.      The Responses set forth herein are based on the best information presently available

to Defendant.  Defendant, however, has not completed its discovery and/or investigation of the

facts underlying this lawsuit, nor has it completed its preparation of this case for trial.  Accordingly,

the Responses set forth herein are provided without prejudice to Defendant's right to amend,

supplement or change said Responses if and when additional, different, or more accurate

information becomes available.   Moreover, these Responses are subject to correction for

inadvertent errors or omissions, if any such errors or omissions are later found to exist.

B.      By responding to Plaintiff's First Interrogatories, Defendant does not waive any

objections that may be appropriate to the use, for any purpose, by any party, of any of the



PLAINTIFF'S EXHIBIT
**1**
Sims v. City of Augusta, et al.

information contained in or derived from the Responses set forth herein or to the admissibility, relevancy or materiality of any such information as to any issue in this case.

## II.       RESPONSES AND OBJECTIONS

**INTERROGATORY NO. 1:**       Identify the person or persons who answered, or provided information to assist in answering, these interrogatories.

Response:       Defendant objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or the work product doctrine.  Without waiving said objection, the written responses were prepared by Defendant's counsel and verified by Anita Rookard, Human Resources Director, c/o Defendant's counsel.  Defendant further states that the information used to respond to these discovery requests was obtained primarily from the following individuals: Anita Rookard, Human Resources Director, c/o Defendant's counsel; Odie Donald, former City Administrator, 55 Trinity Avenue, Atlanta, GA 30303; Wayne Brown, c/o Defendant's counsel; and Rachel Mack, Deputy General Counsel, Augusta Law Departmnt, c/o Defendant's counsel.

**INTERROGATORY NO. 2:**       Identify any documents in your possession relevant to the issues in this case, including those relied upon or referenced in answering these interrogatories, and further identify the factual basis for any asserted or un-asserted privilege or objection which you contend relieves you of the obligation to produce such documents to Plaintiff.

Response:       Defendant refers Plaintiff to Defendant's Responses to Plaintiff First Requests for Production.

**INTERROGATORY NO. 3:**       Identify each and every person whom you know or believe to have knowledge of the relevant facts surrounding this matter and/or lawsuit, including

their full names, addresses, and telephone numbers. After identifying the person, please summarize the facts to which you anticipate he or she could testify.

<u>Response:</u>      Defendant believes that the following individuals have knowledge of the relevant facts surrounding this matter and/or lawsuit:

1.      The Plaintiff, c/o counsel for Plaintiff.  Plaintiff is expected to have information regarding his claims as alleged in the Complaint.

2.      Anita Rookard, Human Resources Director for Defendant, c/o counsel for Defendant. Ms. Rookard may have information regarding Plaintiff's personnel file, medical documentation, Plaintiff's FMLA leave, and Defendant's policies and procedures

3.      Odie Donald, former City Administrator for Defendant, City of Atlanta, 55 Trinity Avenue, Atlanta, Georgia 30303, 404-330-6100, oadonald@gmail.com. Mr. Donald may have information regarding Plaintiff's performance, the goals and directions of the City during his administration, and Plaintiff's termination.

4.      Matthew J. Diamond, DO, Nephrology Associates, PC, 701 Greene Street, Suite 200, Augusta, Georgia 30901, 706-722-6900. Dr. Diamond may have information regarding Plaintiff's medical conditions and medical treatment.

5.      Tony McDonald, current address and contact information unknown.   Mr. McDonald was a deputy administrator, hired on the same day as the Plaintiff, and terminated on the same day as the Plaintiff.

Defendant will supplement as necessary.

**<u>INTERROGATORY NO. 4:</u>**      Identify any expert whom you intend or may intend to use as an expert witness if this case reaches trial, including the subject matter on which the expert will testify, and the substance of all the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

<u>Response:</u>      At this time, Defendant has not identified an expert witness for trial.  If Defendant seeks to utilize expert testimony at trial, they will comply with the requirements set forth in Rule 26 of the Federal Rules of Civil Procedure

**INTERROGATORY NO. 5:**     Identify any and all persons who have given written statements, mechanically recorded statements, or oral statements later reduced to writing, concerning the facts and circumstances of any of the matters complained of in Plaintiff's Complaint, and, as to each such statement please specify:

(a)     the type of statement (written, recorded, oral, transcribed);

(b)     the name and address of the person taking the statement;

(c)     the date on which the statement was taken; and

(d)     the name and address of the person currently in possession of the statement.

Response:     Defendant objects to the interrogatory to the extent that it seeks to elicit information that is protected by the attorney-client privilege and/or the work product doctrine. Without waiving and subject to said objections, Defendant responds that it does not have statements responsive to this interrogatory. Defendant will supplement as necessary.

**INTERROGATORY NO. 6:**     Identify each and every lawsuit, complaint, claim, EEOC claim, administrative proceeding, discrimination complaint, or other action in which Defendant has been named as a party in the last five years. For each lawsuit, complain, claim, or other action, identify all parties thereto; the date on which the action was initiated; the court or agency where the action was filed; the case claim, or action number; describe the nature of the action (e.g. workers' compensation claim; unemployment claim, contract dispute, etc.); and describe in detail how the complaint, lawsuit, or action was resolved.

Response:     Defendant objects to this interrogatory to the extent that it is overly broad and seeks information that is not relevant to any party's claim or defense or the proportional needs of the case. This interrogatory seeks information regarding *every* lawsuit or administrative proceeding filed against the City. The only lawsuit or administrative proceedings that could be

potentially relevant to this case are ones with similar cause of actions as the instant lawsuit. Accordingly, Defendant is limiting its response to employment lawsuits or administrative proceedings brought pursuant to the ADAA, ADEA, or FMLA. Subject to and without waiving the foregoing objection, the City has not had any employment lawsuits or EEOC Charges filed against them in the past five years based upon age discrimination, disability discrimination and/or retaliation, or violation of the FMLA.

**INTERROGATORY NO. 7:**       Identify each and every communication you have had with third parties regarding the subject matter of this lawsuit, either before or after the filing of the Complaint, including e-mails, phone calls, or text messages. Please provide a brief description of the nature of the communication and with whom the communication was had.

Response:       Defendant objects to this interrogatory to the extent that it seeks to elicit information that is protected by the attorney-client privilege and/or work product doctrine. Without waiving and subject to said objections, Defendant has not had any communications with third parties related to the subject matter of this lawsuit apart from counsel, including Defendant's former counsel McFadden Davis, LLC.   Defendant's counsel has also had privileged communications with Odie Donald.   Defendant's counsel has also issued subpoenas for the production of documents to various third parties, as Plaintiff's counsel is aware.

**INTERROGATORY NO. 8:**       Identify each and every communication you or your employees have had regarding the subject matter of this lawsuit, including any communications regarding Plaintiff and other employees, named and unnamed in the Complaint, FMLA leave and termination, either before or after the filing of the Complaint, including e-mails, phone calls, or text messages. Please provide a brief description of the nature of the communication and with whom the communication was had.

<u>Response:</u>      Defendant objects to this interrogatory to the extent that it seeks to elicit information that is protected by the attorney-client privilege and/or work product doctrine. Without waiving and subject to said objections, Defendant refers Plaintiff to documents produced in response to Plaintiff's Request for Production Nos. 9, 10, 12, 14, 16, and 18.

**<u>INTERROGATORY NO. 9:</u>**      Identify any and all reasons for Plaintiff's termination.

<u>Response:</u>      When former Administrator Odie Donald took office, he wanted to reorganize the Administrator's office by bringing on two new deputy administrators to serve with him, just as the Administrator before him had done. Particularly, Mr. Donald felt that the former administration office had become stagnant, and he wanted to create a more proactive office. He noticed that the former administration was not meeting deliverables, e.g., balancing the budget. Accordingly, Mr. Donald re-organized the Administrator's Office, including adding new positions and expanding the roles of other positions. As with the Administrator before him, he wanted to pick his own Deputy Administrators. Thus, Plaintiff was terminated in order for Mr. Donald to handpick a staff curated to his vision for the Administrator's Office.

**<u>INTERROGATORY NO. 10:</u>**      Identify any and all instances when Plaintiff was harassed and humiliated by the Defendant's employees, including but not limited to Mr. Donald. Identify specific dates, circumstances, and the actions taken by the Defendants in reaction to the same.

<u>Response:</u>      Plaintiff was never harassed or humiliated by any employees or agents of Defendant. Further before the instant lawsuit, Defendant had no notice that Plaintiff believed himself to have been harassed by employees of Defendant since Plaintiff never filed any sort of grievance.

**INTERROGATORY NO. 11:**     Identify all employees handling health insurance for Defendant, specifically the financial aspects.

<u>Response:</u>     Defendant employs a Benefits Team within its Human Resources Department who handles health insurance.

**INTERROGATORY NO. 12:**     For each Request for Admission denied by Defendant, please identify the facial basis for each denial.

<u>Response:</u>     Defendant objects to this request, because providing a factual basis for each denial would constitute a separate, discrete interrogatory subpart for each response, and thereby exceed the limit of interrogatories permitted under the applicable rules.  Subject to this objection, Defendant refers Plaintiff to Defendant's Responses and Objections to Plaintiff's First Request for Admissions.

**INTERROGATORY NO. 13:**     Identify if Plaintiff was part of a pension program. If so, identify the details of the program, including but not limited to the length, eligibility, and salary designation.

<u>Response:</u>     As a Georgia Municipal Employee, Plaintiff was a participant in the Defined Benefit Retirement Plan. Defendant refers Plaintiff to the Defined Benefit Retirement Plan bates stamped Augusta 000889-930 for specifics of the plan.

This 17th day of February, 2023.

**FREEMAN MATHIS & GARY, LLP**

100 Galleria Parkway
Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960
E: jbennett@fmglaw.com
E: emily.walker@fmglaw.com

*/s/ John D. Bennett*
John D. Bennet
Georgia Bar No. 059212
Emily M. Walker
Georgia Bar No. 221826
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of DEFENDANT'S RESPONSES AND

OBJECTIONS TO PLAINTIFF'S FIRST INTERROGATORIES via email on the following

counsel of record:

Grant E. McBride, Esq.
Megan Murren Rittle, Esq.
SMITH, WELCH, WEBB & WHITE, LLC
2200 Keys Ferry Court
P.O Box 10
McDonough, Georgia 30253
gmcbride@smithwelchlaw.com
mmrittle@smithwelchlaw.com

This 17th day of February, 2023.

*/s/ John D. Bennett*
John D. Bennett
Georgia Bar No. 059212

## Schevella Nicholes

**From:**      Schevella Nicholes
**Sent:**      Wednesday, March 3, 2021 9:09 AM
**To:**         Anita Rookard
**Subject:**   Sick Leave After FMLA Exhaustion

God morning Ms. Rookard,

Per our conversation this morning, you informed me that Jarvis R. Sims ⬛⬛⬛ will need to take leave in May for a medical reason. Mr. Sims exhausted FMLA leave 2/15/2021, and he will not be eligible for FMLA again until November 20, 2022 granted he meets the hours worked requirement of 1,250 hours worked in the 12-months preceding the leave request. Mr. Sims, also, will not be able to use any remaining sick pool hours until he exhausts all leave accruals (Sick, Vacation, Compensatory Time, etc.).

Thank you,

*Schevella Nicholes, BSBM, MBA*
*Benefits Analyst II*
*City of Augusta/Richmond County*
*535 Telfair St., Suite 400*
*Augusta, GA 30901*
*706-821-2510 direct*
*706-821-2867 fax*
*snicholes@augustaga.gov*



**PLAINTIFF'S EXHIBIT**
**7**
Sims v. City of Augusta, et al.

1                        CERTIFICATE

2

3    STATE OF GEORGIA       )

4    COUNTY OF FORSYTH      )

5

6              I, SHARON J. JOHNSON, Certified Court
     Reporter in and for the State of Georgia, do hereby
7    certify that the foregoing proceedings were taken down by
     me; that the foregoing proceedings were reduced to print
8    by me; that the foregoing pages represent a true,
     correct, and complete transcript of the testimony given
9    by the witness, who was first duly sworn by me; that I am
     not a relative, employee, attorney or counsel of any of
10   the parties; that I am not a relative or employee of
     attorney or counsel for any of said parties; nor am I
11   financially or otherwise interested in the outcome of the
     action.
12
               This certification is expressly withdrawn and
13   denied upon the disassembly, photocopying, reproduction
     of electronic copies, and/or distribution of the
14   foregoing transcript, or any part thereof, including
     exhibits, unless said disassembly, photocopying,
15   reproduction, and/or distribution is done by me and my
     signature and original seal is attached thereto.
16
               I further certify that the original of said
17   deposition shall be filed under seal with Grant E.
     McBride, Attorney at Law, Smith Welch Webb & White, LLC,
18   P.O. Box 10, 2200 Keys Ferry Court, McDonough, Georgia
     30253.
19
               This, the 13th day of May, 2023.
20

21

22

23

24              SHARON J. JOHNSON
                CERTIFIED COURT REPORTER B-1902
25              CERTIFIED VERBATIM REPORTER MASTER 3291