EXHIBIT 3

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 1

1                    UNITED STATES DISTRICT COURT

                     SOUTHERN DISTRICT OF GEORGIA

2                        AUGUSTA DIVISION

3

4        JARVIS SIMS,

5               Plaintiff,           CIVIL ACTION NO.:

                                     1:22-cv-00099-JRH-BKE

6        v.

7

         CITY OF AUGUSTA-RICHMOND

8        COUNTY

9               Defendant.

10

11              The videotaped deposition of Jarvis Sims

12        taken on behalf of the Defendant taken pursuant

13        to agreement of counsel, taken for all purposes

14

15        authorized by the Georgia Civil Practice Act; the

16

17        reading and signing of the deposition being

18

19        reserved; taken before Edwina D. Minniefield,

20

21        CCR, Certified Court Reporter, commencing at 9:06

22

23        a.m. on this the 30th day of March 2023 at 2200

24

25        Keys Ferry Court, McDonough, Georgia.

Page 34

1    employment with Augusta, you were over 40 years of
2    age, right?
3         A.   Yes.
4         Q.   And what is your date of birth?
5         A.      /69.
6         Q.   So at the time of your termination, you were
7    51; were you not?
8         A.   Yes.
9         Q.   Okay.  All right.  And basically, this cause
10   of action is -- is based on your contention that you
11   were terminated because of your age?
12        A.   Yes.
13        Q.   Okay.  And that's totally separate from your
14   medical condition, right?
15        A.   Yes.
16        Q.   Totally separate from your use of leave?
17        A.   Yes.
18        Q.   Okay.  If you'll look at paragraph 60 -- 76,
19   you also allege that the City refused to consider
20   retraining or relocating you to another position.  You
21   see that?
22        A.   Yes.
23        Q.   And do you contend that that was required by
24   the Age Discrimination and Employment Act?
25        A.   I'm not understanding your question.  Could

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 43

1    they will ask your availability, and I will say, "This

2    semester I can't teach."  So I wouldn't say stop

3    working.  I just say I couldn't accept a class.

4         Q.   No, I understand that.  But so -- and what

5    I'm really trying to find out is:  At any point during

6    your time with Augusta, did you receive income from

7    any sources other than the City?

8         A.   When I initially started with Augusta, I was

9    teaching a course, which I had to eventually drop the

10   course because it was too much.

11        Q.   And that would have just been that first --

12        A.   Yes.

13        Q.   -- fall semester?

14        A.   As far as I can remember, yes.

15        Q.   Okay.  I understand that you were diagnosed

16   with kidney disease at some point in 1998; is that

17   correct?

18        A.   Yes.

19        Q.   And how did you come to be diagnosed?

20        A.   I became ill and saw my primary care

21   physician.

22        Q.   Okay.  And how did your symptoms first

23   manifest?

24        A.   Very cloudy urine.

25        Q.   Okay.  Now, when you were with East Point,

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 45

1      A.    I was seeing Kaiser Permanente.  I now see
2   DaVita, Locust Grove.
3      Q.    DaVita?
4      A.    Yes.  Dialysis center.  I have seen Dr.
5   Demetrious Blackmon.
6      Q.    Who's he with?
7      A.    Southern Crescent.  He was with Southern
8   Crescent Nephrology.  I see a new nephrologist.  I
9   don't know his name.  He replaced Dr. Blackmon.
10     Q.    At Southern Crescent?
11     A.    Yes.  I see Piedmont.  I've seen University
12  at Alabama, Birmingham.
13     Q.    Um.  I did notice that.  Yeah.
14     A.    And I've seen Medical University of South
15  Carolina.
16     Q.    The Medical University of South Carolina?
17     A.    Yes, MUSC.  I've seen a Dr. Marcus Brown for
18  heart.  And I don't know if there's others, but I've
19  seen other doctors as well.
20     Q.    Have you actually had a kidney transplant
21  yet?
22     A.    I'm praying for it daily.
23     Q.    But the answer today is no?
24     A.    No.
25     Q.    Okay.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 46

1        MR. BENNETT:  I -- Why don't we take a short

2    break, five minutes, and then we'll get back on.

3        MR. MCBRIDE:  That's fine.

4        MR. BENNETT:  Okay.

5        THE WITNESS:  Yes.

6        THE VIDEOGRAPHER:  The time is 10:04 a.m.

7    We're now off the record.

8                (Off the record.)

9        THE VIDEOGRAPHER:  The time is 10:14 a.m.

10   We're now on the record.

11   BY MR. BENNETT:

12       Q.   Okay.  Mr. Sims, I want to turn to your

13   employment history with Augusta.  You mentioned

14   somebody named Janice Jackson.

15       A.   Yes.

16       Q.   She was the county administrator at the time

17   you were hired, right?

18       A.   Yes.

19       Q.   Okay.  And you were hired as a deputy county

20   administrator, right?

21       A.   Yes.

22       Q.   Okay.  Do you know if your position had to

23   be voted on by the Augusta Commission?  Or if

24   Administrator Jackson was able to make that decision

25   herself?

Page 47

1      A.   My understanding, she was able to hire the

2   deputy.

3      Q.   Okay.  All right.  And is she older or

4   younger than you?

5      A.   Older.

6      Q.   Ms. Jackson also hired somebody named Tony

7   McDonald to serve as co-deputy administrator around

8   the same time she hired you, right?

9      A.   Yes.

10      Q.   And he is older than you are, right?

11      A.   Yes.

12      Q.   Do you have any basis for disputing that he

13   was born in 1960 if that's what the record show?

14      A.   If that's what the record shows.

15      Q.   Okay.  We --he was about nine years older

16   than you, right?

17      A.   I never knew the difference.

18      Q.   Okay.

19      A.   But I knew he was older.

20      Q.   You knew he was older.  Okay.  Are you aware

21   of the names of the people who held the deputy

22   administrator positions before Mr. McDonald and you?

23      A.   Vaguely.

24      Q.   Okay.  Do you remember if somebody named

25   William or Bill Rhinehart?

Page 48

1        A.    I remember seeing paperwork with that name.

2        Q.    Okay.  Do you have any basis --

3        A.    No.

4        Q.    -- for dispute --

5        A.    Ted Rhinehart.

6        Q.    He went by Ted?

7        A.    Yes.

8        Q.    Okay.  But he was a deputy county

9    administrator?

10       A.    Yes.

11       Q.    Okay.  I may have assumed that it -- he went

12   by Bill cause his name was William.

13       A.    No.  It -- it was Ted.

14       Q.    Went by Ted.  Okay.  Do you have any basis

15   for disputing that he was born in 1963 if that's what

16   the paperwork shows?

17       A.    If that's what it shows.

18       Q.    Okay.  And that would make him older than

19   you, right?

20       A.    Yes.

21       Q.    Have you heard of the name Lewis Chester

22   Brazzel?

23       A.    Yes.

24       Q.    He was also a co-deputy administrator before

25   you, right?

Page 49

```
 1        A.    Yes.
 2        Q.    Okay.  And so he and Mr. Rhinehart were the
 3   predecessors of you and Tony McDonald?
 4        A.    Yes.
 5        Q.    Do you have any basis for disputing that he
 6   was born in 1954 if that's what the record show?
 7        A.    If that's what the record shows.
 8        Q.    And that would make Mr. Brazzel or Brazzel
 9   about 15 years older than you?
10        A.    Yes.
11        Q.    Well, if that were the case, do you believe
12   that your hiring to replace individuals who were older
13   than you is indicative of age discrimination?
14        A.    Would you repeat or rephrase your question.
15        Q.    Do you believe that your hiring as a younger
16   worker to replace Mr. Brazzel and/or Mr. Rhinehart is
17   reflective of age discrimination?
18        A.    No.
19        Q.    Why not?
20        A.    I'm not.  Let me understand your question.
21   Would you rephrase it again.
22        Q.    Well, one of the reasons for your age
23   discrimination claim is that the deputy administrators
24   who were hired to replace you and Mr. McDonald were a
25   little bit younger than you and Mr. McDonald, right?
```

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 50

1        A.   Yes.

2        Q.   Okay.

3        A.   Yes.

4        Q.   And my point is, you and Mr. McDonald also

5   replaced former deputy administrators who were younger

6   than you, right?

7        A.   Yes.

8        Q.   Okay.  And so my question is:  What's the

9   difference?

10       A.   I don't see how they're related.

11       Q.   Okay.  And what's -- why?

12       A.   I don't -- I don't even know them besides

13   their names, those two people.  So I never knew their

14   ages until you stated their ages.

15       Q.   Right.  But if -- if what I'm telling you,

16   the records show that you were older than both of --

17   or you were younger than both of them, okay?

18       A.   Yes.

19       Q.   And so why would your replacement by a

20   younger worker be indicative of age discrimination,

21   but your replacement of older workers not be

22   indicative of age discrimination?

23       A.   I don't know the deputies that I replaced or

24   their age.  I had no -- I'm only deal -- dealing with

25   my age and Tony's age.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 53

1   older text from a cellular provider.

2        Q.   Well, Mr. Sims, are you aware that a party

3   to a litigation matter has an obligation to make sure

4   that they are preserving from deletion anything that

5   could be relevant to their claims or their damages?

6        A.   Yes.

7        Q.   Okay.  And it sounds like these

8   communications with Mr. McDonald would have happened

9   after your termination, right?

10       A.   Mr. Mc -- Mr. McDonald and I were -- are --

11  are friends.

12       Q.   Sir, have you even gone back to look to see

13  if those text messages exist?

14       A.   I don't remember.

15       Q.   Okay.  Do you remember any steps that you've

16  taken to make sure that electronic or other documents

17  related to your claims or damages have been preserved

18  from deletion?

19       A.   I don't know how.

20       Q.   So the answer is no?

21       A.   I don't -- I don't remember, sir.

22       Q.   Okay.  Let me hand you what I've marked as

23  Exhibit 3.  Do you recognize Exhibit 3 as a true and

24  correct of a letter that you received from Janice

25  Allen Jackson memorializing your acceptance of an

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 54

1   offer of employment?

2      (Defendant's Exhibit No. 3 was marked into the

3                        record.)

4      A.   Yes.

5      Q.   Okay.  And it looks like your employment

6   officially began on August 13, 2018; is that correct?

7      A.   Yes.

8      Q.   Okay.  And you signed and dated this offer

9   letter, it looks like on -- is that July 23, 2018?

10     A.   That looks like that, yes.

11     Q.   Okay.  And looking at the second paragraph

12  on page 1 of Exhibit 3, am I correct that your initial

13  salary was 122,000 annually?

14     A.   Yes.

15     Q.   Okay.  All right.  And in that same

16  paragraph regarding compensation, you agree that you

17  were an at-will employee during the term of your

18  employment, right?

19     A.   Yes.

20     Q.   And are you familiar with the -- with what

21  the term "at-will" means?

22     A.   Yes.

23     Q.   Okay.  And what does it mean to your

24  knowledge?

25     A.   My understanding at-will employee means the

Page 55

1    employer or the employee can end the employment

2    agreement at any given time.

3         Q.   For any reason as long as it's not illegal,

4    right?

5         A.   Correct.

6         Q.   Okay.  In the last paragraph on page 1 of

7    Exhibit 3, the first page, you also agreed and the

8    City agreed that you would be given severance pay upon

9    termination without cause, right?

10        A.   Yes.

11        Q.   Okay.  And that's a standard provision in

12   offer letters to administrators and deputy

13   administrators, isn't it?

14        A.   Yes.

15        Q.   All right.  And so Tony McDonald was hired

16   and began working right around the same time, correct?

17        A.   Yes.

18        Q.   Okay.  And so you would agree that the

19   former administrator Janice Jackson hired two new

20   deputy administrators to replace the former deputy

21   administrators right around the same time?

22        A.   Yes.

23        Q.   Okay.  Am I correct to assume -- and

24   actually, let me scratch that.

25             So as -- the county administrator for

Page 56

1    Augusta, Richmond County is responsible for overseeing

2    the day-to-day operations of the city, county

3    government, right?

4         A.   Yes.

5         Q.   Okay.  So the Board of Commissioners, they

6    vote on ordinances and certain things like that.  But

7    in terms of like the CEO of the organization, that's

8    the -- that's the equivalent of the county

9    administrator, right?

10        A.   Yes.

11        Q.   And so you and Mr. McDonald as the deputy

12   county administrator, you were directly subordinate to

13   the county administrator and were basically the second

14   in command?

15        A.   Yes.

16        Q.   Okay.  And as a person in that high of

17   ranking, am I correct to assume that you were

18   generally familiar with the City's personnel policies

19   and procedures?

20        A.   Yes.

21        Q.   And it -- wouldn't a person of your rank be

22   expected to be familiar with the personnel policies

23   and procedures?

24        A.   Augusta, at that particular time was

25   updating their PPM, so there were changes that were

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 57

1    taking place.  So some of the changes, I maybe was not

2    up to speed on because they were changing.  But the --

3    the policy that was provided, I was high level

4    familiar with, yes.

5         Q.    What -- what does PPM stand for?

6         A.    The Policy.

7         Q.    Policy and Procedure Manual?

8         A.    Yes.

9         Q.    Let me hand you what's marked as Exhibit 4.

10   Do you recognize Exhibit 4 as a true and correct copy

11   of an Acknowledgement of Receipt of the Personnel

12   Policy and Procedures Manual that you signed and dated

13   on August 13, 2018?

14      (Defendant's Exhibit No. 4 was marked into the

15                          record.)

16        A.    Yes.

17        Q.    So that would have been your first day of

18   work?

19        A.    Yes.

20        Q.    Okay.  And by signing the acknowledgement

21   form, you acknowledged that you had received a copy of

22   the manual and had an opportunity to read the entire

23   manual, right?

24        A.    I would not say the entire manual.  I

25   received it on the 13th, so it was -- my signature

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 59

1      Q.   Okay.  The manual was also contained on the

2   county website, right?

3      A.   I don't remember.

4      Q.   Well, you knew how to access it if you had

5   any questions about it, right?

6      A.   Yes.

7      Q.   And at some point during your employment,

8   somebody named Anita Rookard became the Human

9   Resources Director of the City of Augusta, Richmond

10  County, right?

11     A.   Yes.

12     Q.   Okay. And you knew that if you had questions

13  about policies or procedures, you could go to HR and

14  ask them questions, right?

15     A.   Yes.

16     Q.   That's the purpose of HR, isn't it?

17     A.   Yes.

18     Q.   Okay.  I'll hand you Exhibit 5.  I'm not

19  going to ask you to read this whole document, Mr.

20  Sims.  But do you agree that Exhibit 5 is -- or shows

21  parts of the City's Equal Employment Opportunity

22  Policy?

23       (Defendant's Exhibit No. 5 was marked into the

24                    record.)

25     A.   Yes.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 60

1      Q.   And now this was contained in that personnel

2   policy manual, right?

3      A.   My understanding, yes.

4      Q.   Okay.  Would you agree that under Section

5   200 --

6      A.   I'm sorry.(coughing.)

7      Q.   Bless you.  I'll -- I'll begin again.  Would

8   you agree that under Section 200.001, there are

9   specific references to the prohibition of

10  discrimination on the basis of age, disability, and

11  any other characteristic protected by federal, state,

12  or local law?

13     A.   Yes.

14     Q.   Okay.  And there are also prohibitions on

15  harassment of any employees on the basis of a

16  protected characteristic, right?

17     A.   Yes.

18     Q.   Okay.  And were you also aware that if you

19  felt you or any other employees felt that they were

20  experiencing or observing a suspected incident of

21  discrimination or harassment that they should report

22  that to either their supervisor or the EEO officer?

23     A.   Yes.

24     Q.   And the EEO officer would have been the

25  Director of Human Resources, right?

Page 61

1      A.    No.

2      Q.    Who would it have been?

3      A.    There's a separate department in Augusta.

4      Q.    There's an EEO department separate from HR?

5      A.    Yes.

6      Q.    And I'm asking who would have been the head

7   of that department?

8      A.    They had changes.  I can't remember the

9   person's name.

10      Q.    Okay.  But you knew how to locate that

11   person, right?

12      A.    Yes.

13      Q.    Did you ever contact at any point during

14   your employment either HR or the EEO officer to report

15   discrimination, harassment, or retaliation?

16      A.    I went to the office, yes.

17      Q.    When?

18      A.    I don't know the date, time.

19      Q.    Well, who did you speak with?

20      A.    At the time, the EEO person, I can't

21   remember her last name.  Her first name is Phyllis.

22      Q.    Phyllis?

23      A.    Correct.

24      Q.    Okay.  And who was the county administrator

25   at the time?

Jarvis Sims
March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 65

1      A.   Anita -- I met with Ani0ta before I came

2   back.  Anita, she -- before Mr. Donald came, I found

3   out my illness had drastically declined.

4      Q.   Okay.

5      A.   And I had to meet with Anita to let her know

6   what was taking place.

7      Q.   Okay.  All right.  So let's put a pin in

8   that cause we're going to get to there, and then --

9   just makes sense to do it chronologically, okay?  All

10  right.  Did you ever make a written complaint of

11  discrimination, harassment, or retaliation to HR or

12  the EEO office?

13     A.   No.

14     Q.   Let me hand you Exhibit 6.  All right.  Do

15  you recognize Exhibit 6 as the portions of the policy

16  and procedure manual that discuss the use of sick

17  leave and the sick pool?

18     (Defendant's Exhibit No. 6 was marked into the

19                    record.)

20     A.   Yes.

21     Q.   Okay.  All right.  Let's go to 100.022.

22  Okay.  And -- and by the way, before we get there, so

23  all -- you and other employees would accrue sick leave

24  and vacation leave, right?

25     A.   Yes.

Jarvis Sims                           March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 66

1      Q.    Okay.  And you understand that the sick pool

2   is different from sick leave and vacation leave that's

3   incurred by an employee, right?

4      A.    Yes.

5      Q.    Okay.  And, basically, to be part of the

6   sick pool, you had to kind of pay into the system,

7   right?

8      A.    Correct.

9      Q.    Okay.  And did you understand that pooled

10  leave could only be used for a member's illness,

11  injury, or accident?

12     A.    Yes.

13     Q.    Okay.  And did you also understand that in

14  order to be able to use pooled sick leave, all sick,

15  vacation, and annual leave had to first be exhausted?

16     A.    Yes.

17     Q.    Okay.  And would you also agree that the

18  member has to request the use of pooled sick leave on

19  an appropriate form?

20     A.    Yes.

21     Q.    And were you also aware that a doctor's

22  statement must be provided as to the nature of the

23  illness or injury, the anticipated recuperation period

24  required, and prognosis for recovery or return to

25  work?

Page 67

1      A.    Yes.

2      Q.    Okay.  And we can also agree, can't we, that

3  requests for pooled leave were to be reviewed and

4  either approved or denied by the pooled leave

5  committee?

6      A.    Yes.

7      Q.    Do you know who was on the pooled leave

8  committee between November of 2020 and April of 2021?

9      A.    No.

10     Q.    Okay.  But we can agree, right, that the use

11  of pooled sick leave was not to be decided by the

12  county administrator, but by the pooled leave

13  committee?

14     A.    My understanding from the HR director, Anita

15  Rookard, this request -- my request would have had to

16  been approved by the administrator Odie Donald.

17     Q.    Well, you would agree that's not what the

18  policy actually says?

19     A.    I agree to what I'm reading.

20     Q.    Okay.

21     A.    But I know what was stated to me by the HR

22  director.

23     Q.    Okay.  But you would also agree that there

24  was a pooled leave committee, right?

25     A.    I don't know the members of the committee.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 68

1        Q.    Okay.  But you understood that the use of
2    pooled leave was not for things like routine doctor's
3    appointments, but rather for an actual leave of
4    absence, right?
5        A.    Yes.
6        Q.    Not a partial day absence?
7        A.    Correct.
8        Q.    Okay.  And you were a salaried employee,
9    right?
10       A.    Yes.
11       Q.    So, for instance, if you had to leave four
12   hours early or come into work four hours late because
13   of a doctor's appointment, you would continue to get
14   paid that full day from your salary, right?
15       A.    Yes.
16       Q.    Okay.  Would you also agree that under the
17   policy if a request to use pooled leave is denied,
18   members have an opportunity to appeal the denial?
19       A.    Yes.
20       Q.    Did you ever appeal a denial of sick leave
21   pool?
22       A.    I wasn't given the opportunity.
23       Q.    Was the answer to my question no?
24       A.    I wasn't given the opportunity.
25       Q.    Yes or no, did you ever appeal a denial of

Jarvis Sims
March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 69

1    sick leave pool?

2         A.    No.

3         Q.    Okay.  So I understand that Janice Jackson

4    the former county administrator resigned in April of

5    2019.  Is that accurate to your recollection?

6         A.    No.

7         Q.    What -- what's inaccurate about that?

8         A.    Janice Allen Jackson and the general counsel

9    both were let go by the Board of Commissioners so

10   resign or terminated.  But --

11        Q.    Well, if the -- if the official reason was

12   resigned, you're -- what you're saying is it would

13   have been resigned in lieu of termination?

14        A.    Well, I guess the official reason, I don't

15   know.  But the Board of Commissioners voted to release

16   Janice Allen Jackson and the general counsel on that

17   particular date.

18        Q.    Who was the former general counsel?

19        A.    Andrew.  I believe his last name Mackenzie.

20        Q.    And he was replaced by somebody named Wayne

21   Brown?

22        A.    Yes.

23        Q.    Okay.  But bottom line is, as it relates to

24   Janice Allen -- Allen Jackson, it wasn't a voluntary

25   departure from the City?  Is that what you're saying?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 70

1        A.    Yes.

2        Q.    Okay.  All right.  And then the Commission

3   subsequently voted to appoint you as the interim

4   administrator that same month, right?

5        A.    Yes.

6        Q.    Okay.  And you accepted that role?

7        A.    Yes.

8        Q.    I'm handing you Exhibit 7.  Okay.  Mr. Sims,

9   do you recognize Exhibit 7 as a true and correct copy

10  of a letter that you actually authored and sent to

11  Tony McDonald on April 22, 2019?

12       (Defendant's Exhibit No. 7 was marked into  the

13                          record.)

14       A.    Yes.

15       Q.    Okay.  And, basically, what it memorializes

16  is that the formal general counsel had been

17  terminated.  The council approved the motion to accept

18  the resignation of administrator Janice Jackson and

19  approved the motion to appoint you as interim

20  administrator.

21       A.    Yes.

22       Q.    Okay.  And you were supposed to get a 15

23  percent increase in salary immediately, right?

24       A.    Yes.

25       Q.    And I understand there was actually some

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 72

1      Q.    Okay.  By the way, who made the decision to

2   hire Anita Rookard?

3      A.    I had her as the candidate and the Board of

4   Commissioners confirmed.

5      Q.    They confirmed?

6      A.    Yes.

7      Q.    Does the Board have to confirm

8   director-level employees?

9      A.    Yes, they're involved.  Yes.

10      Q.    Wouldn't the Board also be involved in the

11   termination, for instance, of a deputy county

12   administrator?

13      A.    I -- that was the unusual matter the Board

14   was involved with the directors.  But as far as with

15   the deputy administrators, the administrator has

16   involvement on who they hire.

17      Q.    Are you aware that Ms. Rookard is older than

18   you?

19      A.    I didn't know her age.

20      Q.    If the records show that she was born in

21   1967, would you have any basis for disputing that?

22      A.    No.

23      Q.    And that would make her older than you,

24   right?

25      A.    Yes.

Jarvis Sims
March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 73

1      Q.   Okay.  All right.  And you -- you wouldn't
2  have any reason to believe that someone older than you
3  would have any desire to discriminate against people
4  younger than her, would you?
5      A.   Would you rephrase the question, please.
6      Q.   Do -- do you have any basis for believing
7  that Ms. Rookard was ageist?
8      A.   No.
9      Q.   Never heard her make any ageist comments
10  about you, did -- did you?
11      A.   No.
12      Q.   Did you interview her?
13      A.   Yes.
14      Q.   Okay.  And I'm assuming you wouldn?t have
15  recommended hiring someone who you found to be ageist
16  or prejudiced against people with disabilities, right?
17      A.   Correct.
18      Q.   I'm looking at there the third page of
19  Exhibit 8, which is labeled Augusta 000010, and at the
20  top on the letterhead, it looks like somebody named
21  Maurice McDowell became the interim deputy
22  administrator when you became interim administrator.
23  Is that a correct assumption?
24      A.   Yes.
25      Q.   Is Maurice a man or a woman?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 74

1          A.    A male.

2          Q.    And how old is he?

3          A.    Don't know.

4          Q.    Was he older or younger than you?

5          A.    I think he's younger.

6          Q.    Okay.  And who made the decision to promote

7     him to that interim deputy administrator role?

8          A.    I did.

9          Q.    You did?  Okay.

10          A.    Yes.

11          Q.    From -- from what position?

12          A.    His position at the time was Capital

13     Projects Manager, Capital Projects.

14          Q.    All right.  So when you -- when you

15     eventually went back to deputy administrator after

16     Odie Donald was hired, what happened to Maurice?

17          A.    Maurice was hired as the Parks and

18     Recreation Director.

19          Q.    So he -- he went down into a demoted role?

20          A.    Well, he was initially the capital projects

21     manager.  So when he was hired permanently as the park

22     and recreation director, he was hired -- he actually,

23     went -- promoted to a director position.

24          Q.    Right.  But a director position is lower

25     than the deputy administrator role, right?

Page 75

1       A.    Yes.  But those were interim positions.

2       Q.    So you served as the interim deputy

3  administrator from roughly April of 2019 through early

4  November 2020, right?

5       A.    Interim County Administrative.

6       Q.    I'm sorry.  Interim County Administrator,

7  right?

8       A.    Yes.

9       Q.    Okay.  During that time period, was there

10  any sort of job posting or job notice for the

11  full-time deputy administrator position?

12       A.    Yes.

13       Q.    The full-time county administrator position?

14       A.    Yes.

15       Q.    Okay.  Did you apply?

16       A.    No.

17       Q.    Why not?

18       A.    Basically, once the Board of Commissioners

19  made the determination to do a nationwide search, I

20  thought that was a indicator that they were seeking

21  another candidate.  And I thought it would be best for

22  me to go back to the deputy position.

23       Q.    When did you make that decision?

24       A.    At one of the board meetings when it was a

25  tie vote.  Five commissioners wanted to do an in-house

Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 76

1   and five commissioners wanted to do a nationwide

2   search.  And it -- it was broken.  The tie was broken

3   by the mayor to do a nationwide search.  I made my

4   mind up at that point that I would not apply for the

5   permanent county manager, county administrative

6   position.

7        Q.   And so did you assume based on the vote that

8   you would not have had the support of the mayor and

9   those five commissioners who voted no to an in-house

10  promotion?

11       A.   Yes.

12       Q.   Okay.  Well, you ultimately applied for a

13  position as the city manager for the City of South

14  Fulton during the summer of 2020, didn't you?

15       A.   Deputy.

16       Q.   Deputy city manager?

17       A.   Yes.

18       Q.   Okay.  And would that have been around the

19  same time that you learned of the commissioner's vote?

20       A.   I don't remember.

21       Q.   Well, what prompted you to apply for the

22  City of South Fulton position?

23       A.   I wanted to get home.

24       Q.   And where is home for you?

25       A.   Atlanta.

Page 77

1        Q.    Okay.  So you had to move from Atlanta to

2   Augusta for the position you had?

3        A.    Yes.

4        Q.    Okay.  So already in the summer of 2020, you

5   were interested in going back to Atlanta?

6        A.    Yes.

7        Q.    Okay.  But it's also fair to say that you

8   started applying for new jobs before Odie Donald was

9   hired as the county administrator, right?

10       A.    Yes.

11       Q.    And is that because you were worried about

12  losing your position once a change in county

13  administrator happened?

14       A.    No.  I was ill and I had no support in

15  Augusta.  And I wanted to be home with family if -- if

16  I couldn't take care of myself or if I needed help for

17  anything.

18       Q.    When you say "no support," you're referring

19  to family type of support?

20       A.    Correct.

21       Q.    Okay.  All right.  And so that was your goal

22  to get a job and come back to Atlanta as -- as early

23  as the summer of 2020?

24       A.    Yes.

25       Q.    Okay.  And Odie Donald was ultimately hired

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                                    Page 79

1        A.   I -- it's -- obviously, it was a penny

2    difference.  I just want to make that you're aware of.

3        Q.   Sure.  Yeah.  And -- and it could be that

4    that's a typo.

5        A.   Could be.

6        Q.   Yeah.  But so just in terms of our timeline,

7    it looks like November 14, 2020, that's when he was

8    hired.  And that's when you officially became once

9    again a deputy administrator?

10       A.   Yes.

11       Q.   Okay.  Okay.  It was right around this time

12   that you learned that your condition was starting to

13   deteriorate, right?

14       A.   The documentation, yes.  But before then, I

15   was having a lot of symptoms that I was not aware.  I

16   didn't know why.

17       Q.   What symptoms?

18       A.   I was severely tired, nausea, not able to

19   sleep, not able to really focus.  My blood pressure

20   was extremely high, wasn't feeling well at all.

21       Q.   Okay.  And you were treating with Matthew

22   Diamond and Nephrology Associates at that time?

23       A.   Yes.

24       Q.   Okay.  And, ultimately, you were recommended

25   to get a PD catheter placed, right?

Page 80

1      A.    Yes.

2      Q.    Does that stand for -- do you know what PD

3  stands for?

4      A.    Yes.

5      Q.    Peritoneal something dialysis.  Yes.

6      Q.    Okay.  And so I'm not an expert in this

7  stuff.  I'm sure you know a lot more than I do, but as

8  I understand it -- so that catheter was needed to

9  begin the process of dialysis; is that right?

10     A.    Correct.

11     Q.    Okay.  And dialysis is a procedure where

12  waste products and excess fluid from the blood are

13  removed to help your kidneys once they stop working

14  properly.

15     A.    Yes.

16     Q.    Is that the gist of it?

17     A.    Yes, sir.

18     Q.    Okay.  And so a PD catheter is that placed

19  in your abdomen?

20     A.    Yes.

21     Q.    Okay.  And -- okay.  And so your doctor had

22  recommended you needed that procedure and then to get

23  on dialysis?

24     A.    Yes.  And that's because you had entered

25  chronic kidney stage 5?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 81

1      A.    Yes.

2      Q.    And that's renal failure?

3      A.    Yes.

4      Q.    Okay.  Let me hand you Exhibit 10.  Have you

5   seen Exhibit 10 before?

6      (Defendant's Exhibit No. 10 was marked into the

7                        record.)

8      A.    Yes.

9      Q.    All right.  Is this a true and correct copy

10   of a signed a doctor's note that Dr. Diamond would

11   have transmitted to the City's HR department --

12      A.    Yes.

13      Q.    -- on or about November 12, 2020?

14      A.    Yes.

15      Q.    Okay.  And by the way, was this -- did you

16   physically give this to HR?  Or was it -- was it faxed

17   or sent from the doctor to HR?

18      A.    I don't remember.

19      Q.    Okay.  But, basically, what it says is that

20   the doctor has completed your FMLA paperwork to the

21   best of his ability, right?

22      A.    Yes.

23      Q.    Okay.  And he describes your kidney stage

24   and notes that you are in the process of getting a PD

25   catheter.

Jarvis Sims                                           March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 82

1        A.    Yes.

2        Q.    Okay.  And the estimated placement date for

3    that procedure was December 15, 2020, right?

4        A.    Yes.

5        Q.    Okay. And so what he's telling HR in this

6    note is he expects you'll need to be out of work for

7    three months following the procedure?

8        A.    Yes.

9        Q.    Okay.  So I'm gathering you had already had

10   a discussion with Anita Rookard by this point, right?

11       A.    Yes.

12       Q.    Okay.  so this is -- this is actually before

13   Odie Donald is hired.

14       A.    I told Anita before, yes --

15       Q.    Okay.

16       A.    -- what was going on.  I do need to make a

17   note that the surgery date was changed because of --

18       Q.    Yeah.

19       A.    Covid and all kinds of stuff.

20       Q.    Yeah.  And I noticed that.  And we're going

21   to go through the documents that described those

22   changes.  But, initially, I'd like to discuss the

23   conversation you brought up earlier in -- in your

24   testimony with Ms. Rookard.

25       A.    Yes.

Page 87

1          (Defendant's Exhibit No. 11 was marked into the

2                              record.)

3          A.   Yes.

4          Q.   Okay.  And this appears to be your Dr.

5     Diamond's initial FMLA paperwork that would have been

6     submitted along with the note that we saw on Exhibit

7     10, right?

8          A.   Yes.

9          Q.   Okay.  It's dated November 12, 2020.  Do you

10    see that on the last page?

11         A.   Yes.

12         Q.   Okay.  All right.  And by the way, was --

13    was your first discussion with anyone in the City

14    about your medical situation the discussion that you

15    had with Ms. Rookard that you just described?

16         A.   No.

17         Q.   Who else had -- had you talked with about

18    it?

19         A.   My former supervisor Janice Allen Jackson.

20         Q.   Okay.  But she had left over a year ago

21    prior to this, right?

22         A.   Yes.

23         Q.   Okay.  So between the time Ms. Jackson left

24    and the time of your meeting with Ms. Rookard, had you

25    had any other discussions with anyone at the City

Page 88

1    about your condition?

2         A.   No.  But the -- I was getting sick and the

3    executive assistant, as well as Tony McDonald,

4    sometimes noticed that I was sick.  They -- they could

5    tell I was sick, but they didn't know the details.

6         Q.   Okay.  All right.  And you kept it a private

7    matter until you first spoke with Anita?

8         A.   Yes.

9         Q.   Okay.  Let me hand you Exhibit 12.  All

10   right.  And we're going to go through the subsequent

11   FMLA, but this is the original designation notice that

12   you received from the HR department in response to the

13   note from the note and certification from Dr. Diamond,

14   right?

15        (Defendant's Exhibit No. 12 was marked into the

16                        record.)

17        A.   Yes.

18        Q.   Okay.  And if you look on the second page

19   and it's -- there's some really small fonts, so it's a

20   little bit difficult to -- to read.  But you would

21   agree that the City did approve your original FMLA

22   leave request, right?

23        A.   Yes.  But I see another typo.

24        Q.   All right.  Well, hold on.  So, initially,

25   what it says is leave beginning 12/15/2020 and ending

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 89

1    on 2/15/2020.  Do you see that?

2        A.   Yes.

3        Q.   And that's what -- and then it says, "When

4    you return to work, you'll be on intermittent FMLA

5    leave until the end of your leave year or whenever you

6    have exhaust 480 hours of leave."  Do you see that?

7        A.   Yes.

8        Q.   Okay.  And what's the typo that you --

9        A.   Beginning 12/15/2020 --

10       Q.   Right.

11       A.   -- and ending 2/15/2020?

12       Q.   Right.  Okay.  But so -- so what happened

13   next was you had another call with Ms. Rookard, didn't

14   you?

15       A.   Yes.

16       Q.   Okay.  I'm going to hand you Exhibit 13.

17   All right.  Is this a true and correct copy of an

18   e-mail that you received on -- or that you sent to

19   Anita Rookard on November 18, 2020?

20       (Defendant's Exhibit No. 13 was marked into the

21                        record.)

22       A.   Yes.

23       Q.   All right.  And it says in the subject line,

24   "Please call me ASAP."

25       A.   Yes.

Jarvis Sims                                          March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                                    Page 90

1      Q.   What was the basis for this e-mail?  What

2  caused you to write this?

3      A.   I can't remember.  I do know that I was

4  having a lot of symptoms, severe headaches, not

5  feeling well at all.  My blood pressure was extremely

6  high and my doctor wanted me to go out sooner if I

7  remember timely.

8      Q.   Right.  He wanted you to immediately go out

9  so that you could start preparing and getting your

10  body ready --

11      A.   Yes.

12      Q.   -- for this surgery?

13      A.   Yes.

14      Q.   Okay.  And that's when the FMLA forms were

15  updated, right?

16      A.   Yes.

17      Q.   Okay.  Let?s go through some of those forms.

18  Then we'll take another short break, okay?

19      A.   Sure.

20      Q.   Oh.  And by the way, so in this situation

21  where you called her, did you generally describe the

22  need to go out on FMLA sooner and that your doctor

23  would be updating?

24      A.   I don't remember that particular phone call.

25  But I -- I did send the e-mail.

Page 91

1        Q.    Okay.  Do you remember anything at all about

2    the call?

3        A.    I remember having a lot of issues, severe --

4    severe issues with serious headaches, bad headaches.

5    And I talked with my doctor and he indicated he -- he

6    probably thought I needed to go out sooner.

7        Q.    And that was Dr. Diamond?

8        A.    Matthew Diamond, yes.

9        Q.    Do you know of any discussions between Dr.

10   Diamond and Anita Rookard?

11       A.    Not to my aware -- awareness.

12       Q.    Do you know of any discussions between Dr.

13   Diamond and anyone at the City about your condition?

14       A.    Not that I'm aware of.

15       Q.    Okay.  All right.  Let's go to Exhibit 14.

16   And this is a doctor's note from Dr. Diamond that's

17   also November 18, 2020, the same date as your e-mail

18   and called to Anita, right?

19      (Defendant's Exhibit No. 14 was marked into the

20                         record.)

21       A.    The same date, yes.

22       Q.    Okay.  And is this a true and correct copy

23   of doctor's note that he would have -- his office

24   would have sent to the HR department that same day?

25       A.    Yes.

Page 92

1      Q.   Okay.  And, basically, what he's saying is,

2   "I am recommending Mr. Sims leave begin November 20,

3   2020, instead of December 15, 2020."

4      A.   Yes.

5      Q.   Okay.  And the City ultimately granted that

6   request, correct?

7      A.   Yes.

8      Q.   Okay.  Let me show you Exhibit 15.  This is

9   actually an e-mail chain that you weren't copied on.

10  Have you seen this in our production in advance of

11  your testimony?

12     (Defendant's Exhibit No. 15 was marked into the

13                        record.)

14     A.   No.

15     Q.   Okay.  Do you know who Schevella Nicholes

16  is?

17     A.   Yes.

18     Q.   She was someone in the HR or the benefits

19  department?

20     A.   Yes.

21     Q.   Okay.  And so are the other people who were

22  copied on this e-mail, right?

23     A.   I do not know who Shani Chastain is nor --

24  it's O-Y-A-B-I -- I don't know that person.

25     Q.   Oyabi?

Page 93

```
1        A.    Oyabi.

2        Q.    Okay.  Okay.  Well, I'll just tell you that

3   this is an e-mail that went out.  And as you can see,

4   Anita Rookard was copied, which is used to track FMLA

5   approval, okay?  And you were ultimately approved for

6   12 weeks of FMLA leave starting on November the 20th

7   2020, right?

8        A.    Yes.

9        Q.    Okay.  And at that time, you had a sick

10  leave balance of 165.8 hours.  Do you see that?

11       A.    Yes.

12       Q.    Do you have any reason to dispute that that

13  balance is incorrectly stated?

14       A.    No.

15       Q.    And you also had a vacation balance at that

16  time of 198.45 hours.  Do you see that?

17       A.    Yes.

18       Q.    Okay.  And if you add those two numbers

19  together -- together, you get a little more than 360

20  hours or about nine and a half weeks.  Do you have any

21  reason to dispute that?

22       A.    No.

23       Q.    Okay.  So what -- according to this

24  document, what's -- what it says is you would receive

25  leave with pay for most of your leave.  And then it
```

Jarvis Sims
March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 94

1    says sick pool participation, yes.  Do you see that on

2    the second page?

3        A.   Yes.

4        Q.   And it says, "Department, please notify

5    payroll when the employee has exhausted their leave

6    and provide the total hours payable to this sick pool

7    participant."  Do you see that?

8        A.   Yes.

9        Q.   Okay.  Were you also aware that while you

10   were out on FMLA leave, you would not continue to

11   accrue vacation or sick time?

12       A.   Yes.

13       Q.   Okay.  All right.  In the statement in this

14   e-mail that vacation and other sick leave balance has

15   to be exhausted before an employee can get paid from

16   the sick pool.  That's consistent with the sick pool

17   policy that we went over, right?

18       A.   Yes.

19       Q.   Okay.  All right, last document.  Then let's

20   take a short break.  Let me hand you Exhibit 16.  Do

21   you recognize Exhibit 16 as a true and correct copy of

22   a letter from the HR department that you would have

23   received on or about November 19, 2020?

24       (Defendant's Exhibit No. 16 was marked into the

25                     record.)

Page 96

1             MR. MCBRIDE:  Thank you.

2             MR. BENNETT:  I've got them premarked.

3        (Defendant's Exhibit No. 17 was marked into the

4                      record.)

5    BY MR. BENNETT:

6        Q.   Sir, do you recognize Exhibit 17 as a true

7    and correct copy of the designation notice -- the

8    corrected designation notice that you received from

9    the City's HR department?

10       A.   Yes.

11       Q.   Okay.  And once again, your leave request

12   was approved, right?

13       A.   Yes.

14       Q.   And if you turn the second page, what it

15   says is that your leave was scheduled to begin on

16   November 20, 2020, and end on February 15, 2021,

17   right?

18       A.   Yes.

19       Q.   And you don't dispute that's a 12-week

20   period, do you?

21       A.   Correct.

22       Q.   Okay.  And you were notified that that

23   change in your start and end date if fully utilized,

24   would exhaust your 12-week entitlement to FMLA leave,

25   right?

Page 97

 1        A.    Yes.

 2        Q.    Okay.  And you were told that when you

 3   return, you won't have FMLA leave left.  But you could

 4   reapply for additional FMLA leave on November 20,

 5   2021?

 6        A.    Yes.

 7        Q.    Okay.  You did, in fact, receive all of the

 8   FMLA leave that you actually requested, right?

 9        A.    Yes.

10             MR. MCBRIDE:  Hey, John, can I ask you a

11        quick question about this exhibit?

12             MR. BENNETT:  Uh-huh.

13             MR. MCBRIDE:  Are pages two and three just

14        the same thing?  They've got different Bates

15        numbers, but they look to be the same page.

16        Yeah, it looks like --

17             MR. BENNETT:  Yeah, they -- they may be.

18             MR. MCBRIDE:  I just want to make sure I

19        understand my copy.  So --

20             MR. BENNETT:  Yeah.  That may just be a --

21        an administrative error.

22             MR. MCBRIDE:  It's supposed to be.  It looks

23        like it's supposed to be a two-page document.  So

24        --

25   BY MR. BENNETT:

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 98

1      Q.   Okay.  Before going out on leave, did you

2   have any further discussions with Ms. Rookard?

3      A.   Yes.  I mentioned to Ms. Rookard that I was

4   in the process of having a transplant.  I had some

5   family members -- a friend that was getting tested to

6   see if he was a match and if that would be the case, I

7   would need a transplant.  And she indicated you would

8   not be eligible for FMLA, but you would be eligible

9   for the sick leave pool.

10      Q.   Okay.  And, ultimately, you weren't even

11   placed on a transplant waiting list though until

12   August of 2021, right?

13      A.   No.

14      Q.   Well, we'll go over the medical records.

15   But you went to the Mayo Clinic, didn't you?

16      A.   I went to Piedmont also.  I've listed

17   several places.

18      Q.   Okay.  But you didn't actually have a

19   transplant at any point in 2021, did you?

20      A.   I didn't have a transplant.  However, I had

21   gone through the process at Piedmont here in Atlanta

22   and a friend was matched.  And I was hoping to go for

23   a transplant in '21, and that friend ended up deciding

24   not to go forward with it.

25      Q.   Okay.  So leave would have been unnecessary,

Jarvis Sims                                          March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 99

1    right?

2         A.   No.

3         Q.   Did you have a transplant in 2021?

4         A.   I did not.

5         Q.   Did you have a transplant in 2022?

6         A.   No.

7         Q.   Have you had a transplant yet?

8         A.   No.

9         Q.   Okay.  Let me hand you what's marked as

10   Exhibit 18.  This is a letter -- true and correct copy

11   of the letter that you sent to Odie Donald on November

12   20, 2020, right?

13        (Defendant's Exhibit No. 18 was marked into the

14                        record.)

15        A.   Yes.

16        Q.   How was this delivered?

17        A.   It was a -- a written document.  I had made

18   several attempts to meet with Mr. Donald face-to-face.

19   However, each meeting he canceled or changed the

20   meeting and then canceled.  So I actually had to leave

21   this document with the executive assistant.

22        Q.   Okay.  And who was that?

23        A.   Wanda Gothie.

24        Q.   Okay.  So in other words, before your leave

25   began on November 20, 2020, you never actually met

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 100

1    with Mr. Donald to discuss your leave?

2         A.   Correct.

3         Q.   Okay.  And nor did you have any discussions

4    with him about the nature of your condition or why you

5    needed to leave?

6         A.   I had discussion with Anita Rookard.  And

7    Ms. Rookard indicated that Mr. Donald would be the

8    person who decided if I would be eligible for the sick

9    leave pool.

10        Q.   Right.

11        A.   And --

12        Q.   But I'm asking did you have any discussions

13   directly with Mr. Donald about your need for FMLA

14   leave before you sent this letter?

15        A.   I did not.

16        Q.   Okay.  And before you sent this letter, had

17   you told him orally or in writing anything about the

18   nature of your condition?

19        A.   I did not.

20        Q.   Okay.

21        A.   However, I'd like to state again that there

22   were several attempts to meet with him in person to

23   let him know what was going on.

24             MR. BENNETT:  Object as nonresponsive.

25

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 101

1    BY MR. BENNETT:

2        Q.   Ultimately, the -- those meetings didn't

3    happen, right?

4        A.   Correct.

5        Q.   Okay.  All right.  And in this letter, you

6    notified him that your leave would extend to February

7    15, 2021, right?

8        A.   Yes.

9        Q.   But you didn't indicate in this letter that

10   you would necessarily need additional time following

11   the end of your leave, right?

12       A.   I stated, if I needed an additional time, I

13   will let them know as soon as possible.

14       Q.   Right.  Does -- is there any mention of a

15   kidney transplant in the future in this letter?

16       A.   That was discussed with Ms. Rookard.

17       Q.   Is there any mention of a future kidney

18   transplant in this letter?

19       A.   And not in this letter.

20       Q.   Okay.  Did he respond to this letter?

21       A.   I didn't receive anything.

22       Q.   Did you ever have any personal conversations

23   with Mr. Donald about why you would be out text,

24   voicemails, or anything?

25       A.   No.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 102

1    Q.   All right.  And you have no personal

2  knowledge, do you, that Anita Rookard or someone else

3  discussed with Mr. Donald the nature of your

4  condition?

5    A.   I only know about the past.  And as the HR

6  director, Ms. Rookard in the past, if there are

7  employees who are, you know, directors that are out,

8  that would be discussed with the HR director and the

9  administrator.

10    Q.   The fact that they were going out, right?

11    A.   Yes.

12    Q.   But not the nature of their condition,

13  right?

14    A.   In the past, if it was confidential matters,

15  those matters could be discussed confidentially with

16  the HR director.

17    Q.   Okay.  Do you have any personal knowledge

18  that Ms. Rookard had such a conversation about your

19  medical condition with Mr. Donald?

20    A.   I don't know.

21    Q.   Okay.  During your leave, you continued to

22  search for other jobs, didn't you?

23    A.   During my leave, I can -- I searched for

24  other jobs.  I had applied for other jobs, and there

25  was a job that I had applied for -- early on with the

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                                    Page 103

1    City of Forest Park.  I was announced as a finalist in

2    '21.

3         Q.   Wasn't it true that you --

4         A.   I'm sorry.

5         Q.   Isn't it true that you applied for that

6    position in December of 2020?

7         A.   I can't remember that.  I can't remember.

8    That could be the case.

9         Q.   Let me hand you Exhibit 19.  This is

10   something that your -- I think your lawyer produced.

11   It's in a smaller font.  But do you recognize an

12   e-mail that you sent to Odie Donald on January 25,

13   2021, reflected on this Exhibit? 19?

14      (Defendant's Exhibit No. 19 was marked into the

15                       record.)

16        A.   Yes.

17        Q.   Okay.  And in this e-mail, you wrote, "Good

18   morning, Mr. Donald.  I'm checking in and making you

19   aware that I'm a finalist for a City Manager

20   position," right?

21        A.   Yes.

22        Q.   And he then forwarded that e-mail to Anita

23   Rookard and to Wayne Brown.

24        A.   Okay.

25        Q.   That's what the document shows, right?

Jarvis Sims
March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 104

1      A.    Yes.

2      Q.    All right.  Was this the first time that you

3  had -- well, first of all, this is in reference to a

4  City Manager position with the City of Forest Park,

5  correct?

6      A.    Yes.

7      Q.    And that's not a assistant city manager.

8  That was a full-time city manager?

9      A.    Yes.

10      Q.    Okay.  Had you made anyone aware prior to

11  this e-mail that you had applied or that you were a

12  finalist for the City Manager position?

13      A.    No.

14      Q.    Why not?

15      A.    I did not know I had to make my current

16  employer aware of opportunities that I -- job

17  opportunities.

18      Q.    And I'm not suggesting that you did.  I'm

19  just asking is that the reason why you chose not to?

20      A.    I -- I never knew that a person had to let

21  their employer know that they were applying for other

22  jobs.

23      Q.    Well, why did you send this particular

24  e-mail?

25      A.    Because it hit the paper and I wanted them

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 105

1    to know from me.

2         Q.   Okay.  Which paper?

3         A.   I don't know.  A local paper, I think

4    Clayton News or Clayton Neighbor or something like

5    that.

6         Q.   And it later was published by the Augusta

7    Chronicle, wasn't it?

8         A.   Yes.

9         Q.   Okay.  So it was published locally near

10   Forest Park and Clayton County.  Forest Park is in

11   Clayton County, right?

12        A.   Yes.

13        Q.   So it was published there.  And then the

14   Augusta Chronicle got wind of it and did a similar

15   article?

16        A.   Yes.

17        Q.   Okay.  And do you have any reason to dispute

18   that you applied for that position while you were on

19   FMLA leave?

20        A.   No.  No.

21        Q.   And was this part of your continuing effort

22   to get closer to Atlanta because of your situation?

23        A.   Yes.

24        Q.   Okay.  Were you selected for the position?

25        A.   No.

Page 107

1          A.    Not that I recall.

2          Q.    He didn't call to ask you about it?

3          A.    No.

4          Q.    Okay.  All right.  Do you remember as

5    February 15, 2021 approached, your doctor advised you

6    to remain out of work for an additional period of

7    time?

8          A.    Yes.

9          Q.    Okay.  Through February 25, 2021, right?

10         A.    Yes.

11         Q.    Okay.  Let me hand you Exhibit 20.  Sir, do

12   you recognize Exhibit 20 as a true correct copy of a

13   February 10, 2021, letter from Dr. Diamond to -- that

14   was sent to the HR department?

15       (Defendant's Exhibit No. 20 was marked into the

16                        record.)

17         A.    Yes.

18         Q.    Okay.  And in essence, what he's -- I'm not

19   reading this word for word, but he's saying because of

20   some symptoms you're experience -- you were

21   experiencing as a result of your procedure, it -- he

22   needed you to remain out until February 25, 2021?

23         A.    Yes.

24         Q.    Okay.  And he said that you would be cleared

25   to return to work on February 25, 2021?

Page 108

1      A.   Yes.

2      Q.   And that's when you actually came back to

3  work?

4      A.   Yes.

5      Q.   And you had no restrictions when you came

6  back to work, right?

7      A.   I'm still stage 5 kidney disease.

8      Q.   Right.  But you -- you had no restrictions

9  that impacted your ability to perform the deputy

10 county manager duties, right?

11     A.   I?m -- I'm still -- still now battling with

12 the kidney disease.  But I'm stage 5 kidney disease

13 and from time to time, I still had several of those

14 symptoms.

15     Q.   Right.  Let me ask it a little differently.

16 At any point between February 25, 2021 and April 1,

17 2021, did your doctor give you a note to give to HR

18 which indicated that there were certain things you

19 couldn't do because of your condition?

20     A.   No.

21     Q.   Okay.  And this letter doesn't indicate that

22 you would be limited in your ability to perform the

23 essential functions of your job duty on your return to

24 work, does it?

25     A.   No.  The letter does not reference that I'm

Page 109

1   still diagnosed as stage 5 kidney disease.  That's

2   still and remains now.

3        Q.    Right.  But the doctor didn't say there are

4   restrictions that would prohibit you from doing

5   certain work-related tasks, right?

6        A.    This letter doesn't state that.

7        Q.    Okay.  Did the City grant your request to

8   extend the leave?

9        A.    Yes.

10        Q.    Did you have any communications with Mr.

11   Donald about the request to extend your leave?

12        A.    No.

13        Q.    Aside from the e-mail that you sent about

14   the Forest Park application, where -- do you have any

15   other communications with Mr. Donald at all during

16   your leave of absence?

17        A.    No.

18        Q.    All right.  Let me hand you Exhibit 21.

19   Again, I think I -- I might have handed you two.  Oh,

20   never mind.  I didn't.

21             MR. MCBRIDE:   Thanks.

22   BY MR. BENNETT:

23        Q.    All right.  This is another e-mail in which

24   you weren't copied.  Have you seen this before in

25   preparation for your deposition?

Jarvis Sims                          March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                        Page 110

1       (Defendant's Exhibit No. 21 was marked into the

2                          record.)

3       A.   No.

4       Q.   Okay.  Would you agree that it's an e-mail

5    from Schevella Nicholes to Anita Rookard dated

6    February 15, 2021?

7       A.   Yes.

8       Q.   And the subject line is "Sick Pool Tracker -

9    Jarvis R. Sims."

10      A.   Yes.

11      Q.   Okay.  And what it says is that you started

12   using sick pool as of February 15, 2021.  Do you see

13   that?

14      A.   Yes.

15      Q.   Okay.  And then what she attaches is a sick

16   pool tracking sheet, right?

17      A.   Yes.

18      Q.   And so, as I understand it, Mr. Sims,

19   throughout your 12 weeks at FMLA that was paid for out

20   of your accrued sick and vacation leave; is that

21   right?

22      A.   Yes.

23      Q.   Okay.

24           MR. MCBRIDE:  Lunch?

25           MR. BENNETT:  Why don't we go off real

Page 111

1      quick?

2            MR. MCBRIDE:  Thanks.  Come in.

3            THE VIDEOGRAPHER:  The time is 12:02 p.m.

4      We are now off the record.

5                  (Off the record.)

6            THE VIDEOGRAPHER:  The time is 12:23 p.m.

7      We're back on the record.

8  BY MR. BENNETT:

9      Q.   All right.  Mr. Sims, we're back from a

10  lunch break.  I've handed you Exhibit 22.  Would you

11  agree that this appears to be a -- an updated version

12  of the sick pool tracking sheet that was attached to

13  Exhibit 21?

14    (Defendant's Exhibit No. 22 was marked into the

15                     record.)

16      A.   Yes.

17      Q.   And what it shows is that you were paid 60

18  hours out of the sick pool between February 15, 2021

19  and February 24, 2021, right?

20      A.   Yes.

21      Q.   All right.  So do you have any reason to

22  dispute that you were, in fact, paid for 60 hours out

23  of the sick pool bank?

24      A.   No.

25      Q.   Okay.  Well, you have an allegation in your

Page 112

1  complaint that you were denied the use of sick pool to

2  cover your extended leave of absence.  And that's

3  simply not true, is it?

4       A.   When my leave was extended, I see I use our

5  -- they use additional time sick leave pool.  So I see

6  that, yes.

7       Q.   Okay.  All right.  So you initially

8  requested a leave of absence through February 15th.

9  That's an accommodation, right?

10      A.   Yes.

11      Q.   And you were granted FMLA leave for that

12  full period, right?

13      A.   Yes.

14      Q.   You then asked for some additional time off

15  to recover, and that was granted, right?

16      A.   Yes.

17      Q.   And that period of extended leave you were

18  compensated through the sick pool, right?

19      A.   Yes.

20      Q.   Okay.  And then you ultimately returned to

21  work on February 25, 2021, right?

22      A.   Yes.

23      Q.   Okay.  And at that time, your accruals were

24  reactivated, right?

25      A.   Yes.

Page 113

1          Q.    Okay.  And by accruals, I'm referring to the

2     sick and vacation that you would accrue weekly, right?

3          A.    Yes, yes.

4          Q.    Okay.

5          A.    Biweekly.  Well, weekly yes.  But it?s --

6          Q.    Okay.

7          A.    Yes.

8          Q.    All right.  All right.  I want to talk about

9     the events that transpired between February 25, 2021,

10    and the end of your employment, okay?

11         A.    Okay.

12         Q.    All right.  First, before you got back to

13    work, did you have any further discussions with Anita

14    Rookard or anyone else in HR?

15         A.    When I was dealing with the matters -- after

16    the surgery, I had to extend it.  So I spoke with her

17    then.

18         Q.    Okay.

19         A.    And that's documented.

20         Q.    And have we already covered that discussion?

21         A.    Yes.

22         Q.    Okay.  So -- and that related to your need

23    to extend the leave?

24         A.    Correct.

25         Q.    Okay.  All right.  And then once you got

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 114

1   back to work on February 25th, did you have any

2   further discussions with Ms. Rookard about your

3   condition or possible future leave?

4        A.   Yes.

5        Q.   When was that?

6        A.   I don't know the date.  Okay.  Well, would

7   it have been early on following your return?

8        A.   Early on, yes.

9        Q.   Okay.  And was that discussion in person?

10       A.   Yes.

11       Q.   In your office or her office?

12       A.   More than likely my office.

13       Q.   Was anyone else present?

14       A.   No.

15       Q.   Did you record it?

16       A.   No.

17       Q.   Did you take any notes of the meeting?

18       A.   No.

19       Q.   All right.  And what was said in that

20   meeting?

21       A.   That I was having some family members get

22   tested to see if they were a match for a kidney.  And

23   I would need time if I was able to get a transplant

24   and utilize the sick leave pool.

25       Q.   Okay.

Page 115

1      A.    And she stated it would have to be approved

2   by the administrator.

3      Q.    Okay.  Anything else?

4      A.    She stated, "You would be fine.  It would

5   have to be approved by the administrator, but you

6   should be fine for this request."

7      Q.    Okay.  And -- but this related to a future

8   event that had not yet happened, right?

9      A.    Correct.  But it was in the process of

10  happening.

11     Q.    Okay.  But did you have -- for instance, did

12  you ever have a surgery date scheduled?

13     A.    Yes.

14     Q.    Where?

15     A.    At Piedmont?

16     Q.    For when?

17     A.    It was -- I don't remember the exact date.

18  But yes, there was a date scheduled.

19     Q.    Well, I mean, this is your testimony.  It's

20  -- it's -- do you have any recollection of what the

21  date was?

22     A.    I don't remember the date.  But there was a

23  date scheduled.

24     Q.    Okay.

25     A.    My friend was a match.  We spoke with

Jarvis Sims                                     March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 116

1    someone at Piedmont and they were saying that they do

2    the surgeries on, if I recall, Fridays.  And they were

3    scheduled -- trying to schedule a date.  And we were

4    doing the coordination and he ended up pulling out.

5         Q.   Okay.  All right.  So that never happened?

6         A.   Never happened.

7         Q.   All right.  And I've looked at your medical

8    file.  And I see no indication that you ever submitted

9    any formal request for additional leave associated

10   with a kidney transplant following February 25, 2021;

11   am I correct?

12        A.   That's correct.

13        Q.   Okay.  All right.  And you never sent Anita

14   or anyone else in HR any records from Piedmont showing

15   a surgery date, did you?

16        A.   I mentioned to Anita that I was in the

17   process of having a person, a family member, tested to

18   see if he was a match.  And if he was a match, we were

19   trying to coordinate a date for the surgery.

20        Q.   Right.  My -- my question is:  Did you send

21   anyone in HR --

22        A.   I didn't have a date.

23        Q.   You got to -- you got to let me finish my

24   question.

25        A.   I'm sorry.

Page 117

1      Q.   Did you ever send anyone in HR a date

2   certain for a -- for a procedure that would have

3   occurred between February 25th and April 1, 2021?

4      A.   I did not have a date certain.

5      Q.   Okay.  And so nor did you send them a date

6   certain for a procedure or additional leave following

7   April 1, 2021?

8      A.   Rephrase your question.

9      Q.   Did you ever provide any documentation

10  showing a need for leave on specific dates following

11  April 1, 2021?

12     A.   There was no documentation, but it was

13  verbal.  I said to her that if the person is a match,

14  I would need additional time for the transplant.

15     Q.   Okay.  And -- and you understood that after

16  you -- you had -- you had exhausted all of your FMLA

17  leave, right?

18     A.   Yes.

19     Q.   Okay.  But you are now continuing to accrue

20  vacation and sick leave, right?

21     A.   Yes.

22     Q.   So you understood that in the event you

23  needed an additional leave of absence, you could apply

24  for that.  And if granted, you would first be able to

25  use that accrued vacation and sick leave and then

Page 118

1    apply for sick pool, right?

2        A.    I knew the transplant procedure from the

3    doctor stated I would have to be out about three

4    months.  So I knew I would not have that amount of

5    time.

6        Q.    Okay.  Did -- did you ever send a written

7    application for sick pool leave following February 25,

8    2021?

9        A.    I didn't send a written.  I spoke with her

10   about the need of having that.

11       Q.    Right.  But we went over the sick pool

12   policy, right?

13       A.    Yes.

14       Q.    And did your -- at any point after February

15   25, 2021, did you submit a doctor's note in writing

16   stating the need for leave?

17       A.    I spoke with Ms. Rookard, the HR director,

18   and told her what was going on.  And I've told her

19   that if the transplant was going to take place, I

20   would be needing access to utilizing the sick leave

21   pool.

22            MR. BENNETT:  Okay.  Object as

23        nonresponsive.

24   BY MR. BENNETT:

25       Q.    My question is pretty straightforward.  At

Page 119

1    any point after February 25, 2021, did you submit a

2    doctor's note requesting leave at any point between

3    February 25, 2021 and April 1, 2021?

4         A.   Sir, I wouldn't have had it because I --

5         Q.   It's a yes or no question.

6         A.   I wouldn't have had a doctor's note because

7    we were in the process, sir.  I'm -- I'm not

8    understanding --

9         Q.   Is the answer no?

10        A.   Sir, I'm not understanding your question.

11        Q.   Okay.  At any point after February 25, 2021,

12   did you formally request leave on a specific period of

13   time?

14        A.   I spoke with the HR director and made her

15   aware that I was in the process, sir, of having a

16   transplant.

17             MR. BENNETT:  All right.  I object as

18        nonresponsive.

19             THE WITNESS:  I --

20   BY MR. BENNETT:

21        Q.   My question is -- is very straightforward,

22   sir.  Yes or no?  At any point after your leave, did

23   you submit a specific request for leave during a

24   specific time period?

25        A.   Sir, I'm stating, I spoke with Ms. Rookard,

Jarvis Sims                                           March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 120

1  the HR director, and told her what was going on.

2       Q.   Okay.  So -- so the answer is that you're

3  refusing to answer.  By the way, your -- your meeting

4  that you mentioned earlier with the EEO officer was

5  that a right around the time of your discussion with

6  Anita that you just described?

7       A.   No.

8       Q.   Okay.  Well, I've looked at your EEOC

9  charge.  I've looked at your complaint and I've looked

10 at your discovery responses.  And her name or any

11 reference to your earlier description of that meeting

12 is nowhere to be found.  Why is that the case?

13      A.   I -- I don't know.

14      Q.   Well, you reviewed the EEOC charge before it

15 was filed, right?

16      A.   Yes.

17      Q.   You reviewed the complaint before it's

18 filed, right?

19      A.   Yes.

20      Q.   And you reviewed your discovery responses

21 before they were submitted, right?

22      A.   Yes.

23      Q.   Okay.  Why would you not have included any

24 reference to such a meeting?

25      A.   I met with Phyllis, the EEO person.  I don't

Page 122

1      A.   I don't know the date, sir.

2      Q.   You don't have any documentation to support

3  it?

4      A.   I -- I don't.

5      Q.   You didn't make any notes about the meeting?

6      A.   I did not.

7      Q.   The meeting is not referenced in your EEOC

8  charge?

9      A.   Not that I saw.

10     Q.   It's not referenced in your complaint?

11     A.   No.

12     Q.   It's not referenced in your discovery

13 responses?

14     A.   No.

15     Q.   And we'll go over those later so that you

16 can look at them for yourself.  But she's not even

17 listed as a witness, right?

18     A.   No.

19     Q.   Okay.  I want to ask you more about that in

20 a minute.  But let's talk about your return so let me

21 hand you Exhibit 23.  All right.  Is this a true and

22 correct copy of an e-mail that you received from Odie

23 Donald on March the 1st 2021?

24     (Defendant's Exhibit No. 23 was marked into the

25                        record.)

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                                    Page 123

1        A.   Yes.

2        Q.   And it looks like it was sent to you and

3   Tony McDonald as well as Wanda Gothie and Jessica

4   Williford.  Do you see that?

5        A.   Yes.

6        Q.   Who was Wanda Gothie?

7        A.   She was the executive assistant to the

8   administrator.

9        Q.   To Odie?

10        A.   Yes.

11        Q.   And what about Jessica?

12        A.   She served as the assistant to both deputy

13   administrators.

14        Q.   She was the administrative assistant?

15        A.   Yes.

16        Q.   When were they hired?

17        A.   I don't know.  Wanda was hired after I was

18   hired.  I know that.

19        Q.   Okay.  All right.  And so in this e-mail, it

20   looks like Odie attached some minutes from an

21   administrator's meeting that happened on February 25,

22   2021, right?

23        A.   Yes.

24        Q.   And that's the same date that you returned

25   to work?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 124

1      A.   Yes.

2      Q.   And so, as I'm looking at the minutes, it

3  sounds like the main purpose of this meeting, or at

4  least one of the purposes, was to redistribute the

5  current department assignments for you and Tony

6  McDonald; is that correct?

7      A.   Yes.

8      Q.   Okay.  And it looks like you were assigned

9  several action items related to some type of a SPLOST?

10     A.   Yes.

11     Q.   What -- what was that related?  What type of

12 a SPLOST was that?

13     A.   Augusta had a SPLOST and Mr. Donald wanted

14 updates on the SPLOST projects on the website, updates

15 such as if they were -- I guess the status, if they

16 were in progress, budgeteer items, background, just

17 information about the particular projects.

18     Q.   Okay.  And during this meeting, you were

19 also assigned --

20     A.   There were two SPLOSTS.

21     Q.   Okay.  There was two SPLOSTS.  But then it

22 looks like you were also assigned some tasks related

23 to updating the budget?

24     A.   Yes.

25     Q.   Okay.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 125

1      A.    The departmental budget of the
2    administrator's office, yes.
3      Q.    Okay.  And you actually attended the meeting
4    that's referenced in -- in the minutes, right?
5      A.    Yes.
6      Q.    So you were not excluded from that meeting,
7    were you?
8      A.    Not this meeting, no.
9      Q.    Okay.  Am I correct that shortly following
10   your return, you were also assigned the task of
11   leading a EMA ambulance -- EMA/ambulance services
12   suspension effort or perhaps suspending the
13   suspension?  Do you recall what I'm talking about?
14     A.    I don't.  I know there was a lot of
15   discussions about EMA services in Augusta, backwards
16   and forward about the current provider at the time.
17     Q.    Now, you and Tony McDonald when you were
18   hired you both had separate areas of responsibility,
19   right?
20     A.    Yes.
21     Q.    And how would you describe his areas of
22   responsibility?
23     A.    He was over the, I guess, administrative
24   department, finance, human resources, procurement, IT,
25   fire.  I can't remember the other.

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 126

1      Q.    And what departments were you over?

2      A.    Housing, community development, parks and

3  recreation, engineering, environmental services.

4  There was some more.  There were -- we were each over

5  eight departments.

6      Q.    What about police?

7      A.    Police?  They don't have police.  The

8  sheriff office has --

9      Q.    They just have the sheriff.

10     A.    Correct.

11     Q.    Some counties do have police departments.

12     A.    Correct.  Correct.

13     Q.    But they just have a --

14     A.    Sheriff.

15     Q.    Sheriff?

16     A.    Correct.

17     Q.    Okay.  So, if there were 16 total

18  departments, you each had eight.

19     A.    Correct.

20     Q.    Okay.  All right.  Thank you.  Let me hand

21  you Exhibit 24.

22          MR. MCBRIDE:  Thank you.

23  BY MR. BENNETT:

24     Q.    Is this a true and correct copy of an e-mail

25  that Mr. Donald sent to you and Tony McDonald on March

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 127

1    5, 2021?

2        (Defendant's Exhibit No. 24 was marked into the

3                        record.)

4        A.   Yes.

5        Q.   And he basically was asking the two of you

6    to delete -- to lead a director's meeting that

7    particular day, right?

8        A.   Yes.

9        Q.   Okay.  And that's because he -- he had

10   something else going on, I guess?

11       A.   I don't remember.  But I do remember us

12   leading the meeting.

13       Q.   Okay.  And that's not a meeting that you

14   were excluded from, right?

15       A.   Not this particular meeting.

16       Q.   Okay.  Were there weekly -- a lot of cities

17   or counties will have like a weekly meeting of all

18   department heads.  Is that what y'all did?

19       A.   I'm trying to remember if it was weekly or

20   biweekly, but we did meet with the department heads.

21   And then we would meet individually with our

22   department heads to go over matters, operational

23   matters.

24       Q.   Okay.  All right.  Okay.  And so how many of

25   these types of meetings would there have been either

Page 128

1    -- I guess, you're not sure if they're weekly or

2    biweekly?

3         A.    I can't remember.

4         Q.    Okay.  Well, during the five, six weeks when

5    you returned to work, let's say there were three.

6    Let's say it was biweekly.  Were you ever excluded

7    from a director's meeting?

8         A.    Director's meeting, yes.

9         Q.    Which one?

10        A.    With housing community development.  The

11   director was Hawthorne Welcher and there were matters

12   that were discussed.  He was one of the departments

13   that -- that was one of the departments that I was

14   overseeing, and there were matters that discussed and

15   decisions that were made that I was not a part of.

16   And the director Mr. Welcher stated to me, "Yeah.

17   I've been meeting with Mr. Donald and I wondered why

18   you were not included in these matters."

19        Q.    What else was said?

20        A.    It was -- I was asking him one thing and it

21   was like he was getting different directions.

22        Q.    Okay.  So -- and I want to ask you further

23   about this.  So I was asking about the director's

24   meetings where all of the different directors or

25   department heads were present.

Page 129

1          A.    When you said director, he was a director.

2          Q.    Right.  But I'm talking about the weekly or

3     bi -- biweekly meetings that are described in this

4     e-mail Exhibit 24.  It sounds like there were meetings

5     where all directors were expected to be in attendance.

6          A.    Correct.

7          Q.    Were you ever excluded from one of those

8     meetings?

9          A.    There were director's meetings and then

10    there were departmental meetings.  Director's

11    meetings, I was in -- I was in this meeting, yes.

12         Q.    Were you ever excluded from a meeting like

13    this one?

14         A.    I don't know if there were meetings that I

15    was not included in.

16         Q.    Are you aware of any meeting that happened

17    with all directors or department heads at which you

18    weren't invited?

19         A.    No.

20         Q.    Okay.  And so it sounds like there would

21    also be -- you would also have meetings with

22    individual directors or department heads to talk about

23    things.

24         A.    Yes.

25         Q.    And so you learned that there was one or

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 130

1   more meetings from -- is it a Mr. Hawthorne?

2       A.    Hawthorne.

3       Q.    Where he had been -- he had met directly

4   with Odie Donald.

5       A.    Yes.

6       Q.    Okay.  And Odie Donald was the county

7   administrator, right?

8       A.    Yes.

9       Q.    Okay.  And so, if the county administrator

10  asked for a meeting with a particular director,

11  they're required to go meet with the county

12  administrator, right?

13      A.    Yes.

14      Q.    Nothing prohibited him from having such a

15  meeting, right?

16      A.    Yes.

17      Q.    Okay.  And all you're saying is that there

18  was one or more meetings between Odie Donald and Mr.

19  Hawthorne where you weren't present?

20      A.    Not only this particular meeting.  There

21  were meetings with within the department, within the

22  administrator's office, with the other deputy and

23  other administrators that I was not included in the

24  meeting.

25      Q.    How do you know?

Page 131

1     A.    Because I would find out afterwards.

2     Q.    When were the dates of the meetings?

3     A.    I don't remember the dates.

4     Q.    Okay.  And what --

5     A.    It appeared as if that the meetings were

6  going on, things were discussed and I was excluded.  I

7  was not involved.

8     Q.    Okay.  Did you experience any loss of pay as

9  a result of being excluded?

10    A.    No.

11    Q.    You weren't demoted as a result of an

12 exclusion, were you?

13    A.    No.

14    Q.    And so what evidence do you have that that

15 had anything to do with your age, medical condition,

16 or leave?

17    A.    If I'm a part of the team in making

18 decisions, then I should be included in those meetings

19 and in those decision-making.

20    Q.    Right.  But what I'm asking is:  What

21 evidence do you have that your protected

22 characteristics or your use of leave had anything to

23 do with you not being present in any meeting?

24    A.    I'm not understanding that question.  Can

25 you rephrase it.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 132

1     Q.   Well, for instance, did anyone say "You're
2  being excluded because you took FMLA leave"?
3     A.   No.
4     Q.   Did anybody ever say, "You're being excluded
5  from a meeting because of your age"?
6     A.   No.
7     Q.   And, in fact, Tony McDonald is older than
8  you, right?
9     A.   Yes.
10    Q.   Did anybody ever tell you that you were
11 being excluded from a meeting because of your medical
12 condition?
13    A.   No.
14    Q.   So you're speculating that those things were
15 the result of you being excluded from a meeting?
16    A.   I'm not speculating.  I was not included in
17 those meetings.
18    Q.   But I'm asking why?
19    A.   I don't know.
20    Q.   You're -- you don't know why?
21    A.   I don't know.
22    Q.   Okay.  Do you remember being asked in March
23 of 2021 to prepare an -- something called an
24 Environmental Services Transition Plan?
25    A.   Yes.

Page 133

1        Q.   What is that?

2        A.   Mr. Donald -- I think there was a reason to

3   -- they had made a decision.  They -- before I got

4   back to release the current environmental services

5   director, and this was a transition to make sure any

6   particular projects or things that were going on, I

7   will be aware of them.

8        Q.   Okay.  So let me make sure I got this right.

9   When Mr. -- When Odie Donald came on board at some

10  point thereafter, the decision was made to terminate

11  the Environmental Services Director?

12       A.   Yes.

13       Q.   Who was that?

14       A.   Mark Mehall.

15       Q.   Do you know how old he is?

16       A.   I don't.

17       Q.   Older or younger than you?

18       A.   I don't know.

19       Q.   So he was a director?

20       A.   He was.

21       Q.   Were any other directors let go between

22  mid-November 2021 and March of 2021?

23       A.   The fire director was, I guess, told to re

24  -- retired.  That happened while I was out.

25       Q.   He was asked to resign or retire?

Page 135

1   Augusta, Richmond County.

2        A.    Newton County.

3        Q.    Newton County.  Okay.  And during that time

4   period, you've seen different city managers or city

5   administrators come and go, right?

6        A.   Yes.

7        Q.    And it's -- it's not uncommon, is it, that

8   when a new person in charge of the administration

9   comes on board, organizational changes are made,

10  right?

11       A.   It depends.

12       Q.    But it's not -- that's something that is not

13  unexpected, right?

14       A.    It depends on the organization.  Some

15  organizations retain the staff and some managers

16  change staff.

17       Q.    Right.

18       A.    But, for instance, like typically when a new

19  sheriff is elected, they'll make wholesale changes to

20  the top-level folks in charge, right?

21       A.    It -- some do, some don't.

22       Q.    Right.  Let me get back to the Environmental

23  Service Transition Plan.  So was Mr. Mehall one of the

24  people who you supervised?

25       A.    Yes.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                                    Page 136

1          Q.   Okay.

2               MR. MCBRIDE:  And this is 25, correct?

3               MR. BENNETT:  Yeah, it's 25.

4        (Defendant's Exhibit No. 25 was marked into the

5                         record.)

6   BY MR. BENNETT:

7          Q.   And this is actually a combination of two

8   e-mails.  Let's just start with the first.  So -- all

9   right.  The first three pages of this exhibit are

10  e-mails between you and Mr. Donald related to the task

11  of preparing the Environmental Service Transition

12  Plan, right?

13         A.   Yes.

14         Q.   Okay.  And it looks like you turned in a

15  project plan by e-mail on March 9, 2021; is that

16  right?  I'm looking at the second page of this

17  exhibit.

18         A.   Yes.

19         Q.   Okay.  And then on -- if we look back at the

20  first page of Exhibit 25, which is labeled Augusta

21  527.

22         A.   Yes.

23         Q.   It's a lengthy e-mail from Mr. Donald to you

24  on March the 16th 2021, right?

25         A.   Yes.

Jarvis Sims                                     March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 137

1      Q.   And it looks like he actually attached what

2   you had sent him; is that correct?

3      A.   Yes.

4      Q.   Okay.  And I mean, I'm not going to read

5   this whole e-mail, but it -- he was not pleased with

6   your work product, was he?

7      A.   He wasn't pleased with that, no.

8      Q.   Right.  And one of the things he said in the

9   second paragraph was that the -- the current

10  submission simply regurgitates the document I

11  provided.  And he was clearly displeased with your

12  work product, right?

13     A.   He clear -- he did not give a clear guidance

14  on what he was expecting?

15     Q.   Correct.

16     A.   So there was a disconnect on what he was

17  looking for the first time and what I submitted the

18  first time.  Once we had further discussion, we --

19  then it was fine.

20     Q.   Okay.  So after this e-mail, you redid the

21  transition plan?

22     A.   Yes.

23     Q.   Okay.  Okay.  And then if we look at the

24  last two pages on this -- actually just the last page,

25  which is Bates labeled Augusta 540.  Looks like you

Page 138

1    e-mailed him and said, "I now have more clarification

2    on the transition plan."  And you asked if you could

3    have more time, right?

4         A.   Yes.

5         Q.   And he noted that the deadline was today?

6         A.   Yes.

7         Q.   Were there any verbal discussions between

8    you and Mr. Donald about this particular transition

9    plan?

10        A.   I can't remember.  We had a meeting -- a

11   team meeting when he went over the deliverables, but

12   it was not in detail as far as what he was expecting.

13   So I provided what I thought different approaches with

14   styles and he did not like that particular style.  And

15   I asked for additional clarification.  And then I

16   spoke with Tony McDonald about it, and he stated that

17   was typical from Mr. Mc -- Mr. Donald.  You would give

18   him work and he did not -- did not like it, and he

19   would always change it so just know that.

20        Q.   So, in other words, Tony McDonald was

21   experiencing similar feedback --

22        A.   Yes.

23        Q.   -- when he turned in work product?

24        A.   Yes.

25        Q.   Okay.  And were there other examples of work

Page 139

1   product that you turned into Odie Donald that he made

2   you go back and correct or redo?

3        A.   I can't remember.  I just know he was very

4   critical of my work to the point where he made

5   demeaning comments in front of -- in our small office

6   meeting.

7        Q.   What comments?

8        A.   He was just very -- even if there was a -- a

9   misunderstanding on what was expected, it was the way

10  it was stated and demeaning.

11       Q.   Well, when you -- when you use the word

12  "demeaning," are you referring to specific word usage

13  or his tone?

14       A.   With him was probably a little of both.

15       Q.   Well, I'm -- I'm -- are there any specific

16  words that you can recall as we're sitting here?

17       A.   I can't recall.  But I just know that coming

18  back from FMLA and working with the previous

19  administrator and now with him, it was -- and in my

20  style, it was as serving as the interim administrator,

21  it was totally different.  And it was not inviting as

22  an employee.

23       Q.   Yeah.  And did you observe similar comments

24  made to Tony McDonald?

25       A.   Yes.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 140

1      Q.   So it sounds like Mr. -- Odie Donald's style

2   was -- would you describe it as direct?

3      A.   Yes.

4      Q.   Okay.  And he didn't mince words when he was

5   critical of someone's work product?

6      A.   No.

7      Q.   Okay.  Did you like him?

8      A.   I didn't know him.

9      Q.   You weren't friends?

10     A.   No.  I didn't have work friends.

11     Q.   You were friends with Tony McDonald, weren't

12  you?

13     A.   Yeah.  Yes.

14     Q.   Okay.  But you didn't prefer -- or you

15  preferred Janice Allen Jackson's management style to

16  Odie Donald's management style?

17     A.   I think that would be fair.

18     Q.   Okay.  Now, when he made these comments that

19  were -- that you felt were demeaning, was there any

20  reference to your age or your disability?

21     A.   No.

22     Q.   Was there any reference to your use of

23  leave?

24     A.   No.

25     Q.   Okay.  Just one more e-mail from Mr. Donald.

Page 141

1    What's that exhibit number, sir?

2            THE COURT REPORTER:  26.

3            MR. BENNETT:  26?

4            THE WITNESS:  Yeah.

5        (Defendant's Exhibit No. 26 was marked into the

6                      record.)

7    BY MR. BENNETT:

8        Q.   Okay.  Does this appear to be an e-mail that

9    you and Tony got from Odie Donald on March 31, 2021?

10       A.   Yes.

11       Q.   And this is another e-mail that attaches

12   notes related to an administrator team meeting, right?

13       A.   Yes.

14       Q.   And that team meeting was held on March 25,

15   2021?

16       A.   Yes.

17       Q.   Were you -- were you present at that

18   meeting?

19       A.   Yes.

20       Q.   So you were not excluded from it.  All

21   right.  And I'm not going to go through this, but it

22   looks like once again you and Tony were given various

23   action items to complete.

24       A.   Yes.

25       Q.   Okay.  And it looks like one of the things

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 142

1    related to the transition plan was for you to meet

2    with Directors Mehall and Rookard weekly to address

3    the timeline.

4         A.   Where do you see that?

5         Q.   I'm on the second page under "Agenda

6    Topics."

7         A.   Where do you see weekly meetings?  I'm --

8    I'm looking for it.

9         Q.   Yeah.  Oh, sorry.  I'm actually on the third

10   page.

11        A.   Okay.

12        Q.   Agenda Topics at the bottom?

13        A.   Yes, I see it now.

14        Q.   Okay.  So was Mehall -- I guess he was -- he

15   was told that he was going to be terminated, but then

16   he was given a period, I guess, to stay along and help

17   with the transition.  Is that what happened?

18        A.   Yeah.  Yes.

19        Q.   Okay.  You're kind of squinting.  Is there

20   -- do I get that wrong?

21        A.   I -- I just remember he -- they worked out

22   some type of transition period for him.

23        Q.   Okay.  All right.  Well, you've got this

24   allegation about being excluded from meetings and you

25   mentioned the one with Director Hawthorne.  Are there

Page 143

1  any other meetings you can identify that you believe

2  you were excluded from?

3      A.   I don't remember.  But I just know when I

4  would have conversations with the directors that were

5  under my watch, it was if that the language or the

6  conversations were totally different like I was not

7  knowing that -- it was obvious that there were

8  meetings had already been discussed to the point that

9  directors would state that, "Well, we've already

10  discussed this.  We've already decided this with the

11  administrator."

12      Q.   The Phyllis you mentioned earlier, that's

13  Phyllis Johnson, right?

14      A.   That's her last name.

15      Q.   Is Phyllis Johnson.  Okay.  So I want to go

16  back to your meeting with her.  So can you remember

17  exactly when that was?

18      A.   I can't remember.  But it was -- I think it

19  maybe was even the day of the termination.

20      Q.   The day of the termination?

21      A.   I think so.

22      Q.   Okay.  Not before?

23      A.   Not before -- I can't remember.  But I think

24  it -- I -- it -- I think it maybe was that day.

25      Q.   Okay.  All right.  Well, then let's -- let's

Page 144

1    talk about the termination, and then we'll go to that

2    meeting.  But -- so were there any other meetings?

3    There was no meeting with Phyllis Johnson before your

4    termination.  That's what you believe?

5         A.   Correct.  Not regarding my -- this case.

6    But I had -- I think there was -- I don't remember.  I

7    think it was another matter I met with Phyllis about

8    something else but not regarding this.

9         Q.   Yeah.  Not regarding Odie or anybody else?

10        A.   Correct.

11        Q.   Okay.  Okay.  We -- as part of the

12   discovery, we've searched for and produced e-mails

13   between you and Ms. Rookard, e-mails between you and

14   Mr. Donald, and e-mails between the two of them, have

15   you had a chance to look through those?

16        A.   No.

17        Q.   Okay.  Well, I don't see any indication in

18   any e-mail that's -- we've produced indicating that

19   you ever complained before your termination to Anita,

20   Odie Donald, in writing that you had been excluded

21   from meetings or were being treated unfairly.  Is that

22   correct that you never placed anything like that in

23   writing?

24        A.   No.  I -- I wrote something.  But I didn't

25   submit it to them, yes.

Page 145

1    Q.   You wrote it like a draft e-mail or draft

2    form?

3    A.   No.  Let me go back.  Not a draft e-mail.

4    How did I do it?  I was stressed and I was going to

5    write a letter to Anita about this matter.

6    Q.   But -- but you didn't end up writing it?

7    A.   No.

8    Q.   Okay.

9    A.   Right.

10   Q.   And did you ever have a verbal conversation

11   with Anita about that?

12   A.   No.  But Anita knew I was very stressed.

13   Q.   How did she know that you were stressed?

14   A.   She could tell.

15   Q.   Well, I mean --

16   A.   She kept saying, "You're going to be fine.

17   You're going to be fine.  I'll -- you're going to be

18   fine."

19   Q.   Okay.  And when -- when were those comments

20   made?

21   A.   When I got back, also when I left.  I mean,

22   before I left and when I got back.

23   Q.   Okay.  Okay.  So you understood she was

24   saying that in relation to your kidney condition?

25   A.   I did not know what she was saying it for.

Page 148

1       Q.   Okay.  All right.  You can put that down.
2   Did you have any other surgery procedures in 2021?
3       A.   I -- I actually had to have the PD catheter
4   repositioning twice.
5       Q.   Do you remember when that was?
6       A.   Don't remember.  The PD catheter wasn't
7   working properly, and they -- they had to reposition
8   it.  And then it still wasn't doing what it needed to
9   do and they had to do it again.
10      Q.   You remember that happening in like October
11  of 2021 or possibly October 2022?
12      A.   Not '22.  It would have been '21.
13      Q.   Okay.
14      A.   I don't know if October or November.  But I
15  had to -- I had to have the surgery cause I was -- I
16  started the dialysis but it wasn't working.  So then
17  they had to do the procedure again.
18      Q.   Okay.  I?ll hand you Exhibit 28.  All right.
19  28 shows a couple of e-mails that you sent on March
20  18, 2021, right?
21      (Defendant's Exhibit No. 28 was marked into the
22                      record.)
23      A.   Uh-huh.
24      Q.   Is that a yes?
25      A.   Yes.  And you were notifying the folks in

Page 149

1   the administrator's office that you had a doctor's

2   appointment the following day that was going to cause

3   you to be out for a couple hours, right?

4       A.   Yes.

5       Q.   And you forwarded that same e-mail to Anita

6   Rookard, right?

7       A.   Yes.

8       Q.   And you were ultimately able to attend that

9   appointment, right?

10      A.   Yes.

11      Q.   Was this -- this was just a follow-up

12  appointment, not something for which you needed to

13  leave, like a leave of absence?

14      A.   This was an appointment, follow-up

15  appointment.

16      Q.   Okay.

17      A.   That?s what I'm saying, yes.

18      Q.   Did anybody tell you that you shouldn't or

19  couldn't attend that appointment?

20      A.   No.

21      Q.   Okay.  Let's talk about April the 1st 2021,

22  and let me first hand you Exhibit 29.  Is Exhibit 29 a

23  true and correct copy of a letter that you got from

24  Odie Donald on April 1, 2021?

25      (Defendant's Exhibit No. 29 was marked into the

Page 150

1                              record.)

2        A.    Yes.

3        Q.    And this was notifying you that you were

4    being terminated?

5        A.    Yes.

6        Q.    How did he -- how did you receive this

7    letter?  Was it hand delivered?

8        A.    There was a meeting.

9        A.    Who was present?

10        A.    Myself and Anita Rookard.

11        Q.    Odie wasn't present.

12        A.    And Odie.

13        Q.    And Odie?

14        A.    Yes.

15        Q.    And whose office was this meeting in?

16        A.    It was in Odie?s office.

17        Q.    What time of day?

18        A.    I can't remember.  Can't remember --

19        Q.    Well, do you think it was in the morning?

20        A.    It wasn't at 8 o'clock in the morning.  It

21    -- but I can't remember.  It was --

22        Q.    All right.  And were you handed this letter

23    Exhibit 29 during that meeting?

24        A.    Yes.

25        Q.    Okay.  And so what was said during the

Page 151

1    meeting?

2         A.    They provided me the letter.  During the

3    meeting, I mentioned to Anita, "What about my kidney

4    disease?  What was going on?  You know, how would this

5    affect this?  I needed, you know, the insurance.  I

6    needed all of this for my kidney disease."  And they

7    said -- you know, kind of shoved their shoulders and

8    very insensitive.

9         Q.    Okay.  What else was said?

10        A.    If -- it was effective immediately, so I

11   needed to leave.

12        Q.    Do you remember anything else that was said

13   by either Anita or Odie?

14        A.    I asked them -- they knew about my illness.

15   So I said, "What about my kidney disease?  What about

16   my illness?"  And it was no comment about -- you know,

17   it was just shoving the shoulders, just like, you

18   know, more or less, "Oh, well."

19        Q.    Okay.  And the reason that was given for

20   your separation on this letter is that as the new

21   administrator, Odie Donald had decided to give the

22   office of the administrator a fresh start, right?

23        A.    Yes.  From the letter, yes.

24        Q.    Okay.  And you understood that both you and

25   Tony McDonald were terminated the same day?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 152

1        A.    I found out later.  I didn't know he was
2   being -- I was let go first.
3        Q.    But you know that they -- he was also let go
4   that same day, right?
5        A.    Yes, sir.
6        Q.    You know that now?
7        A.    Yes.
8        Q.    Okay.  And are you aware that his letter
9   also says that it's because he decided to give the
10  office of the administrator a fresh start?
11       A.    I didn't know.  I had never seen his letter.
12       Q.    It's been produced in discovery.  Have you
13  not looked at it?
14       A.    His letter or my letter?
15       Q.    Tony's letter.
16       A.    I don't remember his letter.
17       Q.    Okay.  Do you have any reason to dispute
18  that it's identical?
19       A.    It could probably -- possibly is the same
20  letter.  But I just don't remember.
21       Q.    Okay.  Was anything else said by you, Anita,
22  or Odie during this meeting that you haven't already
23  told me?
24       A.    I mentioned to them in the meeting about my
25  kidney disease and I was going through the process of

Jarvis Sims
March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 154

1      Q.   Okay.  Have you told me everything that you
2  can recall?
3      A.   I've told you everything I can recall.
4      Q.   Okay.  So nobody ever told you verbally or
5  in writing that your separation had to do with your
6  use of FMLA leave, right?
7      A.   No.
8      Q.   Nor your age, right?
9      A.   They didn't say that, no.
10      Q.   Nor your disability?
11      A.   They knew about my disability.
12      Q.   No.  But you were never told orally or in
13  writing that this had to do with your disability,
14  right?
15      A.   I didn't know if it had to do anything with
16  my disability.
17      Q.   Just -- and I'm -- I'm not trying to pick on
18  you.  Just listen to what I'm -- all I'm asking you is
19  --
20      A.   Rephrase your question.
21      Q.   Yeah.  Did anyone from the City ever tell
22  you verbally or in writing that you were being
23  terminated for reasons associated with your
24  disability?
25      A.   I don't know why I was being terminated.  It

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 157

1    I never asked.

2          Q.    Okay.  Excuse me.  Sorry.(sneezing.)  Okay.

3    In your separation letter marked as Exhibit 29, one of

4    the things that you were told was that your health

5    insurance benefits would continue through the end of

6    the current pay period, right?

7          A.    Yes.

8          Q.    Okay.  And you were told that if you

9    accepted severance, a severance package, your benefits

10   would be continued through an additional two-month

11   period, right?

12         A.    Yes.  In this letter, yes.

13         Q.    And then you were told that under separate

14   cover you would get information regarding your right

15   to continue healthcare coverage under Cobra; is that

16   right?

17         A.    Yes. In this letter.

18         Q.    What's that?

19         A.    Yes.  I'm reading the letter, yes.

20         Q.    Okay.  All right.  Let me hand you what's

21   marked as Exhibit 30.  Now, Exhibit 30 is -- is a copy

22   of a certified letter that was sent to you on April

23   30, 2021, right?

24       (Defendant's Exhibit No. 30 was marked into the

25                        record.)

Page 161

1      A.   I can't remember the amount, the dollar

2   amount.  But that was my first time ever receiving

3   unemployment, so I don't remember the dollar amount of

4   whether that was the normal or extra what.  I can't

5   remember.

6      Q.   How many weeks did you receive unemployment

7   for?

8      A.   Whatever was allowed?

9      Q.   I think the max is 26 weeks.  Does that

10  sound right?

11     A.   That sounds right.

12     Q.   Okay.  All right.  So Odie Donald never told

13  you that you were being terminated because of your

14  age, disability, or FMLA leave, right?

15     A.   He didn't tell me no reason why I was being

16  terminated.

17     Q.   Did he ever tell you that you were being

18  terminated because of your age, disability, or FMLA

19  leave?

20     A.   He didn't tell me no reason why I was being

21  terminated.

22     Q.   Is the answer no?

23     A.   I didn't know.  It said, without cause.

24     Q.   I'm just going to keep asking until you

25  answer the question.  Did -- yes or no?  Did he ever

Page 162

1   tell you, you were terminated because of your age,

2   disability, or FMLA leave?  Yes or no?

3        A.   And I'm answering your question.  He did not

4   say why I was terminated.  I just was terminated.

5        Q.   Okay.

6        A.   So I don't know if that had a factor or not,

7   sir.

8             MR. BENNETT:  Counsel, can you please ask --

9             MR. MCBRIDE:  I think he's answered your

10        question several times.

11            MR. BENNETT:  No, he's not.  It's -- it's a

12        yes or no.

13            MR. MCBRIDE:  Well, you want it to be a yes

14        or a no.  But he's given you the best answer he

15        can.

16   BY MR. BENNETT:

17        Q.   Did Ms. Rookard ever tell you that you were

18   being terminated because of your age, disability, or

19   FMLA leave?

20        A.   I don't know why I was being terminated,

21   sir.

22        Q.   Did anybody ever tell you that you were

23   being terminated because of any of those

24   characteristics?

25        A.   I don't know why I was being terminated,

Page 163

1   sir.

2        Q.   Do you watch sports?

3        A.   A little bit.

4        Q.   Okay.  You know, when a new general manager

5   takes over a sports team or a sports organization,

6   it's common for them to make changes in the coaching

7   staff, changes in the players, right?

8        A.   Yes.

9        Q.   Okay.  And if a new collegiate athletic

10  director is hired, frequently, they'll make changes in

11  the coaches that are under them, right?

12       A.   And sometimes they keep them.  Sometimes

13  they retain them.

14       Q.   Okay.  And if a new mayor, if a new governor

15  is elected, it's not uncommon for them to bring on new

16  staff, right?  Or to make changes in the organization?

17       A.   Correct.  And then sometimes, they retain

18  people also.

19       Q.   Okay.  And when you were initially hired,

20  when former administrator Jackson was there, you and

21  Mr. McDonald replaced to prior deputy administrators,

22  right?

23       A.   Yes.

24       Q.   Okay.

25       A.   One of the deputy administrators passed.

Page 164

1     Q.   Okay.  Are you aware that -- was that Mr.

2  Brazzel?

3     A.   Yes.

4     Q.   Are you aware that the two people who

5  replaced you and Mr. McDonald as deputy administrators

6  were named Charles Jackson and Tanika Jackson?

7     A.   I saw it on the website.

8     Q.   Okay.  So you were born in 1969, right?

9     A.   Yes.

10    Q.   Okay.  Do you have any basis for disputing

11  that Charles Jackson was born in September of 1973?

12    A.   I don't know when he was born.

13    Q.   Okay.  Well, that would make him only about

14  four years younger than you, right?

15    A.   That makes him younger than me, yes.

16    Q.   How many years?

17    A.   You said four.

18    Q.   Right.

19    A.   Yeah.

20    Q.   Do you have any basis for disputing that

21  Tanika Jackson was born in April 1974 and was also 47

22  at the time of her hire?

23    A.   She's younger than me.

24    Q.   Four years.

25    A.   But she's younger, yes.

Jarvis Sims                              March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 165

1       Q.    How many years?

2       A.    You stated four.

3       Q.    Okay.  My math sounds correct, doesn't it?

4       A.    It sounds correct.

5       Q.    Okay.  And that 47-year-old is not

6    significantly younger than a 51-year-old, right?

7       A.    I think they're younger.

8       Q.    Are they significantly younger in your mind?

9       A.    A 40-something-year-old and a 50-year-old,

10   they're -- there's younger, yes.

11      Q.    Okay, four years.  Neither Odie Donald nor

12   anyone else with the City ever made any ages comments

13   about you, did they?

14      A.    Not to my knowledge.

15      Q.    And to your knowledge, they never made any

16   derogatory comments about your medical condition or

17   use of leave, did they?

18      A.    Not that I was aware of.

19      Q.    Okay.  Well, tell me all the reasons why you

20   believe that your termination was discriminatory or

21   retaliatory?

22      A.    Before FMLA, before I was requested and

23   receive approval for FMLA, there was no issues with

24   work or nothing.  As after I asked and was approved

25   for FMLA and came back to work, I was fired.  I don't

Jarvis Sims                                          March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 170

1    a demoted role?

2         A.   I didn't ask her that.  I don't remember

3    asking her that.

4         Q.   Did you ever ask Anita or Odie Donald if you

5    could be retained in a demoted role?

6         A.   I knew that there were three vacant director

7    positions or two.  And I think during the meeting, I

8    asked was there anything I could do?  Could they do

9    anything else?

10        Q.   You said, "Can they do anything else."

11        A.   Could they do anything else.  I mentioned in

12   the meeting the date of the termination that I have --

13   I'm -- I'm leading a transplant.  I'm needing a

14   kidney.

15        Q.   Right.  Did you ever specifically ask for a

16   demoted role?

17        A.   I asked if there's anything I could do, if

18   there's anything I --

19        Q.   Is there anything I could do?  But what I'm

20   asking is:  Did you ask for a demoted role?

21        A.   I guess that was my way of asking, was there

22   anything I could do.

23        Q.   Okay.  At any point before your termination

24   meeting, had you asked to be demoted?

25        A.   No.  Because I didn't know that there was a

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 171

1    -- a reason for being -- I didn't know that I was

2    going to be terminated.

3         Q.   At any point prior to your termination

4    meeting, did you ask if you could be retrained on

5    something?

6         A.   I didn't know there was a problem with my

7    performance.

8         Q.   Is the answer, no, you did not ask to be

9    retrained on something?

10        A.   I didn't know there was a problem with my

11   performance for a need to be retrained.

12        Q.   Right.  Well, and you weren't terminated

13   because of your performance.  You were terminated

14   because they wanted a fresh start, right?

15        A.   That's what the letter stated.

16        Q.   Okay.

17        A.   I don't know why I was terminated.

18        Q.   Well, and you were -- notwithstanding your

19   medical condition, you were able to perform the

20   essential functions of the deputy county administrator

21   position, right, after you came back from leave?

22        A.   Would you say your question again.

23        Q.   Yeah.  You had a serious condition.  But you

24   were able to perform all of the essential functions of

25   your position when you came back, right?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 172

1      A.   Yes.  Yes.

2      Q.   Okay.  So in other words, it's not like you

3  needed a -- you needed a demotion as a result of your

4  medical condition making you unable to do some part of

5  your job as the deputy county administrator?

6      A.   Yes.

7      Q.   Okay.  All right.  Last exhibit, this is 31.

8  Do you have any know -- let me just first ask you:  Do

9  you have any knowledge that Odie Donald ever even

10 learned about this meeting that you had with Phyllis

11 Johnson?

12     A.   I don't know.

13     Q.   Okay.  Do you recognize Exhibit 31 as your

14 interrogatory responses?

15    (Defendant's Exhibit No. 31 was marked into the

16                    record.)

17     A.   Yes.

18     Q.   Did you review these before they were

19 submitted?

20     A.   Yes.

21     Q.   And are these responses true and correct to

22 the best of your knowledge?

23     A.   Yes.

24     Q.   All right.  Let's go to your response to

25 Interrogatory Number 1.  So the interrogatory is on --

### Office of the Administrator

GEORGIA   Janice Allen Jackson, Administrator

Suite 910 - Municipal Building
535 Telfair Street - AUGUSTA, GA 30901
(706) 821-2400 - FAX (706) 821-2819

July 20, 2018

Mr. Jarvis R. Sims

Dear Jarvis:

Thank you for accepting my offer of employment beginning Monday, August 13, 2018.

The purpose of this letter is to set forth the compensation and other benefits Augusta, GA (Augusta) has agreed to provide you (Employee) as the Deputy Administrator of Augusta, GA. However, it represents an offer of employment contingent upon the successful completion of pre-employment screening which includes but is not limited to: drug screening, verification of education credentials, verification of prior employment.

COMPENSATION: The annual rate of compensation will be an annual salary of $122,000. You will be designated as a Senior Executive Service (SES) employee, thus you are an at-will employee during the term of your employment. Your rate of compensation is subject to reduction by the Augusta-Richmond County Commission if necessary due to economic conditions (e.g. furlough).

MOTOR VEHICLE ALLOWANCE: $500.00 per month. You will use your personal vehicle for business travel.

MOVING EXPENSES: Employee shall be reimbursed or employer may agree to pay directly for the expense for (1) temporary housing, (2) packing and moving himself, his family and his personal property from Stockbridge, GA to Augusta, GA. Said payment or reimbursement is not to exceed the sum of $10,000 contingent upon receipt of actual expenses incurred, or the lowest of three estimates for moving secured from reputable national moving companies, which may include unpacking, any storage costs necessary and insurance charges.

PROFESSIONAL DEVELOPMENT: Augusta shall budget and pay for reasonable travel and subsistence expenses of Employee for professional and official travel, meetings and occasions necessary to continue the professional development of employee.

DUES AND SUBSCRIPTIONS: Augusta agrees to budget and pay for reasonable professional dues and subscriptions of the employee necessary for his continuation and participation in national, regional, state and local associations and organizations necessary and desirable for his continued professional participation, growth and advancement and for the good of the Employer.

SEVERANCE PAY: In the event Employee is terminated by Augusta, without cause, during such time that Employee is willing and able to perform his duties as Deputy Administrator of Augusta, the Employer agrees to pay Employee severance pay in accordance with the Augusta Severance Policy for SES employees. In the event Employee is terminated for cause or for conviction of a felony or a misdemeanor of moral turpitude, the Employer shall have no obligation to pay the severance sum designated in this paragraph or any accrued benefits (such as annual leave, etc.).



DEFENDANT'S
EXHIBIT
3

Augusta 000094

Mr. Jarvis R. Sims
July 23, 2018
Page 2

Should Employee resign from his position with Augusta during the first two (2) years of employment, Augusta reserves the right to request all or part of funds expended for relocation.

If the terms of this offer are agreeable to you, please indicate your acceptance below.  Further, this letter shall not constitute a contract or agreement for employment for any specific time period, such employment being subject to the Personnel Policies and Procedures of Augusta, GA.

I look forward to working with you.

Sincerely,

Janice Allen Jackson
Administrator

Accepted by:

_____   7/23/18
Jarvis R. Sims                       Date

cc:     Ms. Gwendolyn Conner, Human Resources Director

Augusta 000095

ACKNOWLEDGEMENT OF RECEIPT OF
AUGUSTA, GEORGIA PERSONNEL POLICY & PROCEDURES MANUAL

This Manual is intended for informational purposes only. Nothing in this Manual, Augusta, Georgia practices, or other communications create an employment contract or term. It does not contain all the information you will need during the course of your employment. Furthermore, you will receive information through various notices as well as orally through your supervisor, department head or elected official.

Augusta, Georgia is committed to reviewing its policies, procedures, and benefits periodically and as directed by the Augusta, Georgia Commission or Administrator. Accordingly, the policies, procedures and benefits outlined in this handbook are subject to review and change by Augusta, Georgia at any time.

You are required to acknowledge receipt of your copy of Augusta, Georgia Personnel Policies and Procedures Manual and return to Human Resources for inclusion in your personnel file within thirty (30) days of employment. By signing this acknowledgment you acknowledge that you have received a copy and will have the opportunity to read the entire Manual and agree to be subject to the Manual.

JARVIS R. SIMS
(Printed Name)

_____
(Signature)

Administration
(Department)

8 / 13 / 18
(Date)



All Rights Reserved

DEFENDANT'S EXHIBIT 4

Augusta 000059

## CHAPTER II.

## EQUAL EMPLOYMENT OPPORTUNITY

### Section 200.001  Equal Employment Opportunity

Augusta, Georgia is an Equal Opportunity Employer. We value and respect the diversity of our employees, directors, consultants, representatives, suppliers, vendors, customers, and communities. As part of our culture of respect and appreciation we believe that people with varied backgrounds and perspectives add vitality and creativity to Augusta, Georgia and we encourage diversity in the workplace. To that end, we provide equal employment opportunities regardless of race, color, religion, national origin, sex, age, disability, military service or status, veteran status, citizenship status, or any other characteristic protected by federal, state, or local law. Augusta, Georgia is committed to providing equal opportunity in all our employment and purchasing practices. We will hire, evaluate, transfer, compensate, and promote employees based on skills and performance, and not on any unlawful consideration.

We respect the special needs of individual employees, including those who are pregnant or returning to work after the birth or adoption of a child. Only in valuing diversity and committing to equal opportunity practices will we be able to fully utilize the human and business resources available. At the same time, we believe that by valuing diversity, we enable all to fully realize their potential. All Augusta, Georgia employment decisions are to be based on business related, nondiscriminatory reasons.

Our commitment to equal employment opportunity includes a corporate intolerance of any form of discrimination, sexual harassment, or any other type of harassment. Such behavior undermines the very core of our creed and values. Additional processes have been issued for affirmative action, disability accommodations, harassment in the workplace, and workforce diversity. Performance consistent with the spirit and intent of these policies are expected of each employee and, in the case of management employees, such performance will be evaluated as in any other job-related duty.

For Augusta, Georgia to be successful, our employees must also be successful, as contributors to Augusta, Georgia's mission and objectives and as individuals and citizens. Therefore, in addition to providing a safe and healthy workplace, we are committed to the development of their unique skills and capabilities.

We believe that new experiences on the job and involvement in work teams or special projects are valuable development opportunities.

If you feel you are a victim of any form of discrimination, you have a right to voice your concerns. You can tell your immediate leader, any member of management or the Equal Employment Opportunity office at 706-826-4789. Retaliation against anyone who lodges a complaint in good faith is strictly prohibited and will be subject to discipline up to and including termination.

### Section 200.002  Discrimination and Harassment-Free Workplace

Our value of treating others with respect and dignity carries over to our policy against workplace discrimination and harassment. We do not tolerate unlawful discrimination or harassment against an employee or potential employee based on any legally protected category. Instead, we actively seek to create a workplace that allows employees to feel respected and appreciated. Our efforts to achieve diversity and equal employment are driven by more than compliance with the law.

All Rights Reserved – As approved by the Commission on 05-07-2019

DEFENDANT'S EXHIBIT 5

Discrimination and harassing behavior are destructive to our culture and against our core values. We have no tolerance whatsoever for unlawful discrimination or harassment based on race, color, religion, gender, age, national origin, disability, military service or status, veteran status, citizenship status, or any other characteristic protected by federal, state or local law.

Discrimination is any unfair or unfavorable treatment suffered by any employee because of the employee's inclusion in a protected category. The areas of employment which may be affected by discrimination include, but are not limited to, compensation, promotions, recruiting, job evaluations, job training, and hiring. Harassment is a form of discrimination. Harassment consists of unwelcome conduct, whether verbal, physical, or visual, that is based upon any category protected by law. Harassing behaviors may include, but are not limited to, racist, sexist, ethnic, or other derogatory comments, name-calling, kidding, teasing, or jokes directed at one person or group belonging to a protected category.

Augusta, Georgia will not tolerate discriminatory or harassing conduct that affects pay or benefits, that interferes with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment. Augusta, Georgia will not tolerate discrimination or harassment of employees by anyone, including any supervisor, co-worker, vendor, client, customer, or visitor.

Any individual either experiencing or observing a suspected incident of discrimination or harassment should report the incident to their supervisor, to any Department Head, or to the EEO Officer. If the complaint involves the employee's supervisor, department director, or anyone else in a supervisory position over the employee, the employee should report the incident to the Human Resources Department or to the EEO Officer. Any manager who receives a report of discrimination or harassment must immediately report it to the EEO Officer, but in any event no later than three (3) working days after receipt of the complaint.

All complaints of discrimination and harassment will receive immediate attention. Augusta, Georgia's policy is to investigate all such complaints thoroughly, promptly, and in an impartial manner. If such an investigation reveals that the complaint is valid, Augusta, Georgia will administer disciplinary and other corrective action as appropriate to stop the discrimination or harassment and prevent its recurrence. Such disciplinary action shall include any corrective action deemed necessary, up to and including immediate termination of employment. Discipline will be based on the seriousness of the offense. To the fullest extent practicable, Augusta, Georgia will keep complaints, related investigations, and the terms of their resolution confidential. Retaliation against reporters of harassment or individuals who cooperate with a corresponding investigation is strictly prohibited and will result in discipline up to and including termination.

Respect and dignity for others is the key to providing a discrimination and harassment-free workplace. All Augusta, Georgia employees are responsible for helping to assure that we successfully avoid discrimination and harassment and their effects.

## Section 200.003   Disability Accommodation

Augusta, Georgia is committed to complying fully with the Americans with Disabilities Act (ADA) and ensuring equal opportunity in employment for qualified persons with disabilities. All employment practices and activities are conducted on a non-discriminatory basis.

Hiring procedures and provide persons with disabilities meaningful employment opportunities. Pre-employment inquiries are made only regarding an applicant's ability to perform the essential duties of the position.

Post-offer medical examinations are required only for those positions in which there is a bona-fide job-related physical requirement. They are given to all persons entering the position only after conditional job offers. Medical records will be kept separate and confidential.

Reasonable accommodations are available to all qualified employees with a disability, where their disability affects the performance of essential job functions. All employment decisions are based on the merits of the situation in accordance with defined criteria, not the disability of the individual.

Qualified individuals with disabilities are entitled to equal pay and other forms of compensation (or changes in compensation) as well as equal treatment in job assignments, classifications, organizational structures, position descriptions, lines of progression and seniority lists. Leave of all types will be available to all employees on an equal basis.

Augusta, Georgia is also committed to not discriminating against any qualified employees or applicants because they are related to or associated with a person with a disability. Augusta, Georgia will follow any state or local law that provides individuals with disabilities greater protection than the ADA.

This policy is neither exhaustive nor exclusive. Augusta, Georgia is committed to taking all other actions necessary to ensure equal employment opportunity for persons with disabilities in accordance with the ADA, as amended, and all other applicable federal, state, and local laws.

### Section 200.004  EEO Office Overview

**Purpose and Scope**

The purpose of this policy is to promote employment diversity and equality within the Augusta, Georgia Consolidated Government ("Augusta, Georgia") through a dedicated Equal Employment Opportunity (EEO) Office. This policy is also intended to provide uniformity in the processing of EEO complaints. These policies and procedures exclusively apply to EEO-related issues in connection with direct employees (classified and non-classified) of Augusta, Georgia operating under the authority of the Mayor and the Augusta, Georgia Commission and the employees of those Elected Officials who have opted into the Augusta, Georgia Personnel Policy and Procedures Manual. In addition, these EEO policies and procedures are only intended to address employment discrimination concerns which relate to race, color, gender, pregnancy status, marital status, genetic information, national origin, age, religion, disability or veteran's status.

**EEO Office Statement**

Augusta, Georgia provides equal employment opportunity to all qualified employees and applicants for employment and does not discriminate on any basis prohibited by law, including without limitation: race, color, gender, pregnancy status, marital status, genetic information, national origin, age, religion, disability and veteran's status   Augusta, Georgia is committed to providing equal employment in all of its employment practices, including selection, hiring, assignment, reassignment, promotion, transfer, compensation, discipline and termination. Therefore, it is the policy of Augusta, Georgia not to tolerate illegal discrimination.   Providing equal employment opportunities is a system-wide effort and the responsibility of all employees, the EEO Office, Department Heads, Directors and the City Administrator.

**EEO Office Philosophy and Motto**

C. An employee must maintain a minimum Annual Leave balance of seventy-five (75) hours after the leave is sold.

D. Once sold, the appropriate amount of AL shall be permanently deducted from the employee's leave balance.

E. Requests to sell AL must be submitted through the Department Director to the Human Resources Director, no later than November 1st of each year.

F. Payment for AL sold shall be included in the last payday on or before December 25th each year.

G. AL sale by any eligible employee is strictly voluntary.

H. The payout of any AL shall be contingent upon availability of funds as determined by the Administrator.

## Section 100.015 Scheduling of Sick Leave

Employees that need to use SL must notify their supervisor as soon as practicable of this need, but in any event no later than thirty (30) minutes after the employee's scheduled start time. Failure to notify immediate supervisor of the need to use SL in a timely manner may result in any applicable day being classified as AWOL. If an employee has requested SL for a period of three (3) consecutive working days, or two consecutive shift schedules for Firefighters, a physician's certification must be furnished to permit payment for SL. If there is a reasonable suspicion that an employee is abusing sick leave, he or she may be required to present a physician's certification for any period of time for which sick leave is being requested.

## Section 100.016 Maximum Allowable Sick Leave Carryover

The maximum allowable sick leave that may be accrued and carried into the next calendar year for all employees is nine hundred and ninety (990) hours, other than for shift workers (8 hour shifts), whose maximum is 1056 hours, and Firefighters, whose maximum is explained in Section 100.008.

## Section 100.017 Payment for Unused Sick Leave

Employees will not be paid for unused SL. Provided, however, that employees who are retiring under the then governing defined contribution retirement plan may be paid for up to half of their accrued SL leave at retirement. Employees who are retiring under the then governing defined benefit retirement plan may convert unused SL leave toward retirement credit, not to exceed six (6) months.

## Section 100.018 Sick Leave Pool Policy

### Purpose

The purpose of the Employees' Sick Leave Pool is to supplement an employee's loss of income during the transition period between full-time employment and an extended leave of absence, start of disability retirement, or termination, resulting from that employee's serious illness or injury. The Sick Leave Pool can only be drawn after all Sick Leave and Annual Leave on the employee's record has been exhausted.

### Background

The Sick Leave Pool is viewed as employment benefits to augment those leave benefits provided by Augusta, Georgia. Such benefits apply to both exempt and non-exempt positions. These benefits do not apply to employees who are not otherwise granted sick leave or annual leave under the Leave Policy. Part-time, temporary or contract workers would not be eligible for participation in the Sick Leave Pool.


DEFENDANT'S EXHIBIT

## Section 100.019  Sick Leave Pool Eligibility

### Eligibility criteria are as follows -

a.  Membership is open to all eligible employees on a voluntary basis.

b.  An employee must have been employed by Augusta, Georgia in a full-time regular position for at least twelve (12) months preceding application for membership.

c.  An applicant for membership in the Sick Leave Pool must have a minimum of seventy five (75) unused Sick Leave hours at the time of application.

d.  Applicants for membership shall apply during Benefits "open enrollment" period annually.

## Section 100.020   Application for Membership in Employee's Sick Leave Pool

a.  An employee shall file an application for membership in the Sick Leave Pool with the Human Resources Department during benefits annual "open enrollment" period.

b.  The HR Department will certify that the applicant has or has not met all minimum eligibility requirements for membership.

c.  If the eligibility requirements have been met, membership shall become effective on the first day of the month following receipt of the application for membership by the Human Resources Department.  Confirmation of membership will be sent by the HR Sick Leave Pool Coordinator to the new member, along with a copy to the department.

d.  Upon receipt of the membership confirmation, the HR Department will prepare a transfer of sick leave from the employee's records to the Sick Leave Pool on the Certificate of Transfer Form bearing the employee's signature and date signed.  The completed Certificate of Transfer shall then be forwarded to the Payroll Department. A copy of the Certificate of Transfer Form shall be given to the employee and one maintained in the employee's personnel file.  The HR Department shall be responsible for maintaining records on the Sick Leave Pool.

## Section 100.021   Sick Leave Pool Contributions

a.  The initial contribution will be fifteen (15) sick hours.

b.  When the balance of the Pool falls below twenty (20%) percent of members contributions (number of members times 8 hours), each member will be required to contribute four (4) hours of sick leave from his or her official sick leave record (not to exceed twelve (12) hours in any one fiscal year).

c.  Should a member not have four (4) hours of sick leave on the books at the time the Pool is replenished, he or she will be required to make replenishment upon accruing twenty (20) hours of sick leave.

d.  Should a member be in the process of applying for leave from the Pool at the time the Pool is in need of replenishment, membership in the Pool shall be continued and replenishment shall be waived until the member has returned to duty and has accrued twenty (20) hours of sick leave.

e. Any member who is currently drawing from the Pool may continue as a member until he or she has drawn the maximum number of hours of sick leave (480 maximum) hours authorized. A waiting period of one (1) year from last occurrence is required.

## Section 100.022   Use of Pooled Sick Leave

Requirements for use of pooled sick leave (pooled leave):

1)   Pooled leave will only be used for member's illness, injury, or accident;

2)   All sick and annual leave on the employee's record shall have been exhausted;

3)   The member shall request use of pooled sick leave on the appropriate form.

4)   A doctor's statement must be provided as to the nature of the illness or injury, the anticipated recuperation period required, and prognosis for recovery or return to work.

5)   The Department shall provide the Human Resources Department with the request to use pooled leave on the appropriate form, which shall include:

a)   Date absence began;

b)   Number of hours of absence to date;

c)   Number of hours of Leave Without Pay (if any) during this period;

d)   The employee is not an abuser of leave (e.g. employee does not show a pattern of taking Fridays, Mondays, Days Before and After Holidays off);

e)   The absence is not for a Worker's Compensation injury;

f)   Copy of doctor's statement;

g)   Attestation that the employee/member has no leave left; and has not exhausted 480 maximum hours of pooled sick leave within the past twelve (12) months;

h)   Signature of Department Director; and

i)   Number of hours requested up to a maximum of 480.

All requests to use pooled leave shall be reviewed and approved or denied by a majority of the Pooled Leave Committee. The Committee shall approve requests on a priority of need basis. The number of hours approved may be less than requested, after considering the reason for the request, the number of requests being filed, and the balance of pooled leave available in the Pool.

If the request to use pooled leave is approved, members shall not be required to pay back the sick leave awarded except upon investigation and finding of abuse of the Sick Leave Pool.

If the request to use pooled leave is denied, members shall have the opportunity to appeal the denial to the

**Office of the Administrator**

*Augusta*
G E O R G I A

Jarvis R. Sims, Interim Administrator

Suite 910- Municipal Building
535 Telfair Street - Augusta, GA 30901
(706) 821-2400 – FAX (706)821-9819

April 22, 2019

Mr. Tony McDonald
Deputy Administrator
535 Telfair Street
Augusta, Georgia 30901

Dear Tony:

The Augusta, Georgia Commission, at their regular meeting held on Tuesday, April 16, 2019, took action on the following items:

30.  Moved to executive session: Approve terminating the General Counsel.

Addendum:
Approved motion to accept general counsel's resignation, offer and provide him a 12 month severance pay in the form of a salary and benefits continuation and ask him to provide counseling during that time.

Approved motion to appoint deputy general counsel as interim general counsel effective immediately with a 15% increase.

Approved motion to accept resignation of Administrator Janice Jackson, effective immediately and offer and provide with 12 month severance pay in the form of salary and benefits continuation and cash out vacation pay upon execution of the release and be available for consultation purposes during the severance period.

Approved motion to appoint Jarvis Sims as interim administrator with a 15% increase in salary effective immediately.

If you have any questions, please contact me.

Yours truly,

Jarvis R. Sims
Interim Administrator



DEFENDANT'S
EXHIBIT
7
PENGAD 800-631-6989

Augusta 000014



## Human Resources Department

| Request for Personnel Action |
|---|
| Compensation Analysis |

| Name: Jarvis Sims | Current Title: Interim Administrator |
|---|---|
| Employee ID: 18828 | Department #: 4002 |
| Department Name: Administration | |

**Department Request:**

The Augusta, Georgia Commission has selected to end the interim appointment of employee Jarvis Sims as Interim Administrator thus returning him to the position of Deputy County Administrator at an annual salary of $146,291.96. Changes include:

- Return employee PCN assignment to ADM41CH002.

**Analysis of Department's Request:**

- Approved salary does not create an inequity within the classification or department.
- Further analysis is not applicable as the salary was dictated by the Augusta, Georgia Commission on

**Types of Supporting Documentation Attached:**

- Completed RPA

**Final outcome and summary of compensation analysis:**

- Return employee to Deputy Administrator effective 11/14/2020.

**ROUTING:**

- Human Resources Director
- Administrator has approved RPA.

Compensation Analysis completed by:

_____
Human Resources Professional

12 / 14 / 2020
Date



*Augusta*
G E O R G I A

**Office of the Administrator**

Odie Donald II, Administrator
Jarvis, R. Sims, Deputy Administrator
Tony McDonald, Deputy Administrator

Ste. 910 – Municipal Building
535 Telfair Street – Augusta, GA 30901
(706) 821-2400 – Fax (706) 821-2819

November 17, 2020

Ms. Anita Rookard
Human Resources Director
535 Telfair Street
Augusta, Georgia 30901

Dear Anita:

At the legal meeting held Tuesday, November 17, 2020, the Augusta, Georgia Commission approved an annual salary of $146,291.95 for Jarvis Sims as Deputy Administrator effective November 14, 2020.

If you have any questions, please contact me.

Yours truly,

Odie Donald II
Administrator

Augusta 000006



**Nephrology Associates, PC**
820 St. Sebastian Way, Suite 8A
Augusta, Georgia 30901
Phone 706-722-6900
Fax 706-722-5118
Nephrology-associates.com



RECEIVED
NOV 1 3 2020
BY:

November 12ᵗʰ 2020

To Whom It May Concern,

I have completed Mr. Jarvis Sims' FMLA paperwork to the best of my ability. Jarvis has been a patient of mine since October 2018. He is being treated for his Chronic Kidney Disease stage V. He is currently in the process of getting a PD catheter placed with an estimated placement date of December 15ᵗʰ 2020. Mr Sims will need to be out of work for 3 full months following this procedure. Mr Sims has been being seen bimonthly in my office for the past year.

Please don't hesitate to contact my office with any further questions.

Thank you,

Matthew Diamond, DO

---

Mark T. Smith, MD    Barton C. Brezina, MD    H. Douglas Hubert, MD    Devesh R. Patel, MD
S. Nabil Babar, MD    Matthew Diamond, DO    Ryan Altenburg, DO
Doris Sturcken, FNP-C    Ben Gentry, PA-C    Kirsten Sawyer, PA-C
Jan Ceyssens, PA-C    Stephen Dominey, PA-C

DEFENDANT'S
EXHIBIT
16
PENGAD 800-631-6989

NOV 1 3 2020
BY:...........................



**Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act**

**U.S. Department of Labor**
**Wage and Hour Division**

WAGE AND HOUR DIVISION

DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR. RETURN TO THE PATIENT.

OMB Control Number: 1235-0003
Expires: 6/30/2023

The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. 29 U.S.C. §§ 2613, 2614(c)(3); 29 C.F.R. § 825.305. The employer must give the employee at least 15 calendar days to provide the certification. If the employee fails to provide complete and sufficient medical certification, his or her FMLA leave request may be denied. 29 C.F.R. § 825.313. Information about the FMLA may be found on the WHD website at www.dol.gov/agencies/whd/fmla.

## SECTION I – EMPLOYER

Either the employee or the employer may complete Section I. While use of this form is optional, this form asks the health care provider for the information necessary for a complete and sufficient medical certification, which is set out at 29 C.F.R. § 825.306. You may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Additionally, you may not request a certification for FMLA leave to bond with a healthy newborn child or a child placed for adoption or foster care.

Employers must generally maintain records and documents relating to medical information, medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

(1) Employee name: _JARvis_ _Renault_ _Sims_
*First* *Middle* *Last*

(2) Employer name: Augusta Georgia - Schevella Nicholes     Date: _____ *(mm/dd/yyyy)*
Ph 706-821-2510 Fax 706-821-2867     *(List date certification requested)*

(3) The medical certification must be returned by _____ *(mm/dd/yyyy)*
*(Must allow at least 15 calendar days from the date requested, unless it is not feasible despite the employee's diligent, good faith efforts.)*

(4) Employee's job title: _Deputy Administrator_ Job description (☒ is / ☐ is not) attached.
Employee's regular work schedule: _____
Statement of the employee's essential job functions: _____

*(The essential functions of the employee's position are determined with reference to the position the employee held at the time the employee notified the employer of the need for leave or the leave started, whichever is earlier.)*

## SECTION II - HEALTH CARE PROVIDER

Please provide your contact information, complete all relevant parts of this Section, and sign the form. Your patient has requested leave under the FMLA. The FMLA allows an employer to require that the employee submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to the serious health condition of the employee. For FMLA purposes, a "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves *inpatient care* or *continuing treatment by a health care provider*. For more information about the definitions of a serious health condition under the FMLA, see the chart on page 4.

You may, but are **not required** to, provide other appropriate medical facts including symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment. Please note that some state or local laws may not allow disclosure of private medical information about the patient's serious health condition, such as providing the diagnosis and/or course of treatment.

Page 1 of 4


DEFENDANT'S EXHIBIT
11

Form WH-380-E, Revised June 2020
Augusta 000137

Employee Name: JARVIS R. SIMS

Health Care Provider's name: *(Print)* Matthew Diamond, Do

Health Care Provider's business address: 820 S1 Sebastian Way

Type of practice / Medical specialty: Nephrology

Telephone: 706 722 6900 Fax: 706 922 5118 E-mail: _____

RECEIVED
NOV 1 3 2020
BY: .......................

## PART A: Medical Information

Limit your response to the medical condition(s) for which the employee is seeking FMLA leave. Your answers should be your **best estimate** based upon your medical knowledge, experience, and examination of the patient. **After completing Part A, complete Part B to provide information about the amount of leave needed.** Note: For FMLA purposes, "incapacity" means the inability to work, attend school, or perform regular daily activities due to the condition, treatment of the condition, or recovery from the condition. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b).

(1) State the approximate date the condition started or will start: __10/18/2018__ *(mm/dd/yyyy)*

(2) Provide your **best estimate** of how long the condition lasted or will last: __Lifetime__

(3) Check the box(es) for the questions below, as applicable. For all box(es) checked, the amount of leave needed must be provided in Part B.

☐ **Inpatient Care**: The patient (☐ has been / ☐ is expected to be) admitted for an overnight stay in a hospital, hospice, or residential medical care facility on the following date(s): _____

☐ **Incapacity plus Treatment**: *(e.g. outpatient surgery, strep throat)*
Due to the condition, the patient (☐ has been / ☐ is expected to be) incapacitated for *more than* three consecutive, full calendar days from _____ *(mm/dd/yyyy)* to _____ *(mm/dd/yyyy)*.

The patient (☐ was / ☐ will be) seen on the following date(s): _____
_____

The condition (☐ has / ☐ has not) also resulted in a course of continuing treatment under the supervision of a health care provider *(e.g. prescription medication (other than over-the-counter) or therapy requiring special equipment)*

☐ **Pregnancy**: The condition is pregnancy. List the expected delivery date: _____ *(mm/dd/yyyy)*.

☑ **Chronic Conditions**: *(e.g. asthma, migraine headaches)* Due to the condition, it is medically necessary for the patient to have treatment visits at least twice per year.

☐ **Permanent or Long Term Conditions**: *(e.g. Alzheimer's, terminal stages of cancer)* Due to the condition, incapacity is permanent or long term and requires the continuing supervision of a health care provider (even if active treatment is not being provided).

☑ **Conditions requiring Multiple Treatments**: *(e.g. chemotherapy treatments, restorative surgery)* Due to the condition, it is medically necessary for the patient to receive multiple treatments.

☐ **None of the above**: If none of the above condition(s) were checked, (i.e., inpatient care, pregnancy) no additional information is needed. Go to page 4 to sign and date the form.

Form WH-380-E, Revised June 2020

Augusta 000138

NOV 13 2020

Employee Name: __Jarvis R. Sims__

(4) If needed, briefly describe other appropriate medical facts related to the condition(s) for which the employee seeks FMLA leave. *(e.g., use of nebulizer, dialysis)* __Chronic Kidney Disease Stage 5, htn, With anticipated PD Cath placement__

## PART B: Amount of Leave Needed

For the medical condition(s) checked in Part A, complete all that apply. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage.

(5) Due to the condition, the patient (☐ had / ☑ will have) **planned medical treatment(s)** (scheduled medical visits) *(e.g. psychotherapy, prenatal appointments)* on the following date(s): _____

__PD Cath placement - will need 3 months off following__

(6) Due to the condition, the patient (☑ was / ☐ will be) **referred to other health care provider(s)** for evaluation or treatment(s).

State the nature of such treatments: *(e.g. cardiologist, physical therapy)* __General Surgery, Cardiology, Urology.__

Provide your **best estimate** of the beginning date _____ *(mm/dd/yyyy)* and end date _____ *(mm/dd/yyyy)* for the treatment(s).

Provide your **best estimate** of the duration of the treatment(s), including any period(s) of recovery *(e.g. 3 days/week)* _____

(7) Due to the condition, it is medically necessary for the employee to work **a reduced schedule**.

Provide your **best estimate** of the reduced schedule the employee is able to work. From _____ *(mm/dd/yyyy)* to _____ *(mm/dd/yyyy)* the employee is able to work: *(e.g., 5 hours/day, up to 25 hours a week)* _____

(8) Due to the condition, the patient (☐ was / ☑ will be) **incapacitated for a continuous period of time**, including any time for treatment(s) and/or recovery.

Provide your best estimate of the beginning date __12|15|2020__ *(mm/dd/yyyy)* and end date __02|15|2021__ *(mm/dd/yyyy)* for the period of incapacity.

(9) Due to the condition, it (☐ was / ☑ is / ☑ will be) medically necessary for the employee to be absent from work on an **intermittent basis** (periodically), including for any episodes of incapacity i.e., episodic flare-ups. Provide your best estimate of how often (frequency) and how long (duration) the episodes of incapacity will likely last.

__- post -__
Over the next 6 months, episodes of incapacity are estimated to occur __two times__ times per (☐ day / ☐ week / ☑ month) and are likely to last approximately __8__ (☑ hours / ☐ days) per episode.

Form WH-380-E, Revised June 2020

Augusta 000139

NOV 1 3 2020

Employee Name: __JARVIS      R      Sims__

## PART C: Essential Job Functions

If provided, the information in Section I question #4 may be used to answer this question. If the employer fails to provide a statement of the employee's essential functions or a job description, answer these questions based upon the employee's own description of the essential job functions. An employee who must be absent from work to receive medical treatment(s), such as scheduled medical visits, for a serious health condition is considered to be *not able* to perform the essential job functions of the position during the absence for treatment(s).

(10)  Due to the condition, the employee (☐ was not able / ☐ is not able / ☐ will not be able) to perform *one or more* of the essential job function(s). Identify at least one essential job function the employee is not able to perform:

Signature of
Health Care Provider _____   Date __11/12/2020__ (mm/dd/yyyy)

---

### Definitions of a Serious Health Condition (See 29 C.F.R. §§ 825.113-.115)

**Inpatient Care**

- An overnight stay in a hospital, hospice, or residential medical care facility.
- Inpatient care includes any period of incapacity or any subsequent treatment in connection with the overnight stay.

**Continuing Treatment by a Health Care Provider (any one or more of the following)**

**Incapacity Plus Treatment:** A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves either:

- o  Two or more in-person visits to a health care provider for treatment within 30 days of the first day of incapacity unless extenuating circumstances exist. The first visit must be within seven days of the first day of incapacity; or,
- o  At least one in-person visit to a health care provider for treatment within seven days of the first day of incapacity, which results in a regimen of continuing treatment under the supervision of the health care provider. For example, the health provider might prescribe a course of prescription medication or therapy requiring special equipment.

**Pregnancy:** Any period of incapacity due to pregnancy or for prenatal care.

**Chronic Conditions:** Any period of incapacity due to or treatment for a chronic serious health condition, such as diabetes, asthma, migraine headaches. A chronic serious health condition is one which requires visits to a health care provider (or nurse supervised by the provider) at least twice a year and recurs over an extended period of time. A chronic condition may cause episodic rather than a continuing period of incapacity.

**Permanent or Long-term Conditions:** A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective, but which requires the continuing supervision of a health care provider, such as Alzheimer's disease or the terminal stages of cancer.

**Conditions Requiring Multiple Treatments:** Restorative surgery after an accident or other injury; or, a condition that would likely result in a period of incapacity of more than three consecutive, full calendar days if the patient did not receive the treatment.

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 15 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

**DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR. RETURN TO THE PATIENT.**

Augusta 000140

**Designation Notice
under the Family and Medical Leave Act**

**U.S. Department of Labor
Wage and Hour Division**


WAGE AND HOUR DIVISION

**DO NOT SEND TO THE DEPARTMENT OF LABOR.
PROVIDE TO EMPLOYEE.**

OMB Control Number: 1235-0003
Expires: 6/30/2023

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. While use of this form is optional, a fully completed Form WH-382 provides employees with the information required by 29 C.F.R. §§ 825.300(d), 825.301, and 825.305(c), which must be provided within five business days of the employer having enough information to determine whether the leave is for an FMLA-qualifying reason. Information about the FMLA may be found on the WHD website at www.dol.gov/agencies/whd/fmla.

### SECTION I – EMPLOYER

The employer is responsible in all circumstances for designating leave as FMLA-qualifying and giving notice to the employee. Once an eligible employee communicates a need to take leave for an FMLA-qualifying reason, an employer may not delay designating such leave as FMLA leave, and neither the employee nor the employer may decline FMLA protection for that leave.

Date: 11/16/20 _____ (mm/dd/yyyy)

From: Schevella Nicholes _____ (Employer)   To: Jarvis R. Sims _____ (Employee)

On 11/13/20 _____ (mm/dd/yyyy) we received your most recent information to support your need for leave due to:
*(Select as appropriate)*

- ☐ The birth of a child, or placement of a child with you for adoption or foster care, and to bond with the newborn or newly-placed child
- ☑ Your own serious health condition
- ☐ The serious health condition of your spouse, child, or parent
- ☐ A qualifying exigency arising out of the fact that your spouse, child, or parent is on covered active duty or has been notified of an impending call or order to covered active duty with the Armed Forces
- ☐ A serious injury or illness of a covered servicemember where you are the servicemember's spouse, child, parent, or next of kin *(Military Caregiver Leave)*

**We have reviewed information related to your need for leave under the FMLA along with any supporting documentation provided and decided that your FMLA leave request is:** *(Select as appropriate)*

- ■ **Approved.** All leave taken for this reason will be designated as FMLA leave. Go to Section III for more information.

- ☐ **Not Approved:** *(Select as appropriate)*
    - ☐ The FMLA does not apply to your leave request.
    - ☐ As of the date the leave is to start, you do not have any FMLA leave available to use.
    - ☐ Other _____

- ☐ **Additional information is needed to determine if your leave request qualifies as FMLA leave.** *(Go to Section II for the specific information needed. If your FMLA leave request is approved and no additional information is needed, go to Section III.)*

### SECTION II – ADDITIONAL INFORMATION NEEDED

We need additional information to determine whether your leave request qualifies under the FMLA. Once we obtain the additional information requested, we will inform you **within 5 business days** if your leave will or will not be designated as FMLA leave and count towards the amount of FMLA leave you have available. **Failure to provide the additional information as requested may result in a denial of your FMLA leave request.**

If you have any questions, please contact: _____ at _____
_____ *(Name of employer FMLA representative)*   *(Contact information)*

**Incomplete or Insufficient Certification**
The certification you have provided is incomplete and/or insufficient to determine whether the FMLA applies to your leave request. *(Select as applicable)*

- ☐ The certification provided is incomplete and we are unable to determine whether the FMLA applies to your leave request. *"Incomplete" means one or more of the applicable entries on the certification have not been completed.*

Page 1 of 2

**DEFENDANT'S EXHIBIT 12**

Form WH-382, Revised June 2020

Augusta 000145

Employee Name: Jarvis R. Sims

☐ The certification provided is insufficient to determine whether the FMLA applies to your leave request. *"Insufficient" means the information provided is vague, unclear, ambiguous or non-responsive.*

*Specify the information needed to make the certification complete and/or sufficient:* _____

_____

You must provide the requested information no later than *(provide at least 7 calendar days)* _____ *(mm/dd/yyyy),* unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

**Second and Third Opinions**

☐ We request that you obtain a (☐ second / ☐ third opinion) medical certification at our expense, and we will provide further details at a later time. *Note: The employee or the employee's family member may be requested to authorize the health care provider to release information pertaining only to the serious health condition at issue.*

## SECTION III – FMLA LEAVE APPROVED

As explained in Section I, your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave and will count against the amount of FMLA leave you have available to use in the applicable 12-month period. The FMLA requires that you notify us as soon as practicable if the dates of scheduled leave change, are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against the total **amount of FMLA leave** you have available to use in the applicable 12-month period: *(Select as appropriate)*

☑ Provided there is no change from your **anticipated FMLA leave schedule,** the following number of hours, days, or weeks will be counted against your leave entitlement: beginning 12/15/2020 and ending 02/15/2020.
When you return to work, you will be on Intermittent FMLA leave until the end of your leave year or whenever you have exhausted 480 hours of leave. If you reach the end of your leave year 12/15/2021, before you exhaust your 480 hours of FMLA, you must re-apply.

☐ Because the leave you will need will be **unscheduled,** it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Please be advised: *(check all that apply)*

☐ **Some or all of your FMLA leave will not be paid.** Any unpaid FMLA leave taken will be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☐ **Based on your request, some or all of your available paid leave** *(e.g., sick, vacation, PTO)* **will be used during your FMLA leave.** Any paid leave taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☑ **We are requiring you to use some or all of your available paid leave** *(e.g., sick, vacation, PTO)* **during your FMLA leave.** Any paid leave taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☐ **Other:** _____
*(e.g., Short- or long-term disability, workers' compensation, state medical leave law, etc.)* Any time taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

**Return-to-work requirements.** To be restored to work after taking FMLA leave, you (☐ will be / ☑ will not be) required to provide a certification from your health care provider (fitness-for-duty certification) that you are able to resume work. This request for a fitness-for-duty certification is *only* with regard to the particular serious health condition that caused your need for FMLA leave. **If such certification is not timely received, your return to work may be delayed until the certification is provided.**

A list of the essential functions of your position (☐ is / ☐ is not) attached. If attached, the fitness-for-duty certification must address your ability to perform the essential job functions.

### PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been determined to be covered under the FMLA. 29 U.S.C. § 2617; 29 C.F.R. § 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.
**DO NOT SEND THE COMPLETED FORM TO THE DEPARTMENT OF LABOR. EMPLOYEE INFORMATION.**

Form WH-382, Revised June 2020

Augusta 000146

**From:**    Jarvis Sims
**Sent:**    Wed, 18 Nov 2020 13:58:57 -05:00
**To:**    Anita Rookard
**Subject:**    Please call me ASAP

Get Outlook for iOS



 **Nephrology Associates, PC**
820 St. Sebastian Way, Suite 8A
Augusta, Georgia 30901
Phone 706-722-6900
Fax 706-722-5118
Nephrology-associates.com



November 18th 2020

To Whom It May Concern,

I have completed Mr. Jarvis Sims' FMLA paperwork to the best of my ability. Mr. Sims has been a patient of mine since October 2018. He is being treated for his Chronic Kidney Disease Stage V. He is currently in the process of getting a PD catheter placed with an estimated placement date of 12/15/2020. Mr Sims will need 3 full months off following the placement. I am recommending Mr. Sims leave begin November 20th 2020 as he will need time to prepare for this procedure and will have appointments preceding placement.

Please do not hesitate to contact my office with any further questions.

Thank you,

Matthew Diamond, DO



---

Mark T. Smith, MD    Barton C. Brezina, MD    H. Douglas Hubert, MD    Devesh R. Patel, MD
S. Nabil Babar, MD    Matthew Diamond, DO    Ryan Altenburg, DO
Doris Sturcken, FNP-C    Ben Gentry, PA-C    Kirsten Sawyer, PA-C
Jan Ceyssens, PA-C    Stephen Dominey, PA-C

| | |
|---|---|
| **From:** | Schevella Nicholes |
| **Sent:** | Thu, 19 Nov 2020 11:10:26 -05:00 |
| **To:** | Anita Rookard; Oyabi Ibikunle |
| **Cc:** | Shani Chastain; Jerry Washington |
| **Subject:** | Notification of FMLA Leave (Employee) - Jarvis R. Sims |

**Please disregard the previous notification of FMLA for Jarvis R. Sims. The previous notification stated his sick pool participation incorrectly, it should say YES.**

# *****CORRECTION*****
# Notification of FMLA Leave (Employee)

**DEPARTMENT: This is the only notification of FMLA leave you will receive for the below listed employee. Please notify Human Resources when the employee returns to work as the accruals must be re-started.**

The physician certification required for FMLA approval was received in Human Resources on 11/18/2020, therefore the following employee has been approved for FMLA leave for the following dates:

| | |
|---|---|
| **Name:** | Jarvis R. Sims |
| **Emp #:** | #18828, Exempt |
| **Department:** | Administration, #4002 |

**Dates of approved FMLA Leave with pay:**
**From:**      11/20/2020      **To:**    02/03/2021
**Dates of approved FMLA Leave without pay:**
**From:**      02/04/2021      **To:**    **02/15/2021 (12-Weeks FMLA Exhausted)**

**Sick Leave Balance** at time of **approval**: 165.80 Department once this balance has been exhausted then use the accrued vacation.
**Vacation balance** at time of **approval**: 198.45 Department once this balance has been exhausted employee will be paid from sick pool.

-



## Sick pool participation:  YES  Department please notify payroll when the employee has exhausted their leave and provide the total hours payable to this sick pool participant.

**FMLA**

FMLA requires covered employers to provide up to twelve workweeks of unpaid, "protected" leave to eligible employees who must be absent due to a serious health condition. *This leave is calculated as a "rolling" 12 month period measured backward from the date of any FMLA leave usage.*

Please feel free to contact me if I may be of further assistance.  I may be reached directly at extension 2510 or via email at snicholes@augustaga.gov.

Note:
An employee out on FMLA leave does not accrue vacation or sick time.


Thank you,

*Schevella Nicholes, BSBM, MBA*
*Benefits Analyst II*
*City of Augusta/Richmond County*
*535 Telfair St., Suite 400*
*Augusta, GA 30901*
*706-821-2510 direct*
*706-821-2867 fax*
*snicholes@augustaga.gov*

This e-mail contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. The City of Augusta accepts no liability for the content of this e-mail or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing. Any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of the City of Augusta. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the content of this message which arise as a result of the e-mail transmission. If verification is required, please request a hard copy version.
AED:104.1

**Designation Notice**
**under the Family and Medical Leave Act**

**U.S. Department of Labor**
**Wage and Hour Division**



WAGE AND HOUR DIVISION

**DO NOT SEND TO THE DEPARTMENT OF LABOR.**
**PROVIDE TO EMPLOYEE.**

OMB Control Number: 1235-0003
Expires: 6/30/2023

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. While use of this form is optional, a fully completed Form WH-382 provides employees with the information required by 29 C.F.R. §§ 825.300(d), 825.301, and 825.305(c), which must be provided within five business days of the employer having enough information to determine whether the leave is for an FMLA-qualifying reason. Information about the FMLA may be found on the WHD website at www.dol.gov/agencies/whd/fmla.

## SECTION I – EMPLOYER

The employer is responsible in **all** circumstances for designating leave as FMLA-qualifying and giving notice to the employee. Once an eligible employee communicates a need to take leave for an FMLA-qualifying reason, an employer may not delay designating such leave as FMLA leave, and neither the employee nor the employer may decline FMLA protection for that leave.

Date: 11/19/20 _____ *(mm/dd/yyyy)*

From: Schevella Nicholes _____ *(Employer)*   To: Jarvis R. Sims _____ *(Employee)*

On 11/18/20 _____ *(mm/dd/yyyy)* we received your most recent information to support your need for leave due to:
*(Select as appropriate)*

☐ The birth of a child, or placement of a child with you for adoption or foster care, and to bond with the newborn or newly-placed child

☑ Your own serious health condition

☐ The serious health condition of your spouse, child, or parent

☐ A qualifying exigency arising out of the fact that your spouse, child, or parent is on covered active duty or has been notified of an impending call or order to covered active duty with the Armed Forces

☐ A serious injury or illness of a covered servicemember where you are the servicemember's spouse, child, parent, or next of kin *(Military Caregiver Leave)*

**We have reviewed information related to your need for leave under the FMLA along with any supporting documentation provided and decided that your FMLA leave request is:** *(Select as appropriate)*

■ **Approved.** All leave taken for this reason will be designated as FMLA leave. Go to Section III for more information.

☐ **Not Approved:** *(Select as appropriate)*
    ☐ The FMLA does not apply to your leave request.
    ☐ As of the date the leave is to start, you do not have any FMLA leave available to use.
    ☐ Other _____

☐ **Additional information** is needed to determine if your leave request qualifies as FMLA leave. *(Go to Section II for the specific information needed. If your FMLA leave request is approved and no additional information is needed, go to Section III.)*

## SECTION II – ADDITIONAL INFORMATION NEEDED

We need additional information to determine whether your leave request qualifies under the FMLA. Once we obtain the additional information requested, we will inform you **within 5 business days** if your leave will or will not be designated as FMLA leave and count towards the amount of FMLA leave you have available. **Failure to provide the additional information as requested may result in a denial of your FMLA leave request.**

If you have any questions, please contact: _____ at _____
                                   *(Name of employer FMLA representative)*        *(Contact information)*

**Incomplete or Insufficient Certification**
The certification you have provided is incomplete and/or insufficient to determine whether the FMLA applies to your leave request. *(Select as applicable)*

☐ The certification provided is incomplete and we are unable to determine whether the FMLA applies to your leave request. *"Incomplete"* means one or more of the applicable entries on the certification have not been completed.

Page 1 of 2

DEFENDANT'S EXHIBIT 17 PENGAD 800-631-6989

Form WH-382, Revised June 2020

Augusta 000141

Employee Name: Jarvis R. Sims

☐ The certification provided is insufficient to determine whether the FMLA applies to your leave request. *"Insufficient" means the information provided is vague, unclear, ambiguous or non-responsive.*

*Specify the information needed to make the certification complete and/or sufficient:* _____

You must provide the requested information no later than *(provide at least 7 calendar days)* _____ *(mm/dd/yyyy)*, unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

**Second and Third Opinions**

☐ We request that you obtain a (☐ second / ☐ third opinion) medical certification at our expense, and we will provide further details at a later time. *Note: The employee or the employee's family member may be requested to authorize the health care provider to release information pertaining only to the serious health condition at issue.*

### SECTION III – FMLA LEAVE APPROVED

As explained in Section I, your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave and will count against the amount of FMLA leave you have available to use in the applicable 12-month period. The FMLA requires that you notify us as soon as practicable if the dates of scheduled leave change, are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against the total **amount of FMLA leave you have available to use in the applicable 12-month period:** *(Select as appropriate)*

◼ Provided there is no change from your **anticipated FMLA leave schedule**, the following number of hours, days, or weeks will be counted against your leave entitlement: beginning 11/20/2020 and ending 02/15/2021.
The change to the start date of your FMLA adds approximately 3 weeks to your leave, which causes you to exhaust your 12-weeks of leave entitlement. Therefore, when you return to work, you will not have any hours remaining for intermittent FMLA leave, and you will not be eligible to re-apply until 11/20/2021.

☐ Because the leave you will need will be **unscheduled**, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Please be advised: *(check all that apply)*

◼ **Some or all of your FMLA leave will not be paid.** Any unpaid FMLA leave taken will be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☐ **Based on your request, some or all of your available paid leave** *(e.g., sick, vacation, PTO)* **will be used during your FMLA leave.** Any paid leave taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

◼ **We are requiring you to use some or all of your available paid leave** *(e.g., sick, vacation, PTO)* **during your FMLA leave.** Any paid leave taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☐ **Other:** _____
*(e.g., Short- or long-term disability, workers' compensation, state medical leave law, etc.)* Any time taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

**Return-to-work requirements.** To be restored to work after taking FMLA leave, you (☐ will be / ◼ will not be) required to provide a certification from your health care provider (fitness-for-duty certification) that you are able to resume work. This request for a fitness-for-duty certification is *only* with regard to the particular serious health condition that caused your need for FMLA leave. **If such certification is not timely received, your return to work may be delayed until the certification is provided.**

A list of the essential functions of your position (☐ is / ◼ is not) attached. If attached, the fitness-for-duty certification must address your ability to perform the essential job functions.

### PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been determined to be covered under the FMLA. 29 U.S.C. § 2617; 29 C.F.R. § 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.
**DO NOT SEND THE COMPLETED FORM TO THE DEPARTMENT OF LABOR. EMPLOYEE INFORMATION.**

Page 2 of 2                                                                 Form WH-382, Revised June 2020

Augusta 000142

Employee Name:  Jarvis R. Sims

☐ The certification provided is insufficient to determine whether the FMLA applies to your leave request. *"Insufficient" means the information provided is vague, unclear, ambiguous or non-responsive.*

*Specify the information needed to make the certification complete and/or sufficient:* _____

_____

You must provide the requested information no later than *(provide at least 7 calendar days)* _____ *(mm/dd/yyyy)*, unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

**Second and Third Opinions**

☐ We request that you obtain a (☐ second / ☐ third opinion) medical certification at our expense, and we will provide further details at a later time. *Note: The employee or the employee's family member may be requested to authorize the health care provider to release information pertaining only to the serious health condition at issue.*

### SECTION II - FMLA LEAVE APPROVED

As explained in Section I, your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave and will count against the amount of FMLA leave you have available to use in the applicable 12-month period. The FMLA requires that you notify us as soon as practicable if the dates of scheduled leave change, are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against the total amount of FMLA leave you have available to use in the applicable 12-month period: *(Select as appropriate)*

☑ Provided there is no change from your **anticipated FMLA leave schedule,** the following number of hours, days, or weeks will be counted against your leave entitlement: beginning 11/20/2020 and ending 02/15/2021.

The change to the start date of your FMLA adds approximately 3 weeks to your leave, which causes you to exhaust your 12-weeks of leave entitlement. Therefore, when you return to work, you will not have any hours remaining for intermittent FMLA leave, and you will not be eligible to re-apply until 01/25/2021.

☐ Because the leave you will need will be **unscheduled,** it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Please be advised: *(check all that apply)*

☑ **Some or all of your FMLA leave will not be paid.** Any unpaid FMLA leave taken will be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☐ **Based on your request, some or all of your available paid leave** *(e.g., sick, vacation, PTO)* **will be used during your FMLA leave.** Any paid leave taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☑ **We are requiring you to use some or all of your available paid leave** *(e.g., sick, vacation, PTO)* **during your FMLA leave.** Any paid leave taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

☐ **Other:** _____
*(e.g., Short- or long-term disability, workers' compensation, state medical leave law, etc.)* Any time taken for this reason will also be designated as FMLA leave and counted against the amount of FMLA leave you have available to use in the applicable 12-month period.

**Return-to-work requirements.** To be restored to work after taking FMLA leave, you (☐ will be / ☑ will not be) required to provide a certification from your health care provider (fitness-for-duty certification) that you are able to resume work. This request for a fitness-for-duty certification is *only* with regard to the particular serious health condition that caused your need for FMLA leave. **If such certification is not timely received, your return to work may be delayed until the certification is provided.**

A list of the essential functions of your position (☐ is / ☑ is not) attached. If attached, the fitness-for-duty certification must address your ability to perform the essential job functions.

---

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**
It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been determined to be covered under the FMLA. 29 U.S.C. § 2617; 29 C.F.R. § 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 minutes of respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Avenue, N.W., Washington, D.C. 20210.
**DO NOT SEND THE COMPLETED FORM TO THE DEPARTMENT OF LABOR. EMPLOYEE INFORMATION.**

Form WH-382, Revised June 2020

Augusta 000143



## Office of the Administrator

Odie Donald II, Administrator
Jarvis R. Sims, Deputy Administrator
Tony McDonald, Deputy Administrator

Ste. 910 - Municipal Building
535 Telfair Street – Augusta, GA 30901
(706) 821-2400 – Fax (706) 821-2819

November 20, 2020

Mr. Odie Donald
Administrator
Augusta Richmond County
535 Telfair Street
Augusta, GA 30901

Mr. Donald:

I'm writing this to let you know that I will be out on approved FMLA leave. This leave will be effective today and extends to February 15, 2021. I sincerely apologize for any short notice or inconvenience my absence will cause.

If I anticipate needing any additional time, I will let you know as soon as possible.

Thank you in advance for your understanding in this matter.

Sincerely,

Jarvis R. Sims

cc:     Anita Rookard, Human Resources Director



DEFENDANT'S
EXHIBIT
18

 **Nephrology Associates, PC**
820 St. Sebastian Way, Suite 8A
Augusta, Georgia 30901
Phone 706-722-6900
Fax 706-722-5118
Nephrology-associates.com


RECEIVED
FEB 1 5 2021
BY: ............................

February 10th 2021

To Whom It May Concern,

This letter serves an extension of Mr. Jarvis Sims original FMLA leave. Originally Mr. Sims  was
set to return to work on 02/15/21. However since having his procedure he has been experiencing
additional symptoms and will need additional time to recover. Mr. Sims is now cleared to return
to work on 02/25/21.

Please feel free to contact me if you have any additional questions.

Thank you,

Matthew Diamond, DO

Mark T. Smith, MD    Barton C. Brezina, MD    H. Douglas Hubert, MD    Devesh R. Patel, MD
S. Nabil Babar, MD    Matthew Diamond, DO    Ryan Altenburg, DO
Doris Sturcken, FNP-C    Ben Gentry, PA-C    Kirsten Sawyer, PA-C
Jan Ceyssens, PA-C    Stephen Dominey, PA-C

DEFENDANT'S
EXHIBIT
20

Augusta 000125

**From:** Schevella Nicholes
**Sent:** Mon, 15 Feb 2021 09:50:31 -05:00
**To:** Anita Rookard
**Subject:** Emailing: Sick Pool Tracker - Jarvis R. Sims
**Attachments:** Sick Pool Tracker - Jarvis R. Sims.xls

Ms. Anita,

Jarvis Sims just started using sick pool 2/15/2021. I recorded this week on the attached tracker.

Thank you,

Schevella Nicholes, BSBM, MBA
Benefits Analyst II
City of Augusta/Richmond County
535 Telfair St., Suite 400
Augusta, GA 30901
706-821-2510 direct
706-821-2867 fax
snicholes@augustaga.gov

---

This e-mail contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. The City of Augusta accepts no liability for the content of this e-mail or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing. Any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of the City of Augusta. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the content of this message which arise as a result of the e-mail transmission. If verification is required, please request a hard copy version.
AED:104.1



DEFENDANT'S EXHIBIT
21
PENGAD 800-631-6989

**Sick Pool TRACKING SHEET**

*This form is to be used to track employee hours in each rolling year for FMLA leave.*

| Employee Name: | | **Jarvis R. Sims** | | Department: | | Administration |
|---|---|---|---|---|---|---|
| Job Title and Employee # | | Dep. Cty. Admin. #18828 | | Supervisor: | | |

**Rolling Year Start Date**

| Mon | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Feb | | | | | | | | | | | | | | | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | | | | | | | | | | | | | 37.5 |
| Mar | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Apr | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| May | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Jun | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Jul | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Aug | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Sep | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Oct | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Nov | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Dec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | TOTAL | 0 |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 37.5 |

Special Notes: Full time eligible employees have a rolling twelve (12) week [480 hours] maximum entitlement.

To date you have used ___37.5___ hours as of _____ resulting in an unused balance of ___442.5___ hours.

Augusta_000174

**NOTES**

## Sick Pool TRACKING SHEET

*This form is to be used to track employee hours in each rolling year for FMLA & Sick Pool leave.*

| Employee Name: | JARVIS R. SIMS | Department: | 4002 - ADMINISTRATION |
| --- | --- | --- | --- |
| EXEMPT: Employee # | 18828 | Timekeeper | Odie Donald, Wanda Gothie 2898 |
| FMLA-Employee | | Sick Pool Start Date: 2/15/2021 | SICK POOL - YES |

| Mon | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | TOTAL | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Jan | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | SP begin; RTW |
| Feb | | | | | | | | | | | | | | | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | | | 7.5 | 7.5 | 7.5 | | | | | | | | 60 | 02/25/21 |
| Mar | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Apr | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| May | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Jun | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Jul | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Aug | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Sep | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Oct | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Nov | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| Dec | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0 | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | TOTAL | 60 | |

Special Notes: Full time eligible employees have a rolling twelve (12) week [480 hours] maximum entitlement.

To date you have used ___60___ hours as of _____ resulting in an unused balance ___420___ FMLA Hours

Augusta_000180



DEFENDANT'S EXHIBIT
22
PENGAD 800-631-6989

| From: | Odie Donald |
| Sent: | Mon, 01 Mar 2021 23:09:09 -05:00 |
| To: | Jarvis Sims; Tony McDonald |
| Cc: | Wanda Gothie; Jessica Williford |
| Subject: | Administrator's Office Meeting Minutes |
| Attachments: | Administrative Team Meeting_Feb 25 2021.docx |

See attached.

*In Service,*

Odie Donald II, MBA
Administrator
Augusta-Richmond County
535 Telfair Street, Suite 910
(706) 821-2898  Office
odonald@augustaga.gov

*Augusta*

This e-mail contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. The City of Augusta accepts no liability for the content of this e-mail or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing. Any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of the City of Augusta. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the content of this message which arise as a result of the e-mail transmission. If verification is required, please request a hard copy version.
AED:104.1



DEFENDANT'S EXHIBIT
23

## Administrative Team Meeting | NOTES

*February 25, 2021 | 3:30 p.m. | Conference Room 991*

| Meeting called by | Administrator Donald | Attendees | |
|---|---|---|---|
| Type of meeting | Weekly Staff Updates | Odie Donald | Wanda Gothie |
| Facilitator | Administrator Donald | Tony McDonald | Jessica Williford |
| Notetaker | Executive assistants | Jarvis Sims | |

## AGENDA TOPICS

Agenda topic *Workload and Office Work Distribution*

Administrator Donald will redistribute the current department assignments for the Deputy Administrator's within the next 24 hours with expectations of putting them into effect within seven days.

Assignments will correlate to working groups focused on action items from Commission/Committee meetings.

The Administrator expects that the Deputy Administrator's will step in on behalf of the Administrator for various meetings.

| Action items | Person responsible | Deadline |
|---|---|---|
| Update follow-up report to reflect action items from 2020 and add three columns: assigned time frame, summary of completion, and who assigned to. | Wanda Gothie/Jessica Williford | 02/26/2021 |

## AGENDA TOPICS

Agenda topic *SPLOST 8 & 7*

The Administrator desires to update the SPLOST 8 page to mirror the SPLOST 7 page on the Augusta, Ga. website.

Administrator expects quality updates on SPLOST projects page (highlighting big projects; list the general projects).

The Administrator plans to close SPLOST 7 with an Impact Report.

| Action items | Person responsible | Deadline |
|---|---|---|
| Work to update the SPLOST 7 page (to eventually include an impact report); create a SPLOST 7 memorandum/status update regarding where we are with expenditures to include: historical background, how much was allocated, the total amount allocated to SPLOST, when collections started, projected collection end date, category list of projects – highlighting completed/large projects. | Jarvis Sims | 03/5/2021 |
| Work to mirror the SPLOST 7 project list summary on the SPLOST 8 page of the website. | Jarvis Sims | 03/05/2021 |
| Send Chamber's fact sheet to Wanda to convert to PDF. | Mr. Donald | |
| Add Publisher to administrator's desktop. | W. Gothie | ASAP |

## AGENDA TOPICS

Agenda topic *Developing Administrators Report*

The Administrator supports approving items within the offices funding authority, versus having those items go to the Commission unnecessarily.

Augusta_000434

| Action items | Person responsible | Deadline |
|---|---|---|
| Work to create Augusta specific report, using previous South Fulton report as a guide. | Tony McDonald | 03/5/2021 |

## AGENDA TOPICS
Agenda topic *COVID Task Force and Next Steps*

The Administrator plans to update the Augusta Forward plan and provide an update to Commissioners during the March 9th, Commission meeting.

| Action items | Person responsible | Deadline |
|---|---|---|
| Schedule a working group meeting on the morning of Thursday, March 4, 2021. Managed by T. McDonald | Wanda Gothie | |
| Work to update the Augusta Forward plan using the Implementation plan and combining all submissions. | Tony McDonald | |

## AGENDA TOPICS
Agenda topic *Budget Update*

The Administrator has some additional memberships that will be added to the budget recurring costs.

The Administrator plans to make budget adjustments to increase office capacity.

| Action items | Person responsible | Deadline |
|---|---|---|
| Work to determine where costs may be reduced, and provide the Administrator insights into existing projected costs and detail what the spending plan was and give detail as to where line items are flexible. | Jarvis Sims | 03/03/2021 |

## AGENDA TOPICS
Agenda topic *Department Head Meetings*

The Administrator is currently meeting with the directors bi-weekly to discuss the committee meeting agenda items.

The Administrator plans to incorporate the deliverables for the Administrator's report into a future bi-weekly meeting, as well as incorporate Deputy Administrators into a more active role.

## AGENDA TOPICS
Agenda topic *Interns*

HR will be releasing the job description for interns in the Administrator's Office.

The Administrator plans to start the budget process on June 1, making necessary adjustments to include Biden's rescue plan.

Interns will be working on a variety of tasks to include the budget process.

Page 2

| | |
|---|---|
| **From:** | Odie Donald |
| **Sent:** | Wed, 31 Mar 2021 15:50:00 -04:00 |
| **To:** | Jarvis Sims; Tony McDonald |
| **Cc:** | Wanda Gothie; Jessica Williford |
| **Subject:** | Meeting Notes & Follow Up |
| **Attachments:** | OCA Follow-Up Report _March 2021.pdf, OCA Team Meeting_3_25_21.pdf |
| **Importance:** | High |

Good afternoon Team OCA,

Please find attached meeting notes and assignments from our team meeting on March 25, 2021 as well as the tracking sheet for the Commission requests/assignments. While we have discussed these items, many of which you are actively coordinating, we will use this document to manage deliverables.

*In Service,*

Odie Donald II, MBA
Administrator
Augusta-Richmond County
535 Telfair Street, Suite 910
(706) 821-2898  Office
odonald@augustaga.gov

*Augusta*



DEFENDANT'S EXHIBIT
26
PENGAD 800-631-6989

Administrative Team Meeting |NOTES

*March 25, 2021 |3:30 p.m. | Conference Room 991*

| Meeting called by | Administrator Donald | Attendees | |
|---|---|---|---|
| Type of meeting; | Weekly Staff Updates | Odie Donald | Wanda Gothie |
| Facilitator | Administrator Donald | Tony McDonald | |
| Notetaker | Executive assistants | Jarvis Sims | |

## AGENDA TOPICS

Agenda topic *Review of SPLOST 7 & SPLOST 8*

SPLOST 7 (DA Sims)

o Provide details on total funding allocated on SPLOST 7 projects
o Provide project plans/next steps for funded projects which remain at 50% or less current status
o Website should be updated to reflect current status

SPLOST 8 (DA Sims)

o Begin development of project plans for the approved (46) projects
o Provide feedback to Administrator, at next team meeting, if a contractor project manager is best option to plan and implement the projects

Note: DA McDonald to work with Finance to address amount and proposed projects for bind financing. Have available prior to April 1 meeting.

| Action items | Person responsible | Deadline |
|---|---|---|
| Provide a report of the projects to the administrator: a list of projects that is 50% or less with a plan to complete the projects and a list of projects that is 50% or more with milestones / completion dates | | April 26, 2021 |
| Identify Bond amount and proposed project(s) to bond | Tony McDonald | March 31, 2021 |

## AGENDA TOPICS

Agenda topic *Proposed Budget Adjustments*

o DA McDonald to direct Central Services to absorb the cost of the property in Columbia County
o DA McDonald to allocate the wellness account fees to HR versus administrator's office.
o DA Sims verified next steps to move proposed reductions into new/existing categories.
o In addition to originally projected, office will reduce food line by $7,000, while not adjusting line items below/following food on spreadsheet

| Action items | Person responsible | Deadline |
|---|---|---|
| Notify CS on Columbia County tax bill | Tony McDonald | 10 am April 1, 2021 |
| Notify HR about the wellness account | Tony McDonald | 10 am April 1, 2021 |
| Update Budget Reductions | Jarvis Sims | 10am April 1, 2021 |

Augusta_000615

**AGENDA TOPICS**

Agenda topic *Review of Administrator's Report*

DA McDonald present the draft of the first report:

- o Break out the calls for 911 with the types of calls
- o Use a chart similar to 911 for Animal Services
- o More clarity on the roles of the divisions and what each department trying to tell
- o Each department needs a narrative

| Action items | Person responsible | Deadline |
|---|---|---|
| Administrator's Report | Tony McDonald | April 16, 2021 |

**AGENDA TOPICS**

Agenda topic *Discussion of COVID operations*

- o Employee vaccine clinic Friday, March 26 at the municipal building
- o Review the implementation plan to manage the process post-approval
- o HR will track the number of employees receiving vaccine; if provided by supervisor / department head

| Action items | Person responsible | Deadline |
|---|---|---|
| COVID Implementation | McDonald | Ongoing (Report Out bi-weekly) |

**AGENDA TOPICS**

Agenda topic *Review of pending committee / commission meetings assignments*

- o DA's to review the chart and follow up with the directors as applicable
- o Assignments are assigned by area of oversight (e.g. function, department)
- o Adhere to the deadlines to report to the administrator and/or for a report to the Commission

| Action items | Person responsible | Deadline |
|---|---|---|
| All listed on spreadsheet | Deputy Administrators | Listed on spreadsheet |

**AGENDA TOPICS**

Agenda topic *Department Head Meetings ESC Transition plan*

- o Mr. Sims meets weekly with Directors Mehall and Rookard to address the timeline
- o For each task add a FINAL delivery date
  - ▪ Deliver to Administrator 10:00 am Monday, March 29 (complete)
- o Provide a proposed recruitment and placement plan from Director Rookard
  - ▪ Give to Administrator (April 5, 2021)
- o While hiring for ES Director post the deputy as well. Once the director is hired, he/she will use the pool of applicants to select a deputy. Should be open until filled.

Page 2

Augusta_000616

## AGENDA TOPICS

Agenda topic *Interns*

The interns are selected.

Augusta_000617

**Follow Up Items**
**Augusta Special Called/Commission/Committee Meetings**

| Agenda Item Title | Meeting Date | Action Required | Assigned | Deadline * Tentative Date | Status / Resolution |
|---|---|---|---|---|---|
| **Administrative Services # 7. HCD's Emergency Rental Assistance Program with United Way** | March 9, 2021 | United Way will provide an accurate count of applications submitted, eliminating duplicates<br>Mr. Evans with HCD was urged to contact La-Joi Williamson, Civil and Magistrate Judge, for additional involvement | Mr. Sims | March 26, 2021 | email sent Friday, March 26, 2021 |
| **Administrative Services # 4. Comprehensive Fleet Management Operations, maintenance and replacement policy** | March 9, 2021 | Commission requested a line by line comparison of the new and old policy, and send the item back to the next committee cycle (*would be held on March 30; however, all committee meeting items are moved to the full commission held on March 31, due to Masters week*) | Mr. McDonald | March 31, 2021 | Redlined version and description of changes have been included with the agenda item. Scheduled to go back to committee on April 13. |
| **Special Called meeting # 3. Outside Events** | February 23, 2021 | The Commission approved removing COVID restrictions, specifically for the Saturday Market, and<br><br>**allow the working group to bring back formal recommendations regarding removing COVID restrictions city-wide.<br><br>**Provide a written update to Adminsitrator** | Mr. Sims | March 31, 2021 | |
| **Commission Meeting # 27. Augusta Art Sculptures** | February 16, 2021 | The Commission tasked the Administrator with working with Recreation & Parks and the Greater Augusta Arts Council regarding how best to use funds to purchase sculptures and bring back a recommendation<br><br>**Provide a written update to Adminsitrator** | Mr. Sims | March 31, 2021 | |
| **Commission Meeting # 26. Outside Events** | February 16, 2021 | The Commission tasked the Administrator: Work with Recreation & Parks and the Greater Augusta Arts Council to determine how best to use funds to purchase sculptures and provide a recommendation during the February 23 Committee Meeting. | Mr. Sims | March 31, 2021 | |
| **Commission Meeting # 13. Code 304.5 premises identification enforcement.** | February 2, 2021 | Commission accepted the Administrators recommendation to ensure staff is updating educational activities to include informational notices within utility bills and expanding PSA's to leverage social media to assist in educating the general public of Code 304.5 premises identification enforcement.<br>**(Planning and Development hasn't provided a final update)** | Mr. Sims | March 31, 2021 | **In Progress with Planning & Development** |
| **Commission Meeting Addendum 2. Waiving the liquor license fees.** | January 19, 2021 | Approved a motion to waive the liquor and alcohol license fees for restaurants and bars that were directly affected by the COVID shutdown and rescind the previous action.<br><br>**Provide final numbers to Administrator Donald** | Mr. McDonald | March 31, 2021 | |

Augusta_000618

**Follow Up Items**
**Augusta Special Called/Commission/Committee Meetings**

| Agenda Item Title | Meeting Date | Action Required | Assigned | Deadline * Tentative Date | Status / Resolution |
|---|---|---|---|---|---|
| **Commission Meeting Delegation B Ralph Utley Malik & Mehall** | January 6, 2021 | Tasked the Administrator with following up with Mr. Ralph Utley by instructing Engineering to address the storm drain neglect and instructing Environmental Services to address excessive trash from waste trucks in route to the landfill. | Mr. Sims | April 1, 2021 | |
| **Commission Meeting # 25. Changing Information Technology Titles** | November 17, 2020 | Referred to the Administrator a motion to approve: A. Change the title of the Information Technology Director to the Chief Information Officer. B. Change the title of the Deputy Director of Infrastructure & Communication to the Deputy CIO of Infrastructure & Communication. C. Change the title of Deputy Director of Business Application Services to Deputy CIO of Business Application Services. D. Discuss a salary increase for the DIT and DDI&C of 10%. E. Discuss a salary increase of 5% for the DDBAS | Administrator | April 1, 2021 | |
| **Administrative Services # 9. DocuSign** | February 23, 2021 | Approved authorizing the Administrator with tasking relevant departments to review, procure, and implement an electronic signature software such as DocuSign that would help make the entire Government more efficient in signing delivering and communicating documents. (provide an overview of proposed price, etc to Administrator) | Mr. McDonald | April 6, 2021 | |
| **Commission Meeting # 19. Memorial Plaque** | December 8, 2020 | Approved the erection of a Memorial Plaque at River Walk in honor of Augustans who lost their lives to COVID-19.  **Propose a path forward to the Administrator by April 6** | Mr. McDonald | April 6, 2021 | |
| **Administrative Services # 7. FY21 Tax Break** | February 23, 2021 | Approved authorizing the Administrator, finance department, and other relevant departments to conduct a 30 day review of the impact, feasibility and cost of an up to 15 percent, FY 21, tax break to coincide with federal and state eviction moratoriums for landlords providing workforce and affordable housing. (*update to be provided within 45 days – Friday, April 9* ) | Mr. McDonald | *April 9, 2021* | |

**Follow Up Items**
**Augusta Special Called/Commission/Committee Meetings**

| Agenda Item Title | Meeting Date | Action Required | Assigned | Deadline * Tentative Date | Status / Resolution |
|---|---|---|---|---|---|
| Commission Meeting # 23. 2019 Audit presentation by Mauldin & Jenkins | January 19, 2021 | Admin. and Finance Committee look at management items and come back with a plan and recommendations<br>FINANCE COMMITTEE<br>Sammie Sias – Chair<br>Dennis Williams – Vice Chair Catherine Smith McKnight Francine Scott<br>1) Sheriff's office – outstanding checks, unclaimed property remitted to the state<br>2) Magistrate/Civil/Probate court – excess funds unsolved $133,500<br>3) Streetlights, CVB, & HCD – deficits<br>4) Magistrate/Civil/Probate court – overlapping duties<br>5) Capital Assets – recommend interim attention to assist with proper closeout<br>6) Petty Cash – determine the proper amount for petty cash accounts<br>**Prepard for the April 13 meeting** | Mr. McDonald | April 13, 2021 | |
| Commission Meeting # 20. Cell Tower | January 6, 2021 | Adding an evaluation team to the process; adding them as partners. If not. city will do the evaluation with finance, information technology and SMEs with the administrator as the lead | Mr. McDonald | April 13, 2021 | |
| Commission Meeting Agenda # 3-7. New Applications (Rob Sherman) | December 1, 2020 | Tasked the Administrator with analyzing the concentration of alcohol stores and hold a public hearing. | Mr. Sims | April 13, 2021 | |

Augusta_000620

**Follow Up Items**
**Augusta Special Called/Commission/Committee Meetings**

| Agenda Item Title | Meeting Date | Action Required | Assigned | Deadline * Tentative Date | Status / Resolution |
|---|---|---|---|---|---|
| **Commission Meeting # 28. Transition non-public safety vehicles and associated apparatuses to zero- emission.** | February 16, 2021 | Approved authorizing the Administrator, central services, and relevant departments to conduct a 60-90 day review of transitioning our non-public safety vehicle fleet to zero-emission vehicles (electric) and any associated apparatuses.<br><br>~provide a status to Administrator (30 days) | Mr. McDonald | 90 day review | Central Services / Fleet Management has completed its research and plans to finalize the PowerPoint presentation, including a recommendation, by close of business Thursday, April 1.<br><br>Targeting April 27 for presentation to the Administrative Services Committee, which will give the Administrator's Office time to revise the presentation and recommendation, if necessary. |
| **Commission Meeting # 23. Historical Marker** | November 17, 2020 | Approved the placement of a historical marker (plaque) in the Sandhill's area honoring African-American caddies who carried for the winners of the Master's Golf Tournament.<br><br>~Commissioner Fennoy provided a visual to Administrator Donald | Mr. McDonald | | |
| | | | | | |
| | | | | | |
| | | | | | |

Augusta_000621

**From:** Jarvis Sims
**Sent:** Thu, 18 Mar 2021 18:00:55 -04:00
**To:** Anita Rookard
**Subject:** Fwd: Jarvis Sims Doctors appointment

FYI

Jarvis Sims

Get Outlook for iOS
**From:** Jarvis Sims
**Sent:** Thursday, March 18, 2021 5:41:57 PM
**To:** Odie Donald <ODonald@augustaga.gov>; Wanda Gothie <WGothie@augustaga.gov>; Tony McDonald <WMcDonald@augustaga.gov>
**Subject:** Jarvis Sims Doctors appointment

To All:
I have a scheduled doctors appointment which is on my calendar for tomorrow. The appointment is in the morning at 1030. I initially was coming to the office first however I need to go there first now.

I will be in the office tomorrow after my appointment.

Jarvis Sims

Get Outlook for iOS

This e-mail contains confidential information and is intended only for the individual named. If you are not the named addressee, you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. The City of Augusta accepts no liability for the content of this e-mail or for the consequences of any actions taken on the basis of the information provided, unless that information is subsequently confirmed in writing. Any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of the City of Augusta. E-mail transmissions cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the content of this message which arise as a result of the e-mail transmission. If verification is required, please request a hard copy version.
AED:104.1


DEFENDANT'S
EXHIBIT
28

*Augusta*
GEORGIA

**Office of the Administrator**

Odie Donald II, Administrator
Jarvis R. Sims, Deputy Administrator
Tony McDonald, Deputy Administrator

Ste. 910 – Municipal Building
535 Telfair Street – Augusta, GA.30901
(706) 821-2400 – Fax (706) 821-2819

April 1, 2021
Jarvis Sims
Deputy Administrator

**Via Hand-Delivery**

RE: Termination Without Cause

Dear Mr. Sims,

As the new Administrator, I have decided to give Office of the Administrator a fresh start. Therefore, this is to inform you, on April 1, 2021, that your employment with Augusta Georgia is hereby terminated without cause and effective immediately. You are being released as a Deputy Administrator without cause.

Pursuant to Augusta, Georgia SES Severance Policy and Procedures (Commission Approved-11/5/2019) Section 2.0 (A)(1), which addresses "Discharges without Cause", you are eligible two months of severance pay and the same is being offered to you, subject to the execution of the attached Separation Agreement and Release of Claims and the approval of the Augusta, Georgia Commission, pursuant to the SES Severance Policy and Procedures. Pursuant to the SES Severance Policy and Procedures your severance would be with salary continuation. However, if you would like lump-sum payout severance, please notify the HR director, Anita Rookard and me, via email, by April 8, 2021.

Your final paycheck for hours worked will be paid on the regularly scheduled payday following your last day of work (today).

Your present health insurance benefits will continue through the end this pay period (April 1, 2021) based on your employment. However, if you select severance with salary continuation, and the same is approved by the Commission, your present health insurance benefits will continue to the end of your severance period (two months). Your rights to continue health care coverage under COBRA will be provided to you by mail from our COBRA plan administrator by April 30, 2021.

You can contact Catherine Highsmith of the HR regarding your retirement plan distribution options. All Augusta, Georgia property issued to you and/or in your possession must be returned to me or the Human Resource Director (Anita Rookard) immediately, including, but not limited to, the following: cell phone, laptop, computer and related equipment, flash drives, disc and all other information storage devices, keys, badges, door fobs, security apparatus, files, documents, etc.


DEFENDANT'S EXHIBIT
29

For purpose of communications regarding any matter addressed above or relevant to your employment with Augusta, Georgia, please provide to HR Director Anita Rookard, in writing, the mailing address, email address and phone number by which you are to be contacted, if different from what HR Department has on file for you or if such changes in the future.

I would also like to take this opportunity to thank you for your service as an Augusta, Georgia employee.

Should you have any questions or concerns, feel free to contact me.

Sincerely,

Odie Donald
Administrator

Cc: Anita Rookard, HR Director
    Wayne Brown, General Counsel

Augusta 000071

Page 191

1                    C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF NEWTON)

4    I hereby certify that the foregoing transcript was

5    taken down, as stated in the caption, and the

6    proceedings were reduced to typewriting under my

7    direction and control.

8    I further certify that the transcript is a true and

9    correct record of the evidence given at the said

10   proceedings.

11   I further certify that I am neither a relative or

12   employee or attorney or counsel to any of the parties,

13   nor financially or otherwise interested in this

14   matter.

15   This the 13th day of April 2023.

16

17

18

19

20

                           <%13048,Signature%>

21                         _____

22                         EDWINA D. MINNIEFIELD, CCR

23                         547-6097-2795-9040

24

25