EXHIBIT 4

```
            UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF GEORGIA
                  AUGUSTA DIVISION

JARVIS SIMS,                      )
                                  )
     Plaintiff,                   )
                                  )
vs.                               )  Civil Action File
                                  )   No. 1:22-CV-00099-JRH-BKE
CITY OF AUGUSTA-RICHMOND          )
COUNTY,                           )
                                  )
     Defendant.                   )

                        - - -
```

30(b)(6) deposition of ANITA ROOKARD, taken pursuant to agreement of counsel for purposes of cross, preservation of testimony and all other purposes allowed by the Federal Rules of Civil Procedure; all formalities waived, including the reading and signing of the deposition; before Kelly H. Kelly, CCR, B-2047, in and for the State of Georgia; commencing at 9:06 a.m., on Friday, August 11, 2023, via Zoom videoconference.

```
            KELLY H. KELLY, CCR
       PERIMETER COURT REPORTING, LLC
              P.O. Box 2907
           Cumming, Georgia 30028
               (770) 474-5192
```

Anita Rookard - Vol. 1 - August 11, 2023

1    Q.    Is she the current interim?

2    A.    She's currently the interim.

3    Q.    Okay.  Okay.  Who are the deputy
4  administrators for the last five years?

5    A.    There's a William Rhinehart.  Then there was
6  a Louis Chester.  Then it was Jarvis Sims, Tony McDonald.
7  Then it was Tanikia Jackson and Charles Jackson.

8    Q.    What was the -- Ms. Jackson's first name?

9    A.    Tanikia.

10   Q.    Okay.  And anybody after Mr. Jackson?

11   A.    No, sir.

12   Q.    Who are the current deputy administrators?

13   A.    It is Mr. Jackson.

14   Q.    Just Mr. Jackson?

15   A.    Yes.

16   Q.    And is that -- those names the order you gave
17  me generally in time order from oldest to newest?

18   A.    I'd say so, yes.

19   Q.    Okay.  Did any of these individuals except --
20  you know, you don't have to talk about Mr. Sims, but did
21  anyone else ever take FMLA leave?

22   A.    No, sir.

23   Q.    Do you know if any of them were out for any
24  other medical leave?

25   A.    No, sir.

Anita Rookard - Vol. 1 - August 11, 2023

1  Q. Did any of these individuals have a
2  disability?
3           MR. BENNETT: Objection to form. You
4      can still answer if you can.
5  BY THE WITNESS: (Resuming)
6      A. I don't know.
7      Q. Did any of these individuals inform the City
8  that they had a disability?
9      A. No.
10     Q. Okay. Did the City regard any of these
11 individuals as having a disability?
12     A. No.
13          MR. BENNETT: Objection to form. The
14     question calls for a legal conclusion.
15          MR. McBRIDE: Okay.
16 BY MR. McBRIDE: (Resuming)
17     Q. Was there any reason that the City would have
18 believed any of these individuals to have a disability?
19     A. No.
20     Q. Okay. All right. Can you tell me who Bill
21 Spivey was?
22     A. He was an employee in the planning and
23 development department.
24     Q. And how does the planning and development
25 department fit into the overall hierarchy of the City?

Anita Rookard - Vol. 1 - August 11, 2023

1  evaluating subordinates?
2          MR. BENNETT:  I'm going to object on the
3      grounds that this is beyond the scope of the
4      Notice.  You can still answer if you can.
5  BY THE WITNESS:  (Resuming)
6      A.    I can't answer that, sir.
7      Q.    Okay.  All right.  Let's talk about -- well,
8  I think you had said earlier you're not away of anyone
9  other than Mr. Sims and Mr. Donald (sic) that were let go
10 on that fresh-start basis, correct?
11     A.    Correct.
12     Q.    Okay.  And I think -- well, as the 30(b)(6)
13 witness, do you know what went into that fresh-start
14 determination?
15     A.    No, sir.
16     Q.    Okay.  I think in your individual deposition
17 you had said essentially that is a decision made by
18 Mr. Odie Donald alone, correct?
19     A.    Correct.
20     Q.    Do you know if he received any legal advice
21 on that from the in-house counsel?
22          MR. BENNETT:  Let me object on the
23      grounds that that calls for privileged
24      information and you are not to answer that
25      question.

1  BY MR. McBRIDE: (Resuming)
2      Q.   Yeah, and to be clear I don't want to know
3  what the communications were.  I'm just trying to figure
4  out if that was -- if there was advice given.
5           MR. BENNETT:  I'm instructing you not to
6      answer that question.
7           MR. McBRIDE:  Okay.
8           MR. BENNETT:  And it's beyond the scope
9      of the Notice.
10 BY MR. McBRIDE: (Resuming)
11     Q.   All right.  I am going to share the screen
12 again.  Can you look at Number 3 and read that to
13 yourself and let me know if you're the best person to
14 answer those questions?
15     A.   Yes, sir.
16     Q.   Okay.  All right.  Specifically for medical
17 claims what kind of insurance coverage does the City
18 have?
19     A.   We have health insurance -- health benefit
20 insurance.  The standard.
21     Q.   And who is that with?
22     A.   Our current insurance is with Blue Cross Blue
23 Shield.
24     Q.   And would that have been the carrier or the
25 insurer in 2020/2021?

```
 1        A.      Yes, sir.
 2        Q.      Okay.  How long have you utilized Blue Cross
 3   Blue Shield?
 4        A.      They've had blue shield -- Blue Cross -- Blue
 5   Cross Blue Shield for the last five years.
 6        Q.      Does the City have any kind of health
 7   insurance -- or self-insurance program for health
 8   insurance?
 9        A.      We are self-insured.
10        Q.      Okay.  What -- what's the structure of that
11   self-insurance?  Like how does that interact with Blue
12   Cross Blue Shield?
13        A.      Blue Cross Blue Shield is our insurance
14   carrier.  We are self-insured.  We pay for our health
15   care insurance.  We play -- pay Blue Cross Blue Shield
16   for the service.
17        Q.      Okay.  Then, I guess, tell me what is your
18   understanding when you say we are self-insured?
19        A.      I mean we are responsible for our insurance,
20   meaning we pay for our health -- I'm hearing someone
21   talking as I'm talking.
22        Q.      Just continue.  I think the court reporter --
23   that -- that may have come out.  Just -- just continue
24   your answer.
25        A.      Okay.  Meaning self-insured meaning we pay
```

1   for our health care for our employees.  We provide health
2   care for our employees.  We provide the base cost of our
3   health care.
4       Q.   When you say that, is that you're directly
5   providing medical care?
6       A.   We are paying for the medical care.  Blue
7   Cross Blue Shield provides the medical care.
8       Q.   Okay.  So when you're saying self-insured,
9   are you just saying that you're paying the premiums for
10  Blue Cross Blue Shield?
11      A.   Yes.
12      Q.   Okay.  If there is a condition or some
13  coverage issue where Blue Cross Blue Shield tells an
14  employee, hey, we're not going to cover this, is there
15  any kind of going back to the City to ask for the City to
16  cover it?
17      A.   No, sir.  We have a third party that
18  administers our benefits and benefit information for us
19  with Blue Cross Blue Shield.
20      Q.   Okay.  So tell me what -- how does that
21  operate?  What do they do when they administer the
22  benefits?
23      A.   Our third party are the ones who speak
24  directly with Blue Cross Blue Shield.  Any
25  concerns/issues they go through the third party.  They

```
 1    don't speak with us.
 2         Q.    So who is that third party?
 3         A.    EPIC.
 4         Q.    Is that E-p-i-c?
 5         A.    Yes.
 6         Q.    Okay.  So essentially if an employee has a
 7    medical-related question about payment for care, the City
 8    doesn't get involved with that?  You would just send them
 9    over to EPIC?
10         A.    No, sir.  They automatically would call EPIC.
11         Q.    Okay.  Well, let's just say an employee made
12    a mistake and called human resources instead --
13         A.    We would refer them.
14         Q.    Okay.  And what kind of information does EPIC
15    give the City about the administration of the Blue Cross
16    Blue Shield insurance?
17         A.    We get usage information.  We get holistic
18    claims information.  We get cost information.  Those
19    type . . .
20         Q.    When you say usage information, what does
21    that encompass?
22         A.    That would be all of our employees that are
23    covered by the insurance, all of the employees that are
24    using the insurance from a broad prospective.  Like we
25    get our skeletal information.  We would get information
```

Anita Rookard - Vol. 1 - August 11, 2023

```
 1        A.    Correct.
 2        Q.    Where does that information go once it gets
 3   to the City?
 4        A.    In a file.  It doesn't go anywhere.
 5        Q.    I mean does anybody review it?
 6        A.    No.
 7        Q.    Okay.  Does anybody make any decisions based
 8   on it?
 9        A.    I missed that.
10        Q.    Sorry.  Does anybody make any decisions based
11   on it?
12              MR. BENNETT:  Objection to form.  Are
13        you asking like does anybody make personnel
14        decisions?
15              MR. McBRIDE:  Well, I'm trying to figure
16        out if anybody makes any -- takes any action
17        with it whatsoever, makes any kind of policy
18        decisions, personnel decisions, anything.  I
19        mean --
20              MR. BENNETT:  Well, objection.
21        Compound.  You may -- you can answer if you
22        can.
23   BY THE WITNESS:  (Resuming)
24        A.    I don't make any kind of personnel decisions
25   based on the information that I receive.
```

```
 1   30(b)(6) representative?
 2        A.    No, sir.
 3        Q.    Okay.  Are there any non-retaliation policies
 4   or procedures when it comes to FMLA or disability?
 5        A.    I don't understand your question.
 6        Q.    Yeah.  I mean does the City have any policies
 7   that essentially say, hey, if somebody is taking time
 8   because of FMLA or time because they've given an
 9   accommodation for leave or intermittent leave, is there
10   anything that says, hey, supervisor, you can't
11   discriminate against them, fire them for taking it, that
12   kind of thing?
13        A.    If I'm not mistaken, the federal law says
14   that.
15        Q.    Right.  I'm trying to find out if -- if the
16   City has a policy that would incorporate that?
17        A.    We don't because federal law says that.
18        Q.    Okay.  And I take your answer to mean that
19   essentially you would conform your practice to what
20   federal law says?
21        A.    Correct.
22              MR. McBRIDE:  Okay.  I think those are
23        all the questions I have.
24              MR. BENNETT:  Let me ask just a few
25        follow-up questions.
```

Anita Rookard - Vol. 1 - August 11, 2023

```
 1                    DIRECT EXAMINATION
 2   BY MR. BENNETT:
 3         Q.    Ms. Rookard, is it the City's policy to
 4   comply with the federal antiretaliation statutes?
 5         A.    Yes, it is.
 6         Q.    All right.  You were asked some questions
 7   about health insurance.  Does the City make any
 8   employment-related decisions based on claims made by an
 9   employee under the health insurance plan?
10         A.    No.
11         Q.    Okay.  You were asked about whether the --
12   the personnel policy speaks to terminating someone for a
13   fresh start or questions to that effect.  So first of
14   all, did Mr. Mac -- did -- did Mr. Odie Donald have the
15   authority to -- to terminate Mr. Sims and Mr. McDonald
16   without cause?
17         A.    He did.
18         Q.    Okay.  Does the City's policy manual or
19   handbook list out every single reason for which someone
20   can be terminated?
21         A.    It does not.
22         Q.    Okay.  So, for instance, if an employee
23   intentionally urinated on the floor of a bathroom, would
24   that be grounds for termination?
25         A.    It is.
```

# C E R T I F I C A T E

STATE OF GEORGIA       )

COUNTY OF HENRY        )


        I, KELLY H. KELLY, Certified Court Reporter in and for the State of Georgia, do hereby certify that the foregoing proceedings were taken down by me; that the foregoing proceedings were reduced to print by me; that the foregoing pages represent a true, correct, and complete transcript of the testimony given by the witness, who was first duly sworn by me; that I am not a relative, employee, attorney or counsel of any of the parties; that I am not a relative or employee of attorney or counsel for any of said parties; nor am I financially or otherwise interested in the outcome of the action.

        This certification is expressly withdrawn and denied upon the disassembly, photocopying, reproduction of electronic copies, and/or distribution of the foregoing transcript, or any part thereof, including exhibits, unless said disassembly, photocopying, reproduction, and/or distribution is done by me and my signature and original seal is attached thereto.

        I further certify that the original of said deposition shall be filed under seal with Grant E. McBride.

        This, the 25th day of August, 2023.

*Kelly H. Kelly*

KELLY H. KELLY
CERTIFIED COURT REPORTER B-2047