**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | |
|---|---|
| **JARVIS SIMS,** ) | |
| **Plaintiff.** ) | |
| ) | **Civil Action No.:** |
| ) | **1:22-cv-00099-JRH-BKE** |
| **vs.** ) | |
| ) | |
| **CITY OF AUGUSTA-RICHMOND** ) | |
| **COUNTY,** ) | |
| **Defendant.** ) | |
| ) | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S STATEMENT OF MATERIAL FACTS**

COMES NOW, Jarvis Sims, Plaintiff in the above-styled action, by and through his

undersigned counsel, and hereby files this, Plaintiff's Response to Defendant's Statement of

Material Facts, respectfully showing the Court as follows:

**I. The City of Augusta-Richmond County**

**A. The City's Organizational Structure**

1.

Admitted.

2.

Admitted.

3.

Admitted.

4.

Admitted.

5.

Admitted.

{Doc: 03437856.DOCX}                              1

6.

Admitted.

**B. The City's Equal Employment Opportunity Policy**

7.

Admitted.

8.

Admitted.

9.

Admitted.

10.

Admitted.

11.

Admitted.

12.

Admitted.

13.

Admitted.

14.

Admitted.

**C. The City's Leave Policies**

15.

Admitted.

16.

Admitted.

17.

Admitted.

18.

Admitted.

19.

Admitted.

20.

Admitted.

**D. The City's Health Insurance Program**

21.

Admitted.

22.

Admitted.

**II. The Plaintiff's Employment with the City**

**A. The Start of Plaintiff's Employment with the City**

23.

Admitted.

24.

Admitted.

25.

Admitted.

26.

Admitted.

27.

Admitted.

28.

Admitted.

**B. The Plaintiff's Role as Interim Administrator**

29.

Admitted.

30.

Admitted.

31.

Admitted.

32.

Admitted.

33.

Admitted.

34.

Admitted.

35.

Admitted.

36.

Admitted.

37.

Admitted.

**C. The Plaintiff Requests and Receives FMLA Leave as well as Additional Leave for Which he Paid Through the Sick Pool**

38.

Admitted.

39.

Admitted.

40.

Admitted.

41.

Admitted.

42.

Admitted.

43.

Admitted.

44.

Admitted.

45.

Admitted.

46.

Admitted.

47.

Admitted.

48.

Admitted.

49.

Admitted.

50.

Admitted.

51.

Admitted.

52.

Admitted.

53.

Admitted.

54.

Denied. Shortly after Mr. Odie Donald assumed his position as City Administrator, he was notified via phone call that Mr. Jarvis Sims would be taking FMLA and was provided with his FMLA paperwork. (Deposition of Anita Rookard ("Rookard Dep.")[1] at p. 56, ln. 11-15; Donald Dep. at p. 52, ln. 20-25)[2].

55.

Admitted.

---

[1] Cited excerpts and exhibits from the deposition of Anita Rookard are attached hereto as Exhibit 4.
[2] Cited excerpts and exhibits from the deposition of Odie Donald are attached hereto as Exhibit 1.

56.

Admitted.

57.

Admitted.

58.

Admitted.

59.

Denied to the extent that it deals with time off contemplated for transplant surgery; admitted as to the extension of the FMLA leave.

60.

Admitted.

61.

Admitted.

62.

Admitted.

**D. The Plaintiff's Return to Work Between February 25, 2021 and April 1, 2021**

63.

Admitted.

64.

Admitted.

65.

Admitted.

66.

Denied as stated. After Mr. Sims returned from FMLA leave, Mr. Sims was excluded from director's meetings with housing community development. (Sims Dep. at p. 128, 4-18)[3]. This was one of the departments that Mr. Sims was responsible for overseeing. *Id.* Mr. Sims was also excluded from "meetings within the department, within the administrator's office, [and] with the other deputy and other administrators[.]" (Sims Dep. at p. 130, ln. 20-24).

67.

Denied as stated. After Mr. Sims returned from FMLA leave, Mr. Sims was excluded from director's meetings with housing community development. (Sims Dep. at p. 128, 4-18). This was one of the departments that Mr. Sims was responsible for overseeing. *Id.* Mr. Sims was also excluded from "meetings within the department, within the administrator's office, [and] with the other deputy and other administrators[.]" (Sims Dep. at p. 130, ln. 20-24).

68.

Admitted.

69.

Admitted.

70.

Admitted.

71.

Admitted.

72.

---

[3] Cited excerpts and exhibits from the deposition of Jarvis Sims are attached hereto as Exhibit 2.

Admitted.

73.

Admitted.

74.

Denied to the extent that he indicated he would need leave for a transplant in May of 2021. (Declaration of Jarvis Sims[4], ¶ 15; Rookard Dep. at 101:11-102:4; Rookard Dep. Ex. 7).

75.

Admitted.

76.

Admitted.

77.

Admitted.

78.

Admitted.

79.

Admitted.

80.

Denied to the extent that Ms. Rookard indicated to Mr. Sims that she would discuss the situation with Mr. Donald. (Declaration of Jarvis Sims, ¶¶ 16, 17).

81.

Admitted.

---

[4] Declaration of Jarvis Sims is attached hereto as Exhibit 3.

82.

Admitted.

**E. The Plaintiff's Termination**

83.

Admitted.

84.

Admitted.

85.

Admitted.

86.

Admitted.

87.

Denied. Mr. Donald is of the opinion that he consulted with Wayne Brown (hereinafter, "Mr. Brown"), the City's General Counsel and Ms. Rookard prior to Mr. Sims' termination. (Donald Dep. at p. 45, ln. 17-22). Ms. Rookard is of the opinion that Mr. Donald did not consult her about the termination of Mr. Sims prior to the same (Rookard Dep. at p. 31, ln. 6-9; p. 31, ln. 10-12). Ms. Rookard did not become aware that Mr. Donald wanted to terminate his Deputy Administrators until the day they were terminated, on April 1, 2021. (Rookard Dep. at p. 31, ln. 1-5).

88.

Admitted.

89.

Admitted.

90.

Admitted.

91.

Admitted.

92.

Admitted.

93.

Admitted.

94.

Denied to the extent this suggests that this was the practice of the Defendant. (Declaration of Jarvis Sims, ¶¶ 6-12).

95.

Denied to the extent this is being offered for the idea that those administrators were removed and replaced in order to "clean house" or provide a "fresh start" for the Office of the Administrator. (Declaration of Jarvis Sims, ¶¶ 6-12).

96.

Admitted.

97.

Denied as stated. Mr. Donald never provided Mr. Sims with a specific reason as to why he was being terminated. (Sims Dep. at p. 161, ln. 15-16).

98.

Admitted.

99.

Admitted.

100.

Admitted.

101.

Denied as a legal conclusion.

102.

Denied. Shortly after Mr. Odie Donald assumed his position as City Administrator, he was notified via phone call that Mr. Jarvis Sims would be taking FMLA and was provided with his FMLA paperwork. (Rookard Dep. at p. 56, ln. 11-15; Donald Dep. at p. 52, ln. 20-25).

103.

Admitted.

104.

Admitted.

105.

Admitted.

106.

Admitted.

107.

Admitted; Plaintiff was only back at work for a little over a month before he was terminated without cause.

### III. The Structure pf the Administrator's Office After Plaintiff's Termination

108.

Admitted.

109.

Admitted.

110.

Admitted.

111.

Admitted.

112.

Admitted.

113.

Admitted.

114.

Admitted.

115.

Admitted.

116.

Admitted.

Respectfully submitted this 9th day of October, 2023.

SMITH WELCH WEBB & WHITE, LLC

*/s/Grant E./ McBride*
Grant E. McBride
Georgia Bar No. 109812
Megan Murren Rittle
Georgia Bar No. 384595
Attorneys for Plaintiff

P. O. Box 10
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 (telephone)

{Doc: 03437856.DOCX}                     13

(770) 957-9165 (facsimile)
gmcbride@smithwelchlaw.com
mrittle@smithwelchlaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| JARVIS SIMS, | ) | |
|     **Plaintiff.** | ) | |
| | ) | **Civil Action No.:** |
| | ) | **1:22-cv-00099-JRH-BKE** |
| **vs.** | ) | |
| | ) | |
| **CITY OF AUGUSTA-RICHMOND** | ) | |
| **COUNTY,** | ) | |
|     **Defendant.** | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

This is to certify that on October 9, 2023, I electronically filed **PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to attorneys of record.

Respectfully submitted this 9th day of October, 2023.

SMITH WELCH WEBB & WHITE, LLC

*/s/Grant E./ McBride*
Grant E. McBride
Georgia Bar No. 109812
Megan Murren Rittle
Georgia Bar No. 384595
Attorneys for Plaintiff

P. O. Box 10
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 (telephone)
(770) 957-9165 (facsimile)
gmcbride@smithwelchlaw.com
mrittle@smithwelchlaw.com

```
1    Administrator's role, from Augusta?
2         A     No.  Oh, no.
3         Q     Okay.
4         A     No.
5         Q     So what I'm trying to do is kind of figure
6    out the balance between HR and, essentially, you.
7         A     Okay.
8         Q     What kind of -- Like hiring and firing --
9         A     Okay.
10        Q     -- what was the scope of your authority for
11   hiring and firing folks, I guess, in two ways; one, in
12   your office, the Administrator's office --
13        A     Uh-huh (affirmative).
14        Q     -- and then, kind of in Augusta as a whole,
15   at least as you understood it.
16        A     Yeah.  So in my office, those
17   responsibilities, I have the ability to hire and fire
18   within allowable rules and regulations and policy.
19        Q     Okay.
20        A     Outside of my office, those decisions are
21   made by, you know, basically, two verticals.  If it's a
22   constitutional officer, it is the public by way of
23   their vote.
24        Q     Okay.
25        A     If it is a department head, it is the
```

**EXHIBIT**

**1**

**Odie Donald - April 20, 2023**

```
1         A     Yeah, I think it's a combination of if the
2   budget and -- so you can't -- in short, the answer is
3   yes.  But I would want to add some context that if
4   there is a position X that you want to hire for, but it
5   is not in your budget --
6         Q     Okay.
7         A     -- you could not hire for that role because
8   of class and compensation rules.
9         Q     Got you.
10        A     So those are the type of reviews.  It's
11  almost as if if it checks those required boxes --
12        Q     Okay.
13        A     -- then it gets a sign-off, if it doesn't,
14  then you can't sign off on it.
15        Q     Okay.  That's fair.  All right.  So you come
16  in in November of '20.  When do you start evaluating
17  Office of the Administrator staff?
18        A     I would say that that is likely a continuous
19  process.
20        Q     Okay.
21        A     Yeah.  It's probably less of a -- a
22  staff-only evaluation.  I think it's an evaluation of
23  the productivity of the City.
24        Q     Okay.  And I think you said within the Office
25  of the Administrator -- I mean, you're the final say on
```

**Odie Donald - April 20, 2023**

```
 1    county government, the chair is elected among the
 2    Commissioners --
 3         A     No.
 4         Q     -- right?
 5         A     -- that is not correct.
 6         Q     Okay.
 7         A     It depends on the form of government.
 8         Q     I got you.
 9         A     So you can, in some instances, run to be the
10    county Commission chair, similar to Fulton County.
11         Q     Okay.
12         A     In other governments, I have seen where
13    they're elected amongst their peers.
14         Q     Got you.
15         A     But it depends on the form of government.
16         Q     Nothing is simple in Georgia.  Okay.  So
17    Mr. Sims was the intern Administrator when you were
18    hired for the full-time position; correct?
19         A     Yes.
20         Q     Did you have conversations with him about the
21    transition process of you coming in as the permanent
22    Administrator?
23         A     I don't believe so.
24         Q     Okay.  Is there any reason for that, or just
25    didn't happen?
```

Odie Donald - April 20, 2023

```
 1        A    Yeah, just, you know, I was running the City,
 2   you know, prior to joining.
 3        Q    Got you.  Okay.  Let's talk about when
 4   Mr. Sims was terminated.  I have that as April 1st of
 5   '21.  Does that sound about right?
 6        A    I don't remember the exact time.
 7        Q    That's fair.  I've got a letter in here.
 8   That's probably the easiest way to do it.
 9        A    Yes.
10        Q    So based on what you just told me, my
11   understanding is that would have been just a decision
12   that you made, Commission is not signing off on that,
13   nobody else is really weighing in on that.  Is that
14   fair?
15        A    I don't believe the Commission would have
16   weighed in on that.
17        Q    All right.  Did you talk to anyone else about
18   terminating him as your Administrator, before doing so?
19        A    I would imagine that at that time I may have
20   consulted with legal.
21        Q    Okay.  And is that Mr. Brown?
22        A    Yeah, I would think so.  Yeah.
23        Q    Okay.
24        A    Again, it's -- it's been a while.  So I don't
25   remember --
```

**Odie Donald - April 20, 2023**

1    Q    Okay.  And it's dated April 1st, 2021;
2    correct?
3    A    Yes, sir.
4    Q    And it looks like, at the bottom, that's your
5    signature?
6    A    Yes, sir.
7    Q    On the second page, I should say.  And then,
8    looks like it was sent to Anita Rookard and Wayne
9    Brown.  HR, and General Counsel.
10   A    Yes, sir.
11   Q    Okay.  So before giving -- And my
12   understanding it says on here you, essentially, met
13   with Mr. Sims, gave him the letter, and I guess, talked
14   about it?
15   A    Yes, sir.
16   Q    Okay.  What I'm trying to understand is,
17   before this --
18   A    Uh-huh (affirmative).
19   Q    -- you talked to HR and legal about it.  Did
20   you ever talk to Mr. Sims and say, hey, I'm thinking
21   about letting you go, or have any discussions with him
22   about it?
23   A    No.
24   Q    What went into this decision?
25   A    Well, I think, you know, it is common

**Odie Donald - April 20, 2023**

```
 1   practice that as -- of similar in positions like
 2   Administrators, city managers, professional basketball
 3   coach, athletic director -- you know, those types of
 4   roles, as you come in, you know, you evaluate an
 5   organization and you bring in staff.
 6              You know, it -- it would be the equivalent of
 7   Damon Stoudamire at Georgia Tech who just started as
 8   their new coach who is bringing in a new coaching staff
 9   now that he's looked and evaluated and, you know,
10   things of that nature.  I think that would be similar
11   to here.
12        Q    Can you kind of walk me through the timeline
13   of why this happened in April when you came in back in
14   November?
15        A    Yeah, that I -- I would not -- you know, I
16   think as you come in, you -- you know, early on, you
17   find your way around the building and all that good
18   stuff.  You look at everything from the budget, which
19   creates your programs, you know, and funds those, and
20   how they operate; what the Commission is desiring from
21   the organization; what the citizens would like to see.
22   And then once you evaluate those things, you determine
23   do you have the resources -- personnel and everything
24   else -- to make that happen, and then make a decision
25   based on that.
```

**Odie Donald - April 20, 2023**

```
 1          Q     Did you have a person in mind to replace him
 2    when you let him go?
 3          A     No.
 4          Q     Okay.
 5          A     No.  We did a recruitment to land -- It was
 6    actually more than one Administrator that -- Deputy
 7    Administrator that was let go.
 8          Q     Right.
 9          A     There was another gentleman, Mr. McDonald.
10    And those two roles -- recruited for both.
11          Q     Okay.  And it looks like in the records --
12    and I know it's been a while --
13          A     Uh-huh (affirmative).
14          Q     -- I'll represent to you that -- Well, do you
15    remember who replaced Mr. Sims?
16          A     I do not.  I had two Deputy Administrators.
17    They started around the same time, not exactly.  I
18    think the gentleman --
19          Q     Was it Charles Jackson --
20          A     Mr. Jackson --
21          Q     Looked like you had Mr. Jackson and
22    Mrs. Jackson.
23          A     But they are not --
24          Q     Right.
25          A     Okay.  Yeah, they're not related or married
```

**Odie Donald - April 20, 2023**

```
 1        A     Yeah, it wouldn't have been to replace a
 2   single person.  It is -- They were both hired as Deputy
 3   Administrators to deliver the work.  So I wouldn't -- I
 4   don't think it was in mind of -- not I don't think --
 5   It was not in mind of one person replaces one person.
 6   It is the new direction of the office.
 7        Q     All right.
 8        A     Yeah.
 9        Q     So you had mentioned that you kind of came in
10   and did some evaluations.  Are there any like formal
11   evaluations of Mr. Sims that you did that would be in
12   writing somewhere?
13        A     No, I don't believe there was.
14        Q     Okay.
15        A     Again, the evaluation was more on the
16   progress of the government's service delivery more than
17   a person.  Yeah.
18        Q     Okay.  So Mr. Sims, before you got there,
19   was, essentially, in your position, right, as the
20   interim Administrator?
21        A     Yes.
22        Q     My assumption is that he was qualified to do
23   that job as he was in that position for a period of
24   time.  Is that fair from your perspective?
25        A     I would not know.
```

**Odie Donald - April 20, 2023**

1       Q      Okay.

2       A      So those decisions are made by the

3   Commission, and so they would have to answer that

4   question for you.

5       Q      To your recollection, did the Commission or

6   the mayor ever have negative things to say about

7   Mr. Sims?

8       A      Oh, I don't know.  They wouldn't have said

9   those to me.

10      Q      Okay.

11      A      Yeah.

12      Q      So nobody said anything to you negative about

13  him?

14      A      No.

15      Q      Okay.  Did you do any kind of evaluation to

16  determine whether Mr. Sims would be a good fit for

17  another role at Augusta, prior to termination?

18      A      I don't believe so.  I am not -- I wouldn't

19  remember that, just to be honest.

20      Q      That's fair.  Were you aware that Mr. Sims

21  was on medical leave shortly after you started as

22  Administrator?

23      A      I believe so.  I believe I got a FMLA or, you

24  know, they told me that he was taking some time off for

25  FMLA.

```
 1  you do get notice when someone in the Administrator's
 2  office is out on leave or taking medical leave or that
 3  kind of thing?
 4      A    Yes.
 5      Q    Okay.  And to the extent you remember, was
 6  that normally an e-mail? a phone call? a conversation?
 7      A    Yeah, that, I don't remember.  It could
 8  likely be an e-mail or a telephone call.  I -- I just
 9  -- Yeah, I don't know what the process is in Augusta.
10      Q    Okay.  So when you came in to the role, what
11  were the job duties of the Deputy Administrator?
12      A    The job duties -- I mean, I guess they would
13  have been the same as what I described to you.  They
14  manage a portfolio.  They may get called on by either
15  the Administrator or the Commission.  You know, maybe
16  they speak to a community group or something of that
17  nature.  It would be mostly like a administrative
18  support for offices and the City.
19      Q    Okay.
20      A    Yeah.  And most of that stuff, I guess, would
21  be done by department heads, so it's managing the work
22  of department heads.
23      Q    Okay.
24           (Whereupon, Exhibit No. 10 was marked for
25           identification.)
```

**Odie Donald - April 20, 2023**

```
 1        A       -- the person that was in the permanent role
 2    before me was terminated.
 3        Q       Right.
 4        A       And I was selected to, technically, replace
 5    that person.
 6        Q       Right.
 7        A       And that termination would reflect that the
 8    Commission did not see the government going to the
 9    highest level of efficiency, so they brought me in to
10    do that.
11        Q       Okay.
12        A       And in doing so, you know, any adjustments
13    and things of that nature were solely based on what I
14    believe the resources necessary, whether it be people
15    resources, financial resource, organizational
16    resources.  That was -- My decisions were based on
17    that, not a -- a person.  So I think if you look at
18    your Exhibit 4 --
19        Q       Sure.
20        A       -- I think it -- it mentions that as a new
21    Administrator, I've decided to give the Office of the
22    Administrator a fresh start.  And that's -- that is --
23        Q       And is that what you meant by fresh start?
24        A       Correct.
25        Q       So I understand what I'm hearing you say --
```

**Odie Donald - April 20, 2023**

```
 1        Q     Did you do any kind of evaluation of Mr. Sims
 2   to determine whether his skill set fit into that new
 3   type of office that you wanted to run?
 4        A     Hmmm.  I don't -- I guess I don't remember.
 5        Q     Okay.
 6        A     Potentially.  I'm giving it thought as I
 7   talk.
 8        Q     Sure.
 9        A     But that was quite a long time ago --
10        Q     Sure.
11        A     -- in the world of government.
12        Q     And that's fair.  If you don't recall --
13        A     Yeah.
14        Q     Like I said, I'm just trying to figure out
15   what you remember.  It just seems to me that if you had
16   someone sort of with the institutional knowledge --
17        A     Uh-huh (affirmative).
18        Q     -- it might make sense to keep them around if
19   they could do what you wanted to do.  But it sounds
20   like you kind of just said, well, let's just clean
21   slate it.
22        A     Well, yeah, I think institutional
23   knowledge -- I mean, I guess it's up and down the
24   organization, and there was value from everybody, for
25   sure.  But I also think there's, again, value in, if
```

```
 1    clear understanding that MVs -- in this business,
 2    including ours of executive government leadership, new
 3    leaders have their own direction, teams, all of those
 4    different things.  And so that is more a function of
 5    the government, it has nothing to do with Mr. Sims or
 6    Mr. McDonald.  Yeah.
 7         Q    So in your other -- I mean, is this kind of
 8    your -- I'm going to say policy, but just -- your
 9    practice.  Is that, generally, your practice, whenever
10    you go into a new municipal/governmental-type position,
11    is that you'll, essentially, replace the folks that are
12    there, with your folks?
13         A    I'm not -- I wouldn't call it my folks.  But,
14    you know, I think there may be personnel changes in
15    different places, but not always.
16         Q    Okay.
17         A    You know, it is organizations -- every
18    organization needs something different.  You know, you
19    may --
20         Q    Sure.
21         A    You could use Phil Jackson for an example.
22    I'll just use that.  I'm not as good as he is, but when
23    he was with the Bulls, he had one organization and
24    maybe some of those folks came with him.  But when he
25    went somewhere else, it might be a totally new team or
```

**Odie Donald - April 20, 2023**

```
 1   it might be the exact same, you know, group of people
 2   as before.  So I -- I think that is just, again, in the
 3   business, it is a common practice that if a new mayor
 4   comes in, there will be a different chief of staff.
 5   But it doesn't always happen that way.
 6        Q    Got you.
 7        A    So I wouldn't -- wouldn't want to generalize
 8   myself or the context of the business.  But I think
 9   it's an expectation that when there are new leaders
10   that come in, there are staff and organizational
11   changes.
12        Q    Okay.
13        A    Yeah.  And I think that would be true for me
14   as well.
15        Q    For the record, I was a big fan of Phil
16   Jackson.  But Jerry Krause, he's on my list, he ruined
17   my childhood.
18        A    Okay.
19        Q    Wonderful team, and then he just blew it all
20   up.
21        A    Okay.
22        Q    Anyway.  All right.  Did you have any kind of
23   discussion, I guess, sharing your vision of the office,
24   or anything like that, with Mr. Sims when he came back
25   from FMLA leave?
```

**Odie Donald - April 20, 2023**

```
1          A      I don't recall.

2          Q      Okay.

3          A      Yeah.

4          Q      And I think you said you didn't really have

5    any negative job performance reviews of Mr. Sims during

6    his time with you.

7          A      Yeah, I -- I don't -- I -- truly, again, I

8    think I told you, I would have to really go deep in my

9    memory bank there.  I'm -- I mean, I think the scope

10   and breadth of the work that I've done since then, I --

11   I would -- given some thought, you know, maybe I would

12   have something.  But I -- nothing is coming to mind

13   right now.

14         Q      Okay.

15         A      Yeah.

16         Q      If you leave and, for some reason, wake up in

17   the middle of the night and this is on your mind, just

18   let her know --

19         A      Yeah.

20         Q      -- that would be great.

21         A      Yeah.

22         Q      I didn't see any kind of write-ups in his --

23         A      Yeah --

24         Q      -- personnel file.

25         A      -- I don't -- I just don't -- I literally
```

**Odie Donald - April 20, 2023**

```
1   what -- what it was.  But I don't believe it was for
2   this position, you know.
3        Q    Okay.
4        A    Yeah.
5        Q    And that makes sense.  You're not an
6   engineer, right, so you --
7        A    That's right.  Yeah.  So -- correct.  Yeah,
8   yeah, yeah.  So . . .
9        Q    All right.  I was looking for a document, but
10  either I forgot to print it out or we'll get to it
11  later.
12            We have covered quite a few of these.  All
13  right.  So I have in my note that Ms. Tanikia Jackson
14  was hired on August 7 of '21.  Does that sound right?
15       A    Oh, I have no idea.  That's probably -- I
16  mean, if it's -- whatever the Augusta start dates are
17  going to say, that's going to be correct.  Yeah.
18       Q    Okay.  So just refer to the documents?
19       A    Yeah, yeah.
20       Q    If that is the case, I think both
21  Mr. McDonald and Mr. Sims were let go on April 1st.
22       A    Okay.
23       Q    Why would you wait until August 7th to have a
24  new person come in?
25       A    Oh, I think just the recruiting.  It's not
```

Page 18

1        Q.   All right.  Well, you were terminated on

2    April the 1st 2021, right?

3        A.   Yes.

4        Q.   Okay.  How soon after that did you retain

5    Mr. McBride and his firm?

6        A.   I don't know exactly the date, but in '21

7    after termination.

8        Q.   Was it within 60 days of your termination?

9        A.   I don't know if it was 60 or 65.  I don't

10   know the exact number.

11       Q.   Okay.

12       A.   But it was after the termination.

13       Q.   It was in 2021 after your termination?

14       A.   Yes, sir.

15       Q.   Okay. And I take it by no later than that

16   date, you anticipated the possibility of a legal claim

17   against the City of Augusta, right?

18       A.   Would you repeat your question.

19       Q.   By the time you would have retained Mr.

20   McBride and his firm, you anticipated a legal claim

21   against the City of Augusta, right?

22       A.   I was wrongly terminated.

23       Q.   Well -- yeah.  What I'm -- I know that's

24   your claim.  My -- my question really is -- and maybe

25   I should ask it this way.  When is the first date that

EXHIBIT
2

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 19

1    you felt that you were wrongfully terminated?

2         A.   April 1st.

3         Q.   2021?

4         A.   Correct.  And on that date, did you believe

5    you had been terminated because of your age,

6    disability, and/or use of medical leave?

7         A.   Yes.

8         Q.   Okay.  During your employment with the City

9    of Augusta, am I correct to assume that you had a

10   personal cell phone?

11        A.   Yes.

12        Q.   Okay.  And what is that cell phone number?

13        A.   ████████████████

14        Q.   Do you still have that same personal cell

15   phone number today?

16        A.   Yes.

17        Q.   Okay.  Has the carrier for that cell phone

18   number changed since April 1, 2021?

19        A.   No.

20        Q.   Okay.  And who was the carrier?

21        A.   T-Mobile.

22        Q.   Have you gotten a -- a new cell phone

23   device?  And by that, I mean your physical phone since

24   April 1, 2021?

25        A.   Yes.

Jarvis Sims                                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 23

 1        A.   Sims.Jarvis@gmail.  And I have an older one
 2   I've used Jarvis_sms@yahoo.com.
 3        Q.   Did you have both of those during your
 4   employment?
 5        A.   Yes.
 6        Q.   What would you say was the primary one that
 7   you used?
 8        A.   The Gmail.
 9        Q.   Okay.  And I realize you had a work-related
10   e-mail account with Augusta, right?
11        A.   Yes.
12        Q.   Okay.  And my question is:  Did you ever
13   send or receive any e-mails regarding your medical
14   leave utilizing either your Gmail or your Yahoo at any
15   point in 2021?
16        A.   I don't recall.  I don't remember.
17        Q.   Okay.  Would you have ever sent or received
18   any e-mails using either of those accounts to anyone
19   at the City of Augusta such as Odie Donald, Tony
20   McDonald, or Anita Rookard?
21        A.   My -- say the question again, sir.
22             MR. BENNETT:  Can you repeat the question,
23        ma'am.
24             THE COURT REPORTER:  (Readback attempted.)
25             MR. BENNETT:  No, no.  I'll -- I'll reask

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 38

1    your home?

2         A.   Yes.

3         Q.   What's the monthly amount of that?

4         A.   11 -- roughly 1180.  I think it's 1179 and

5    so many cents, but 1180.

6         Q.   Yeah.  Tell me about your education.  You

7    graduated from high school, right?

8         A.   Yes.

9         Q.   Okay.  And where was that?

10        A.   Walter Franklin George High School in

11   Atlanta.

12        Q.   Okay.  Where in Atlanta?  Is that school

13   still -- still in existence?

14        A.   It's now called South Atlanta High School.

15        Q.   Okay.  And did you go to college after

16   graduating high school?

17        A.   Yes.

18        Q.   Where did you go?

19        A.   I went to Atlanta Metropolitan State

20   College, which was called at that time Atlanta Junior

21   College, and Georgia State University for my

22   undergraduate degree.

23        Q.   So you went to the junior college, which was

24   like a two year?

25        A.   Yes.

Page 41

1        A.    Yes.

2        Q.    Okay.  So where did you work immediately

3   before that?

4        A.    City of East Point.

5        Q.    Okay.  And you were there for a pretty long

6   time, weren't you?

7        A.    Yes.

8        Q.    Okay.  I have down -- just looking from your

9   application, it looks like sometime in 2002 through

10  2018.

11       A.    That's correct.

12       Q.    Okay.  And what was the last job that you

13  held with East Point?

14       A.    Senior Management Analyst.

15       Q.    What is --

16       A.    Capital projects person.

17       Q.    Capital projects.  Okay.  Did you ever hold

18  a city or county manager -- or city manager position

19  there?

20       A.    No.

21       Q.    Okay.  Did they have a city manager?

22       A.    Yes.

23       Q.    Is that who you reported to?

24       A.    Yes.

25       Q.    Did you ever have any disciplinary action

Case 1:22-cv-00099-JRH-BKE   Document 45   Filed 10/09/23   Page 37 of 70
Jarvis Sims                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 43

1    they will ask your availability, and I will say, "This

2    semester I can't teach."  So I wouldn't say stop

3    working.  I just say I couldn't accept a class.

4         Q.   No, I understand that.  But so -- and what

5    I'm really trying to find out is:  At any point during

6    your time with Augusta, did you receive income from

7    any sources other than the City?

8         A.   When I initially started with Augusta, I was

9    teaching a course, which I had to eventually drop the

10   course because it was too much.

11        Q.   And that would have just been that first --

12        A.   Yes.

13        Q.   -- fall semester?

14        A.   As far as I can remember, yes.

15        Q.   Okay.  I understand that you were diagnosed

16   with kidney disease at some point in 1998; is that

17   correct?

18        A.   Yes.

19        Q.   And how did you come to be diagnosed?

20        A.   I became ill and saw my primary care

21   physician.

22        Q.   Okay.  And how did your symptoms first

23   manifest?

24        A.   Very cloudy urine.

25        Q.   Okay.  Now, when you were with East Point,

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 79

1        A.    I -- it's -- obviously, it was a penny

2    difference.  I just want to make that you're aware of.

3        Q.    Sure.  Yeah.  And -- and it could be that

4    that's a typo.

5        A.    Could be.

6        Q.    Yeah.  But so just in terms of our timeline,

7    it looks like November 14, 2020, that's when he was

8    hired.  And that's when you officially became once

9    again a deputy administrator?

10       A.    Yes.

11       Q.    Okay.  Okay.  It was right around this time

12   that you learned that your condition was starting to

13   deteriorate, right?

14       A.    The documentation, yes.  But before then, I

15   was having a lot of symptoms that I was not aware.  I

16   didn't know why.

17       Q.    What symptoms?

18       A.    I was severely tired, nausea, not able to

19   sleep, not able to really focus.  My blood pressure

20   was extremely high, wasn't feeling well at all.

21       Q.    Okay.  And you were treating with Matthew

22   Diamond and Nephrology Associates at that time?

23       A.    Yes.

24       Q.    Okay.  And, ultimately, you were recommended

25   to get a PD catheter placed, right?

Jarvis Sims                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 80

1        A.    Yes.

2        Q.    Does that stand for -- do you know what PD

3   stands for?

4        A.    Yes.

5        Q.    Peritoneal something dialysis.  Yes.

6        Q.    Okay.  And so I'm not an expert in this

7   stuff.  I'm sure you know a lot more than I do, but as

8   I understand it -- so that catheter was needed to

9   begin the process of dialysis; is that right?

10        A.    Correct.

11        Q.    Okay.  And dialysis is a procedure where

12   waste products and excess fluid from the blood are

13   removed to help your kidneys once they stop working

14   properly.

15        A.    Yes.

16        Q.    Is that the gist of it?

17        A.    Yes, sir.

18        Q.    Okay.  And so a PD catheter is that placed

19   in your abdomen?

20        A.    Yes.

21        Q.    Okay.  And -- okay.  And so your doctor had

22   recommended you needed that procedure and then to get

23   on dialysis?

24        A.    Yes.  And that's because you had entered

25   chronic kidney stage 5?

Jarvis Sims                              March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 84

1      Q.    Yeah.

2      A.    But I asked her to come to my office and I

3   wanted to speak with her about a confidential matter

4   and told her that I was -- what was going on with me

5   with my kidney and she seemed very empathetic.  And I

6   told her that I wanted this to be a matter of only who

7   need to know and she understood.  And I told her that

8   I would have to have this surgery and -- and I would

9   be out.  And I gave her the -- you know, told her I

10  would have the paperwork.

11     Q.    And do you remember anything else that was

12  said?

13     A.    I told her that I had family, friends that

14  were being tested to see if they were a match for a

15  transplant.  And I was in hope of having a transplant

16  and I would need additional time.  And she stated you

17  would be eligible for the sick leave pool and you

18  could use that time.

19     Q.    Okay.  So she -- did she explain that you

20  would have to exhaust your accrued sick and vacation

21  and other leave --

22     A.    Yeah, she told --

23     Q.    -- before you --

24     A.    Yeah.  I was going to be out with the FMLA,

25  so yes.  I would have to use -- I would have to

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 86

1      A.    I didn't go -- I told her I had to have
2   surgery.
3      Q.    A surgery.  Okay.
4      A.    Yes.
5      Q.    And -- but you mentioned the possible need
6   for a kidney transplant in the future.
7      A.    Yes.
8      Q.    Okay.  And that's something that happens
9   when somebody gets to stage 5 renal failure, right?
10      A.    I'm not understanding your question.
11      Q.    Well, you would -- you wouldn't need a
12   kidney transplant until you got to stage 5?
13      A.    Yes.  Correct.
14      Q.    Okay.  I'm not a doctor, so I might not be
15   articulating this as best as your physicians would.
16   I'm just doing my best.
17      A.    Sure.
18      Q.    Okay.  So -- and would this conversation
19   have been around the time of this doctor's note from
20   Dr. Diamonds or before?
21      A.    I would think maybe around the time or a
22   little before.  I can't remember the exact time.
23      Q.    Okay.  Let's go to Exhibit 11.  All right.
24   Do you see where this says, "Certification of Health
25   Care Provider?

Page 95

1       A.    Yes.

2       Q.    Okay.  And it confirms that your new FMLA

3   start date would be November 20, 2020, right?

4       A.    Yes.

5       Q.    And the new FMLA end date would be 12 weeks

6   later February 15, 2021, right?

7       A.    Yes.

8       Q.    And it says from 11/20 to 2/3/2021, you

9   would be paid from your accrued leave, right?

10      A.    Yes.

11      Q.    And then it says for the remainder of the

12  time, you would be paid from the sick pool, right?

13      A.    Yes.

14      Q.    Okay.

15           MR. BENNETT:  Why don't we take a short

16      break.

17           THE VIDEOGRAPHER:  The time is 11:24 a.m.

18      We're now off the record.

19                (Off the record.)

20           THE VIDEOGRAPHER:  The time is 11:43 a.m.,

21      and we're back on the record.

22  BY MR. BENNETT:

23      Q.    Okay, Mr. Sims, I?ll hand you Exhibit 17.

24  Well, I might have given you an extra copy.  Give one

25  to your counsel.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 98

1       Q.   Okay.  Before going out on leave, did you
2   have any further discussions with Ms. Rookard?
3       A.   Yes.  I mentioned to Ms. Rookard that I was
4   in the process of having a transplant.  I had some
5   family members -- a friend that was getting tested to
6   see if he was a match and if that would be the case, I
7   would need a transplant.  And she indicated you would
8   not be eligible for FMLA, but you would be eligible
9   for the sick leave pool.
10      Q.   Okay.  And, ultimately, you weren't even
11  placed on a transplant waiting list though until
12  August of 2021, right?
13      A.   No.
14      Q.   Well, we'll go over the medical records.
15  But you went to the Mayo Clinic, didn't you?
16      A.   I went to Piedmont also.  I've listed
17  several places.
18      Q.   Okay.  But you didn't actually have a
19  transplant at any point in 2021, did you?
20      A.   I didn't have a transplant.  However, I had
21  gone through the process at Piedmont here in Atlanta
22  and a friend was matched.  And I was hoping to go for
23  a transplant in '21, and that friend ended up deciding
24  not to go forward with it.
25      Q.   Okay.  So leave would have been unnecessary,

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 100

1    with Mr. Donald to discuss your leave?

2         A.    Correct.

3         Q.    Okay.  And nor did you have any discussions

4    with him about the nature of your condition or why you

5    needed to leave?

6         A.    I had discussion with Anita Rookard.  And

7    Ms. Rookard indicated that Mr. Donald would be the

8    person who decided if I would be eligible for the sick

9    leave pool.

10        Q.    Right.

11        A.    And --

12        Q.    But I'm asking did you have any discussions

13   directly with Mr. Donald about your need for FMLA

14   leave before you sent this letter?

15        A.    I did not.

16        Q.    Okay.  And before you sent this letter, had

17   you told him orally or in writing anything about the

18   nature of your condition?

19        A.    I did not.

20        Q.    Okay.

21        A.    However, I'd like to state again that there

22   were several attempts to meet with him in person to

23   let him know what was going on.

24             MR. BENNETT:  Object as nonresponsive.

25

Page 112

1   complaint that you were denied the use of sick pool to

2   cover your extended leave of absence.  And that's

3   simply not true, is it?

4        A.   When my leave was extended, I see I use our

5   -- they use additional time sick leave pool.  So I see

6   that, yes.

7        Q.   Okay.  All right.  So you initially

8   requested a leave of absence through February 15th.

9   That's an accommodation, right?

10       A.   Yes.

11       Q.   And you were granted FMLA leave for that

12  full period, right?

13       A.   Yes.

14       Q.   You then asked for some additional time off

15  to recover, and that was granted, right?

16       A.   Yes.

17       Q.   And that period of extended leave you were

18  compensated through the sick pool, right?

19       A.   Yes.

20       Q.   Okay.  And then you ultimately returned to

21  work on February 25, 2021, right?

22       A.   Yes.

23       Q.   Okay.  And at that time, your accruals were

24  reactivated, right?

25       A.   Yes.

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 126

1      Q.   And what departments were you over?

2      A.   Housing, community development, parks and

3  recreation, engineering, environmental services.

4  There was some more.  There were -- we were each over

5  eight departments.

6      Q.   What about police?

7      A.   Police?  They don't have police.  The

8  sheriff office has --

9      Q.   They just have the sheriff.

10     A.   Correct.

11     Q.   Some counties do have police departments.

12     A.   Correct.  Correct.

13     Q.   But they just have a --

14     A.   Sheriff.

15     Q.   Sheriff?

16     A.   Correct.

17     Q.   Okay.  So, if there were 16 total

18 departments, you each had eight.

19     A.   Correct.

20     Q.   Okay.  All right.  Thank you.  Let me hand

21 you Exhibit 24.

22          MR. MCBRIDE:  Thank you.

23 BY MR. BENNETT:

24     Q.   Is this a true and correct copy of an e-mail

25 that Mr. Donald sent to you and Tony McDonald on March

Jarvis Sims                        March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 127

1   5, 2021?

2       (Defendant's Exhibit No. 24 was marked into the

3                          record.)

4       A.   Yes.

5       Q.   And he basically was asking the two of you

6   to delete -- to lead a director's meeting that

7   particular day, right?

8       A.   Yes.

9       Q.   Okay.  And that's because he -- he had

10  something else going on, I guess?

11      A.   I don't remember.  But I do remember us

12  leading the meeting.

13      Q.   Okay.  And that's not a meeting that you

14  were excluded from, right?

15      A.   Not this particular meeting.

16      Q.   Okay.  Were there weekly -- a lot of cities

17  or counties will have like a weekly meeting of all

18  department heads.  Is that what y'all did?

19      A.   I'm trying to remember if it was weekly or

20  biweekly, but we did meet with the department heads.

21  And then we would meet individually with our

22  department heads to go over matters, operational

23  matters.

24      Q.   Okay.  All right.  Okay.  And so how many of

25  these types of meetings would there have been either

Page 128

1    -- I guess, you're not sure if they're weekly or

2    biweekly?

3         A.   I can't remember.

4         Q.   Okay.  Well, during the five, six weeks when

5    you returned to work, let's say there were three.

6    Let's say it was biweekly.  Were you ever excluded

7    from a director's meeting?

8         A.   Director's meeting, yes.

9         Q.   Which one?

10        A.   With housing community development.  The

11   director was Hawthorne Welcher and there were matters

12   that were discussed.  He was one of the departments

13   that -- that was one of the departments that I was

14   overseeing, and there were matters that discussed and

15   decisions that were made that I was not a part of.

16   And the director Mr. Welcher stated to me, "Yeah.

17   I've been meeting with Mr. Donald and I wondered why

18   you were not included in these matters."

19        Q.   What else was said?

20        A.   It was -- I was asking him one thing and it

21   was like he was getting different directions.

22        Q.   Okay.  So -- and I want to ask you further

23   about this.  So I was asking about the director's

24   meetings where all of the different directors or

25   department heads were present.

Jarvis Sims                              March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 130

1    more meetings from -- is it a Mr. Hawthorne?

2        A.    Hawthorne.

3        Q.    Where he had been -- he had met directly

4    with Odie Donald.

5        A.    Yes.

6        Q.    Okay.  And Odie Donald was the county

7    administrator, right?

8        A.    Yes.

9        Q.    Okay.  And so, if the county administrator

10   asked for a meeting with a particular director,

11   they're required to go meet with the county

12   administrator, right?

13       A.    Yes.

14       Q.    Nothing prohibited him from having such a

15   meeting, right?

16       A.    Yes.

17       Q.    Okay.  And all you're saying is that there

18   was one or more meetings between Odie Donald and Mr.

19   Hawthorne where you weren't present?

20       A.    Not only this particular meeting.  There

21   were meetings with within the department, within the

22   administrator's office, with the other deputy and

23   other administrators that I was not included in the

24   meeting.

25       Q.    How do you know?

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 132

1    Q.   Well, for instance, did anyone say "You're
2    being excluded because you took FMLA leave"?
3    A.   No.
4    Q.   Did anybody ever say, "You're being excluded
5    from a meeting because of your age"?
6    A.   No.
7    Q.   And, in fact, Tony McDonald is older than
8    you, right?
9    A.   Yes.
10   Q.   Did anybody ever tell you that you were
11   being excluded from a meeting because of your medical
12   condition?
13   A.   No.
14   Q.   So you're speculating that those things were
15   the result of you being excluded from a meeting?
16   A.   I'm not speculating.  I was not included in
17   those meetings.
18   Q.   But I'm asking why?
19   A.   I don't know.
20   Q.   You're -- you don't know why?
21   A.   I don't know.
22   Q.   Okay.  Do you remember being asked in March
23   of 2021 to prepare an -- something called an
24   Environmental Services Transition Plan?
25   A.   Yes.

Page 139

1  product that you turned into Odie Donald that he made

2  you go back and correct or redo?

3       A.   I can't remember.  I just know he was very

4  critical of my work to the point where he made

5  demeaning comments in front of -- in our small office

6  meeting.

7       Q.   What comments?

8       A.   He was just very -- even if there was a -- a

9  misunderstanding on what was expected, it was the way

10  it was stated and demeaning.

11       Q.   Well, when you -- when you use the word

12  "demeaning," are you referring to specific word usage

13  or his tone?

14       A.   With him was probably a little of both.

15       Q.   Well, I'm -- I'm -- are there any specific

16  words that you can recall as we're sitting here?

17       A.   I can't recall.  But I just know that coming

18  back from FMLA and working with the previous

19  administrator and now with him, it was -- and in my

20  style, it was as serving as the interim administrator,

21  it was totally different.  And it was not inviting as

22  an employee.

23       Q.   Yeah.  And did you observe similar comments

24  made to Tony McDonald?

25       A.   Yes.

Jarvis Sims                                          March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 150

1                              record.)

2          A.    Yes.

3          Q.    And this was notifying you that you were

4     being terminated?

5          A.    Yes.

6          Q.    How did he -- how did you receive this

7     letter?  Was it hand delivered?

8          A.    There was a meeting.

9          A.    Who was present?

10         A.    Myself and Anita Rookard.

11         Q.    Odie wasn't present.

12         A.    And Odie.

13         Q.    And Odie?

14         A.    Yes.

15         Q.    And whose office was this meeting in?

16         A.    It was in Odie?s office.

17         Q.    What time of day?

18         A.    I can't remember.  Can't remember --

19         Q.    Well, do you think it was in the morning?

20         A.    It wasn't at 8 o'clock in the morning.  It

21    -- but I can't remember.  It was --

22         Q.    All right.  And were you handed this letter

23    Exhibit 29 during that meeting?

24         A.    Yes.

25         Q.    Okay.  And so what was said during the

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 151

1    meeting?

2         A.    They provided me the letter.  During the

3    meeting, I mentioned to Anita, "What about my kidney

4    disease?  What was going on?  You know, how would this

5    affect this?  I needed, you know, the insurance.  I

6    needed all of this for my kidney disease."  And they

7    said -- you know, kind of shoved their shoulders and

8    very insensitive.

9         Q.    Okay.  What else was said?

10        A.    If -- it was effective immediately, so I

11   needed to leave.

12        Q.    Do you remember anything else that was said

13   by either Anita or Odie?

14        A.    I asked them -- they knew about my illness.

15   So I said, "What about my kidney disease?  What about

16   my illness?"  And it was no comment about -- you know,

17   it was just shoving the shoulders, just like, you

18   know, more or less, "Oh, well."

19        Q.    Okay.  And the reason that was given for

20   your separation on this letter is that as the new

21   administrator, Odie Donald had decided to give the

22   office of the administrator a fresh start, right?

23        A.    Yes.  From the letter, yes.

24        Q.    Okay.  And you understood that both you and

25   Tony McDonald were terminated the same day?

Page 153

1    a transplant in the meeting.

2         Q.   In the meeting at which you were terminated?

3         A.   Yes.

4         Q.   Okay.  And what else was said?

5         A.   It was effective immediately, and I needed

6    to leave the building immediately.  There was -- told

7    me to, you know, if I had personal things in my office

8    to go ahead and get them, to leave.

9         Q.   Okay.  Was anything else said?

10        A.   I don't remember.

11        Q.   Did you make any notes of the meeting?

12        A.   I was completely shocked.

13        Q.   So no notes?

14        A.   I can't remember.  I mean, I was just in

15   awe, just complete shocked that, you know, I was

16   terminated.  So I can't remember if I -- I can't

17   remember.  I was --

18        Q.   Yeah.

19        A.   -- shocked.

20        Q.   Well, you haven't produced any notes?

21   That?s -- that's what --

22        A.   No.

23        Q.   -- I'm asking.  And you didn't record it,

24   right?

25        A.   No.

Jarvis Sims                                    March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

Page 161

1      A.   I can't remember the amount, the dollar

2   amount.  But that was my first time ever receiving

3   unemployment, so I don't remember the dollar amount of

4   whether that was the normal or extra what.  I can't

5   remember.

6      Q.   How many weeks did you receive unemployment

7   for?

8      A.   Whatever was allowed?

9      Q.   I think the max is 26 weeks.  Does that

10  sound right?

11     A.   That sounds right.

12     Q.   Okay.  All right.  So Odie Donald never told

13  you that you were being terminated because of your

14  age, disability, or FMLA leave, right?

15     A.   He didn't tell me no reason why I was being

16  terminated.

17     Q.   Did he ever tell you that you were being

18  terminated because of your age, disability, or FMLA

19  leave?

20     A.   He didn't tell me no reason why I was being

21  terminated.

22     Q.   Is the answer no?

23     A.   I didn't know.  It said, without cause.

24     Q.   I'm just going to keep asking until you

25  answer the question.  Did -- yes or no?  Did he ever

Jarvis Sims                                      March 30, 2023
Sims, Jarvis Vs. City Of Augusta-Richmond County

                                                    Page 163

1    sir.

2         Q.   Do you watch sports?

3         A.   A little bit.

4         Q.   Okay.  You know, when a new general manager

5    takes over a sports team or a sports organization,

6    it's common for them to make changes in the coaching

7    staff, changes in the players, right?

8         A.   Yes.

9         Q.   Okay.  And if a new collegiate athletic

10   director is hired, frequently, they'll make changes in

11   the coaches that are under them, right?

12        A.   And sometimes they keep them.  Sometimes

13   they retain them.

14        Q.   Okay.  And if a new mayor, if a new governor

15   is elected, it's not uncommon for them to bring on new

16   staff, right?  Or to make changes in the organization?

17        A.   Correct.  And then sometimes, they retain

18   people also.

19        Q.   Okay.  And when you were initially hired,

20   when former administrator Jackson was there, you and

21   Mr. McDonald replaced to prior deputy administrators,

22   right?

23        A.   Yes.

24        Q.   Okay.

25        A.   One of the deputy administrators passed.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **JARVIS SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | **1:22-cv-00099-JRH-BKE** |
| **vs.** | ) | |
| | ) | |
| **CITY OF AUGUSTA-** | ) | |
| **RICHMOND COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DECLARATION OF JARVIS SIMS

1. Pursuant to 28 U.S.C. § 1746, I, Jarvis Sims, declare under penalty of perjury under the laws of the United States that the following is true and correct.

2. I am over the age of eighteen and fully competent to testify as to the matters contained in this declaration. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

3. I served as a Deputy Administrator for the Defendant under both Mr. Donald and the prior Administrator, Janice Jackson.

4. I also served as the interim Administrator for the Defendant prior to Mr. Donald being hired.

5. During this time, I was involved in employee termination.

{Doc: 03438812.DOCX}                              1

**EXHIBIT**
**3**

6.    During this time, there was a systematic protocol for contemplating the termination of any employee within the organization.

7.    This protocol necessitated the involvement of several key personnel: the Administrator or, if unavailable, the Deputy Administrator of the concerned department, the HR Director, the designated EEO official, and the appointed Attorney for the said department.

8.    If the Administrator was not present for any reason, the Deputy Administrator was mandatorily required to provide a comprehensive report detailing the circumstances and justifications surrounding the proposed termination to the Administrator.

9.    This procedure has been followed throughout the time I was employed by the Defendant; I know that both Ms. Jackson and I followed this established practice during the term we served as the Administrator.

10.   Mr. Donald would have been expected to follow the same procedure when he was the Administrator.

11.   When I was fired, this process was not followed, which is a deviation from established procedures.

12.   Additionally, the Defendant did not have any established policy of "clearing house" when a new Administrator or department head is hired.

13.     After I returned from my FMLA leave, I discussed taking additional time
        from the sick pool for a future transplant surgery with the HR director, Ms.
        Rookard.

14.     I explained to her that there was a potential donor that was being evaluated
        for compatibility for the transplant and that I would need approximately two
        months of leave when the transplant was scheduled.

15.     At that time, I did not have a specific day for the transplant because it had
        not yet been scheduled; however, I told Ms. Rookard that the transplant
        would take place during the month of May of 2021.

16.     Ms. Rookard told me that she would discuss and clarify my situation with
        Mr. Donald.

17.     I understood this to mean that she would need to speak to Mr. Donald to
        authorize use of the sick pool.

18.     I also understood this to mean that she would discuss my disability and my
        need for a transplant with Mr. Donald.

19.     Instead of hearing back about this request, I was terminated.

20.     After I was terminated, the potential donor opted against the donation and
        the transplant was not scheduled in May of 2021 due to lack of a viable
        organ.

21.     I declare under penalty of perjury, that the foregoing is true and correct.

Executed this 9th day of October, 2023.

# Jarvis Sims

Jarvis Sims

**Signature:** _Jarvis Sims (Oct 9, 2023 14:09 EDT)_

**Email:** sims.jarvis@gmail.com

# Declaration

**Final Audit Report** 2023-10-09

| | |
|---|---|
| Created: | 2023-10-09 |
| By: | Shannon DuCray (sducray@smithwelchlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAARP6_BzjCVVc7VafBS_UzaEgzZEYydNMr |

## "Declaration" History

📄 Document created by Shannon DuCray (sducray@smithwelchlaw.com)
2023-10-09 - 5:32:11 PM GMT

📧 Document emailed to Jarvis Sims (sims.jarvis@gmail.com) for signature
2023-10-09 - 5:33:58 PM GMT

📄 Email viewed by Jarvis Sims (sims.jarvis@gmail.com)
2023-10-09 - 5:38:36 PM GMT

✍️ Document e-signed by Jarvis Sims (sims.jarvis@gmail.com)
Signature Date: 2023-10-09 - 6:09:50 PM GMT - Time Source: server

✅ Agreement completed.
2023-10-09 - 6:09:50 PM GMT

🔴 **Adobe Acrobat Sign**

**Anita Rookard - April 19, 2023**

| | |
|---|---|
| 1 | When was the first time that you became aware |
| 2 | that he wanted to get rid of his administrators, his |
| 3 | deputies? |
| 4 | A.    When he brought me in the office the day of |
| 5 | the termination on April 1st. |
| 6 | Q.    Okay.  So my understanding is you weren't |
| 7 | consulted on that aspect of getting rid of the deputies |
| 8 | before it happened? |
| 9 | A.    Correct. |
| 10 | Q.    Do you know if anybody in the HR department |
| 11 | was consulted or involved in that process? |
| 12 | A.    No one. |
| 13 | Q.    And is that normal that you-all wouldn't be |
| 14 | consulted in a process of terminating an employee? |
| 15 | A.    It is normal for the administrator's office. |
| 16 | Q.    Okay. |
| 17 | A.    HR is not involved in how a new administrator |
| 18 | decides to set up or structure their office.  HR is not |
| 19 | involved in that. |
| 20 | Q.    Okay.  Did you -- well, you already said you |
| 21 | weren't consulted prior to the terminations on April 1st, |
| 22 | right? |
| 23 | A.    Correct. |
| 24 | Q.    Did you provide any feedback or |
| 25 | recommendations to Mr. Donald when you had that meeting |

**EXHIBIT**

**4**

**Anita Rookard - April 19, 2023**

```
1    work there?
2         A.     No, it's a contribution.
3         Q.     Okay.
4         A.     You contribute a percentage, and the
5    government contributes a percentage as long as you're
6    working.
7         Q.     I see.  Okay.  Okay.  I think that makes
8    sense.
9                And I know there's documents that's been
10   produced.  I assume that y'all have a pension-plan
11   document, correct?
12        A.     Correct.
13        Q.     And would that be the best source of
14   information about how the pension plan works?
15        A.     Yes.
16        Q.     Are there any other documents that would talk
17   about the pension plan or explain how it works?
18        A.     No, sir.
19        Q.     All right.  And has the pension plan been
20   modified since Mr. Sims was terminated?
21        A.     No, sir.
22        Q.     You have Mr. Sims' personnel file, correct?
23        A.     We do.
24        Q.     Are you aware of any complaints or negative
25   reviews of him in that file?
```

**Anita Rookard - April 19, 2023**

```
 1        A.      I am not.

 2        Q.      Okay.  Are you personally aware of any

 3   complaints about Mr. Sims' work performance?

 4        A.      I am not.

 5        Q.      I'm guessing this happened -- well, I'm not

 6   guessing.  This happened before you were hired, but do

 7   you have any idea why he was selected as the interim city

 8   administrator?

 9        A.      I do not.

10        Q.      Do you have any reason to believe that he was

11   not qualified for his role as the interim city

12   administrator or deputy city administrator?

13        A.      I do not.

14        Q.      Okay.  Based on your -- on your knowledge, do

15   you believe he was qualified?

16        A.      I don't know enough about Mr. Sims to have an

17   opinion.

18        Q.      That's fair.  Well, part of this is what I'm

19   trying to figure out, you know, because you sort of

20   represent HR, right?

21        A.      Uh-huh (affirmative).

22        Q.      I mean, you're the -- you're the head of HR.

23               I'm just trying to figure out are you aware

24   of any point at which Augusta would have deemed him not

25   qualified for his position?
```

**Anita Rookard - April 19, 2023**

1      A.      No, sir.

2      Q.      Okay.  Does Augusta do any kind of annual or

3  formal evaluations of its employees?

4      A.      We do evaluations.  Each department does

5  evaluations of their employees.

6      Q.      Okay.  The reason I asked is I didn't really

7  see any in the personnel file that I was provided.

8      A.      And you may not.  Mr. Sims was the interim

9  administrator, and so --

10      Q.      Right.

11      A.      -- unless he initiated reviews for his team,

12  there wouldn't be or -- you know, and the Commission

13  didn't do reviews on the administrator to that extent.

14      Q.      So yeah -- and that's my next question is the

15  Commission didn't do any kind of formalized review

16  process for the administrator's office, correct?

17      A.      Not that I'm aware of.

18      Q.      Okay.  Are you aware that if Mr. Donald did

19  any formal reviews of Mr. Sims or Mr. McDonald while he

20  was there?

21      A.      I'm not aware of any.

22      Q.      Okay.  And would I be correct in assuming

23  that if there were evaluations, they would be put in the

24  personnel files?

25      A.      Correct.

**Anita Rookard - April 19, 2023**

1       A.      No, sir.

2       Q.      I think you had mentioned before, generally,

3  when FMLA is approved, there's some kind of communication

4  to the department head about that, but I didn't -- I

5  didn't see anything --

6       A.      Correct.

7       Q.      -- in the file.

8               Would there have been some documentation of

9  that that went to Mr. Donald or a phone call or something

10  like that?

11      A.      Mr. Donald received a phone call that

12  Mr. Sims would be out for FMLA, and he probably did

13  receive a document, either he did or his administrative

14  assistant received the FMLA document stating that he

15  would be out.

16      Q.      Okay.  So as I understand your testimony, it

17  would have been -- somebody in your office would have

18  reached out to say, hey, he's going to be out, but it

19  wouldn't have been you directly; is that fair?

20      A.      No, sir.

21      Q.      Okay.  Okay.  Do you know -- you may or may

22  not know this, but your department handles health

23  insurance, correct?

24      A.      Correct.

25      Q.      Is the city of self-insured, or do they have

**Anita Rookard - April 19, 2023**

```
 1        A.      What I stated to Mr. Sims at that time is
 2   please put it in writing and let us know when you decide
 3   what you're going to need.
 4        Q.      Okay.  And was that a verbal conversation, a
 5   phone conversation?
 6        A.      It was verbal.
 7        Q.      Okay.  Give me one second.  I might be about
 8   done.
 9               (Displaying Plaintiff's Exhibit No. 7.)
10   BY MR. MCBRIDE:   (Resuming)
11        Q.      So I guess I just want to make sure.  I'm
12   going to share with you an e-mail dated -- can you see
13   that okay?
14        A.      I can.
15        Q.      Let me zoom in a little bit, too, so we can
16   read it better.  It looks like it's an e-mail from
17   Schevella Nicholes dated March 3rd, 2021 to you, right?
18        A.      Uh-huh (affirmative).
19        Q.      And then it's per our conversation this
20   morning, you informed me that Jarvis Sims, blank, will
21   need to take leave in May for a medical reason.  And then
22   it says he exhausted his leave and goes on to talk about
23   other things.
24        A.      Uh-huh (affirmative).
25        Q.      Do you recall that conversation with
```

101

## Schevella Nicholes

**From:**     Schevella Nicholes
**Sent:**     Wednesday, March 3, 2021 9:09 AM
**To:**       Anita Rookard
**Subject:**  Sick Leave After FMLA Exhaustion

God morning Ms. Rookard,

Per our conversation this morning, you informed me that Jarvis R. Sims ▮▮▮▮▮will need to take leave in May for a medical reason. Mr. Sims exhausted FMLA leave 2/15/2021, and he will not be eligible for FMLA again until November 20, 2022 granted he meets the hours worked requirement of 1,250 hours worked in the 12-months preceding the leave request. Mr. Sims, also, will not be able to use any remaining sick pool hours until he exhausts all leave accruals (Sick, Vacation, Compensatory Time, etc.).

Thank you,

*Schevella Nicholes, BSBM, MBA*
*Benefits Analyst II*
*City of Augusta/Richmond County*
*535 Telfair St., Suite 400*
*Augusta, GA 30901*
*706-821-2510 direct*
*706-821-2867 fax*
*snicholes@augustaga.gov*

1



PLAINTIFF'S EXHIBIT

**7**

Sims v. City of Augusta, et al.

1       A.      Mr. Tony McDonald.

2       Q.      Right.  So just those two, correct?

3       A.      Correct.

4       Q.      What about department heads?

5       A.      I don't understand your question.

6       Q.      I'm sorry.  I'll go ahead and rephrase.  Are

7  you aware of any department heads that were let go in

8  that time frame in order to give the City or the

9  administrator a fresh start?

10      A.      No, sir.

11      Q.      Okay.  Is there any policy that authorizes

12  supervisors to fire subordinates because they want a

13  fresh start for the department?

14              MR. BENNETT:  Objection to form.  You

15      can answer if you understand it.

16  BY THE WITNESS:  (Resuming)

17      A.      I do not understand your question.

18      Q.      Well, so you'd agree with me Mr. Sims in this

19  case was let go and it stated in the letter because the

20  department wanted to have a fresh start; is that your

21  understanding?

22      A.      That's my understanding.

23      Q.      Okay.  Is there any written policy in place

24  that would essentially let a supervisor get rid of

25  existing subordinates in order to obtain a fresh start?

EXHIBIT
5

1              MR. BENNETT:  Objection to form.  You

2       can answer if you can.

3   BY THE WITNESS:  (Resuming)

4       A.     I'm not aware of any written policy.

5       Q.     Is there any informal policy?

6       A.     I'm not aware of any policy.

7       Q.     Okay.  Is it a practice of the City that when

8   a new supervisor comes in, they release subordinates to

9   get a fresh start in that given department?

10       A.     I'm not aware, sir.

11       Q.     Okay.  Is there any review process that any

12   supervisor would do either under written policy,

13   unwritten policy, practice, custom, anything that a new

14   supervisor would come in and review existing staff prior

15   to making termination decisions?

16       A.     I'm not -- I don't understand your

17   question --

18       Q.     Okay.

19       A.     -- because I am a supervisor.  As a

20   supervisor I observe my staff when I come into the

21   position.

22       Q.     Right.  And that's what -- really what I'm

23   trying to find out.  I understand your practice.  Is

24   there any formalized system of review that the City would

25   have a supervisor go through in terms of