**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **JARVIS SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | **1:22-cv-00099-JRH-BKE** |
| **vs.** | ) | |
| | ) | |
| **CITY OF AUGUSTA-** | ) | |
| **RICHMOND COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Jarvis Sims, Plaintiff in the above-styled action, and hereby files this Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, respectfully requesting that this Court deny Defendant's Motion for Summary Judgment based on the following:

## INTRODUCTION

Jarvis Sims served the City of Augusta-Richmond County ("Augusta" or "Defendant") first as a Deputy Administrator, then as the interim Administrator prior to the hiring of Mr. Odie Donald as the permanent Administrator. During that time, Mr. Sims suffered from chronic kidney disease, a medical condition that worsened over time. When Mr. Donald assumed office in late 2020, Mr. Sims' kidney disease had progressed to late-stage kidney failure. Mr. Sims had to undergo surgery to prepare for dialysis, hoping it would buy him for a kidney transplant. Mr. Sims took leave under the Family and Medical Leave Act ("FMLA") to have that surgery. When he returned to his job from leave, he immediately perceived hostility and an effort to prevent him from effectively doing his job. When he notified Augusta that he believed he had a match for a kidney transplant and that

he would like to request additional time off for the transplant, he was fired. Thirty-five (35) days after he returned from FMLA leave, Mr. Sims was terminated – without cause – and told only that Mr. Donald wanted to give the Office of the Administrator a "fresh start."

Defendant now contends that there is no genuine issue of material fact in this case. However, there is ample evidence such that a reasonable factfinder could conclude that Mr. Sims was discriminated against because of his disability and this "fresh start" excuse was mere pretext. First, Mr. Donald never evaluated Mr. Sims to determine whether he was a good fit for Mr. Donald's view of the Office of the Administrator. Second, this effort to create a "fresh start" was made approximately five months after Mr. Donald took the position and no replacement candidate was selected for the position for four months after Mr. Sims was fired. Third, Mr. Donald deviated from standard practice in not involving Human Resources in his decision to terminate Mr. Sims weeks after he returned from leave and days after providing notice that he would need additional time off for a transplant. Accordingly, for the following reasons, Plaintiff asks the Court deny Defendant's Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS

Mr. Sims became Deputy Administrator with the City of Augusta on August 13, 2018. *See* Defendant's Statement of Material Facts ("DSOMF") ⁋ 23. In April of 2019, the Commission voted to release former Administrator Janice Allen Jackson from her position. DSOMF ⁋ 29. Shortly thereafter, on April 16, 2019, the Commission voted to appoint Mr. Sims as interim Administrator. DSOMF ⁋ 30. Mr. Sims held this position until November 14, 2020, at which point Odie Donald was hired as the Administrator and Mr. Sims returned to his position as Deputy Administrator. DSOMF ⁋ 30; Plaintiff's Statement of Additional Facts ("PSAF") ⁋ 1.

Mr. Sims' job duties as a Deputy Administrator were effectively to provide "administrative support for Offices and the City" and "manag[e] the work of department heads." PSAF ¶ 3. More specifically, Mr. Sims oversaw eight departments, including housing, community development, parks and recreation, engineering, environmental services. *Id.* An essential function of Mr. Sims' job was to attend meetings with all department heads and facilitate individual meetings with each department head to go over operational matters. PSAF ¶ 4.

Mr. Sims has worked in local government for more than twenty years. PSAF ¶ 5. Throughout this time, Mr. Sims had chronic kidney disease, a medical condition in which the renal system deteriorates over time. PSAF ¶ 6. When Mr. Donald assumed the role of Administrator and Mr. Sims returned to the role of Deputy Administrator in November of 2020, Mr. Sims had entered chronic kidney disease stage five. PSAF ¶ 7.  As a result, Mr. Sims was experiencing several symptoms that impacted his daily life and his ability to live and work, such as fatigue, nausea, difficulty sleeping, lack of focus, and high blood pressure. PSAF ¶ 8. Due to Mr. Sims' worsening medical condition, his doctor, Dr. Matthew Diamond, recommended placing Mr. Sims on a peritoneal dialysis ("PD") catheter, which was needed to begin the process of dialysis. DSOMF ¶ 41. On November 12, 2020, Mr. Sims submitted FMLA certification paperwork to Defendant's Human Resources Department. DSOMF ¶ 43. This marked the first of many interactions that Mr. Sims had with the Human Resources Department Director, Anita Rookard, regarding his medical condition and need for surgery. DSOMF ¶ 43, 44, 45, 46. Around that time, Mr. Donald was also notified via phone call that Mr. Sims would be taking FMLA and was provided with his FMLA paperwork. PSAF ¶ 9.

Mr. Sims was open about the implications of his kidney failure, notifying Ms. Rookard that he was actively looking for a donor so he could undergo a kidney transplant. PSAF ¶ 10. In fact,

Mr. Sims was communicating with a friend who had agreed to donate his kidney and they were still working out scheduling. *Id.* Mr. Sims told Ms. Rookard that when a donor was confirmed, he would need to take additional time off to have a transplant. PSAF ⁋ 11. Mr. Sims even asked Ms. Rookard as to the process for taking additional time off, to which she replied that he "would be eligible for the sick leave pool" and could use it once the time came. PSAF ⁋ 12. However, Ms. Rookard advised Mr. Sims that it was Mr. Donald who would have to provide official approval that Mr. Sims was eligible for the sick leave pool. PSAF ⁋ 13. Mr. Donald was the sole authority who could approve Mr. Sims' sick leave pool request. *Id.* Ms. Rookard assured Mr. Sims that she would discuss Mr. Sims' health condition with Mr. Donald for the purposes of notifying him that he would be applying to utilize the sick leave pool when he needed to schedule the transplant surgery. PSAF ⁋ 14.

Mr. Sims began his FMLA leave on November 20, 2020, a week after he returned to the position of Deputy Administrator and Mr. Donald became Administrator. PSAF ⁋ 15. Mr. Sims returned to work from FMLA leave on February 25, 2021. *Id.* After Mr. Sims returned from FMLA leave, he faced sudden hostility and exclusion. Mr. Sims was excluded from director's meetings with the housing community development – one of the departments that Mr. Sims was responsible for overseeing. PSAF ⁋ 16. Mr. Sims was also excluded from "meetings within the department, within the administrator's office, [and] with the other deputy and other administrators[.]" PSAF ⁋ 17. Mr. Sims was never provided an explanation as to why he was excluded from meetings he regularly attended prior to taking FMLA leave. PSAF ⁋ 18. At the meetings that Mr. Sims was allowed to attend after his return from FMLA, Mr. Donald was publicly "very critical of [Mr. Sims'] work to the point where he made demeaning comments… in [the] small office meeting." PSAF ⁋ 19. Mr. Sims noted that his treatment was "totally different" after "coming back from

FMLA." *Id.* Precisely 35 days after Mr. Sims returned to work, on April 1, 2021, he was terminated without cause by Defendant. PSAF ℙ 20.

As the head of his department, Mr. Donald had the "ability to hire and fire [employees in his office] within allowable rules and regulations and policy." PSAF ℙ 21. The Defendant a systematic protocol for contemplating the termination of any employee within the organization. PSAF ℙ 22. This protocol necessitated the involvement of several key personnel: the Administrator or, if unavailable, the Deputy Administrator of the concerned department; the HR Director; the designated EEO official, and the appointed attorney for the said department. *Id.* These protocols were upheld and followed by Mr. Sim's predecessor, Ms. Janice Jackson, and by Mr. Sims in his capacity as interim Administrator. PSAF ℙ 23. Mr. Donald was also expected to apply the same protocols. *Id.* Mr. Donald is of the opinion that he consulted with Wayne Brown (hereinafter, "Mr. Brown"), the City's General Counsel and Ms. Rookard prior to Mr. Sims' termination. PSAF ℙ 24. However, Ms. Rookard maintains that Mr. Donald did *not* consult her about the termination of Mr. Sims prior to the same. PSAF ℙ 25.  In fact, Ms. Rookard did not become aware that Mr. Donald wanted to terminate Mr. Sims until the day he was terminated, on April 1, 2021. *Id.*

Mr. Donald's stated reason for terminating Mr. Sims was that he wanted to give the Office of the Administrator a "fresh start." PSAF ℙ 26. There is not, however, any written or informal policy in place that lets a supervisor get rid of existing subordinates in order to obtain a "fresh start." PSAF ℙ 27. It is common practice for Administrators to "evaluate an organization and… bring in staff" once they assume their position. PSAF ℙ 28. However, it is not established policy for the Administrator to replace the previous staff of the Office of the Administrator once a new Administrator assumes the role. PSAF ℙ 28. In fact, it is common for a new administration to retain individuals from the previous organization. PSAF ℙ 30.

Mr. Donald sought this "fresh start" on April 1, 2021; five months after he assumed his role as Administrator. PSAF ⁋⁋ 39; 40. Mr. Donald's explanation for the gap is that he first had to (1) come in and "find [his] way around the building", (2) evaluate the budget, (3) evaluate what the Commission is desiring from the organizations, and (4) evaluate what the citizens would like to see. *Id.* While it is customary for every department in the City of Augusta to do evaluations of their employees, Mr. Donald did not perform an evaluation of the staff working in the Office of the Administrator when he became Administrator in November of 2020. PSAF ⁋⁋ 31; 32. Mr. Sims' personnel file, kept and updated by the Human Resources department, does not contain any evaluations of Mr. Sims by Mr. Donald. PSAF ⁋ 33.  Mr. Donald never conducted a formal evaluation of Mr. Sims's performance as Deputy Administrator. PSAF ⁋ 34. Mr. Donald was not aware that any individual working for the City of Augusta had a negative opinion of Mr. Sims' work performance. PSAF ⁋ 35. Ms. Rookard was not aware of any complaints or negative reviews made about Mr. Sims. PSAF ⁋ 36. Ms. Rookard was not aware of any complaints made about Mr. Sims' work performance. PSAF ⁋ 37. Ms. Rookard had no reason to believe that Mr. Sims was not qualified for his role as the interim Administrator or Deputy Administrator. PSAF ⁋ 38.

Despite Mr. Donald's purported desire to find the right people for his vision of the Office of the Administrator, he had no recollection of having any conversations with Mr. Sims after his return from FMLA leave about his vision for the new Office of the Administrator or how Mr. Sims might fit into it. PSAF ⁋ 41. Mr. Donald cannot recall if he ever evaluated Mr. Sims to determine whether his skill set aligned with the goals that he had for the Office of the Administrator. PSAF ⁋ 42. Prior to terminating Mr. Sims, Mr. Donald did not perform any kind of evaluation to determine if Mr. Sims was a good fit for another position in the City of Augusta. PSAF ⁋ 43. He never had any conversation with Mr. Sims about his imminent termination. PSAF ⁋ 44.

Mr. Sims was notified of his termination on April 1, 2021, at a meeting with Ms. Rookard and Mr. Donald, where they handed him a letter of termination. PSAF ¶ 45. Mr. Donald never provided Mr. Sims with a specific reason as to why he was being terminated. PSAF ¶ 46. At the meeting, he asked Ms. Rookard how this would affect his kidney disease, as he needed insurance for continuous treatment. PSAF ¶ 47. In response, Ms. Rookard and Mr. Donald shrugged their shoulders. *Id.* Ms. Rookard and Mr. Donald told Mr. Sims that the termination was effective immediately and that he needed to leave the building as soon as possible. *Id.*

Despite the stated goal of a "fresh start" for the office, Mr. Donald did not have a person in mind to replace Mr. Sims when he fired Mr. Sims. PSAF ¶ 48. Mr. Donald did not hire a new Deputy Administrator to replace Mr. Sims until August 7, 2021, 128 days after his termination. PSAF ¶ 49.

## ARGUMENT AND CITATION OF AUTHORITY

### A.   Summary Judgment Standard.

Summary judgment is only appropriate when the moving party can establish that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. V. United States,* 516 F.3d 1235, 1243 (11th Cir. 2008). A fact is material if "it would affect the outcome of the suit under the governing law." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 247-248 (1986)).

In deciding a summary judgment motion, the Court should view the facts in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). All facts and all inferences must be construed in favor of the non-movant. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868, (2014). The essential question is "whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

"If reasonable minds could differ as to the import of the evidence… and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Storm v. ITW Insert Molded Prods*, 470 F. Supp.2d 117, 122 (D. Conn. 2007). A trial court may not decide between competing factual disputes in ruling a motion for summary judgment. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (*citing Anderson*, 477 U.S. at 255). If a reasonable jury could return a verdict for the nonmoving party, summary judgment is inappropriate. *Id.*

Summary Judgment should not be granted unless it is clear that a trial is unnecessary and any doubts in this regard should be resolved against the moving party. *Anderson*, 477 U.S. at 255; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

**B.    There is a genuine issue of fact as to whether Defendant retaliated against Mr. Sims under the ADA and FMLA for taking FMLA leave for his disability when it terminated his employment without cause.**

To succeed on either an ADA or FMLA retaliation claim, a party must demonstrate that their employer "intentionally discriminated against [him] in the form of an adverse employment action" for having exercised a protected right. *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). In other words, Plaintiff must show "that [his] employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* (*quoting King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). The moving party can prove retaliation using direct and/or circumstantial evidence. *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017). Given the covert nature that discrimination frequently takes on, most retaliation cases surround circumstantial evidence of

retaliation. This case is no exception; while Mr. Sims cannot provide direct evidence of retaliation, there is ample circumstantial evidence of retaliation.

Where an employee alleges retaliation under the FMLA or the ADA without direct evidence of the employer's intent, the Court applies the burden shifting framework established in *McDonnell Douglas Corp. v. Green*. *See Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018). To establish a prima facie case of retaliation under either act, an employee must demonstrate (1) [he] engaged in statutorily protected activity, (2) [he] suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Id. See also Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010).

(a)    Defendant does not dispute the first two elements of a prima facie case.

In its Motion for Summary Judgment, Defendant does not dispute that Mr. Sims meets the first prong of the framework's prima facie test. That is, Mr. Sims undoubtedly engaged in a protected activity by taking FMLA leave from November 20, 2020 to February 15, 2021. *See Meade v. Gen. Motors LLC*, 317 F. Supp. 3d 1259, 1281 (N.D. Ga. 2018) (holding that an employee's decision to take FMLA leave is statutorily protected activity).

Defendant also does not dispute that Mr. Sims suffered an adverse employment decision when he was terminated by Defendant on April 1, 2021. Termination "is certainly an adverse employment action." *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1298 (11th Cir. 2006).  Therefore, Mr. Sims suffered an adverse employment decision when he was terminated by Defendant on April 1, 2021.

(b)    There is a genuine issue of material fact as to the third element of causation.

Defendant does dispute the third element of the prima facie case, causation.

"[T]o demonstrate a causal connection [Dobson] needs to demonstrate only that the protected activity and adverse action were not completely unrelated." *Caldwell v. Clayton Cty. Sch. Dist.*, 604 F. App'x 855, 860 (11th Cir. 2015) (*per curiam*)

> (unpublished) (citation omitted). "Close temporal proximity between the
> employee's protected conduct and the adverse employment action generally is
> sufficient to create an issue of fact to establish a causal connection." *Stokes v. City
> of Montgomery*, Civil Action No. 2:07cv686–WHA, 2008 WL 4369247, at *15
> (M.D. Ala. Sept. 25, 2008) (citation omitted); *see also Thomas v. Cooper Lighting,
> Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citation omitted) ("The
> burden of causation can be met by showing close temporal proximity between the
> statutorily protected activity and the adverse employment action."); *Hurlbert v. St.
> Mary's Health Care Sys.*, Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (citation
> omitted). "But mere temporal proximity, without more, must be 'very close,' " and
> a "three to four month disparity between the statutorily protected expression and
> the adverse employment action is not enough." *Thomas*, 506 F.3d at 1364 (citation
> omitted).

*Dobson v. Fulton Cnty., Georgia*, No. 119CV00902ELRRGV, 2020 WL 5549246, at *12 (N.D.

Ga. July 9, 2020), *report and recommendation adopted*, No. 1:19-CV-00902-ELR, 2020 WL

5548771 (N.D. Ga. Aug. 31, 2020); *see also Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th

Cir. 2013); *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010).

　　　In this case, Mr. Sims was terminated from his position by Mr. Donald thirty-five (35) days

after returning from FMLA leave. PSAF ⁋ 20. There is ample evidence that both Mr. Donald and

the Human Resources department knew that Mr. Sims had taken FMLA leave and had made it

known that he would need additional leave time for a potential transplant. *See* PSAF ⁋ 9; DSOMF

⁋ 43, 44, 45, 46. On November 12, 2020, Mr. Sims submitted FMLA certification paperwork to

Defendant's Human Resources Department, marking the first of many interactions that Mr. Sims

had with the Human Resources Department Director, Mr. Anita Rookard, regarding his medical

condition and need for surgery. DSOMF ⁋ 43, 44, 45, 46. Further, the Human Resources

Department notified Mr. Donald shortly after Mr. Sims was approved for FMLA leave and gave

him all of Mr. Sims' FMLA paperwork. PSAF ⁋ 9. Therefore, both the Human Resources

Department and Mr. Donald knew of Mr. Sims' FMLA leave before Mr. Sims left to undergo

surgery. Therefore, Defendant was aware of the protected conduct at the time of the adverse employment action.

Courts have held that "close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). The Eleventh Circuit has held that "temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs[;] … to hold otherwise would undermine the remedial purposes of the FMLA." *Jones*, 854 F.3d at 1272. Courts have grappled with the period that constitutes "temporal proximity" between the employee's protected conduct and the adverse employment action, typically holding that a period of around thirty days is sufficiently close to create a genuine issue of material fact. *Chavous v. City of Saint Petersburg*, 576 F. Supp. 3d 1040, 1058 (M.D. Fla. 2021), *reconsideration denied*, No. 8:20-CV-1614-KKM-JSS, 2022 WL 252577 (M.D. Fla. Jan. 27, 2022). In this case, Mr. Sims was terminated 35 days after he returned to work and days after he discussed the need for additional time for the transplant. PSAF ⁋ 19. Mr. Sims' FMLA leave – taken for the purpose of undergoing surgery to install a peritoneal dialysis ("PD") catheter – ran from November 20, 2020 until February 15, 2021. DSOMF ⁋ 41, 48. However, Mr. Sims needed ten (10) additional days to recover from surgery, and therefore did not return to work until February 25, 2021. DSOMF ⁋ 56; PSAF ⁋ 14. He was thereafter terminated 35 days later, on April 1, 2021. PSAF ⁋ 19.

The Eleventh Circuit has held that a thirty-six (36) day gap between the date an employee returns to work and the date of his termination is sufficiently close to "rais[e] a genuine dispute as

to whether [the employee's] taking of FMLA leave and his termination were casually related." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1273 (11th Cir. 2017). While the Court of Appeals in *Jones* did not *require* additional evidence to determine a survival of summary judgment, the Court entertained evidence that corroborated the causal connection. Here, ample evidence is present.

After returning from FMLA leave, Mr. Sims experienced persistent exclusion and demeaning behavior that ultimately culminated in his termination. In a nutshell, the role of a Deputy Administrator requires managing the work of department heads and providing administrative support for offices and the City. PSAF ⹋ 3. Further, Mr. Sims oversaw eight departments, including housing, community development, parks and recreation, engineering, environmental services. PSAF ⹋ 3. An essential function of Mr. Sims' job was to attend meetings with all department heads and facilitate individual meetings with each department head to go over operational matters. After Mr. Sims returned to work following his FMLA leave, he was excluded from several meetings "within the department, within the administrator's office, with the other deputy, and other administrators[.]" PSAF ⹋ 16. Mr. Sims was never provided a reason as to why he was excluded from meetings he regularly attended prior to taking FMLA leave. PSAF ⹋ 17. At the meetings that Mr. Sims was allowed to attend after his return from FMLA, Mr. Donald was publicly "very critical of [Mr. Sims'] work to the point where he made demeaning comments…in our small office meeting." PSAF ⹋ 18. Mr. Sims noted that his treatment was "totally different" after "coming back from FMLA." PSAF ⹋ 19. These actions corroborate Mr. Sims' claim that his FMLA leave, and his termination were not "wholly unrelated." *See Krutzig*, 602 F.3d at 1234; *see also* Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 595 (11th Cir. 2017) (holding that the causation prong for the purpose of a prima facie FMLA retaliation claim was satisfied when

the plaintiff was fired less than two weeks after her last day of FMLA leave and the "evidence of temporal proximity [was] strongly corroborated" by her supervisor's negative comments regarding her FMLA leave). Therefore, when analyzed in light most favorable to the nonmoving party, Mr. Sims has raised a genuine dispute of material fact that the protected activity and the adverse employment action were not wholly unrelated. *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017).

**C.     There is a genuine issue of fact as to whether Defendant discriminated against Mr. Sims in violation of the ADA.**

To establish a prima facie case of employment discrimination based on his alleged disability under the ADA, the plaintiff must demonstrate that (1) he has a disability; (2) he is qualified to perform the essential functions of the position with or without reasonable accommodation; and (3) his employer discriminated against him because of his disability. *See Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir.1997).

(a)     <u>Plaintiff is disabled and his disability falls within the definition of "disability" under the ADA.</u>

In order to satisfy his first burden, the Plaintiff must show that he is disabled and that his disability falls within the definition of "disability" under the ADA. *See Vaughn v. Nationsbank Corp.*, 137 F. Supp. 2d 1317, 1323 (N.D. Ga. 2000). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such impairment; or, (C) being regarded as having such impairment." 42 U.S.C. § 12102(2). Mr. Sims must be deemed to be "disabled" for the purposes of the ADA if he satisfies one of these three definitions.

The Supreme Court has explained that, in deciding whether a physical impairment under 42 U.S.C. § 12102(2)(A) limits one or more of the plaintiff's major life activities, Courts must first determine whether the plaintiff has an impairment and then determine whether that impairment

constitutes a major life activity. *See Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196. These inquiries under the ADA are questions of law for the court. *Id.* Although the ADA does not define "impairment," courts can utilize the Equal Employment Opportunity Commission ("EEOC") regulations issued to implement Title I of the ADA, which provides that a physical impairment can be "any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal ... digestive, genitourinary, hemic and lymphatic, skin and endocrine ...." 29 C.F.R. § 1630.2(h)(1) (1999). This list is not exhaustive and merely indicates some disablements that fall within the meaning of impairment under the ADA. Where the Plaintiff's "impairment" is stage five kidney disease (kidney failure) or weekly dialysis, as it is here, Courts have a disability. *See Vaughn v. Nationsbank Corp.*, 137 F. Supp. 2d 1317, 1324 (N.D. Ga. 2000).

The next step in the analysis is whether the physical impairment substantially limits a major life activity. *See Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir.1996). Courts, including the Eleventh Circuit, frequently look to EEOC regulations for this analysis. *Id.* These regulations explain that the term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(i), (ii) (1997). Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(*i*) (1997).

Here, Mr. Sims' alleged disability is stage five kidney disease (kidney failure). This condition "clearly has a substantial limitation on [Plaintiff's] mobility and renal function which greatly impairs his ability to perform his job" such that Plaintiff "has a disability within the meaning of the ADA and has satisfied the first element of his prima facie case of employment discrimination." *See Vaughn v. Nationsbank Corp.*, 137 F. Supp. 2d 1317, 1324 (N.D. Ga. 2000). Accordingly, Plaintiff can establish that he has a disability as contemplated by the ADA.

(b)   <u>Plaintiff is a qualified individual with a disability who can perform the essential functions of his job.</u>

In order to satisfy the second element, the Plaintiff must show that he is a "qualified individual with a disability" who "with or without reasonable accommodation, can perform the essential functions of his [the] employment position." 42 U.S.C. § 12111(8). In analyzing "qualified" under the ADA, Courts focus on whether the Plaintiff can ably perform his job. *See* 29 C.F.R. § 1630.2(m–n) (1999). Here, Defendant's own Administrator and Human Resources Director concede that Mr. Sims never received any complaints or negative reviews – either personally or about his work performance. PSAF ¶¶ 28, 29. Mr. Sims served for years as a Deputy Administrator and his termination was not for any failure to perform or lack of qualification for the position. Moreover, the Defendant does not dispute that he was qualified for his role. PSAF ¶ 38. Therefore, Mr. Sims satisfies this requirement.

(c)   <u>A reasonable fact-finder could conclude that Plaintiff was discriminated against because of his disability.</u>

In order to satisfy the third element, the Plaintiff must show that he was subjected to unlawful discrimination because of his disability. 42 U.S.C. §§ 12112(a); *see Morisky v. Broward County,* 80 F.3d 445, 447–49 (11th Cir.1996). "This third element is more properly stated as 'the defendant took an adverse employment action.'" *Equal Emp. Opportunity Comm'n v. Phoebe Putney Mem'l Hosp., Inc.*, 488 F. Supp. 3d 1336, 1351 (M.D. Ga. 2020). The plaintiff's burden to

initially satisfy the elements of a prima facie case is not great. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The burden of establishing a prima facie case ... is not onerous"); *see Turlington v. Atlanta Gas Light Co.*, 153 F.3d 1428, 1432 (11th Cir. 1998) ("[A] plaintiff's burden in proving a prima facie case is light."); *see Reed v. Huntsville City Bd. of Educ.*, No. CV-06-S-1071-NE, 2009 WL 10703860, at *8 (N.D. Ala. Feb. 24, 2009) (*referencing Williams v. Ford Motor Co.,* 14 F.3d 1305, 1308 (8th Cir.1994) (it requires only that the plaintiff establish facts adequate to permit an inference of discrimination)). If a Plaintiff does so, then she "is entitled to survive summary judgment." *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

Here, Plaintiff was subjected to an adverse employment action – termination – and there is ample evidence sufficient to create a genuine issue of fact as to whether Mr. Sims was discriminated against because of his disability. Mr. Sims made the Defendant aware of his worsening condition and provided medical documentation in support of the same. DSOMF ¶ 46. Mr. Donald was notified by Human Resources, pursuant to established policy. PSAF ¶ 9. After returning from FMLA leave, Mr. Sims approached Ms. Rookard about needing additional time for a kidney transplant surgery. PSAF ¶¶ 10, 11. Ms. Rookard told Mr. Sims that she would discuss Mr. Sims' health condition with Mr. Donald to obtain approval for use of the sick pool. PSAF ¶ 14. There is a conflict in the record as to whether Mr. Donald actually consulted with Ms. Rookard prior to termination (though the standard process would be to do so). PSAF ¶¶ 24, 25.

Given the evidence, particularly the temporal proximity and the lack of an articulable basis beyond a "fresh start" for the office, a reasonable juror could conclude that there was a causal link between Mr. Sims disability and his termination.

**D.**     **There is a genuine issue of material fact sufficient to survive summary judgment as to whether Defendant's proffered, non-discriminatory reason for terminating Plaintiff is pretext for discrimination.**

Retaliation claims under the ADA and the FMLA and discrimination cases under the ADA based on circumstantial evidence are all analyzed under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Cusick v. Yellowbook, Inc.*, 607 F. App'x 953, 954–55 (11th Cir. 2015) (ADA discrimination); *Batson*, 897 F.3d at 1328–29 (ADA & FMLA retaliation). If the employee can establish a prima facie case, the burden shifts back to the employer to "articulate a legitimate, nondiscriminatory reason" for his termination. *Velez v. Sprint/United Mgmt. Co.*, No. 619CV987ORL31LRH, 2020 WL 8224605, at *3 (M.D. Fla. Dec. 15, 2020). Finally, if the employer meets this burden, then the employee must show that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination. *Id.* To satisfy this burden, the employee must present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1244 (11th Cir. 2010). "One way a plaintiff can satisfy [his] burden is by demonstrating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *See Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1235 (S.D. Fla. 2022).

There is a genuine issue as to whether defendant has even presented a legitimate, nondiscriminatory reason to rebut. Defendant's proffered reason for Mr. Sims' termination is simply that Mr. Donald wanted to give the Office of the Administrator a "fresh start." This is another way of saying that the Defendant fired Plaintiff without any reason at all, let alone a nondiscriminatory one. There is evidence that this was not standard practice for the Defendant.

PSAF ⁋⁋ 27; 28. There is, indeed, evidence to the contrary. PSAF ⁋ 30. A generic "fresh start" basis gives no more reasoning than if a decision maker says "I don't want you to work for me anymore." If such a statement automatically defaults to being a "legitimate, nondiscriminatory reason," it significantly undermines the burden shifting analysis. Employers would automatically satisfy the burden by just firing employees and giving no reason at all. Accordingly, there is no legitimate reason for the Plaintiff to even rebut and a jury should determine the ultimate question of discrimination.

However, assuming for the sake of argument that the "fresh start" rhetoric is considered a legitimate non-discriminatory reason, there is ample evidence for a reasonable factfinder to find that reason unworthy of credence. For example, Mr. Sims firing deviated significantly from protocol for terminating employees. Normal protocol included the involvement of several key personnel: the Administrator or, if unavailable, the Deputy Administrator of the concerned department; the HR Director; the designated EEO official, and the appointed Attorney for the said department. PSAF ⁋⁋ 22, 23. Here, however, the Director of HR claims that she was not involved at all and did not know Mr. Sims was going to be terminated until she appeared at the meeting for his termination on April 1, 2021. PSAF ⁋ 25.

Moreover, according to Defendant, there is no written or informal policy in place that lets a supervisor get rid of existing subordinates in order to obtain a "fresh start." PSAF ⁋⁋ 27, 28, 29. While it is common practice for the Administrator to "evaluate an organization and… bring in staff" once they assume their position, none of that took place here. Mr. Donald never evaluated Mr. Sims to gauge his professional capabilities or whether he would be a good fit with the new administration; there is no record that Mr. Donald performed *any* evaluation of Mr. Sims during his time as Administrator. PSAF ⁋⁋ 33, 34. While Mr. Donald was quick to conclude that Mr. Sims

was inadequate to serve in his administration, he could not articulate any problems with Mr. Sims' performance – whether observed by him, personally, or other individuals working for the City of Augusta. PSAF ₱ 34. Ms. Rookard is similarly not aware of any complaints or negative reviews ever made about Mr. Sims or his work performance. PSAF ₱₱ 36, 37. To make matters worse, Mr. Donald cannot recall a singular conversation he had with Mr. Sims after his return from FMLA leave where he enlightened Mr. Sims about his vision for the new Office of the Administrator and evaluated whether Mr. Sims would be a good fit. PSAF ₱ 41. Mr. Donald cannot recall if he ever evaluated Mr. Sims to determine whether his skill set aligned with the goals that Mr. Donald had for the Office of the Administrator. PSAF ₱ 42. Prior to terminating Mr. Sims, Mr. Donald did not perform any kind of evaluation to determine if Mr. Sims was a good fit for another position within his Office. PSAF ₱ 43.

Moreover, Mr. Donald was so concerned about this "fresh start" that he did not have a person in mind to replace Mr. Sims when he fired him. PSAF ₱ 48. Despite the integral role that a Deputy Administrator plays in the Office of the Administrator, Mr. Donald chose to have a vacant position in his office rather than continue to employ Mr. Sims – the person who had been doing the job for years at that point, who did not have any negative evaluations, and who Mr. Donald never even tried to evaluate. Indeed, Mr. Donald did not hire a new Deputy Administrator to replace Mr. Sims for ***months*** – not until August 7, 2021, precisely one-hundred and twenty-eight (128) days after his termination. PSAF ₱ 49. In other words, based on these facts, a reasonable juror could conclude that Mr. Donald was more concerned about getting rid of Mr. Sims than he was about finding someone who met his "vision" for the Office of the Administrator.

To be clear, this is not to say that there might not be a world in which a new boss comes in and wants to clear house to satisfy some vision he or she may have for the department. But, if this

were a legitimate goal, would there not be some effort to actually see how the existing staff fits into that goal? A reasonable factfinder could find the "fresh start" statement unworthy of belief where Mr. Donald never bothered to evaluate Mr. Sims to see if he could contribute to his vision for the Office. Mr. Donald simply cannot point to any reason as to why Mr. Sims would not have been a good fit for the new Office of the Administrator because he didn't even attempt to find one. The facts in this case simply do not compel, as a matter of law, that his reason for terminating a dedicated servant like Mr. Sims were legitimate and non-discriminatory.

Plaintiffs who suffer discrimination because of their disabilities do not always have the luxury of a Defendant who says "I'm getting rid of you because I do not want to deal with your disability." In such cases, the law permits juries to make the determination as to whether an individual was terminated for a discriminatory reason. Here, a reasonable juror could conclude that Mr. Sims was not fired because of some need for a "fresh start," but rather because he had recently been diagnosed with a deadly disease – one that had recently forced Mr. Sims to take FMLA leave for twelve (12) weeks, one that had recently forced Mr. Sims to alert Ms. Rookard that he may need additional leave in the future for a kidney transplant, and one that Mr. Donald simply did not want to deal with early in his tenure as the new Administrator. There is a genuine issue of material fact sufficient to survive summary judgment and the Motion should be denied.

**E.     There is a genuine issue of material fact as to whether Defendant failed to accommodate Mr. Sims under the ADA.**

To establish a claim of failure to reasonably accommodate a disability, a plaintiff must prove: (1) he has a disability within the meaning of the statute; (2) defendant had notice of his disability; (3) with a reasonable accommodation he could perform the essential functions of his position; and (4) the defendant refused to make such accommodations. *Richardson v. Honda Mfg. of Alabama, LLC*, 635 F. Supp. 2d 1261, 1279 (N.D. Ala. 2009). An employer must provide

reasonable accommodations for employees with known disabilities unless the accommodations would cause undue hardship to the employer. *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1365 (11th Cir. 2000). "Accommodations are reasonable, and thus required under the Act, only if they allow the employee to perform his essential job functions." *Id.* Plaintiff has the burden of identifying a reasonable accommodation that would allow his to perform the essential functions of his job. *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1286 (11th Cir.1997).

As outlined above, Mr. Sims has a disability within the meaning of the ADA. Further, Defendant has conceded that it had notice of Mr. Sims' disability. *See* DSOMF ¶¶ 42, 45, 46, 47, 52. Mr. Sims spoke extensively with the Human Resources Director, Ms. Rookard. *See* DSOMF ¶¶ 42, 45, 46, 47, 52. Ms. Rookard was intimately aware that Mr. Sims' kidney disease had progressed into kidney failure, and that Mr. Sims was attempting to obtain a kidney transplant. PSAF ¶¶ 10, 11. While it is true that Mr. Sims never had any discussions with Mr. Donald regarding the details of his disability, Mr. Donald still had ample notice of the same. PSAF ¶ 9. In fact, Human Resources informed Mr. Donald via phone call that Mr. Sims would be taking FMLA leave and provided him with Mr. Sims' FMLA paperwork, which detailed Mr. Sims' chronic kidney disease. *Id.* Therefore, a reasonable factfinder could conclude that Defendant had notice of Mr. Sims' disability.

Defendant argues that it accommodated Mr. Sims by approving his FMLA leave. However, this is not the concern. It is Mr. Sims' position that Defendant failed to accommodate him by firing him shortly after he notified them that he would need additional leave to undergo a kidney transplant; leave that he notified Defendant he would need in May and that Defendant contends he should have been able to receive under the Defendant's sick pool policy. PSAF ¶¶ 10-14. Mr. Sims had discussions with the Defendant about his imminent kidney transplant, notifying them that he

had found a potential match. *Id.* Mr. Sims inquired as to how he was able to take additional leave having exhausted FMLA leave, but knowing that additional sick pool leave was available. *Id.* In response, Ms. Rookard informed Ms. Sims that he "would be eligible for the sick leave pool" and could use it once the time came. PSAF ℙ 12. Additional leave outside of FMLA leave is a standard form of accommodation under the ADA, and there is no doubt that Mr. Sims alerted the Defendant that he would need it, even if he did not know the precise date of the transplant surgery at the time he made the request.

It is Defendant's position that Mr. Donald did not fail to accommodate Mr. Sims before terminating him because Mr. Sims did not *formally* submit a sick leave pool request for a specific date. However, organ transplants, by their nature, are usually not the type that can be scheduled with specificity; they are dependent on the availability of the organ. In this case, Mr. Sims was communicating with a friend who had agreed to provide the organ and they were still working out scheduling. PSAF ℙ 10. The friend ultimately backed out, but that is immaterial to the fact that Mr. Sims put the Defendant on notice and requested the accommodation of additional time off to address his disability. Mr. Donald had ample notice of Mr. Sims' plan to request additional time off for a transplant. PSAF ℙ 9. There is evidence in the record that Ms. Rookard would notify him as much shortly after Mr. Sims made it known to her. *Id. See also,* PSAF ℙℙ 10-14.

Further, Mr. Sims' unfulfilled request for accommodation was not unreasonable. Requesting time off for a kidney transplant that would quite literally save Mr. Sims' life and improve his quality of living may be construed as a reasonable accommodation under the ADA. The standard puts the onus on the employee to identify an accommodation "that would allow [him] to perform the essential functions of [his] job." *Richardson v. Honda Mfg. of Alabama, LLC*, 635 F. Supp. 2d 1261, 1279 (N.D. Ala. 2009). In this case, limited time off for a kidney transplant

would have allowed Mr. Sims to perform his professional responsibilities without the daily mental and physical ailments associated with kidney failure. Mr. Sims has openly attested to his struggles during that time period, in which he felt symptoms such as fatigue, nausea, difficulty sleeping, lack of focus, and high blood pressure. PSAF ¶ 8. Asking the Defendant to allow him additional time off to undergo surgery is a reasonable accommodation. As the kidney transplant would exponentially increase his quality of life (and, therefore, ability to work), Mr. Sims' requested accommodation would allow him to perform the essential functions of his job.

Lastly, there is ample evidence that Defendant refused to provide such accommodation, firing Mr. Sims instead. Mr. Sims was terminated without any cause mere days after he put the Defendant on notice of his accommodations request. When viewed in light most favorable to the Plaintiff, a reasonable factfinder could conclude that the two incidents are related. In other words, there is a genuine issue of material fact sufficient to survive summary judgment as to whether Defendant failed to accommodate Mr. Sims by terminating him shortly after he vocalized his request for accommodation.

**F.      Plaintiff does not oppose the Defendant's Motion as to his ADEA claims.**

Mr. Sims does not oppose the Defendant's Motion as to his ADEA claims.

## CONCLUSION

Thus, based on the foregoing, Plaintiff respectfully requests that this Court deny Defendant's Motion to for Summary Judgment on all claims except as to Count IV of his Complaint, dealing with the ADEA.

Respectfully submitted this 9th day of October, 2023.

SMITH WELCH WEBB & WHITE, LLC

*/s/Grant E./ McBride*
Grant E. McBride
Georgia Bar No. 109812

Megan Murren Rittle
Georgia Bar No. 384595
Attorneys for Plaintiff

P. O. Box 10
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 (telephone)
(770) 957-9165 (facsimile)
gmcbride@smithwelchlaw.com
mrittle@smithwelchlaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

| | | |
|---|---|---|
| **JARVIS SIMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.:** |
| | ) | **1:22-cv-00099-JRH-BKE** |
| **vs.** | ) | |
| | ) | |
| **CITY OF AUGUSTA-** | ) | |
| **RICHMOND COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### CERTIFICATE OF SERVICE

This is to certify that on October 9, 2023, I electronically filed **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to attorneys of record.

Respectfully submitted this 9th day of October, 2023.

SMITH WELCH WEBB & WHITE, LLC

*/s/Grant E./ McBride*
Grant E. McBride
Georgia Bar No. 109812
Megan Murren Rittle
Georgia Bar No. 384595
Attorneys for Plaintiff

P. O. Box 10
2200 Keys Ferry Court
McDonough, GA 30253
(770) 957-3937 (telephone)
(770) 957-9165 (facsimile)
gmcbride@smithwelchlaw.com
mrittle@smithwelchlaw.com