IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

JARVIS SIMS,                          *
                                      *
        Plaintiff,                    *
                                      *
            v.                        *        CV 122-099
                                      *
CITY OF AUGUSTA-RICHMOND              *
COUNTY,                               *
                                      *
        Defendant.                    *

─────────────

O R D E R

─────────────

Before the Court is Defendant's motion for summary judgment.[1]

(Doc. 42.)   For the following reasons, Defendant's motion is

**GRANTED**.

## I. BACKGROUND

Defendant is a consolidated local government.  (Doc. 42-2, ¶

1; Doc. 45, at 1.)  Defendant's governmental structure includes a

Mayor and Board of Commissioners, who are elected officials that

oversee Defendant's governmental and legislative functions.  (Doc.

42-2, ¶ 2; Doc. 45, at 1.)  Defendant's Administrator reports to

the Mayor and Board of Commissioners and oversees the day-to-day

operations of the government.  (Doc. 42-2, ¶ 3; Doc. 45, at 1.)

─────────────────────────────

[1] Plaintiff also filed a motion for extension of time to respond to Defendant's
motion for summary judgment.  (Doc. 44.)  Plaintiff timely filed his response
to Defendant's motion on October 9, 2023.  (Doc. 45.)  Therefore, Plaintiff's
motion for extension of time (Doc. 44) is **DENIED AS MOOT**.

The Administrator is responsible for hiring and firing his or her own Deputy Administrators and others within the Office of the Administrator. (Doc. 42-2, ¶ 4; Doc. 45, at 1.) The Administrator ordinarily employs two Deputy Administrators who are responsible for overseeing Defendant's departments and respective directors. (Doc. 42-2, ¶ 6; Doc. 45, at 2.)

On July 20, 2018, then-Administrator Janice Allen Jackson hired Plaintiff as a Deputy Administrator, and Plaintiff began working on August 13, 2018 as an at-will employee. (Doc. 42-2, ¶ 23; Doc. 45, at 3.) Around the same time, Ms. Jackson hired Tony McDonald as the other Deputy Administrator. (Doc. 42-2, ¶ 24; Doc. 45, at 3.)

In April 2019, Defendant's Board of Commissioners released Ms. Jackson from her position and appointed Plaintiff as Interim Administrator. (Doc. 42-2, ¶¶ 29-30; Doc. 45, at 4.) Defendant then conducted a nationwide search and ultimately selected Odie Donald to assume the Administrator position. (Doc. 42-2, ¶ 35; Doc. 45, at 4.) Mr. Donald began working on November 14, 2020, and Plaintiff returned to his position of Deputy Administrator the same day. (Doc. 42-2, ¶¶ 35-36; Doc. 45, at 4.)

Plaintiff was diagnosed with chronic kidney disease in 1998 and began experiencing worsening symptoms in November 2020. (Doc. 42-2, ¶¶ 38-39; Doc. 45, at 5.) Due to his worsening symptoms, Plaintiff's doctor recommended placing him on a peritoneal

dialysis ("PD") catheter to begin dialysis. (Doc. 42-2, ¶ 41; Doc. 45, at 5.) Plaintiff submitted a doctor's note to Defendant's Human Resources Department advising Defendant that Plaintiff was scheduled to have a PD catheter placed on December 15, 2020 and would need to miss work for three months after. (Doc. 42-2, ¶ 42; Doc. 45, at 5.) Accordingly, Plaintiff submitted Family and Medical Leave Act ("FMLA") certification paperwork to Defendant's Human Resources Department indicating he would need a leave of absence from December 15, 2020 to February 15, 2021. (Doc. 42-2, ¶ 43; Doc. 45, at 5.) Defendant's Human Resources Department approved Plaintiff's FMLA leave request. (Doc. 42-2, ¶ 44; Doc. 45, at 5.)

Later, Plaintiff contacted Anita Rookard, Defendant's Human Resources Director, and informed her his doctor wanted him to immediately start leave to prepare for surgery because his symptoms had worsened. (Doc. 42-2, ¶¶ 32, 45-46; Doc. 45, at 4-5.) Plaintiff's doctor filed updated paperwork, and Defendant's Human Resources Department granted Plaintiff's request and notified him he would be entitled to up to twelve weeks of FMLA leave from November 20, 2020 to February 15, 2021. (Doc. 42-2, ¶¶ 47-48; Doc. 45, at 6.) On November 20, 2020, Plaintiff delivered a letter to Mr. Donald's executive assistant informing him Plaintiff would be on FMLA leave from that day until February 15, 2021, but Plaintiff never discussed with Mr. Donald the nature of Plaintiff's

medical condition or the reasons for his leave of absence.  (Doc. 42-2, ¶¶ 52-53; Doc. 45, at 6.)  Moreover, neither Ms. Rookard nor anyone else spoke to Mr. Donald about Plaintiff's medical condition, and Mr. Donald had no knowledge of Plaintiff's medical condition or why he needed a leave of absence.[2]  (Doc. 42-2, ¶ 54.)

On February 15, 2021, Defendant received a letter from Plaintiff's doctor indicating Plaintiff needed more time to recover and would be cleared to return to work on February 25, 2021.  (Doc. 42-2, ¶ 56; Doc. 45, at 7.)  Defendant again granted Plaintiff's request for additional leave through February 25, 2021, even though his FMLA entitlement expired February 15, 2021, and Defendant paid him for the additional leave period through the sick pool bank.  (Doc. 42-2, ¶¶ 57-58; Doc. 45, at 7.)

Plaintiff returned to work on February 25, 2021.  (Doc. 42-2, ¶ 60; Doc. 45, at 7.)  He claims thereafter he was excluded from meetings he usually would have attended, Mr. Donald made demeaning comments about his work product, frequently made changes to his work, and became very critical of him.  (Doc. 42-2, ¶ 71; Doc. 45, at 8; Doc. 42-5, at 75.)

---

[2] Plaintiff provides shortly after Mr. Donald became the Administrator, "he was notified via phone call that [Plaintiff] would be taking FMLA and was provided with his FMLA paperwork."  (Doc. 45, at 6.)  However, as the Court explains below, the record shows Mr. Donald only knew Plaintiff would take FMLA leave, but not why.  (Doc. 45, at 24, 66.)  Therefore, the Court finds it undisputed that, although Mr. Donald knew Plaintiff was taking FMLA leave, he did not know why.

4

Shortly after returning to work, Plaintiff spoke with Ms. Rookard and advised her he was seeking a kidney transplant and would potentially need additional leave. (Doc. 42-2, ¶ 73; Doc. 45, at 9.) Plaintiff "never provided any specific dates on which he might potentially need leave," but Plaintiff claims he told Ms. Rookard he was planning the transplant for May 2021. (Doc. 42-2, ¶ 74; Doc. 45, at 9.) At no point did anyone inform Mr. Donald of Plaintiff's potential need for additional leave.[3] (Doc. 42-2, ¶ 80.) Moreover, Plaintiff never provided Ms. Rookard or anyone else with documentation requesting additional leave for a transplant or indicating he scheduled the transplant. (Doc. 42-2, ¶ 79; Doc. 45, at 9.) As of his March 30, 2023 deposition, Plaintiff still had not received a kidney transplant. (Doc. 42-2, ¶ 79; Doc. 45, at 9.)

On April 1, 2021, Mr. Donald and Ms. Rookard called Plaintiff into a meeting, and Mr. Donald informed Plaintiff he was being terminated. (Doc. 42-2, ¶ 83; Doc. 45, at 10.) During the meeting, Plaintiff was given a letter indicating that, as the new Administrator, Mr. Donald decided to give the Office of the Administrator a "fresh start," and Plaintiff was being terminated

---

[3] Plaintiff denies this statement "to the extent that Ms. Rookard indicated to [Plaintiff] that she would discuss the situation with Mr. Donald." (Doc. 45, at 9.) As the Court explains below, there is no evidence Ms. Rookard ever discussed Plaintiff's potential need for additional leave with Mr. Donald. In fact, both Ms. Rookard and Mr. Donald represent she never did. (Doc. 42-4, at 20-21, 26; Doc. 42-7, ¶ 9; Doc. 42-3, at 25; Doc. 42-8, ¶¶ 7, 9-10.) Based on this, the Court finds it undisputed that Mr. Donald was not informed about Plaintiff's potential need for additional leave for a kidney transplant.

"without cause."   (Doc. 42-2, ¶ 83; Doc. 45, at 10.)   The same day, Mr. Donald terminated Mr. McDonald for the same reason, providing him the same termination letter.   (Doc. 42-2, ¶¶ 84-85; Doc. 45, at 10.)   Mr. McDonald never took FMLA or medical leave during his employment, nor requested any kind of accommodation related to a medical condition.   (Doc. 42-2, ¶ 89; Doc. 45, at 10.)   Ms. Rookard was not involved in the decision to terminate either Plaintiff or Mr. McDonald,[4] and she was not aware of Mr. Donald's intention to do so until he asked her to sit in on the termination meeting on April 1, 2021.   (Doc. 42-2, ¶¶ 87-88; Doc. 45, at 10.)

At the time of their termination, Mr. Donald did not have a replacement in mind for either Plaintiff or Mr. McDonald.   (Doc. 42-2, ¶ 108; Doc. 45, at 12.)   Following their terminations, Defendant recruited and hired two new Deputy Administrators to fit "the new direction of the office."   (Doc. 42-2, ¶¶ 109, 111; Doc. 45, at 13.)

---

[4] Plaintiff disputes whether Ms. Rookard was involved in the decision to terminate Plaintiff and Mr. McDonald because "Mr. Donald is of the opinion that he consulted with Wayne Brown . . . , the City's General Counsel and Ms. Rookard prior to Mr. Sims's termination."   (Doc. 45 at 10 (citing Doc. 45, at 19).) However, in Mr. Donald's deposition transcript Plaintiff cites to, Mr. Donald states he "may have consulted" with Mr. Brown.   (Id. at 19.)   Ms. Rookard testified Mr. Donald did not consult her about terminating Plaintiff and Mr. McDonald before he terminated them.   (Id. at 62.)   Therefore, the Court finds it undisputed that Mr. Donald did not consult with Ms. Rookard or otherwise involve her in his decision to terminate Plaintiff and Mr. McDonald prior to their termination on April 1, 2021.

Plaintiff filed this lawsuit on July 29, 2022, asserting three claims under the Americans with Disabilities Act Amendments Act of 2008 ("ADA"), one claim under the Age Discrimination in Employment Act of 1967 ("ADEA"), and one claim under the FMLA. (Doc. 1, at 8-18, 20.) Defendant filed a motion for summary judgment on September 18, 2023, which Plaintiff partially opposes. (Docs. 42, 45.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a motion for summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of fact is 'material' if . . . it might affect the outcome of the case . . . [and it] is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted). The Court must view factual disputes in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the nonmoving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The Court should not weigh

7

the evidence or determine credibility. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998).

Defendant does not bear the burden of proof at trial and therefore may "satisfy its initial burden on summary judgment in either of two ways." McQueen v. Wells Fargo Home Mortg., 955 F. Supp. 2d 1256, 1262 (N.D. Ala. 2013) (citing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)). First, Defendant "may simply show that there is an absence of evidence to support [Plaintiff's] case on the particular issue at hand." Id. (citation omitted). If this occurs, Plaintiff "must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. (citation omitted). Or second, Defendant may "provide affirmative evidence demonstrating that [Plaintiff] will be unable to prove [his] case at trial." Id. (citation omitted and emphasis in original).

8

"Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions." Preis v. Lexington Ins., 508 F. Supp. 2d 1061, 1068 (S.D. Ala. 2007). Essentially, the Court has no duty "to distill every potential argument that could be made based upon the materials before it on summary judgment." Id. (citing Resol. Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995)). Accordingly, the Court will only review the materials the Parties specifically cite and legal arguments they expressly advance. See id.

In this action, the Clerk provided Plaintiff notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 43.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), have been satisfied. Plaintiff responded to the motion (Doc. 45), and Defendant replied in support (Doc. 48). The time for filing materials has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration. In reaching its conclusions, the Court evaluated the Parties' briefs, other submissions, and the evidentiary record in the case.

### III. DISCUSSION

Plaintiff asserts the following claims: (1) failure to accommodate in violation of the ADA; (2) retaliation in violation of the ADA; (3) discrimination in violation of the ADA; (4) discrimination in violation of the ADEA; and (5) retaliation in violation of the FMLA. (Doc. 1, ¶¶ 35-90.) Defendant moves for summary judgment on each of them. (Doc. 42-1, at 9-25.) The Court addresses each of Plaintiff's claims.

### A. ADEA Claim

Plaintiff alleges Defendant discriminated against him because of his age in violation of the ADEA. (Doc. 1, ¶¶ 71-81.) Specifically, Plaintiff claims Defendant intended to discriminate against him because of his age, and his age was the but-for cause of his termination. (Id. ¶ 75.) Defendant moves for summary judgment, arguing Plaintiff cannot establish a prima facie case of age discrimination and, even if he could, he cannot show Defendant's proffered reason for terminating him is pretextual. (Doc. 42-1, at 22-25.) Plaintiff "does not oppose" Defendant's motion for summary judgment as to his ADEA claim. (Doc. 45-2, at 23.) Based on this, the Court finds Plaintiff abandoned his claim that Defendant discriminated against him in violation of the ADEA, and Defendant's motion for summary judgment is **GRANTED** as to that claim. See Dunmar, 43 F.3d at 599 ("[G]rounds alleged in the

10

complaint but not relied upon in summary judgment are deemed abandoned." (citation omitted)).

**B. ADA Claims**

Plaintiff brings three claims under the ADA: (1) failure to accommodate; (2) retaliation; and (3) discrimination. (Doc. 1, ¶¶ 35-70.) The Court addresses each in turn.

### 1. Failure to Accommodate

Plaintiff alleges Defendant failed to accommodate him in violation of the ADA. (Doc. 1, ¶¶ 35-48.) Specifically, Plaintiff argues "Defendant failed to accommodate him by firing him shortly after he notified [Defendant] that he would need additional leave to undergo a kidney transplant." (Doc. 45-2, at 21.) Defendant contends it did not fail to accommodate Plaintiff because (1) he did not make a specific demand for an accommodation; and (2) he never had the kidney transplant, so he never required an accommodation. (Doc. 42-1, at 10-11; Doc. 48, at 11-13.)

The law is clear that "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007). To establish a prima facie case for failure to accommodate under the ADA, "the plaintiff must show that: (i) he is disabled; (ii) he is a qualified individual; and (iii) he was

discriminated against by defendant's failure to provide a reasonable accommodation." Williamson v. Clarke Cnty. Dep't of Hum. Res., 834 F. Supp. 2d 1310, 1319 (S.D. Ala. 2011) (citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001)). Moreover, to trigger an employer's duty to provide a reasonable accommodation, the employee must make a specific demand for an accommodation. Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999).

The Parties dispute whether Plaintiff made an adequate demand for accommodation when he informed Ms. Rookard he was planning to have a kidney transplant in May 2021. (Doc. 42-1, 10-11; Doc. 45-2, at 21-22; Doc. 48, at 12.) But even if this constitutes a specific demand for accommodation, Plaintiff's failure to accommodate claim still fails. Plaintiff's claim is based on him notifying Ms. Rookard "he would need additional leave to undergo a kidney transplant" in May 2021. (Doc. 45-2, at 21.) Plaintiff does not dispute that, even as of his March 30, 2023 deposition, he still had not received a kidney transplant. (Doc. 42-2, ¶ 79; Doc. 45, at 9.) As a result, even if Plaintiff would have remained employed by Defendant in May 2021, he would not have required such an accommodation to perform the essential functions of his job, so Defendant had no duty to provide him one. See D'Onofrio v. Costco Wholesale Corp., 964 F.3d 1014, 1022 (11th Cir. 2020) ("[I]f an employee does not require an accommodation to perform h[is]

essential job functions, then the employer is under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided." (citations omitted)).   Therefore, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's failure to accommodate claim.

## 2. Retaliation

Plaintiff also brings a claim for retaliation in violation of the ADA.   (Doc. 1, ¶¶ 49-59.)   Defendant moves for summary judgment, arguing: (1) Plaintiff's alleged exclusion from meetings and Mr. Donald's critical comments do not constitute adverse employment actions; and (2) it articulated a legitimate, non-discriminatory reason for terminating Plaintiff, and he cannot show that reason was pretextual.   (Doc. 42-1, at 11-22.)   In response, Plaintiff addresses his ADA and FMLA retaliation claims together.   (Doc. 45-2, at 8-13.)

"To establish a prima facie case of retaliation under [the FMLA and the ADA], an employee must demonstrate (1) that [he] engaged in statutorily protected conduct, (2) that [he] suffered an adverse employment action, and (3) that a causal connection exists between the two."   Batson v. Salvation Army, 897 F.3d 1320, 1329 (11th Cir. 2010) (citations omitted).   Plaintiff specifies the statutorily protected activity that serves as the basis of both his retaliation claims is his "taking FMLA leave from November 20, 2020 to February 15, 2021."   (Doc. 45-2, at 9 (citation

13

omitted).)   Engaging in FMLA leave is a protected activity under the FMLA, and Defendant does not argue otherwise.   (See Docs. 42-1, 48); see also Coleman v. Redmond Park Hosp., LLC, 589 F. App'x 436, 439 (11th Cir. 2014) ("The FMLA grants private employees periods of leave for certain family or health-related events." (citation omitted)).   However, Plaintiff does not cite to any authority establishing FMLA leave is a protected activity under the ADA, and the Court is unaware of any.   (See Doc. 45-2.) Moreover, the entire portion of Plaintiff's response that purportedly addresses both of his retaliation claims only discusses his FMLA retaliation claim, not his ADA retaliation claim.   (Id. at 9-13.)   Because Plaintiff failed to address Defendant's arguments as to his ADA retaliation claim, the Court finds Plaintiff also abandoned that claim.   See Dunmar, 43 F.3d at 599; Schwarz v. Bd. of Supervisors ex rel. Vills. Cmty. Dev. Dists., 672 F. App'x 981, 983 (11th Cir. 2017) (holding the plaintiffs waived any challenge to the defendants' motion for summary judgment on certain claims by failing to address them in response to the motion for summary judgment); Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."

(citations omitted)).  Accordingly, Defendant's motion for summary

judgment as to Plaintiff's ADA retaliation claim is **GRANTED**.

　　3. Discrimination

　　Plaintiff also alleges Defendant discriminated against him in

violation of the ADA.  (Doc. 1, ¶¶ 60-70.)  Defendant moves for

summary judgment on this claim.  (Doc. 42-1, at 11-22.)  Title I

of the ADA provides:

> No covered entity shall discriminate against a qualified
> individual on the basis of disability in regard to job
> application procedures, the hiring, advancement, or
> discharge of employees, employee compensation, job
> training, and other terms, conditions, and privileges of
> employment.

42 U.S.C. § 12112(a).  The Parties do not dispute there is no

direct evidence of discrimination.  (Doc. 42-1, at 12; Doc. 45-2,

at 17.)  Accordingly, the burden-shifting framework established in

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies.

Akridge v. Alfa Ins. Cos., 93 F.4th 1181, 1191 (11th Cir. 2024)

(citations omitted).  Thus, a plaintiff alleging discrimination

under the ADA bears the initial burden of establishing a prima

facie case of disability discrimination.  Id. (citation omitted).

　　To establish such a prima facia case, an employee must show:

"(1) he is disabled; (2) he was a 'qualified individual' at the

relevant time, meaning he could perform the essential functions of

the job in question with or without reasonable accommodations; and

(3) he was discriminated against because of his disability."

Lucas, 257 F.3d at 1255 (citation omitted). If the employee meets his burden of establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for his termination. Akridge, 93 F.4th at 1191 (citation omitted). If the employer provides such a reason, the burden shifts back to the employee to show the reason is pretext for discrimination. Id. (citation omitted). Only upon making this showing can the employee's claim survive summary judgment.

Plaintiff contends he satisfied his burden of establishing a prima facie case of disability discrimination. (Doc. 45-2, at 13-16.) Defendant does not dispute Plaintiff satisfies the first two prongs of the prima facie case: that he was disabled and was a "qualified individual." (See Doc. 48); see also Lucas, 257 F.3d at 1255 (citation omitted). Rather, Defendant argues Plaintiff did not satisfy the third prong: he was discriminated against because of his disability. (Doc. 48, at 4-6.) Specifically, Defendant asserts there is no dispute Mr. Donald did not know about Plaintiff's medical condition.[5] (Id.) Plaintiff disagrees,

---

[5] Although Plaintiff addresses whether Mr. Donald knew of his disability under the third prong of the prima facie case, Defendant addresses the issue in arguing Plaintiff cannot show its legitimate reason for terminating him was pretext for discrimination. (Doc. 42-1, at 19; Doc. 45-2, at 9-11; Doc. 48, at 4-5.) As discussed herein, the Eleventh Circuit has routinely addressed arguments concerning an employer's knowledge of an employee's disability under the third element of a prima facie case of ADA discrimination. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1182-86 (11th Cir. 2005). Accordingly, the Court addresses Defendant's argument that Mr. Donald lacked knowledge of

16

arguing a genuine dispute as to this fact exists. (Doc. 45-2, at 16.)

As stated previously, to establish a prima facie case for ADA discrimination, Plaintiff must show he was subject to discrimination "because of" his disability. Lucas, 257 F.3d at 1255 (citation omitted). "It is well established in this Circuit that 'a decision-maker who lacks actual knowledge of an employee's disability cannot fire the employee "because of" that disability.'" Williamson, 834 F. Supp. 2d at 1322 (citing Cordoba, 419 F.3d at 1186; Morisky v. Broward Cnty., 80 F.3d 445, 448 (11th Cir. 1996)). Plaintiff first argues a genuine dispute of material fact exists as to whether Defendant had knowledge of his disability because he "made . . . Defendant aware of his worsening condition and provided medical documentation in support of the same." (Doc. 45-2, at 16 (citing Doc. 42-2, ¶ 46).) In support of this proposition, Plaintiff only cites to paragraph forty-six of Defendant's statement of undisputed material facts, which states: "Plaintiff subsequently informed Ms. Rookard that his symptoms were worsening and that his doctor wanted him to immediately start leave to prepare for surgery [for his PD catheter]." (Id. (citing Doc. 42-2, ¶ 46); Doc. 42-2, ¶ 46.) Plaintiff also argues Defendant obtained knowledge of his disability when, "[a]fter

---

Plaintiff's disability as an argument directed toward the third element of a prima facie case of ADA discrimination as well.

returning from FMLA leave, [he] approached Ms. Rookard about needing additional time for a kidney transplant." (Doc. 45-2, at 16.)

To the extent Plaintiff argues Defendant had constructive knowledge of his disability because he informed Ms. Rookard of it multiple times, this argument fails for two reasons. First, the Eleventh Circuit has rejected the theory that constructive knowledge is sufficient to support an ADA discrimination claim, holding actual knowledge is required. Cordoba, 419 F.3d at 1185. Second, the law is clear that "an employee cannot be fired 'because of' a disability unless *the decisionmaker* has *actual* knowledge of the disability." Id. (first emphasis added). The Parties do not dispute it was Mr. Donald, not Ms. Rookard, who had the authority to, and ultimately did, fire Plaintiff. (Doc. 42-2, ¶¶ 4, 83; Doc. 45, at 1, 10.) Therefore, Plaintiff informing Ms. Rookard of his condition is insufficient to show Defendant had actual knowledge of it. See Cordoba, 419 F.3d at 1185.

Nonetheless, Plaintiff argues Mr. Donald eventually obtained actual knowledge of Plaintiff's disability because, "[s]hortly after Mr. Donald assumed his position as City Administrator, he was notified via phone call that [Plaintiff] would be taking FMLA and was provided with [Plaintiff's] FMLA paperwork." (Doc. 45-1, ¶ 9; see also Doc. 45—2, at 16 ("Mr. Donald was notified by Human Resources [of Plaintiff's disability], pursuant to established

policy." (citing Doc. 45-1, ¶ 9)).)  Plaintiff cites to Ms. Rookard
and Mr. Donald's deposition transcripts for support.  (Doc. 45-1,
¶ 9 (citing Doc. 45, at 24, 66).)  When asked if Mr. Donald would
have received some documentation or a phone call notifying him
about Plaintiff's FMLA leave, Ms. Rookard responded: "Mr. Donald
received a phone call that [Plaintiff] *would be out for FMLA*, and
he probably did receive a document, either he did or his
administrative assistant received the FMLA document *stating that
he would be out*." (Doc. 45, at 66 (emphasis added).)  Furthermore,
when Mr. Donald was asked whether he was aware Plaintiff was on
FMLA leave shortly after Mr. Donald became the Administrator, he
answered: "I believe so.  I believe I got a[n] FMLA or, you know,
they told me that *he was taking some time off for FMLA*." (Id. at
24 (emphasis added).)  Defendant argues this testimony is
insufficient to establish Mr. Donald knew about Plaintiff's
medical condition.  (Doc. 48, at 4 n.3.)  The Court agrees.  At
best, this testimony demonstrates Mr. Donald knew Plaintiff was
taking FMLA leave.  But it does not establish that, by virtue of
that knowledge, Mr. Donald knew about Plaintiff's medical
condition.

Plaintiff further argues Mr. Donald obtained knowledge of
Plaintiff's disability because "Ms. Rookard told [Plaintiff] that
she would discuss [his] health condition with Mr. Donald to obtain
approval for use of the sick pool." (Doc. 45-2, at 16 (citing

Doc. 45-1, ¶ 14).)   Defendant contends that, even if Ms. Rookard made such a statement, the statement is immaterial because there is no evidence such a conversation ever occurred between Ms. Rookard and Mr. Donald.   (Doc. 48, at 5; Doc. 47, ¶ 14.)   Again, the Court agrees with Defendant.   Plaintiff stated in his declaration "Ms. Rookard told [him] that she *would* discuss and clarify [his] situation with Mr. Donald," and Plaintiff "understood this to mean that she would discuss [his] disability and [his] need for a transplant with Mr. Donald." (Doc. 45, at 59 (emphasis added).)   But the record is devoid of evidence showing Ms. Rookard *actually discussed* Plaintiff's medical condition with Mr. Donald.   Indeed, Ms. Rookard testified she never discussed Plaintiff's FMLA leave or his medical condition with Mr. Donald. (Doc. 42-4, at 20-21, 26; Doc. 42-7, ¶ 9.)   Moreover, Mr. Donald testified that no one ever told him about Plaintiff's medical condition, and he was not aware of Plaintiff's medical condition until this litigation began.   (Doc. 42-3, at 25; Doc. 42-8, ¶¶ 7, 9-10.)

In short, Plaintiff failed to show a genuine dispute of material fact exists as to whether Mr. Donald had actual knowledge of his disability.   As a result, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's ADA discrimination claim. See Cordoba, 419 F.3d at 1185.

## C. FMLA Claim

Finally, Plaintiff alleges Defendant retaliated against him in violation of the FMLA. (Doc. 1, ¶¶ 82-90.) Defendant contends summary judgment is appropriate on this claim because: (1) Plaintiff's alleged exclusion from certain meetings and Mr. Donald's alleged critical comments are not actionable adverse employment actions; and (2) even if they were, Defendant proffered a legitimate, non-discriminatory reason for terminating him, and he cannot show that reason is pretextual. (Doc. 42-1, at 11-22.)

The FMLA prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice" it makes unlawful. 29 U.S.C. § 2615(a)(2). Where, as here, there is no direct evidence of retaliatory intent, the Court, like in the ADA discrimination context, applies McDonnell Douglas's burden-shifting framework. Martin v. Brevard Cnty. Pub. Schs., 543 F.3d 1261, 1268 (11th Cir. 2008) (citations omitted). Under that approach, an employee must first establish a prima facie case of FMLA retaliation. Id. (citation omitted). Once the employee does so, the employer then must articulate a legitimate, non-discriminatory reason for the adverse action. Id. (citation omitted). Then, the burden shifts back to the employee to "show that the employer's proffered reason was pretextual by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons

21

for the adverse employment decision." Id. (internal quotation marks and citation omitted).

To establish a prima facie case of FMLA retaliation, Plaintiff "must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." Id. (citation omitted). Defendant argues Plaintiff's alleged exclusion from certain meetings and Mr. Donald's critical comments were not adverse employment actions that could support Plaintiff's prima facie case. (Doc. 42-1, at 13-16.) Plaintiff's response does not address these arguments. (See Doc. 45-2.) Instead, Plaintiff clarifies the adverse employment action was his termination on April 1, 2021. (Id. at 9.) Defendant does not dispute this constitutes an actionable adverse employment action. (See Doc. 48.) Moreover, Defendant does not dispute that Plaintiff satisfies the other elements of his prima facie case. (See Docs. 42-1, 48); Martin, 543 F.3d at 1268 (citation omitted). Rather, Defendant argues it provided a legitimate, non-discriminatory reason for terminating Plaintiff, and Plaintiff cannot show that reason is pretext for discrimination. (Doc. 42-1, at 16-22; Doc. 48, at 6-11.) Accordingly, the Court turns its inquiry to these issues.

Defendant explains Mr. Donald terminated Plaintiff for a non-discriminatory reason because he "wanted to give the Office of the

22

Administrator a 'fresh start' and to handpick his own Deputy Administrators, just as the previous Administrator" did.   (Doc. 42-1, at 16-17.)   Indeed, Mr. Donald testified he wanted to re-organize the Office of the Administrator to align with his vision. (Doc. 42-8, ¶ 13; Doc. 42-3, at 18-19, 26, 28.)   Plaintiff argues a genuine dispute exists as to whether Defendant's reason can be considered a legitimate, non-discriminatory one.   (Doc. 45-2, at 17-18.)  However, as Defendant points out, the Court has previously found this reason sufficient.   See Mawulawde v. Bd. of Regents of Univ. Sys. of Ga., No. CV 105-099, 2009 WL 10678751, at *16 (S.D. Ga. Mar. 27, 2009) (finding a new hospital section chief's desire to "bring in his own team" was a legitimate non-discriminatory reason for terminating the plaintiff and noting such a practice is "typical for faculty recruited into leadership positions").   And Mr. Donald's testimony is certainly sufficient to carry Defendant's "exceedingly light" burden of production on this issue.  Ellison v. St. Joseph's/Candler Health Sys., Inc., 775 F. App'x 634, 644 (11th Cir. 2019) (citation omitted).

Plaintiff claims that, if the Court accepts Defendant's reason as a legitimate one, "[e]mployers would automatically satisfy the burden by just firing employees and giving no reason at all." (Doc. 45-2, at 18.)  But even if so, the Eleventh Circuit "ha[s] repeatedly and emphatically held that employers may fire an employee for a good reason, a bad reason, a reason based on

erroneous facts, or for no reason at all, as long as [their] action is not for a discriminatory reason." Carlisle v. Rhodes & Rhodes Fam. Dentistry, No. 22-13901, 2024 WL 621421, at *5 (11th Cir. Feb. 14, 2024) (internal quotation marks omitted) (quoting Flowers v. Troup Cnty. Sch. Dist., 803 F.3d 1327, 1338 (11th Cir. 2015)). Accordingly, the Court finds Defendant proffered a legitimate, non-discriminatory reason for terminating Plaintiff and turns to whether Plaintiff showed a genuine dispute of material fact exists as to whether that reason is pretext for retaliation. See Martin, 543 F.3d at 1268 (citations omitted).

"A plaintiff may show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Diaz v. Transatlantic Bank, 367 F. App'x 93, 97 (11th Cir. 2010) (quoting Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 256 (1981)). To do so, "[a] plaintiff may point to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reason." Id. (quoting Brooks v. Cnty. Comm'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006)). "However, a plaintiff cannot merely quarrel with the wisdom of the employer's reason, but must meet the reason head on and rebut it." Id. (citation and internal quotation marks omitted). While close temporal proximity between the protected activity and an adverse

24

employment action is evidence of pretext, it is "probably insufficient to establish pretext by itself." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (citation omitted).

Plaintiff advances several arguments as to why Defendant's termination rationale was pretextual. (Doc. 45-2, at 10-12, 18-20.)

### 1. Deviation from Termination Protocol

Plaintiff first argues Defendant's proffered reason for his termination is pretextual because Mr. Donald "deviated significantly from protocol for terminating employees" when he terminated Plaintiff. (Doc. 45-2, at 18.) According to Plaintiff, normal termination protocol includes the involvement of the Director of Human Resources, Ms. Rookard, but she claims she was not involved at all and did not know Plaintiff would be terminated until she attended the April 1, 2021 meeting. (Id.) Defendant contends that, even if Mr. Donald deviated from the usual practice for terminating employees, this does not establish pretext because there is no evidence Mr. Donald deviated from the usual protocol in a discriminatory way. (Doc. 48, at 7-8.)

The Court finds this evidence does not create a genuine dispute of material fact as to whether Defendant's proffered reason was pretextual. "Standing alone, deviation from a company policy does not demonstrate discriminatory animus." Mitchell v. USBI

Co., 186 F.3d 1352, 1355-56 (11th Cir. 1999) (citations omitted).
This is especially so because there is no evidence Plaintiff's
decision to take FMLA leave motivated Mr. Donald to deviate from
the usual practice.   See id. at 1356 ("[D]eviation from company
policy [is] not evidence of discrimination, absent a nexus between
[the] deviation and [the] employee's protected status[.]" (citing
EEOC v. Tex. Instruments Inc., 100 F.3d 1173, 1182 (5th Cir.
1996)).   Since there is no evidence Mr. Donald terminated Plaintiff
because Plaintiff took FMLA leave, Mr. Donald's purported
deviation from Defendant's policy for terminating employees does
not support a finding of pretext.   See Mitchell, 186 F.3d at 1355-
56 (citations omitted).

   2. No Written Policy Supporting Defendant's Rationale

   Next, Plaintiff points to Defendant's lack of a "written or
informal policy in place that lets a supervisor get rid of existing
subordinates in order to obtain a 'fresh start'" to establish
Defendant's proffered rationale was pretextual.   (Doc. 45-2, at
18.)   However, the Court finds this insufficient to create a
genuine dispute of material fact as to whether Defendant's reason
for terminating Plaintiff was pretextual.   Plaintiff cites to no
authority to support his proposition that lack of a written or
informal policy for a termination decision constitutes evidence of
pretext.   (See Doc. 45-2.)   Moreover, such a conclusion would be
unworkable, as there are a multitude of reasons an employer may

want to fire an employee.  The law is clear, though, that only a discriminatory reason is prohibited.  See Carlisle, 2024 WL 621421, at *5 (quoting Flowers, 803 F.3d at 1338).  And, for the reasons discussed herein, there is no evidence upon which a reasonable juror could rely to conclude Defendant's decision was motivated by Plaintiff taking FMLA leave.   Thus, the lack of a written or informal policy supporting Defendant's rationale is insufficient to show pretext.

   3. Mr. Donald Never Evaluated Plaintiff for Fit and Terminated Him Without a Replacement in Mind

Plaintiff argues Mr. Donald's failure to evaluate Plaintiff to determine whether he was a good fit for Mr. Donald's vision for the Office of the Administrator and Mr. Donald's decision to terminate Plaintiff without a replacement in mind establishes Defendant's rationale is pretextual.  (Doc. 45-2, at 18-19.) Defendant contends these arguments amount to no more than quibbles with its employment decision.  (Doc. 48, at 9.)  The Court agrees with Defendant.  Plaintiff does not cite to any evidence indicating Defendant's decision to terminate him was in any way motivated by him taking FMLA leave.  (See Doc. 45-2.)  Plaintiff's arguments he was never evaluated for fit, and Mr. Donald terminated him without a replacement in mind, show, at best, that Mr. Donald did not thoroughly think through his decision before terminating Plaintiff.  However, as the Court stated previously, a bad reason

for terminating Plaintiff is not actionable — only a discriminatory reason is.  See Carlisle, 2024 WL 621421, at *5 (quoting Flowers, 803 F.3d at 1338).   Therefore, the Court finds Mr. Donald's decision to terminate Plaintiff without evaluating him and without having a replacement in mind do not show Defendant's rationale for his termination is pretextual.

4. Exclusion from Meetings and Mr. Donald's Critical Behavior

Plaintiff further contends Defendant's proffered rationale was pretextual because, upon returning from FMLA leave, Plaintiff was excluded from meetings he otherwise would have attended and were purportedly essential to his job function.  (Doc. 45-2, at 12.)  Plaintiff also claims that, at the meetings he was allowed to attend after returning from FMLA leave, Mr. Donald was very critical of his work and made demeaning comments.  (Id. (citation omitted).)   Plaintiff contends the treatment was "totally different" after returning from FMLA leave.  (Id. (citation omitted).)  Plaintiff argues this shows "his FMLA leave[] and his termination were not 'wholly unrelated.'"   (Id. (citations omitted).)

The Court finds this evidence does not create a genuine dispute of material fact precluding summary judgment because, again, Plaintiff does not explain how these instances could be motivated by his taking FMLA leave.  (See Doc. 45-2.)  Plaintiff does not specify what Mr. Donald said that was "demeaning" about

28

his work product. (See id.) Regardless, federal employment laws are decidedly not civility codes. See Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) ("Title VII is not a civility code . . . ."). Moreover, Plaintiff admitted Mr. Donald made similar comments to Mr. McDonald, Mr. Donald's style was "direct," Mr. Donald did not mince words when he was critical of someone's work product, and none of Mr. Donald's comments referenced Plaintiff's use of leave. (Doc. 42-2, ¶ 72; Doc. 45, at 8-9.)

As for Plaintiff's allegation he was excluded from meetings, Plaintiff does not explain how this treatment differed from his treatment before. (See Doc. 45-2.) Notably, Plaintiff only worked as a Deputy Administrator under Mr. Donald for six days before taking FMLA leave to have his PD catheter placed. (Doc. 42-2, ¶¶ 35-36, 48; Doc. 45, at 4, 6.) Plaintiff does not specify whether he attended meetings with Mr. Donald before he left for FMLA leave that he was not allowed to attend when he returned. (See Doc. 45-2.) Accordingly, the Court finds a reasonable juror could not conclude this evidence demonstrates Defendant's proffered rationale is pretextual. See Martin, 543 F.3d at 1268 (citations omitted).

5. Temporal Proximity

Finally, Plaintiff argues the close temporal proximity — 35 days — between when he returned from FMLA leave and when he was

terminated establishes pretext. (Doc. 45-2, at 10.) Defendant argues close temporal proximity alone is insufficient to establish pretext. (Doc. 48, at 10–11.) Indeed, the Eleventh Circuit has stated time and again "temporal proximity can[no]t, by itself, show pretext." A.P. v. Fayette Cnty. Sch. Dist., No. 21-12562, 2023 WL 4174070, at *10 (11th Cir. June 26, 2023) (citing Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1137 n.15 (11th Cir. 2020)).

As explained above, none of the evidence Plaintiff cites would allow a reasonable juror to conclude that Plaintiff's decision to take FMLA leave motivated Mr. Donald's decision to terminate him. This is especially so considering Mr. Donald also terminated Mr. McDonald on the same day, for the same reasons, and Mr. McDonald never took FMLA or medical leave while employed as a Deputy Administrator. (Doc. 42-2, ¶¶ 84, 89; Doc. 45, at 10.) Plaintiff failed to show pretext because he has not shown a discriminatory reason more likely motivated Defendant's decision to terminate him, nor has he shown Defendant's proffered rationale is unworthy of credence. Diaz, 367 F. App'x at 97 (quoting Burdine, 450 U.S. at 256). Therefore, the Court finds the evidence does not indicate a genuine dispute of material fact exists as to whether Defendant's legitimate termination rationale was pretextual. For that reason, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's FMLA retaliation claim.

## IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Doc. 42) is **GRANTED**. The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendant, **TERMINATE** all other pending motions and deadlines, if any, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 30th day of August, 2024.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

31